# EXHIBIT 3





















June 4, 2024

*via email Michael.Nobles@usda.gov*
*Privileged and Confidential*
*Pursuant to 5 U.S.C. § 552(b)(4),(9)*

Michael Nobles, District Ranger
United States Forest Service
United States Department of Agriculture
San Bernardino National Forest
602 S. Tippecanoe Ave.
San Bernardino, CA 92408

District Ranger Nobles:

I am writing in response to your letter from the U.S. Forest Service (USFS) to BlueTriton Brands, Inc. (BTB) dated May 24, 2024 (Letter), which followed the in-person meeting between our respective teams at the USFS's offices on May 22, 2024 (Meeting). These followed the recent detailed submissions delivered by BTB to the USFS at the USFS's request, on April 23, 2024, and May 14, 2024 (Detailed Submissions).

As a preliminary matter, we wish to thank you for taking the time to meet with us to discuss the various issues related to BTB's pending special use permit application. BTB appreciates its nearly century-long relationship with the USFS in the San Bernardino National Forest, and BTB is committed to continuing its sustainable operations in Strawberry Canyon, as we have for over 120 years.

Given BTB's substantial efforts to work with the USFS on this matter, we are puzzled by the arbitrary nature of your actions over the past few months. We do not understand: (i) your suddenly urgent demands for information on 14 days' notice after having taken no material action on our permit application for 400+ days; (ii) your summary dismissal of the Detailed Submissions in their entirety as "insufficient," without offering any meaningful explanation as to why those submissions were insufficient or how they could be improved; or (iii) your numerous statements set forth in your Letter and at the Meeting that appear to constitute a drastic shift in USFS policy and/or to be made without merit. These actions have created the impression that the USFS is purposefully taking an adversarial posture towards BTB and the exercise of its water rights.

Nevertheless, in the interest of satisfying your requests and continuing our relationship, we have put forth our best efforts to comply with your most recent set of demands. These demands include, among other things, reproducing 9+ years of nearly 70 project submissions within an 8-business day period. As set forth on Attachment 1 to this letter, we have re-delivered as many of the requested materials as we have been able to locate within the 8-business day period imposed. We will continue to work to prepare and assemble any remaining materials as quickly as possible and will plan to re-deliver them to the USFS in due course on a rolling basis. Given our substantial efforts in preparing these materials on short notice, we hope that you will find them satisfactory.



BlueTriton Brands
4718 Mountain Creek Parkway
Dallas, TX 75236

louis.mixon@bluetriton.com
Mobile: (903) 216-2858
bluetriton.com

*BTB Response to USFS Meeting and Letter (May 2024)*
*Privileged and Confidential Pursuant to 5 U.S.C. § 552(b)(4),(9)*

*Page 2 of 2*

We note that all information provided hereunder (or to be provided in accordance herewith) is delivered to the USFS for informational purposes only.  BTB continues to consider the USFS's demands and BTB's legal rights in connection therewith, and BTB expressly retains all, and does not waive any, rights and/or remedies in connection therewith (including, without limitation, the right to pursue administrative and/or judicial relief in accordance with applicable law).

We look forward to hearing from you.

Sincerely,

Louis W. Mixon, III
Senior Natural Resource Manager, BlueTriton Brands, Inc.

cc:          Danelle Harrison
             Dave Anderson
             Wendy Brimmer
             Jamahl Butler
             Kelly Giron
             Noel Ludwig
             Nicole Molinari
             Santiano Rivera
             Joshua Rider, Esq.
             Hih Song Kim, Esq.
             Brendan O'Rourke
             Tam Pham
             Christopher W. Hasbrouck, Esq.
             Robert E. Donlan, Esq.


Attachments:    Attachment 1
                Exhibits A - D



            

ATTACHMENT 1

BTB RESPONSES TO USFS DEMANDS

A. <u>Water Rights</u>.

*"As an initial matter, as you stated in your correspondence, the water extracted by BlueTriton from National Forest lands consists of percolating groundwater. (This is a revision of previous claims concerning surface water rights). The Forest agrees with this conclusion. However, at various times your correspondence refers to BlueTriton's appropriative rights to this groundwater. This is inaccurate. All BlueTriton's operations on National Forest lands are conducted under permits issued by the Forest Service, and this has been true of every predecessor back to the construction of these facilities under permit in the 1920's and 30's. The water groundwater rights remain with the United States and are used permissively. And BlueTriton's permits make clear that no water rights are transferred. Even if these operations were not under permit, adverse possession and prescriptive rights do not hold against the sovereign. The ground water rights utilized here remain with the United States as the overlying landowner. . [sic] Continued use of these rights requires compliance with BlueTriton's current permit, and future use of these rights is contingent upon the Forest receiving a complete application for a future permit. (And one requirement for that application is a thorough explanation of the proposed use. [sic]"  (Letter at p. 1)*

BTB is not aware of any binding authority, whether State or Federal, for the proposition that the water rights that BTB (and its predecessors) have relied on, since the first special use permit was issued back in 1930, are actually the property of the USFS (rather than BTB).   This position is inconsistent with California law, Federal regulations, and the undisputed understanding of the USFS over the last 90+ years.

As you know, rights for the diversion and collection of water on Federal lands are established under State law, not Federal law (*see, e.g.,* Ruby E. Huffman, 64 Interior Dec. 57 (1957)).  The Forest Service Handbook acknowledges this longstanding doctrine by requiring the inclusion of a standard permit clause in all special use authorizations for any use or occupancy that utilizes water (including surface water or groundwater) and/or requires water rights (including appropriative water rights).  (*See* Forest Service Handbook 2709.11 – Special Uses, Chapter 50, p. 154 (October 4, 2023)).  The standard permit clause is included in Permit No. FCD728503 issued by the USFS to BTB, which remains in effect today:

"The term 'water rights' includes all authorizations, such as certificates, reservations, decrees, or permits, for water use issued under state, local, or other law and all water rights otherwise recognized under state law.  **Any necessary water rights must be acquired and maintained by the holder in accordance with <u>state law</u>** and the terms of [this] permit."  (Emphasis added.)



           

*ATTACHMENT 1 – BTB Responses to USFS Demands*

---

*Page 2 of 7*

As your Letter acknowledges, BTB's boreholes and tunnels collect percolating groundwater. Rights to percolating groundwater may be either overlying or appropriative, and the collection and use of percolating water for beneficial use on non-overlying land is, by definition, appropriative (*see City of Pasadena v. City of Alhambra*, 33 Cal. 2d 908, 925 (1949)).

The precise extent of BTB's water rights in Strawberry Canyon is currently pending before the California Superior Court in Fresno County. Nevertheless, based on a series of legal opinions issued to BTB's predecessors by their respective legal counsel dating back to 1929, BTB strongly believes that it has lawfully established rights to collect water in Strawberry Canyon under California law, and we are confident that the courts will agree with our position. As you know, BTB has long claimed appropriative rights to percolating groundwater, as well as pre-1914 appropriative rights to surface water, in East Twin Creek and Strawberry Creek. These water rights are established by diversion and use of water, and were recognized in *Del Rosa Mutual Water Company v. Carpenter*, No. 31798 (Cal. Superior Ct., Oct. 19, 1931). For the avoidance of doubt, these water rights do not require permits from the California State Water Resources Control Board.

In fact, the USFS itself has recognized BTB's longstanding water rights on multiple occasions, including in the USFS's recent summary judgment filings in *Center for Biological Diversity v. Forest Service*, No. 15-cv-02098 (C.D. Cal) in February of 2016:

> "Since the 1890s, Arrowhead Puritas Waters, Inc., which through a series of mergers and name changes is now part of Nestlé Waters North America Inc. [now BTB], and its predecessors have been exercising their water rights under State law by extracting and transmitting water from and across the San Bernardino National Forest."

(Federal Defendant's Brief in Support of Summary Judgment at p. 2 (citing Federal Defendant's Statement of Undisputed Facts)).

It appears that the USFS has now changed its position with respect to BTB's water rights without explanation, in contravention of longstanding USFS policy and practice (and without any known legal basis). While the USFS may claim certain groundwater rights for itself in Strawberry Canyon, those rights are separate and distinct from the water rights that BTB and its predecessors have relied on to support their water collections in Strawberry Canyon over the last century.

B.    Specificity of Responses.

***"As noted in our meeting yesterday, your responses to my previous letters are not sufficient in detail both in regard to the current operations under your permit or for our consideration for future permitted operations. This is now the third time that I have emphasized the lack of sufficient detail in your responses. For that reason, I am glad that we had the opportunity to discuss why your answers were deficient and what further information is needed. As you work to provide me with sufficient detailed responses, please review my previous correspondence. You will see that the questions are designed to elicit responses that are quantitative in nature. Your answers should be tabular where appropriate." (Letter at pp. 1-2)***



BLUETRITON

---

           

*ATTACHMENT 1 – BTB Responses to USFS Demands*

---

As we attempted to explain at the Meeting, this type of generalized response is not helpful to the process if the USFS's goal is to obtain the information requested.  In some cases, the information sought by the USFS may be available.  In other cases, that information may not exist.  In any event, other than your information request with respect to the San Manuel Band of Mission Indians (SMBMI) as noted below, you have repeatedly refused to give any specifics as to how BTB's Detailed Submissions were deficient, or to specify what specific information you are seeking instead.  Your summary dismissals of material as "insufficient," and your vague assertions of "where appropriate," do not appear to be intended to elicit useful information.  BTB also strongly disputes your representation in the Letter that you provided any meaningful direction to BTB at the Meeting.  We appreciate the USFS's eagerness to obtain the information requested, but we cannot provide information that the USFS refuses to specify.

For the avoidance of doubt, we believe that our responses were, in fact, appropriately detailed.

C.  <u>San Manuel Band of Mission Indians</u>.

***"As we discussed, one area where detail is significantly lacking concerns the quantities of water that were delivered to the Tribe (the San Manuel Band of Mission Indians) in the past and will be delivered to the Tribe in the future. It is essential that, as the permittee, you provide a detailed account of the uses of this water. It is not appropriate to broadly categorize the water use as 'primarily industrial, domestic and irrigation uses.' While the Forest's knowledge of the uses of this property are incomplete, our records currently indicate no irrigated agricultural uses on the property. Nor are there any municipalities on the property. So far as we are aware there are no residences on the property. The existing hotel and conference facility is not currently being operated and is being maintained by a skeletal staff. Thus, there are no significant operations in these categories on the property that would justify the use of up to 8 million gallons of water per month. We require a detailed description of the use of the waters diverted to this property including quantities for each use. Both BlueTriton and the Tribe noted in response that unused waters are returned to the stream below the property. The Forest appreciates this, but both State law and Forest policy would indicate that water that cannot be put to a beneficial use should be bypassed at the point of diversion rather than being diverted only to be returned to the water course at a lower point. The intervening Forest lands should not be deprived of water that is not being put to a beneficial use on the Tribe's immediate property." (Letter at p. 2)***

The SMBMI is a sovereign nation and distinct political entity, separate and apart from BTB.  BTB has no legal authority to compel the SMBMI to disclose the specific details of its internal operations, and BTB is in no position to make any comments or representations with respect thereto.  Nevertheless, BTB has engaged with the SMBMI on multiple occasions, and has asked them to respond to your demands for information.  The SMBMI previously provided a substantial response to the USFS, which we attached to our Detailed Submissions, and which was delivered to the USFS.  The SMBMI has now provided a second substantial response to the USFS, which we have attached hereto as <u>Exhibit A</u>.



BLUETRITON

           

*ATTACHMENT 1 – BTB Responses to USFS Demands*

---

As noted above, the SMBMI is an unrelated third party over which BTB has no control.  BTB's predecessor purchased all of the water rights to the Arrowhead Springs from the SMBMI's predecessor back in the 1930s, and agreed to deliver 20% of the flow through the pipeline in perpetuity under an ongoing contract.  All consideration for this 20% flow was pre-paid back in the 1930s.  Now BTB is obligated to continue making these deliveries to the SMBMI in accordance with the terms of the contract.  It would be patently unreasonable to hold a vendor responsible for a customer's use of property after a sale is complete and the customer has taken delivery (and the vendor's control over the property has ended).

D.  <u>April 2024 Summary Report</u>.

***"One portion of your response that should be forwarded immediately is the April 2024 summary report that was not submitted by the May 15th deadline. This is a requirement of your permit and failure to report constitutes noncompliance." (Letter at p. 2)***

Thank you for noting this oversight.  We believed that we had previously delivered the April 2024 report to the USFS, but upon further review, it appears that it was inadvertently omitted from our prior delivery of revised reports on May 14, 2024.  Upon receipt of the full Letter from the USFS on May 30, 2024, BTB discovered the oversight and promptly delivered the April 2024 report to the USFS via email later that day.  We apologize for any inconvenience.

E.  <u>Water Use Projections</u>.

***"Further detailed information about the projected uses of water withdrawn from Forest Lands is necessary to consider your application for a future permit. Specifically, please provide the information requested in my letter dated 18-Apr-2024." (Letter at p. 2)***

As explained previously, BTB collects percolating groundwater at Arrowhead Springs using a gravity-fed system of tunnels and boreholes.  The system does not utilize any pumps or mechanized facilities to collect or transport water.  Accordingly, the volumes collected from the system each month vary based on climatic and hydrologic conditions.  Because collection rates and beneficial use quantities are dynamic, BTB is unable to predict with any certainty exactly how much water will be collected or delivered for any particular beneficial use at a given point in the future.  Nor is it possible to accurately state the beneficial uses to be made from a particular borehole or tunnel; water collected at the boreholes and tunnels is commingled in the system, and the sources cannot be disaggregated when delivered (though the amounts collected from each source, and the amounts discharged at each discharge point, can generally be accounted for).

BTB maintains operational readiness of the Arrowhead Springs load station as part of our portfolio of springs supporting the Arrowhead Brand.  Our business relies on optimal sourcing from the portfolio to meet factory and consumer requirements.  We may or may not utilize specific sources until required for support.  Water quality and operational readiness must be maintained.



           

*ATTACHMENT 1 – BTB Responses to USFS Demands*

---

*Page 5 of 7*

Given these limitations (which were described in greater detail in the Detailed Submissions), we note that any projections that BTB provides will necessarily be rough approximations with no material benefit or usefulness to the USFS, and that the USFS's continued demands for them (despite these known and unavoidable shortcomings) seem quite arbitrary. If the USFS has further ideas on this matter, we would be happy to schedule a technical discussion to discuss potential resolutions.

We are currently preparing monthly water use projections for Arrowhead Springs through the end of calendar year 2024. These projections will be broken out by source and by month, and will be based on the last year of data. We will plan to deliver these projections to you as soon as they are complete.

F.  Summary Note on Line 57.

> **"To the extent that you believe your Summary Note on line 57 of your November 2023 Period Reporting Summary can be explained more clearly, please expound upon the Note."  (Letter at p. 2)**

We assume that this statement refers to the Transect 6 removal that we described at length in the Detailed Submissions. Accordingly, we would like to reiterate that the removal of the Transect 6 infrastructure did not cause a reduction in flow and was not the cause of any high-bias readings. In fact, no measurement challenges were experienced prior to 2022 at the Transect 6 facility, since pipeline pressures at that time were balanced from all sources with a stable flow regime. However, as noted in our November 2023 reporting documentation, BTB's shutting-in of certain spring sources following the issuance of the SWRCB Order created pipeline hydraulic operating conditions never before encountered in Strawberry Canyon. These new conditions included reduced flow in portions of the pipeline due to the discharge to atmospheric pressure and entrained air in the pipeline, creating turbulent flow and high bias readings. As part of its normal maintenance and operation of the collection system, BTB was able to diagnose the root cause of the issue, and installed and adjusted pressure maintenance valves and air evacuation valves to resolve any measurement errors. These modifications should provide for accurate measurement at the SMBMI meter going forward.

In sum, the temporary closure of certain sources in accordance with the SWRCB Order reduced flow, which was partially offset by an increase in flow associated with the removal of the Strawberry Station discharge point. These changes, combined with the removal of the Transect 6 discharge point (per the USFS's request), created the imbalance in the system. As noted above, these issues have now been resolved.

G.  Decommissioning Plan.

> **"As we discussed, your decommissioning plan should be technical in nature, specifying the construction methods, access, ground disturbance, etc."  (Letter at p. 2)**

We previously delivered with the Detailed Submissions a concept decommissioning plan for the USFS's review. We will be happy to deliver a more detailed and technical decommissioning plan, but as you know, this will take considerable time and effort (since it will include, among other things,



           

appropriate photographs of all applicable locations, local topographic surveys, access and erosion control plans, restoration, etc.). We will continue our efforts in preparing this plan (including preparing the associated materials), and will deliver it to the USFS in due course when complete.

We would like to reiterate that Section VIII(G)(4) of the existing permit concerns the decommissioning process and, by its plain terms, applies only to "water wells that are no longer needed or maintained." BTB can confirm that all spring sources connected to BTB's collection and transmission system (including spring sources 7, 7A, 7B, and 7C) continue to be both needed and maintained in accordance with BTB's business and operational needs.

H.  Declaration Regarding Non-Use.

***At the Meeting, we recall that you made the following statements in connection with the discussion of the decommissioning plan (paraphrased to the best of our ability): (i) if drought conditions exist, then BTB should reduce all water collections to zero (regardless of BTB's underlying water rights); (ii) if BTB reduces water collections at any source to zero for any period of time (regardless of whether such reductions are the result of USFS-required testing, SWRCB-required orders, customary maintenance and operations, or any other reason), then such reduction to zero constitutes "non-use"; and (iii) any non-use at any source for any period of time gives rise to a legally-binding obligation that BTB immediately decommission and remove all physical infrastructure related to that source, and cease collections from that source on a permanent basis.***

These positions would constitute a radical departure from the parties' longstanding understanding of the terms of these special use permits over the last 90+ years. We would appreciate you confirming (or correcting) our recollection, and providing a written explanation for these statements.

I.  Updated Operations and Maintenance Plan.

***"Please submit your Operations & Maintenance Plan (due 1-May-2024)."***

Per your request, we have attached as Exhibit B hereto BTB's draft Operating Plan for 2024. We are currently working on preparing Attachments A, B, and C to the Plan, and will plan to deliver the fully compiled and executed Operating Plan to the USFS in due course when complete.

J.  Re-Delivery of Prior Submissions.

***"For the missing monthly hydro reports (2015 and later) and quarterly biological reports (since inception of AMP)."***

It is not entirely clear what this reference refers to, but given your express statements at the Meeting, we assume that you are referring to your contention that the USFS apparently has "zero" or "essentially zero" submissions from BTB (or its predecessors) in its permit file. This is a surprising development, since BTB has delivered many dozens of deliverables to the USFS at its request over



           

the past 9+ year period.  In fact, our February 2023 permit renewal application included an exhaustive accounting of the nearly 70 project submissions (including 40+ hydrological and biological submissions) delivered to the USFS over the past 9+ year period (including delivery dates).  If the USFS confirms that these documents have in fact gone missing, please let us know as soon as possible so that we can take any appropriate measures in response (particularly with respect to any confidential materials that may be included in the missing documents).

As noted above, the USFS's sudden demand to re-assemble and re-deliver 9+ years of 70+ project submissions within an 8-business day period is a heavy lift.  Having said that, we have endeavored to re-assemble and re-deliver as many of the requested materials as we have been able to locate within the 8-business day period allotted.  Please see <u>Exhibit C</u> attached hereto, which includes a link to a dataroom that includes as many of the requested materials as we have been able to locate within the 8-business day period imposed.  We will continue to work to prepare and assemble any remaining materials as quickly as possible, and will plan to re-deliver them to the USFS in due course on a rolling basis.

K.  <u>Recorded Agreements</u>.

*"Please provide a copy of the contractual agreement between BTB and the San Manuel Band of Missian [sic] Indians."*

Per your request, we have attached copies of the recorded agreements as <u>Exhibit D</u> hereto.  As noted in our Detailed Submissions, these documents have been recorded in the Official Records of San Bernardino County for nearly a century, and the USFS is deemed to be on record notice of the matters described therein.  Copies should also be available from the County Recorder's Office.



BLUETRITON

           

**EXHIBIT A**

**ADDITIONAL INFORMATION SUBMITTED BY SMBMI TO USFS**

Following BTB's discussions with the SMBMI regarding the USFS's requests for information outlined above, the SMBMI agreed to provide the following additional statement to the USFS:

*The Tribe understands that BlueTriton Brands ("BTB") has been asked by the United States Forest Service ("USFS") for information regarding the use of the water provided to the Arrowhead Springs property by BTB. The Tribe uses the water delivered by BTB at the Arrowhead Springs property for a variety of beneficial and reasonable purposes as has occurred historically. The property is large with a variety of facilities, including, but not limited to, a conference and event center, administration buildings, and recreational and cultural facilities. Such facilities are used by the Tribe daily, including use by tribal citizens, various governmental departments and their employees that are housed in the administrative buildings, and for events. The Arrowhead Springs property lies within the Tribe's ancestral territory. The Tribe is intimately tied to their ancestral lands as this landscape has and continues to play an important role in the Tribe's cultural traditions. The Tribe has a history of responsible land and resources management and conducts restoration of native habitat and fire management activities on this property. For example, the Tribe, USFS and County of San Bernardino have jointly participated in the development and implementation of fire protection plans that include the property and rely upon the use of water. In keeping with the Federal government's fiduciary duty to the Tribe and the federal and state policies recognizing tribal expertise in stewardship of ancestral lands and the water and other natural resources on such lands, the Tribe would be glad to speak further with the USFS on a government-to-government basis.*

*The Tribe has broad water rights claims, including, but not limited to, those acknowledged by the California State Water Resources Control Board in order WR 2023-0042 ("SWRCB Order"). The Tribe's submission of the above information to BTB regarding water delivery to and uses of such water at the Tribe's Arrowhead Springs property does not constitute a waiver of the Tribe's sovereign immunity nor is it an admission or waiver as to any finding of fact or legal conclusions, including those made in connection with BTB's Special Use Permit with the USFS (the "Permit") or the SWRCB Order, adopted by the California State Water Resources Control Board on September 19, 2023, and as stayed by the California Superior Court. The Tribe is not a party to, nor is it bound by the terms of the Permit or the SWRCB Order, and therefore, to the extent either refers to the Tribe's land ownership or water rights claims, they do not adjudicate, resolve, or quantify any of the Tribe's claims or rights as they relate to land and water.*



           

EXHIBIT B

DRAFT OPERATING PLAN

**[Document Commences on Following Page]**



            

# OPERATING PLAN

ARROWHEAD SPRINGS

SAN BERNARDINO, CALIFORNIA



BlueTriton Brands, Inc.

Ontario, California

June 2024

# TABLE OF CONTENTS

OPERATING PLAN ............................................................................................................1

1.0    SCOPE ..............................................................................................................1

2.0    RESPONSIBILITY AND COMMUNICATION PROTOCOL...................................1

    2.1    Routine and Non-Routine Operation and Maintenance ................................1

    2.2    Emergency Maintenance ..............................................................................2

    2.3    Medical Emergencies and Law Enforcement Incident/Criminal Activity ......2

    2.4    Incident Notification .....................................................................................2

3.0    ACCESS TO WATER COLLECTION SYSTEM AND PROJECT AREA....................3

4.0    ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES .........3

5.0    NON-ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES ...4

6.0    EMERGENCY MAINTENANCE ACTIVITIES........................................................4

7.0    HYDROLOGIC AND RIPARIAN STUDIES AND ADAPTIVE MANAGEMENT PLAN .......5

8.0    RESOURCE MITIGATION MEASURES ...............................................................5

    8.1    Cultural and Historic Resources ..................................................................5

    8.2    Water Quality................................................................................................5

    8.3    Water Resources ..........................................................................................6

    8.4    Riparian and Aquatic Resources ..................................................................6

    8.5    Wildlife..........................................................................................................6

    8.6    Species of Concern.......................................................................................6

    8.7    Sanitation .....................................................................................................6

    8.8    Hazardous Materials .....................................................................................6

    8.9    Access for Hydrologic and Riparian Studies ................................................6

    8.10    Helicopter and Drone Operations ...............................................................7

    8.11    Invasive Species .........................................................................................7

    8.12    Fire Prevention and Control .......................................................................7

9.0    ACCEPTANCE & APPROVAL ............................................................................7

Exhibit 3, P. 032

# ATTACHMENTS

Attachment A – Project Aviation Safety Plan

Attachment B – Routine Maintenance Activities

Attachment C – Fire Prevention and Control Plan

# OPERATING PLAN

For Operation and Maintenance of Water Collection and Pipeline Infrastructure in Conjunction with U.S. Department of Agriculture, Fores Service Special Use Authorization ID FCD728503 per Amendment 1, dated April 19, 2023 (District Ranger Michael Nobles).

**BlueTriton Brands , Inc. (Permittee)**

## 1.0    SCOPE

Permittee operates and maintains a spring water collection system and water conveyance pipeline located in the San Bernardino National Forest (SBNF) collectively known as Arrowhead Springs. Spring water collection infrastructure includes a total of ten horizontal boreholes located within four spring vaults and two spring water collection tunnels.  The aggregate length of the pipeline covered under this permit is approximately 4.5 miles.

BlueTriton Brands, Inc. (BTB) operates five communication sites associated with the spring complexes and pipeline.  The communication sites are co-located with the spring vaults and are operated for the purpose of transmitting monitoring data describing system performance and security information.  BTB also operates and maintains four helicopter landing areas.

Operation of the Arrowhead Springs water collection and conveyance system requires periodic maintenance activities and occasional large-scale maintenance activities.  The scope of operations and maintenance activities are described in this document.  This document includes implementation details of how the permittee will comply with permit terms and resource mitigation measures.

## 2.0    RESPONSIBILITY AND COMMUNICATION PROTOCOL

Efficient and accurate communication during operations and maintenance of this project is essential.  A clear and consistent communication protocol will help to ensure that any issue is quickly and satisfactorily resolved.

### 2.1    Routine and Non-Routine Operation and Maintenance

The Permit Administrator will be the primary contact for all activities, required notifications, and for coordinating approvals by the Authorized Officer, i.e. District Ranger, unless otherwise specified in the Project Aviation Safety Plan, Fire Prevention and Control Plan or as stated under Medical Emergencies and Law Enforcement Incidents below.

## 2.2    Emergency Maintenance

The permittee will notify and request approval from the Forest Service of any emergency work as soon as possible.  The Permit Administrator shall also be the contact in emergency maintenance situations during Forest Service office hours.  However, when the Permit Administrator cannot be reached, Permittee will contact the District Ranger for the area where the emergency exists.  When emergencies arise after hours and/or on weekends, the Permit Administrator will be notified on the next normal workday.

## 2.3    Medical Emergencies and Law Enforcement Incident/Criminal Activity

Permittee calls 911 or Forest Service Dispatch for immediate assistance.

## 2.4    Incident Notification

The permittee will contact the Authorized Officer as soon as practicable after the occurrence of any of the following incidents on National Forest System lands covered by a special use authorization.

- *An incident resulting in death, permanent disability, or personal injuries that are life-threatening or that are likely to cause permanent disability.*

- *A search and rescue operation to locate a person.*

- *Any other incident that has high potential for serious personal injury or death or significant property, environmental, or other natural resource damage, including avalanches, landslides, flooding, fire, structural failures, and release of hazardous materials.*

| Role | Responsibility | Contact |
|------|----------------|---------|
| Permittee Representative | Responsible for project execution and oversight and providing emergency and Incident notification. Completing required notifications. Obtaining required permits, approvals, and monitoring oversight | Mr. Tam Pham<br>Senior Springs Resource<br>(909) 229-1650<br>tam.pham@bluetriton.com |
| Forest Service Authorized Officer | Issue permit and ensure holder compliance with terms and conditions of the authorization. | District Ranger Michael Nobles<br>602 S Tippecanoe Avenue<br>San Bernardino, CA 92408<br>(909) 382-2600<br>michael.nobles@usda.gov |
| Forest Service Special Use Administrator | Primary contact for permit holder. Responsible for administering permit per its terms and conditions. | District Ranger Michael Nobles<br>602 S Tippecanoe Avenue<br>San Bernardino, CA 92408<br>(909) 382-2600<br>michael.nobles@usda.gov |
| Forest Service Dispatch | Receives reports emergencies and wildfires, communications for helicopter flights and, coordination and contact for law enforcement and EMS | (909) 382-2600 |

Exhibit 3, P. 035

## 3.0    ACCESS TO WATER COLLECTION SYSTEM AND PROJECT AREA

Access for all site activities including routine maintenance; emergency maintenance; and hydrologic, riparian, and habitat studies will require the following site access.

- *Helicopter flights.*

- *Vehicle access to the lower pipeline areas from SBNF Road 1N24.*

- *Drone flights for aerial photography to support riparian and habitat studies.*

- *Hiking trails along the pipeline alignment and hiking trails to/from the helicopter landing areas.*

Details and conditions pertaining to helicopter access and drone flight activity are provided in the Project Aviation Safety Plan included in Attachment A.

## 4.0    ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES

Routine maintenance activities are those that are scheduled and regularly carried out to ensure safe and efficient operation of the spring water collection infrastructure, and that do not include increased land occupancy or new ground disturbance.  Basic non-ground disturbing Operation & Maintenance work such as that described in this section is allowed, consistent with terms and conditions of permit, including its appendices and this approved Operating Plan, without prior notification to the authorized officer.

The typical maintenance activities are described in Attachment B.  Typical maintenance of water collection and pipeline facilities are not limited to the activities described in Attachment B.  Maintenance does not include expansion or increase in scope or intensity to the water system components but does include replacement or repair of facilities "in kind."

The working area is the area needed for temporary use when routine maintenance work is conducted on the existing improvements.  The following working areas, as described in Table 1, are approved for use during the term of the permit:

| Table 1 – Working Areas | |
|---|---|
| *Improvement* | *Working Area\** |
| Vault Structures | 5-feet around structures |
| Above-Ground Pipeline | 2.5-feet each side |
| Buried Pipeline and Road 1N24 | 10-feet each side |
| Trails | 3-feet each side |
| Helicopter Landing Areas | 30-foot radius circle |
| *\*Prior notification and approval from the authorized officer is required if any additional working area beyond the set distance is needed for routine maintenance activities.* | |

Road maintenance will be performed in accordance with Appendices C & D of the permit.

Exhibit 3, P. 036

## 5.0    NON-ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES

Prior Notification to Authorized Officer Is Required for Non-Routine Maintenance Activities or System Modifications or Upgrades.  At a minimum, permittee will notify authorized officer of any plans for any system upgrades, ground disturbing activities, vegetation clearing, or helicopter flights that are in addition to existing authorized facilities, operations, and/or specified working areas.  This requirement does not include emergency work, see also Section 6 , regarding Emergency Maintenance Activities.

- *Ground disturbing work and vegetation clearing in previously surveyed areas may be allowed and approved to proceed after notification, unless new listed species must be considered.*

- *BTB would also refresh resource surveys for ground disturbing work in previously surveyed areas when new listed species must be considered.*

- *Resource surveys for ground disturbing work in areas not previously surveyed are required and would be completed for Forest Service review and approval prior to beginning any ground disturbing work in these areas.*

- *As appropriate, the special use authorization would be amended with additional uses, activities, and terms and conditions.*


## 6.0    EMERGENCY MAINTENANCE ACTIVITIES

Extraordinary events, such as wildfire, torrential rains, earthquakes, debris flows, tree fall, vandalism, or other unforeseen conditions, may damage the pipeline and its structures and require atypical emergency maintenance.  When work on the system is required on an emergency basis, emergency repair to pipelines and structures is conditionally authorized under this new permit.

- *Permittee is required to notify and request approval from the Forest Service of any emergency work as soon as possible.*

- *Permittee is required to utilize previously approved temporary work areas to the extent such use is possible.*

Emergency maintenance necessary to maintain operation of the conveyance pipeline and to prevent resource damage may include an increased frequency and intensity of the maintenance activities described in Attachment B,  and additional related activities including removal of selected trees, additional helicopter flights, increased personnel presence on site, an increase in the number of supplies/equipment utilized, and greater than normal occurrence of some routine maintenance procedures.  Scheduling of standard operations and maintenance actions may be interrupted or conducted at different intervals based upon the demand generated by non-standard conditions.

## 7.0    HYDROLOGIC AND RIPARIAN STUDIES AND ADAPTIVE MANAGEMENT PLAN

Permittee has committed to conduct a series of hydrologic, riparian, and habitat studies. The studies are described in the Adaptive Management Plan (AMP), the Paired Basin Study Plan, and the Hydrologic Data Collection Plan documents which have been transmitted under separate cover. Monitoring Stations and Established Plots - Required monitoring of resource conditions in locations downstream from the authorized facilities will include installation of instrumentation. All sites will include simple markers for established plots and cross sections.

## 8.0    RESOURCE MITIGATION MEASURES

### 8.1    Cultural and Historic Resources

If cultural materials are uncovered during project implementation, federal and state laws require work be stopped immediately in that area until an archeologist can evaluate the findings and provide additional protection measures or mitigate the impacts.  Because there is high archaeological sensitivity at two sites on 1N24 for about 1/2 mile, an archaeological monitor must be present when work is done on 1N24. Call the Permit Administrator to schedule this monitor as far in advance of road work as possible.

### 8.2    Water Quality

All activities will be conducted in a manner to achieve the water quality objective identified in the AMP.  Activities will be conducted in accordance with the following Best Management Practices (BMP) provided in the USFS Technical Guide FS-990a.  BMPs will be applied to all activities that include planned ground disturbance or construction activities in the project area.  The following BMPs described in USFS Technical Guide FS-990a will be applied.

- *Fac-8 - Nonrecreational Special Use Authorizations.*

- *Fac-9 - Pipelines, Transmission Facilities, and Rights-of-Way.*

- *Aq-Eco-2 - AqEco-2. Operations in Aquatic Ecosystems.*

- *WatUses-4 - Water Diversions and Conveyances.*

- *Road-4 - Road Operations and Maintenance.*

Application of each specific BMP will be proposed to the Permit Administrator in conjunction with the work plans submitted for approval prior to ground disturbance or construction activities.

Exhibit 3, P. 038

### 8.3    Water Resources

The permittee will install shut-off valves, flow control devices, and wildlife drinkers as described in Appendix B of the permit. Permittee will also take actions identified in the AMP to achieve stated SBNF goals regarding water flows and riparian conditions.

### 8.4    Riparian and Aquatic Resources

The permittee will take actions identified in the AMP to achieve stated SBNF goals regarding water flows and riparian conditions.  The Transect 6 discharge was installed, and removed, at the request of the USFS.

### 8.5    Wildlife

The permittee will install two wildlife drinkers at locations described in Appendix B of the permit. Plans for these features will be submitted to the authorized officer for approval prior to installation.

### 8.6    Species of Concern

The permittee will avoid use of motorized equipment during limited Operating Periods (LOPs), as described in Appendix B, unless survey confirms that the species are not nesting.  LOPs and associated avoidance and minimization measures apply to all activities described in this document, AMP, Paired Basin Study Plan, and Hydrologic Data Collection Plan documents. Vegetation management work is prohibited during the LOPs described in the Resource Mitigation Measures.

### 8.7    Sanitation

Trash shall be removed daily during all on-site activities for the protection of wildlife.

### 8.8    Hazardous Materials

Refueling of equipment and storage of fuel and other hazardous materials will not occur within 100 meters of Riparian Conservation Areas (perennial and seasonal streams, seeps, springs, and meadows).

### 8.9    Access for Hydrologic and Riparian Studies

The Hydrologic and Riparian studies require the clearing of helispots in the East Twin Creek drainage to provide access for monitoring.  Up to three helispots (TC I through 3) within Section 36, Township 2 North Range 4 West (refer to the June 14, 2017, map in the project records) may be developed.  Up to 12 additional helicopter flights are permissible to support monitoring.

- *Helispots will be cleared of brush in a 20-foot by 20-foot area; however, no trees will be removed.*

- *Brush will be cleared along foot trail access routes from the helispots to East Twin Creek monitoring locations.*

---

Exhibit 3, P. 039

The authorized USFS officer will approve final locations for any helispots, and access routes developed for monitoring in East Twin Creek.  Pre-work resource surveys will be conducted if required by the authorized officer.  Approved access routes and helispots will be amended to, and become part of, Hydrologic and Riparian Studies Plans.

## 8.10    Helicopter and Drone Operations

The Project Aviation Safety Plan (Attachment A) describes both helicopter and drone (small Unmanned Aircraft System or sUAS) usage to complete the project activities described in AMP, Paired Basin Study Plan, and Hydrologic Data Collection Plan documents.  The permittee will provide Notification to Permit Administrator and Unit Aviation Officer (UAO) prior to any flight to:

- *Determine if a LOP is needed for nesting/breeding bird season for flycatcher/vireo if determined to be present during the permit period;*

- *Avoid any concerns with other flights in area - de-conflict airspace if needed; and,*

- *Provide Federal Interagency Communications Center (FICC)/dispatch with information to track flight if needed during fire season.  The permittee will communicate with FICC/dispatch the day of any flight to ensure positive radio communication with dispatch over assigned frequency at beginning of day/flights into area and to close out last flight/exit from area at end of day.*

The Permittee is responsible for reporting mishaps related to sUAS usage.  Special Use Permit FCD728503 also describes additional responsibilities for recovery of hazardous material, equipment retrieval, and liability after a sUAS mishap.  Permittee representatives responsible for contacting UAO are listed in Section 2 of this document.

## 8.11    Invasive Species

Invasive Species within the project area will be managed in accordance with the Weed Management Plan provided as an attachment to the AMP.

## 8.12    Fire Prevention and Control

A project-specific fire prevention and control plan is provided in Attachment C of this document.

## 9.0    ACCEPTANCE & APPROVAL

This plan will be reviewed periodically and will be revised to reflect changed condition, except for the Project Aviation Plan, which will be submitted annually to the authorized officer for approval by the SBNF Aviation Officer.

Signatures appear on the next page.

_____         _____

Tam M. Pham                              Louis W. Mixon, III

Senior Springs Resource                  Senior Natural Resource Manager

BlueTriton Brands, Inc.                  BlueTriton Brands, Inc.

_____

District Ranger Michael Nobles

US Department of Agriculture, Forest Service

Exhibit 3, P. 041

**EXHIBIT C**

**RE-DELIVERY OF PROJECT SUBMISSIONS**

BTB-USFS - Previous Project Submissions
Password: Hunton1901
https://hunton.egnyte.com/fl/C6JZCrY8rd



            

Exhibit **D**

Recorded Agreements

**[Documents Commence on Following Page]**



            

STATE OF CALIFORNIA )
                ) ss
COUNTY OF SAN BERNARDINO)

On this 19th day of July, A.D.,1930, before me, M. E. Crane, a Notary Public in and for said County and State, personally appeared Walter R. Holt and Margaret B. Holt, his wife, known to me to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

(NOTARIAL SEAL)             M. E. Crane

            Notary Public in and for said County and State

No. 3, "Endorsed" Recorded at request of SECURITY TITLE INS. & GUARANTEE CO. Aug. 21, 1930, at 9 A.M. in book 645, page 121, Official Records, San Bernardino County, Calif. Fulton G. Feraud, County Recorder, by Eva Bemis, Deputy. Fee $1.00.

            Compared

    A.Larmore      M. Smith

        o o o o

THIS AGREEMENT made and entered into this 6th day of August, 1930, by and between ARROWHEAD SPRINGS CORPORATION, a corporation organized and existing under and by virtue of the laws of the State of Delaware duly qualified to do business in the State of California (hereinafter called "Arrowhead"), and CALIFORNIA CONSOLIDATED WATER COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California (hereinafter called "Consolidated"),

WITNESSETH: THAT, WHEREAS, on the 4th day of December, 1928, Charles J. Anthony entered into a certain agreement with California Consumers Company, a Delaware corporation, relative to the purchase by California Consumers Company from Arrowhead of certain real estate, personal property, water and water rights of Arrowhead, all as more particularly described in said agreement and in certain exhibits and schedules attached thereto and made a part thereof; and

WHEREAS, on the said 4th day of December, 1928, the said Charles G. Anthony and California Consumers Company entered into a certain agreement amending the agreement as above described, which latter agreement was entitled "Amendatory Contract", and, among other things, amended paragraph eleventh of said contract first above described; and

WHEREAS, subsequent to the said 4th day of December, 1928, the said contract so entered into by and between Charles G. Anthony and California Consumers Company was fully approved and ratified by Arrowhead, as if the same had been originally entered into by the duly authorized officers of Arrowhead and was fully approved by stockholders of Arrowhead; and

WHEREAS, on the 19th day of December, 1928, the said Charles G. Anthony, California Consumers Company and Arrowhead entered into a contract entitled "Second Amendatory Contract", further amending said contract of December 4, 1928, as amended by the amendatory contract; and

WHEREAS, on the 25th day of February 1929, Arrowhead and Consolidated entered into an agreement relative to the carrying out of said agreements aforesaid, and containing additional

covenants and agreements thereto; and

WHEREAS, all right and interest of California Consumers Company in and to said contract, said amendatory contract and said second amendatory contract were, subsequent to the execution thereof, transferred by California Consumers Company to Consolidated; and

WHEREAS, subsequently Arrowhead made, executed and delivered to Consolidated certain bills of sale, assignments and other instruments in consummation of the terms of said agreements and particularly a certain warranty deed, which deed was recorded on the 12th day of May, 1929 in Book 476, page 175, Official Records of San Bernardino County, California, which warranty deed granted to Consolidated, among other things, certain easements and water rights belonging to Arrowhead situate in San Bernardino County, California; and

WHEREAS, since the execution and delivery of said instruments and warranty deed a controversy has arisen between the parties hereto as to the character and amount of water to which Consolidated is entitled under the terms of said contracts and said deed, and as to the character and amount of water which Arrowhead has retained under said contracts and deed, and during such controversy each of the parties hereto has made such examination of the said premises of Arrowhead and contiguous properties with reference to the amount and flow of water, both surface and sub-surface, thereon and thereunder, as to satisfy it in the execution of this agreement; and

WHEREAS, the parties hereto now desire to enter into an agreement for the purpose of completely compromising and settling all disputes, controversies and matters of every kind and nature as between the parties relative to the amount of water to be received by Consolidated and the amount of water to be retained by Arrowhead,

NOW, THEREFORE, for the purpose of fully compromising and settling all of said questions of every kind or nature, and for and in consideration of the premises and of the covenants and agreements herein contained, the parties hereto do agree as follows:

First: Consolidated agrees that it will, as soon as practicable after the execution of this agreement, and at its own cost and expense, construct and build a pipe line at least three inches outside diameter from the intake of the present pipe line of Arrowhead in Strawberry Canyon, constructed in 1929, to the springs located in upper Strawberry Canyon, twelve thousand three hundred (12,300) feet, more or less, north of the present pipe line intake of Arrowhead in Strawberry Canyon, and also that it will construct a pipe line of at least three inches outside diameter from the end of said pipe line in Strawberry Canyon belonging to Arrowhead one hundred (100) feet north of the tunnel in Cold Water Canyon to a point ten (10) feet north of the existing storage reservoir, having dimensions of 50 x 100', belonging to Arrowhead, back of the existing hotel building of Arrowhead, and also that it will construct a pipe line from the said reservoir to storage tanks and leading depot owned and operated by Consolidated west of Hot Water Canyon.

Second: Upon the completion of said pipe line by Consolidated, it may thereafter, without interference from Arrowhead, conduct all water developed by it in Strawberry Canyon through the pipe line so constructed by it, and also through the present pipe line constructed in 1929 by Arrowhead, which latter pipe line consists of six inch, four inch and three inch outside dimension steel pipe, and Arrowhead hereby grants Consolidated an easement to use for the purpose aforesaid Arrowhead's said pipe line and any line, whatever the size thereof, constructed by way of replacement thereof or substitution therefor. Of the water so developed and conveyed through said pipe line, Consolidated shall be entitled to one-half thereof, and Arrowhead shall be entitled to one-half, and the point of delivery of that portion of said water to which Arrowhead is entitled shall be the point ten (10) feet north of the said rectangular reservoir having a dimension of 50 x 100', back of the hotel building of Arrowhead. The method of measurement of said water, so that both Consolidated and Arrowhead shall receive their proper proportionate part thereof, shall be agreed upon by and

124

between an engineer designated by Arrowhead and an engineer designated by Consolidated. If the two engineers so designated shall fail to agree, then they shall designate a third engineer who shall be impartial and the decision of any two of the three engineers thus designated shall be binding upon the parties hereto as to the method of measurement of said water.

Arrowhead hereby grants to Consolidated (without any warranty whatsoever, except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein) the sole and exclusive right to develop water from any and all sources whatever, whether surface, subterranean, seepage or otherwise, in Strawberry Canyon, and whether within or without the real properties now owned by Arrowhead, and hereby grants to Consolidated (without any warranty whatsoever, except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein) one-half of all water developed from any and all sources, whatever in Strawberry Canyon, reserving to itself one-half of all such water.

Third: The pipe line above referred to, that is to say, that portion thereof constructed by Consolidated and that portion thereof constructed in 1929 by Arrowhead and now belonging to it, shall continue to be maintained at all times hereafter by Consolidated, at its own cost and expense, but Consolidated shall not be required to replace the whole, or any portion, of the said pipe line constructed by Arrowhead in 1929 and above referred to. Consolidated shall make all replacements required in that portion of said pipe line constructed or to be constructed by it, and Arrowhead shall make all replacements required in that portion of said line constructed by it. The officers, agents and representatives of each of said parties shall at all times have the right to inspect all springs, pipe lines, structures and measuring devices without interference from the other party.

Fourth: If at any time Consolidated is not using, selling, distributing or storing all of the one-half of the water flowing through said pipe line to which it is entitled hereunder, Arrowhead shall have the right to use for domestic purposes, human consumption, irrigation purposes or such other beneficial use upon its property as it may deem suitable, that portion of said one-half of such water not used, sold, distributed or stored by Consolidated, and whenever the storage facilities of Consolidated are full and can receive no more water without overflow, then Arrowhead shall be conclusively deemed to be entitled to the use, for the purposes aforesaid, of that portion of the water in said pipe line to which Consolidated is entitled hereunder but which Consolidated is not using, selling, distributing or storing, until the storage facilities of Consolidated can receive such water. If at any time Arrowhead is not using for domestic purposes, human consumption, irrigation purposes or such other beneficial use upon its property as it may deem suitable, all of the one-half of the water flowing through said pipe line to which it is entitled hereunder, Consolidated shall have the right to use, sell, distribute and store the portion thereof not used by Arrowhead. Consolidated agrees that it shall not be deemed to be using, selling or distributing water, within the meaning of this Paragraph Fourth or of Paragraph Sixth below, which is used for irrigation purposes outside of the watershed in which such water is obtained or which is used for irrigation purposes within such watershed upon real property not owned by Consolidated at the time of such use.

Fifth: In consideration of the premises, Consolidated does hereby wholly release, surrender and quitclaim unto Arrowhead any right whatsoever which it may have obtained by virtue of said contracts and/or said warranty deed, or otherwise, to any surface or sub-surface water existing in Cold Water Canyon within or outside of the boundaries of the real estate owned by Arrowhead.

Sixth: Consolidated agrees that Arrowhead shall have the right to use for domestic purposes, human consumption, irrigation purposes or such other beneficial use upon its property as it may deem suitable, that portion of the water developed and owned by Consolidated

125

in Waterman Canyon not used, sold, distributed or stored by Consolidated, and whenever the storage facilities of Consolidated are full and can receive no more water without overflow, then Arrowhead shall be conclusively deemed to be entitled to the use, for the purposes aforesaid, of that portion of said water which Consolidated is not using, selling, distributing or storing, until the storage facilities of Consolidated can receive such water.

Seventh: Arrowhead and Consolidated agree that their respective engineers shall as early as practicable determine the exact descriptions for perpetual easements in favor of Consolidated in respect of additional reservoirs, pipe lines, tunnels, collecting basins and similar facilities as may be hereafter needed by Consolidated, its successors or assigns, in so far as it may be feasible to determine such descriptions at this time. When such descriptions shall have been determined, Arrowhead agrees to grant to Consolidated perpetual easements in respect thereof, and to grant such additional perpetual easements, not limited by specific description, as may be reasonable in order to assure to Consolidated, its successors and assigns, the right to develop, collect, store and distribute water in accordance with the warranty deed, as modified by this agreement; and thereupon Consolidated agrees to quitclaim to Arrowhead the perpetual easement granted to Consolidated in said warranty deed in the following words:

"Also a perpetual easement to lay, construct, erect, use, operate, maintain, repair and replace necessary additional reservoirs, pipe lines, tunnels, collecting basins and similar facilities as may be hereafter needed by the grantee, its successors or assigns, in, on and across other property of the grantor, hereinafter described."

reserving and excepting, however, the easements to be granted by Arrowhead to Consolidated as provided in this paragraph Seventh.

Eighth: It is understood and agreed that notwithstanding any expression in said contracts and/or deed to the contrary, Consolidated shall not have the right to use any hot water arising on the property owned by Arrowhead that would interfere in any manner with the use of said water by Arrowhead, whether said water at the time of such use by Arrowhead is hot or cold, and Consolidated does hereby release and quitclaim unto Arrowhead any right to the use of hot water, except as aforesaid, which it may have obtained by virtue of any expression in said contracts and/or warranty deed.

Ninth: Notwithstanding any expression in said warranty deed, Consolidated shall not be entitled to any water flowing from Indian Springs and/or from the tunnels located at and adjoining said springs, except such surplus of said water as may exist after Arrowhead has made use of the same for all drinking and culinary purposes in and about its hotel, bungalows and out-buildings, and Consolidated does hereby release and quitclaim unto Arrowhead any right to the use of said water from Indian Springs and/or tunnels adjacent thereto, which it may have obtained by virtue of said contracts and/or warranty deed, except the right to the surplus above described. Consolidated hereby quitclaims to Arrowhead a perpetual easement to use, operate, maintain, repair and replace the Indian Springs pipe line of Consolidated, and Arrowhead agrees to maintain said pipe line and replace the same in whole or in part when and as often as it or any part thereof becomes worn out.

Tenth: In consideration of the foregoing and of all the contracts and to warranty deed described in the recitals of this agreement, it is hereby expressly covenanted and agreed by and between the parties to this agreement that this final adjustment and modification of the said contracts and warranty deed shall operate as and be the final adjustment of all obligations and liabilities in respect of water rights if anywise arising out of any or all previous negotiations, liabilities and agreements between the parties hereto, or any of their respective predecessors in interest, officers and/or agents, and each of the parties hereto does hereby release and discharge the other of and from any and all causes of action which have arisen between the parties hereto in respect of water rights, or on account of which either of the parties hereto may be liable to the other in respect of water rights, and this final agreement

126

shall and does entirely absolve each of the parties hereto from any suit or claim to be made
or asserted by either of the parties against the other in respect of water rights, except for
matters hereafter arising based on this agreement or on said warranty deed as modified hereby.
Except as modified hereby, however, said warranty deed and each and all of the agreements,
terms and provisions thereof, shall be and remain in full force and effect.

IN WITNESS WHEREOF, the said parties have caused this instrument to be executed by their
respective officers, thereunto duly authorized, and their respective corporate seals to be
hereto affixed the day and year first above written.

(CORPORATE SEAL)                        ARROWHEAD SPRINGS CORPORATION
                                        By C. M. Rice, Vice President
                                        And J. C. Macfarland, Assistant Secy.

(CORPORATE SEAL)                        CALIFORNIA CONSOLIDATED WATER COMPANY
                                        By T. W. Brown, Vice Pres.
                                        And C. A. Warne, Asst. Sec'y.

STATE OF CALIFORNIA )
                    ) ss
COUNTY OF LOS ANGELES)

On this 6th day of August, 1930, before me, Mary S. Alexander, a notary public in and
for the said county and state, residing therein, duly commissioned and sworn, personally
appeared C. M. Rice, known to me to be the Vice president and J. C. Macfarland known to me
to be the Assistant secretary of ARROWHEAD SPRINGS CORPORATION, one of the corporations
that executed the foregoing agreement known to me to be the persons who executed the fore-
going agreement on behalf of such corporation and acknowledged to me that such corporation
executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

(NOTARIAL SEAL)                         Mary S. Alexander
                                        Notary Public in and for the County of
                                        Los Angeles, State of California

STATE OF CALIFORNIA )
                    ) ss
COUNTY OF LOS ANGELES)

On this 6th day of Aug. 1930, before me, Olive M. Peters, a notary public in and for
the said county and state, residing therein, duly commissioned and sworn, personally appeared.
T. W. Brown known to me to be the Vice president and C. A. Warne, known to me to be the Ass't.
secretary of CALIFORNIA CONSOLIDATED WATER COMPANY, one of the corporations that executed the
foregoing agreement, known to me to be the persons who executed the foregoing agreement on
behalf of such corporation and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

(NOTARIAL SEAL)                         Olive M. Peters
                                        Notary Public in and for the County of
                                        Los Angeles, State of California

No. 92, "Endorsed" Recorded at request of ATTORNEY, Aug. 21, 1930, at 11:30 A.M. in
book 648, page 122, Official Records, San Bernardino County, Calif. Fulton G. Faraud, County
Recorder, by Eva Demis, Deputy. Fee $3.30.

                            Compared
                    A.Larmore        N. Smith
                        o o o o o o

GRANT DEED

CARRIE THOMAS, a widow, in consideration of Ten Dollars, to her in hand paid, the receipt of which is hereby acknowledged, does hereby GRANT TO Ethel Thomas, a single woman, all that real property in the County of San Bernardino, State of California, described as:

The South half of Lot 185, in Baldwin Lake Tract No. 1973, as per plat of said Tract of record in the office of the County Recorder of said County in Book 25 of Maps, at page 71 thereof.

SUBJECT TO taxes, assessments, conditions, restrictions, reservations, easements, rights and rights of way of record.

TO HAVE AND TO HOLD to the said grantee, her heirs or assigns forever.

WITNESS my hand this 16th day of October, 1934.

Consideration less than $100.                    Carrie Thomas

STATE OF CALIFORNIA
                              } ss
COUNTY OF LOS ANGELES

On this 16th day of October, 1934, before me, the undersigned, a Notary Public in and for said County, personally appeared Carrie Thomas, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same.

WITNESS my hand and official seal.

(NOTARIAL SEAL)                    Wade C. Bliss

                    Notary Public in and for said County and State

No. 55.  "Endorsed."  Recorded at Request of Grantee, Nov 3 1934 at 31:12 A. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif. Fulton G. Bacon, County Recorder, By A. R. Schultz, Deputy. Deputy...

                              Compared

                    F. Cooley              R. Oakes

                    o o o o o

THIS AGREEMENT made and entered into this 5th day of September, 1932, by and between AROWHEAD SPRINGS CORPORATION, LTD., (formerly Arrowhead Springs Company Ltd.), a corporation organized and existing under and by virtue of the laws of the State of California, duly qualified to do business in the State of California, (hereinafter called "Arrowhead") and CALIFORNIA CONSOLIDATED WATER COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California, (hereinafter called "Consolidated"),

WITNESSETH:

WHEREAS, on the 6th day of August, 1930, the parties hereto entered into a certain agreement, which agreement was thereafter recorded in the office of the County Recorder of San Bernardino County, California, in Book 608, at page 122 of Official Records of said County; and

WHEREAS, the parties hereto have determined to enter into a new agreement, whereby each will acquire certain rights and will agree to perform certain obligations distinct and different from the rights and obligations existing under or on account of said agreement of August 6, 1930, (which agreement, for convenience, will be hereinafter referred to as the "principal agreement"),

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the parties hereto do agree as follows:

First: Consolidated agrees that it will forthwith, upon the execution of this agreement, and at its own cost and expense, develop to the fullest reasonable extent all springs,

304

seepages and other sources of water, if reasonably available; gathering in Strawberry Canyon and all lateral canyons opening into the said lines, lying north of the westerly line of the south half of Section 31 and of Section 32, Township 2 South, Range 3 West, S.B.B. & M., and produce and continue to furnish such sources of water sufficient water to fill the pipe line built by Consolidated, either and in accordance with the terms of said principal agreement, in ordinary seasons to continuation.

Second: Consolidated shall hereafter at all times develop all water developed and saved by it in Strawberry Canyon, and in the Easterly Canyons northerly of said line established in paragraph First hereof, through the said pipe line, and except that all of the water so developed, saved and produced by it such such sources of supply shall be conducted through said pipe line, and not otherwise, to the point of delivery hereinbelow referred to. Of all such water so developed and saved and conveyed through said pipe line, Consolidated shall be entitled to eighty per cent (80%) of the constant flow thereof and Arrowhead shall be entitled, without cost, to twenty per cent (20%) of the constant flow thereof. The point of delivery of said 20% of said water to which Arrowhead is entitled (which is the point of delivery referred to hereinabove in this paragraph) shall be a point in the aforesaid pipe line ten (10) feet north of the rectangular reservoir having dimensions of 50 x 100 feet back of the hotel building of Arrowhead. The method of measurement of said water, so that both Consolidated and Arrowhead shall receive their proportionate part thereof, as hereinabove set out, shall be agreed upon by and between an engineer designated by Arrowhead and an engineer designated by Consolidated. If the two engineers so designated shall fail to agree, then they shall designate a third engineer, who shall be impartial, and the decision of any two of the three engineers thus designated shall be binding upon the parties hereto as to the method of measurement of said water.

Third: Arrowhead grants to Consolidated any and all right, title or interest which Arrowhead now has to develop water from any and all sources whatever, whether surface, subterranean, seepage, or otherwise, in Strawberry Canyon and the lateral canyons northerly of the said northerly line of the said South half of said Sections 31 and 32 above described.

Arrowhead also grants to Consolidated all right, title or interest which it now has or heretofore had in or to the title to, or ownership of, any and all water that Consolidated has heretofore or may hereafter develop from any and all sources whatsoever in Strawberry Canyon and lateral canyons northerly of said northerly line of the south half of said Sections 31 and 32; subject, however, to the right of Arrowhead to have delivered to it by Consolidated at the point of delivery aforesaid, twenty per cent (20%) of all such water developed and saved by Consolidated.

The aforesaid grants are without warranty except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein.

If, within three (3) years from the date of this agreement, Consolidated does not develop a flow of water in Strawberry Canyon and/or any lateral to it, southerly of said line above established, additional to the flow of water developed by Consolidated northerly of said established line, then Arrowhead shall be exclusively entitled, so far as Consolidated is concerned, to develop and produce such additional flow of water at any and all places southerly of said established line; provided that such development and production of water shall not affect or impair the right of Consolidated to develop and produce water northerly of said established line. In the event of the development of any water southerly of said established line, by either party hereto, and northerly of the

south section lines of said Sections 31 and 32, [illegible] Consolidated shall [illegible] be entitled to an equal one-half part thereof. In the event of the development by [illegible] of any water southerly of the south section line of Sections 31 and 32, [illegible] shall be entitled to the whole thereof, so far as Consolidated is concerned.

Fourth: It is understood and agreed that all of the covenants, terms and conditions of paragraph Fourth of said principal agreement has [illegible] agreed to and modified, except that the same shall be deemed to have been amended so as to constitute the words "eighty per cent (80%) of the water flowing through said pipe line" wherever reference is made to the water to which Consolidated is entitled, in lieu of the words "one-half of the water flowing through said pipe line," and except that the same shall be deemed to have been amended so as to substitute the words "twenty per cent (20%) of the water flowing through said pipe line" wherever reference is made to the water to which Arrowhead is entitled, in lieu of the words "one-half of the water flowing through said pipe line."

Fifth: Consolidated agrees that upon the execution of this agreement it will pay to Arrowhead the sum of fifteen thousand dollars ($15,000.00) towards the development by Arrowhead of water in Cold Water Canyon. Arrowhead agrees that said payment of $15,000.00 was induced by its promise, which it hereby covenants itself to perform, to actually commence the development of water in said Cold Water Canyon within one (1) year from the date hereof, and at its own cost (not exceeding one-half $15,000.00) to diligently prosecute such work to completion; such work to be done in such manner and to involve the construction of such pipe lines, reservoirs and other [illegible] as Arrowhead may deem advisable.

Sixth: Except as amended hereby, said principal agreement shall not be affected hereby and each and every sentence, clause or paragraph of said principal agreement not amended hereby, and with which this agreement is not inconsistent, and particularly paragraphs Third, Fifth, Sixth, Seventh and Ninth of said principal agreement, are hereby reaffirmed, and the parties hereto agree that said paragraphs shall not in anywise be affected by anything contained in this agreement.

Seventh: Arrowhead does hereby grant, without warranty, to Consolidated the right to use one miner's inch constant flow of the water arising from Penyugal Springs, or from other springs in the vicinity thereof, but not for sale of natural mineral water, and does also hereby grant to Consolidated the necessary easement for a pipe line to convey from said Penyugal Springs or vicinity to the reservoirs of Consolidated, the exact route and description of such easement to be hereafter agreed upon by the parties hereto. Consolidated does hereby agree that it shall not have any right to the hot water existing at the property of Arrowhead Springs Corporation, Ltd., other than the one miner's inch above described in this paragraph.

Eighth: WHEREAS, Consolidated has stated to Arrowhead that certain false and fraudulent representations were made by Arrowhead and/or by certain of its officers, agents and/or employes prior to and at the time of the purchase by Consolidated and/or California Consumers Company, its predecessor in interest, of the properties and business as set forth and described in that certain agreement of the 4th day of December, 1928, the Amendatory Contract of the same date, the Second Amendatory Contract of the 19th day of December, 1928, and the agreement of February 20, 1929, which agreements are recited in the principal agreement of August 6, 1930, and that Consolidated and California Consumers Company, its predecessor, relied upon such false and fraudulent representations in the making of all of such agreements and in the purchase of said properties; and

WHEREAS, Arrowhead has denied that any of such false or fraudulent representations were so made by it, or any of its officers, employes or agents, and the parties hereto desire to fully release and discharge any and all claims and causes of action arising on

306

account of any such alleged false or ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓,

NOW, THEREFORE, for and in consideration of the ▓▓▓▓▓▓▓ and of the covenants, terms and provisions of this agreement, the parties hereby ▓▓▓▓ fully and completely ▓▓▓▓ and discharge each other of and from any and all manner of actions, claims, ▓▓▓▓▓ or obligations arising out of or on account of any ▓▓▓ representations, false, ▓▓▓▓▓▓ or otherwise, of any kind or nature, made or alleged to have been made by either ▓▓▓▓ hereto, or any of their respective officers, agents or ▓▓▓▓▓, in connection with or ▓▓▓▓▓▓▓▓ to, or otherwise affecting or having to do with, the ▓▓▓▓▓▓▓ of the business and properties of Arrowhead to Consolidated or to California Consolidated Company, a corporation, or in connection with the amount of water developed or to be developed upon the properties of ▓▓▓▓▓▓ or the amount of water sold by it, or the value of said water, or in connection with the execution of said principal agreement and/or this agreement, and do hereby release and discharge each other from any and all other obligations, claims of action, claims or ▓▓▓▓▓ of every kind or nature whatsoever arising out of, or on account of, or in any manner connected with, the sale by Arrowhead to Consolidated, or to California Consolidated Company, of its water distribution business and certain water rights, as provided in said agreement of the 4th day of December, 1928, and subsequent hereinbefore designated, except such as are contained in, or arise out of, or ▓▓▓▓▓▓ by the following:

(a) The warranty deed of February 27, 1929, ▓▓▓▓▓ on the 12th day of May, 1929, in Book 476, Page 175 of Official Records of San ▓▓▓▓▓ County, California, as ▓▓▓▓▓ by said principal agreement of August 6, 1929;

(b) The principal agreement of August 6, ▓▓▓ to ▓▓▓▓▓ by this agreement;

(c) The agreement dated January 2, 1931, ▓▓▓▓▓ by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "Arrowhead Water Agreement," as ▓▓▓▓ by ▓ agreement of even date herewith.

(d) The agreement dated August 6, 1930, entitled by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "▓▓▓▓ Maintenance Agreement," as amended by agreement of even date herewith;

(e) This agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their respective officers, thereunto duly authorized, and their respective corporate seals to be hereto affixed, the day and year first above written.

(CORPORATE SEAL)                                   ARROWHEAD SPRINGS CORPORATION, LTD.

                                                   By G. M. Rice, Vice-President

                                                   And J. S. ▓▓▓▓▓▓, Assistant Secretary

(CORPORATE SEAL)                                   CALIFORNIA CONSOLIDATED WATER COMPANY

                                                   By S. C. ▓▓▓▓▓▓▓▓, Exec. Vice President

                                                   And G. A. ▓▓▓▓, Asst. Secretary

Prepared by ▓
Attorney's Approval
  Pillsbury, Madison & Sutro By _
  Other Attorneys _
  or Lawler Degnan
  Form previously approved by
Description approved  J. Paul Nesse
(R. of W. Approval _
Approved _
Approved _
Manager's Approval for Execution _

STATE OF CALIFORNIA }
                    } ss
COUNTY OF LOS ANGELES }

On this 26th day of September, 1931, before me, Mary S. Alexander, a notary public in and for the said county and state, residing therein, duly commissioned and sworn, personally appeared G. M. Rice, known to me to be the Vice-President, and J. S. ▓▓▓▓▓▓▓▓, known to me to be the Assistant Secretary of ARROWHEAD SPRINGS CORPORATION, Ltd., one of



F. Cooley                    R. Quinn

o p.o.o.o

TO ALL WHOM IT MAY CONCERN:

NOTICE is hereby given that I, H. N. Eastwood, am the owner of certain premises described as follows, to-wit: Lot 34, Block 50, .............. of ................, as Book 34, page 78 of Official Records of San Bernardino County; ...................; that I have obtained knowledge that building is in course of construction ..................... that from .......... have not elapsed since I obtained this knowledge; ...................... not be responsible for the construction of said building, or for the material or labor used or to be used therein, or for any alteration or repair thereof, or for any ............... said building, or any addition thereto, or which has been performed, furnished or ......... in any manner or .... upon said land, or upon the building thereon, or addition thereto, or which may hereafter be performed, furnished, or used upon said land, or building, or addition thereto, or for the service of any architect.

THAT HAL WILSON and MORTENSE WILSON are the purchasers of said property under a contract of purchase.

THAT _ is the lessee of said property.

No. and Street _                    H. N. Eastwood

STATE OF CALIFORNIA    }
                        } ss
COUNTY OF SAN BERNARDINO }

H. N. Eastwood being duly sworn deposes and says:  That the above and within notice is a true copy of a notice posted on lot 34, block 50, tract 5420.   Records of San Bernardino County, California, on the third day of December, 1934 by H. N. Eastwood and that the facts therein stated are true of his own knowledge.

H. N. Eastwood

Subscribed and Sworn to before me this 3rd day of December, 1934.
(NOTARIAL SEAL)                    Mae A. C. Fleming

                        Notary Public in and for said County and State

STATE OF CALIFORNIA    }
                        } ss
COUNTY OF SAN BERNARDINO }

On this third day of December, A. D., 1934, before me, Mae A. C. Fleming, a Notary Public in and for said County and State, personally appeared H. N. Eastwood known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.



the corporations that executed the foregoing application, known to me to be the persons who executed the foregoing agreement on behalf of such corporation, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Mary S. Alexander

(NOTARIAL SEAL)                                    Notary Public in and for the County

of Los Angeles, State of California

No. 70. "Endorsed." Recorded at Request of C. H. Shep, Dec 3 1954 at 1:01 P. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif. Fulton G. Pownall, County Recorder. By A. R. Schultz. Deputy. Fee $1.10.