# EXHIBIT 5

# *Yuhaaviatam of San Manuel Nation*

November 15, 2024

Danelle Harrison, Forest Supervisor
San Bernardino, National Forest
U.S. Forest Service
U.S. Department of Agriculture
602 S Tippecanoe Avenue
San Bernardino, CA 92408

**Re:    Yuhaaviatam of San Manuel Nation's Need for United States Forest Service to Continue Allowing Delivery of Water to Sacred Ancestral Land Known as the Arrowhead Property**

Dear Forest Supervisor Harrison:

I would like to thank you and the other representatives of the San Bernardino National Forest ("SBNF") for meeting with me and other Tribal Council Members of the Yuhaaviatam of San Manuel Nation, also federally recognized as the San Manuel Band of Mission Indians (the "Nation"), to discuss the Nation's expectations for government-to-government consultation to ensure the Nation has access to critically needed water for its Arrowhead property until the Nation can connect to municipal water.  Such expectations were outlined in the attached November 4, 2024 letter I sent to you (Attachment 1).  The Nation has continually informed the leadership of the SBNF of the Nation's critical need for and the dependence upon water delivered from Strawberry Canyon to the Arrowhead property.  Under the current SBNF order, the SBNF plans to cut off the delivery of such water to the Arrowhead property on January 15, 2025.

The Arrowhead property and Strawberry Canyon are located in the Nation's ancestral territory, and both constitute culturally significant sacred sites, as defined in Executive Order 13007.  These lands feature prominently in the Nation's oral history and were once the site of ancient village known as Apuiva't that was occupied by the Nation's ancestors.  The Nation re-acquired the Arrowhead property in 2016 to protect the important cultural and natural resources on the property.

The Arrowhead property is not only featured in the Nation's history but constitutes a foundational resource for its people as well as future generations.  These lands remain a key spiritual site for medical and cultural practices and government operations.  The Nation has

*26569 Community Center Drive ● Highland, CA 92346*
*Office: (909) 864-8933*
Exhibit 5, P. 059                                    Exhibit 13

government administrative offices, a fire station, tribal cultural facilities and grounds, event spaces, and a native plant propagation area located on the Arrowhead property. Please see the map of the facilities located on the property that was previously provided to you, which is Exhibit 6 to Attachment 2 of this letter. These facilities are used daily by Tribal citizens, employees, and others, including local, state, and federal firefighters and other first responders. In 2024, over 60 events have occurred in the event spaces. This does not include the daily use by the Nation and its employees and the training events, where fire fighters and other first responders from more than 20 city, state, federal and other agencies receive training.

Moreover, the approximately 2,000 acres that make up the Arrowhead property are essential for the growth of the Nation's land base to house and provide community spaces for its citizens. This is especially true as the Nation's adjacent Reservation is small, consisting of approximately 1,100 acres, most of which is steep and rugged hillside not suitable for additional community spaces or housing.

The Nation understands SBNF described the Arrowhead property as "not operating" and not used by the Nation, a misimpression the agency expressed in SBNF's June 24, 2024 Notice of Denial of Application for Use and Occupancy of National Forest Lands; Termination of Special Use Permit FCD728503 that originally terminated the delivery of water to the Arrowhead property. We hope that our meetings over the past three months, the tours of the property and other information the Nation has provided have corrected such mistaken impression and demonstrated the importance of the Arrowhead property to the Nation's daily life and future.

Attached please find a summary memorializing our discussions to date regarding the critical need for continued delivery of water to the Arrowhead property (Attachment 2). Specifically, the enclosed summary addresses: (1) the Nation's rights to Strawberry Canyon water; (2) the Arrowhead property's water needs and limited current water delivery; (3) the Nation's responsible stewardship of the Arrowhead property and use of water; and (4) the Nation's willingness to connect its Arrowhead property to other water sources and the challenges to implementing such solution. This letter and the attachments, including the summary, may contain proprietary information of the Nation. As such, if SBNF, United States Forest Service ("USFS") or United States Department of Agriculture ("USDA") is requested to share this letter via the Freedom of Information Act ("FOIA") or other federal law, the Nation requests advance notification and an opportunity to consult on whether some of the information meets one of the exceptions in FOIA.

The Nation expresses its appreciation to the agency for meeting with the Nation over the past few months, but we regret that no solution has been identified to provide the water critically needed for the Arrowhead property by the SBNF set deadline of January 15, 2025. The Nation hopes that providing this information to you again in writing will help find solutions, to achieve a

balance that would protect both the Strawberry Creek environment as well as the Nation's vital interests in the water that it needs for its Arrowhead property, and thereby avoid disastrous consequences that would come from ceasing water delivery effective January 15, 2025.

Sincerely,

*Lynn R. Valbuena*

Lynn R. Valbuena
Chairwoman
Yuhaaviatam of San Manuel Nation


cc:    Randy Moore, Chief, U.S. Forest Service
       Reed Robinson, Director, Office of Tribal Relations, U.S. Forest Service
       Rudy Soto, Deputy Assistant Secretary, External and Intergovernmental Affairs, USDA
       Senator Alex Padilla
       Senator Laphonza Butler
       Representative Jay Obernolte
       Representative Pete Aguilar
       Yuhaaviatam Tribal Council of San Manuel

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION

# Attachment 1

# *Yuhaaviatam of San Manuel Nation*

November 4, 2024

Danelle D. Harrison, Forest Supervisor
San Bernardino National Forest
U.S Forest Service
602 S. Tippecanoe Ave.
San Bernardino, CA 92408

RE:  Government-to-Government Consultation Regarding Yuhaaviatam of San Manuel Nation's
       Continued Access to Water from Strawberry Canyon

Dear Supervisor Harrison,

The purpose of this letter is to set forth the expectations of the Yuhaaviatam of San Manuel Nation ("Nation"), also federally recognized as the San Manuel Band of Mission Indians, regarding the process for meaningful government-to-government consultation with San Bernardino National Forest officials (collectively as local agency officials referenced herein as "SBNF") about the Nation's continued access to needed  water from Strawberry Canyon for use on our adjacent Arrowhead property until we can secure a long-term water supply solution, including potential connection to the local municipal water system. As you are aware, the San Bernardino National Forest (as the federally-designated natural resource, referenced herein as the "Forest") is within our ancestral territory, and we have many sacred sites and cultural resources within the Forest. Our Reservation is adjacent to the Forest, and we plan to place our Arrowhead property into trust status with the federal government. The Nation has rights to water in the area, including but not limited to, riparian rights, state pre-1914 appropriative water rights, and federal Tribal water rights.

As such, the federal government, including SBNF, has a trust responsibility to the Nation and we expect government-to-government consultation to occur in a manner consistent with Executive Order 13175 issued November 6, 2000; Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships issued on January 21, 2021; the United States Department of Agriculture (USDA) Forest Service Action Plan issued February 2023 and United States Forest Service (USFS) Tribal Consultation policies and handbooks; and Joint Secretarial Order 3403 issued November 15, 2023. Additionally, since 1970, the federal government has had an overarching policy of eliminating federal paternalism towards tribal governments and instead promoting self-determination for tribes, including transferring federal programs to tribal governments for administering. This policy of self-determination was most recently reinforced by President Biden when he issued Executive Order 14112 in December 2023, which prioritizes partnerships with tribal leaders, respect for tribal sovereignty, trust in tribal priorities, and dignity for tribal nations.  We ask that our consultation on continued access to water from Strawberry Canyon be conducted in a manner consistent with these various federal policies.

Supervisor Harrison, San Bernardino National Forest
p. 2

Any action that will cut off water to the Nation cannot be made without the SBNF, USFS and USDA consulting with the Nation and considering the impact of such action on the Nation. Indeed, we believe it is the duty of the SBNF, USFS and USDA to safeguard the Nation's rights and access to such water. As set forth in the Joint Secretarial Order 3403, the SBNF, USFS and USDA are charged with the "highest trust responsibility" to protect Tribal interests and must "ensure that all decisions by the Departments relating to Federal stewardship of Federal lands, waters, and wildlife under their jurisdiction include consideration of how to safeguard the interests of any Indian Tribes such decisions may affect." Furthermore, Joint Secretarial Order 3403, recognizes that "Tribal consultation and collaboration must be implemented as components of, or in addition to, Federal land management priorities and direction for recreation, range, timber, energy production, and other uses, and conservation of wilderness, refuges, watersheds, wildlife habitat, and other values" and that "the Departments will benefit by incorporating Tribal expertise and Indigenous knowledge into Federal land and resources management."

The Nation and our representatives would like to have a dialogue with you, and any other appropriate USFS and USDA officials, about the specific issues that need to be discussed during this consultation period and the process and timeline for discussing those issues. We are putting this communication in writing to ensure that SBNF and the Nation are on the same page regarding the issues that need to be focused on for the next 30 days and the process of consultation on those issues. Please let me know if you disagree with anything contained in this letter, and please feel free to share this letter with any appropriate officials within USFS and USDA. However, this communication may contain proprietary information of the Nation. As such, if SBNF, USFS or USDA is requested to share this letter via the Freedom of Information Act (FOIA) or other federal law, the Nation requests advance notification and an opportunity to consult on whether some of the information meets one of the exceptions in FOIA.

**Background and Recent Meetings with SBNF**

For over one hundred years, Strawberry Canyon has served as the primary water source for our 2,000-acre Arrowhead property adjacent to the Forest. Since at least the 1930s, water has been conveyed from Strawberry Canyon to our Arrowhead property through a diversion and delivery system developed and maintained by a commercial bottled water company, which is now owned by BlueTriton Brands. On July 26, 2024, the SBNF terminated BlueTriton's Special Use Permit FCD728503 and directed the company to immediately cease operation and maintenance of the water diversion and delivery system. This decision by the SBNF was made without any consultation with the Nation and would have immediately shut off the Nation's access to water for our Arrowhead property. However, after vigorous outreach by the Nation and our representatives to the federal government, we were pleased that you modified the July 26 order to allow for the Nation to continue to receive water through the diversion and delivery system until January 15, 2025.

The Nation's representatives began conducting weekly meetings with you and other SBNF representatives in mid-August of this year. During our initial meeting, you and your staff indicated that the environmental health of Strawberry Creek (the "Creek") is poor. We indicated that the environmental health of the Creek is important to the Nation given that the Creek and the

Supervisor Harrison, San Bernardino National Forest
p. 3

surrounding area are a part of our ancestral territory and contain cultural resources. Although the Nation has rights to water in that area, including but not limited to, riparian rights, state pre-1914 appropriative water rights and federal Tribal water rights, we care deeply about the environmental health of the Creek and entire Forest. Our people have been on this land and utilized its resources since time immemorial, and we will continue to be here for generations to come. We want the Creek and Forest to be healthy and committed to you at that meeting that we would prioritize finding a solution to provide water for our Arrowhead property that protected the health of the Creek and would work with the Forest to improve the environmental health of the Creek.

The Nation has determined that the best long-term solution to provide water for our Arrowhead property is to connect the property to the nearest municipal water system. However, the closest connection is miles from the Arrowhead property's gravity-fed system that currently delivers water to facilities throughout the property.  It will take time and substantial funding to build the necessary infrastructure. The Nation's initial analysis indicates that it will take a minimum of 3 years to build but possibly longer, and we will need federal assistance to help cover the cost of construction of the infrastructure. Such infrastructure would benefit the area, not just the Arrowhead property, as it would allow others in the area to connect to municipal water. However, as indicated above, such widespread benefits will take time and resources to establish, and as such, we asked the SBNF to work with us to ensure that our Arrowhead property can continue to access water from Strawberry Canyon until we can connect to a municipal water system.

On several occasions, the Nation's representatives have orally provided information to SBNF officials about the amount of water our Arrowhead property needs and the purposes for which the water is used. Additionally, the Nation has indicated that we could work with SBNF to reduce our water usage during this transition period, so long as any reduction does not increase the likelihood of wildfires from the Forest harming the Nation's lands or surrounding areas.  The Nation has been in communication with our Congressional delegation about potential legislative language to ensure our continued access to water, and we have been speaking with SBNF officials about the development of a co-stewardship agreement that could cover our access to water until we connect to a municipal water system.

It has now been over two months since the weekly meetings began, and the SBNF is still planning to shut off our access to water on January 15, 2025. There has not been any mechanism identified by the SBNF, other than the Congressional action proposed and sought by the Nation, that will provide the Nation with continued access to its longstanding water source until we connect to municipal water. Mostly recently, SBNF officials suggested the use of a co-stewardship agreement, which the Nation supports, but our research so far indicates that a co-stewardship agreement cannot be put in place by January 15. Given this, the Nation would like to memorialize some of our views shared during these meetings and share our views on the next steps which we would like to discuss with you in our next meeting.

Supervisor Harrison, San Bernardino National Forest
p. 4

**San Manuel Band's Connection to Strawberry Creek**

The Forest and surrounding territory are the ancestral lands of the Nation. Long before the Forest was established, our people lived on the lands, utilized the resources, and did so in a sustainable manner. We lost control and access to much of our ancestral territory after colonization, the mission system, California statehood, and failed federal policies that sought to assimilate and terminate our people. Our current Reservation, which is adjacent to the Forest, comprises a little more than 1,000 acres and is inadequate to encompass our government and community needs. We have been working to re-acquire some of our homelands so we can provide housing and fully develop our government for our citizens. To this end, we were able to re-acquire our Arrowhead property, which is also adjacent to the Forest, and have been in the process of exchanging additional lands with the SBNF since 2017. We will be considering seeking to place our Arrowhead property into federal trust status so that it can expand our existing Reservation.

The re-acquisition of these lands is significant to our people because we need more land to live on and because these lands hold sacred sites and cultural artifacts and resources. The hot and cold water springs, flora and other resources located throughout these lands and the Forest are culturally significant to our community. The Arrowhead rock formation on these lands is of particular importance to our people because it provided direction for safety and water and other natural resources for our people prior to and at a time when we were being run off our lands and terminated by settlers in the 1800s. Strawberry Canyon, which is located near the Arrowhead, also contains many sites that meet the definition of Indian Sacred Sites contained in Executive Order 13007. The Nation continues subsistence and cultural practices in this area, including gathering of plants and ancestral ceremonies.

Protection of our ancestral territory, regardless of whether we currently own the land or not, has always been a priority for us and it will continue to be a priority. The Nation and our people are not going anywhere. As such, the lands and their resources need to be cared for to ensure the survival of the San Manuel people for generations to come. That is why the Nation wants to connect our Arrowhead property to a municipal water system and begin co-managing Strawberry Creek to improve its environmental health.

**The Government-to-Government Consultation Process Moving Forward**

Given that the USFS still plans to shut off our water access on January 15, 2025, the Nation wants to set forth the issues and information that we believe need to be discussed over the next 30 days and the laws and policies that govern such consultation. Additionally, the Nation wants to ensure that the SBNF understands who is authorized to speak on behalf of the Nation when it comes to government-to-government consultation. Although I am the Chairwoman of the Nation, any member of our Tribal Council has the authority to speak on behalf of the Nation. Additionally, for purposes of discussions with the SBNF regarding the continuation of water access for our Arrowhead property, members of the Nation's Office of Intergovernmental Affairs are authorized to convene meetings and the Nation's staff attending such meetings may speak and work with SBNF on this topic on behalf of the Nation, but with the understanding that as is required by the Nation's laws, the Tribal Council will make any final decisions on behalf of the

Nation. Please let me know if you have any questions as to who is an authorized representative of the Nation.

The Nation would like to continue weekly consultation with SBNF officials but would like to identify and invite additional representatives from the USFS and USDA to discuss the next round of specific issues to be addressed, as identified below:

- Water needs and usage of Nation's Arrowhead property. SBNF officials repeatedly have asked for information regarding the amount of water the Nation needs for its Arrowhead property and how the water we currently receive is used. Tribal representatives believe they have orally provided this information during prior weekly meetings, but Forest officials seem to still have questions. In an effort to provide consistent and clear information to the SBNF, the Nation will be providing via a separate communication our water needs and usage for our Arrowhead property. The Nation's expectation is that any information shared on water usage is done within the context of consultation and should be protected and held in confidence.

- Documentation of current environmental health of Strawberry Creek. SBNF officials indicated that the environmental health of Strawberry Creek is in poor condition. The Nation has requested that the SBNF share with us the data and information regarding the environmental health of the Creek and the causes of and any proposed solutions to address any impairment. Additionally, the Nation has requested that our water and cultural team, and other Tribal representatives, be provided with access to the Forest, including the Creek, so that we can also assess the environmental health of the Creek and determine if any of our cultural resources and sites are being impaired. The Creek and Canyon are our ancestral lands, and they contain important cultural resources and sites. The health of the Creek and Forest are significantly important to the Nation and impact our adjacent lands and overall cultural health. SBNF should not be making any decisions about the Creek without first consulting with the Nation. Indeed, as recognized in Joint Secretarial Order 3403, the Nation's indigenous knowledge is invaluable to the preservation of the natural and cultural resources in the Forest, and the SBNF, USFS and USDA should consult the Nation's experts, including but not limited to, individuals from the Nation's Environmental Management and Cultural Resource Management Departments.

- Legal authorities of the Forest Supervisor, USFS, and USDA to extend water access for the Nation. During our discussions, SBNF officials have conveyed that they have concerns about extending the Nation's access to water. However, the Nation has not been provided with any legal analysis or other information explaining this concern. We would like to identify a meeting at which USFS and USDA lawyers can be available to discuss the various

Supervisor Harrison, San Bernardino National Forest
p. 6

authorities of the SBNF, USFS, and USDA regarding making water available beyond January 15, 2025, to the Nation from our ancestral territory.

- <u>Decommissioning Plan from BlueTriton Brands</u>. To be clear, the Nation's relationship with the SBNF is a government-to-government relationship that is separate and distinct from any ongoing litigation or process involving the SBNF and BlueTriton Brands ("BlueTriton") or other parties. SBNF's termination of BlueTriton's Special Use Permit has a significant negative impact on the Nation, and we should have been consulted on it and the impact to the Nation considered prior to taking this action. Pursuant to SBNF's requirements, we understand that BlueTriton has filed its decommissioning plan to remove its water diversion and delivery system from Strawberry Canyon with the SBNF. The Nation is requesting that a copy be shared with us and that we be consulted on the plan and its impact on the Nation. We also request that the SBNF consult with the Nation about mitigating any harm that implementation of the plan may have on the Nation. Again, our consultation with the SBNF about the removal plan is separate and distinct from any ongoing proceeding between the SBNF and BlueTriton, or other parties, and we will work with you to make sure that we only consult on those matters that directly impact the Nation as required by Executive Order 13175, Joint Secretarial Order 3403, USFS' Action Plan and other federal policies.

The Nation looks forward to discussing the issues and process outlined in this letter with you at our next meeting.

Sincerely,

*Lynn R. Valbuena*

Lynn R. Valbuena
Chairwoman
Yuhaaviatam of San Manuel Nation

cc:     Randy Moore, Chief, U.S. Forest Service
        Reed Robinson, Director, Office of Tribal Relations, U.S. Forest Service
        Rudy Soto, Deputy Assistant Secretary, External and Intergovernmental Affairs, USDA
        Senator Alex Padilla
        Senator Laphonza Butler
        Representative Jay Obernolte
        Representative Pete Aguilar
        Yuhaaviatam Tribal Council of San Manuel

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Attachment 2

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# SUMMARY OF INFORMATION ON THE CRITICAL NEED FOR CONTINUED DELIVERY OF WATER TO THE YUHAAVIATAM OF SAN MANUEL NATION'S ARROWHEAD PROPERTY
## (November 15, 2024)

In furtherance of its effort to engage in government-to-government consultation with the United States Forest Service ("USFS"), the United States Department of Agriculture ("USDA") and the San Bernardino National Forest ("SBNF"), the Yuhaaviatam of San Manuel Nation, also federally recognized as San Manuel Band of Mission Indians (the "Nation"), hereby memorializes information the Nation has provided to the SBNF regarding the Nation's critical need for continued delivery of water to the Nation's sacred ancestral land known as the Arrowhead property.  Specifically, the summary addresses:  (1) the Nation's rights to Strawberry Canyon water; (2) the Arrowhead property's water needs and limited current water delivery; (3) the Nation's responsible stewardship of the Arrowhead property and use of water; and (4) the Nation's willingness to connect its Arrowhead property to other water sources and the challenges to implementing such solution.

Notably, this summary distills information provided to the SBNF but does not represent all the information provided to the agency.  Such information may contain proprietary information of the Nation.  As such, if SBNF, USFS or USDA is requested to share this summary via the Freedom of Information Act ("FOIA") or other federal law, the Nation requests advance notification and an opportunity to consult on whether some of the information meets one of the exceptions in FOIA.  The Nation is amenable to providing additional information the agency may need and to working collaboratively with the agency to find feasible solutions.

**Section 1 - The Nation's Rights to Strawberry Canyon Water:**  The Nation and its ancestors have relied upon the water from Strawberry Canyon since time immemorial.  Indeed, the Nation's ancestors used such water at the ancient village known as Apuiva't located in what is today known as the Arrowhead property.  Hotel and other facilities that were built on the Arrowhead property starting in the 1800s also relied upon such water.  To this day, the primary source of water for the Arrowhead property is the water from Strawberry Canyon.  Not surprisingly, the Nation and its Arrowhead property have broad water rights claims to water in Strawberry Canyon that authorize the current and future use of such water, including, but not limited to, the following:

- State riparian water rights, as Strawberry Creek and East Twin Creek flow across the Arrowhead property owned by the Nation.  Such rights were acknowledged by the State Water Resources Control Board ("SWRCB") in its now-stayed Cease and Desist Order (https://www.waterboards.ca.gov/water_issues/programs/administrative_hearings_office/

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

docs/2023/wro2023-0042_corrected.pdf , *see* pages 89-90). The Nation has the right to use water diverted under its riparian water right for a variety of beneficial uses, including temporary storage. It is also entitled to divert from structures on separate, upstream lands so long as doing so does not injure intervening owners' rights. *See, e.g.*, *Lodi v. East Bay Municipal Utility Dist.*, 60 P.2d 439 (Cal. 1936).

- State pre-1914 appropriative water rights, based on: (1) the Arrowhead property's diversions of water from Strawberry Canyon for use at the hotel and other facilities on such land prior to 1914, which were recorded with the County of San Bernardino on November 30, 1887, and can be located at Book C pages 296-299, and (2) the Nation's appropriative rights in East Twin Creek, which the Nation may divert further upstream, including from Strawberry Canyon, pursuant to state law, including California Water Code Section 1706, which allows pre-1914 users to move a point of diversion further upstream. These rights are senior to all other rights as recognized in the *Del Rosa* judgment regarding water rights (*see* <u>Exhibit 1</u>, paragraph (a) on pages 9-10). Indeed, the *Del Rosa* judgement acknowledges that the Arrowhead property had been using and relying on water from East Twin Creek and its tributaries, including Strawberry Creek, for over 50 years prior to the 1931 date the judgment was entered and decrees almost the entire flow of East Twin Creek and its tributaries to the Arrowhead property. This right predates all other state water rights, and the USFS lacks authority to modify the priority and administration of a recognized state water right. The Nation also possesses other pre-1914 rights in East Twin Creek and its tributaries by virtue of being the sole shareholder of the Del Rosa Mutual Water Company.

- Federal aboriginal water rights, rooted in the fact that Strawberry Canyon lies in the Nation's aboriginal territory. In fact, as discussed above, the Nation's ancestors had a village on and around the Arrowhead property.

As is evident, the Nation's water rights outlined above are separate from and not dependent on BlueTriton's water rights. Under a 1931 Agreement (*see* <u>Exhibit 2</u>), BlueTriton, as a successor in interest, is required to provide 20% of the water it obtains from the water infrastructure located within the SBNF to the Arrowhead property. For nearly a century, the property has relied on this infrastructure to receive water from Strawberry Canyon to which the Nation has its own broad water rights claims, as described in further detail in the preceding paragraph.

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

<u>**Section 2 - The Arrowhead Property Water Needs and Limited Current Water Delivery**</u>:

The Nation's consultants have determined that approximately 100 acre-feet per year ("AF/Y") are needed to maintain the current uses at the approximately 2,000 acre Arrowhead property.  As shown on the chart below, the water need varies by month and weather conditions with more being used during the hot fire season months.

| PRELIMINARY ESTIMATE OF ARROWHEAD PROPERTY WATER NEED FOR CURRENT USES* | |
| --- | --- |
| **MONTH** | **Acre-Feet** |
| January | 4.46 |
| February | 5.58 |
| Marc | 7.43 |
| April | 9.68 |
| May | 10.40 |
| June | 12.17 |
| July | 13.70 |
| August | 12.17 |
| September | 9.76 |
| October | 7.67 |
| November | 5.50 |
| December | 4.05 |
| **Total Acre-Feet Per Year** | **102.59** |

**\*This chart provides preliminary numbers representing the current best estimate of water need at the Arrowhead property and is subject to change based on seasonal rainfall and changes in the use and operations of such lands.  The chart and the water quantities on this chart do not represent and are not a waiver of the Nation's water rights, and the Nation reserves the right to assert such rights.**

The Nation has not asked for and is not using all the water that the BlueTriton facilities can deliver.  Instead, the Nation is currently receiving water from three of the twelve diversion points in the BlueTriton facilities (Diversion Points 2, 3 and 8).  This is a fraction of the total amount that the twelve diversion points can produce (*see* <u>Exhibit 3</u> showing the various diversion points).  The amount of water produced by these diversion points varies significantly from month to month and year to year depending on the amount of precipitation received.  2023 and 2024

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

were very wet years, and the water received through the diversion points exceeds drought year flows.  Any water not used on the property is released back into the watershed.  The Nation values conservation and is always striving to improve its water use efficiency.  The Nation inquired as to whether or not the existing system could be automatically controlled to deliver water as needed by the Nation.  Unfortunately,  the Nation was informed that the system is operated manually and there is currently no mechanism by which the diversion points can be automatically shut off or reduced in volume, and that any shutting down of the system requires flushing and sanitizing the facilities, which can take weeks.  In addition, the Nation understands that it is difficult to make changes in the system, as the operator must physically go to the facilities, some of which can only be accessed by helicopter, to make changes to the amount of water being diverted and delivered through the facilities.

To address any environmental concerns, the Nation is amenable to the diversion of water from diversion points lower in Strawberry Canyon (Diversion Points 10, 11 and 7) that the California State Water Resources Control Board acknowledged show no or less connectivity to the surface water flow in Strawberry Creek, instead of the current diversion points (Diversion Points 2, 3 and 8).  In addition, the Nation's consultants have opined that maintaining instead of decommissioning the BlueTriton infrastructure could allow it to be used to enhance the Strawberry Creek environment by delivering water along the course of the creek during times of drought or other times of need.  The Nation presented this information and suggested that this be studied before decommissioning and dismantling the infrastructure.

**Section 3 - The Nation's Responsible Stewardship of the Arrowhead Property and Use of Water:**  Since the 2016 purchase of the sacred Arrowhead property, the Nation has exercised responsible stewardship based on its mission, traditional values, and indigenous knowledge of protecting natural and cultural resources.  As discussed below, these efforts include significantly reducing water use, instituting wildfire protection, restoring native plants and other natural resources, and returning any unused water to the surrounding watershed.

The estimated 100 acre-feet per year water demand is necessary to maintain the approximately 2,000 acres that make up the Arrowhead property, including the Nation's administrative offices, fire station, Department of Public Safety facilities, tribal cultural facilities and grounds, event spaces, and a native plant propagation area located on the Arrowhead property and defensible green spaces and fire hydrants around the numerous structures.  Please refer to the attached map of the facilities located on the property (*see* Exhibit 4).  As shown on the map, there are two tanks that hold the water received from Strawberry Canyon to be used in the numerous facilities and fire hydrants on the property.  The system is gravity fed and, thus, the tanks are located near the highest point of the property.

The numerous facilities located on the Arrowhead property are used daily by Tribal citizens, employees, and others, including local, state, and federal firefighters and other first responders.  In addition to the daily use by Tribal Citizens and employees, over 60 events have occurred in

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

the event spaces alone in 2024. In addition to these events, fire fighters and other first responders from more than 20 city, state, federal and other agencies have attended training events in the property's other facilities in 2024, including, but not limited to, Cal-Fire, San Bernardino County, City of San Bernardino, City of Ontario, City of Rancho Cucamonga, City of Chino, Fontana Police Department, City of Barstow, City of Big Bear, City of Apple Valley, City of Rialto, City of Colton, City of Redlands, City of Loma Linda, San Bernardino County Sheriffs, Riverside County Sheriffs, LA County Sheriffs, California State Park Rangers, US Marshalls, San Bernardino Police Department, Redlands Police Department, USFS, and San Bernardino Department of Corrections.

The defensible green spaces constitute approximately 1% of the entire 2,000-acre property and are concentrated next to important facilities. In a marked departure from the previous owner's practices, the Nation instituted water conservation measures. Specifically, the Nation ceased watering planted areas by approximately 40%. The Nation also curtailed the evaporative loss of water by not filling pools that are not in use (*see* Exhibit 5 showing the areas that the Nation has stopped watering but that were watered by the previous owner).

The Nation has set about restoring areas at the Arrowhead property and elsewhere, including removing invasive non-native species and replanting areas with native species. To support such efforts, and to provide for gathering and use of such plants by the Tribal community, the Nation has started a native plant propagation area on Arrowhead property. The Nation's Cultural Resource Management and Environmental Departments manage this work, and the Nation employs a full-time ethno-botanist and other experts to assist. In addition, recognizing the high wildfire risk in the area, the Nation conducts fuel reduction and creates defensible spaces (including green spaces) around facilities. Fuel reduction is accomplished using large herds of goats while larger fuel is removed by Tribal employees and San Bernardino County and Cal-Fire pursuant to contract.

The Nation was surprised that SBNF questioned and asked for proof that water is needed at the Arrowhead property to fight fires since the SBNF recognizes the danger of wildfires in the area and uses the Arrowhead property water and the lands for training to prepare for and fight such fires. As stated by the SBNF on their website, "the San Bernardino National Forest is historically one of the most wildfire prone forests in the country" and "fire seasons are longer and fire behavior often more extreme." (*See* https://www.fs.usda.gov/main/sbnf/fire). In response to such request for information on the wildfire risk to the Arrowhead property and the need for water to fight such wildfire risk, the Nation provides the following information.

The hotel facilities on the property were destroyed three times prior to 1940s by fires, requiring the hotel facilities to be rebuilt. In addition to these fires, the 1980 Panorama, 2002 Arrowhead and the 2003 Old Fire burned Strawberry Canyon and portions of the Arrowhead property, including buildings and facilities. Additional notable fires around the Arrowhead property include the 1986 Glenwood, 1994 Highway 18, 1996 Waterman 3, 1996 Badger, 2017 Mile, and

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION

2019 Hillside Fires.  This does not include the smaller fires over the years within the area.  In all the recent large and small fires, the Arrowhead property's hydrants have been used by local, state, and federal resources assigned to fight these fires.  In addition, the rotary wing resources utilize the Arrowhead property's pond, the only dipping pond available on the "front country" between Hwy. 18 and Hwy. 330.  You can find a history of wildfires in the area at https://projects.capradio.org/california-fire-history/#11.02/34.1932/-117.3816 and the designation of the area as a Fire Hazard Severity Zone (FHSZ) in the State Responsibility Area (SRA) at https://experience.arcgis.com/experience/03beab8511814e79a0e4eabf0d3e7247/.

To combat potential wildfire, the Arrowhead property maintains a strategically located fire station and a system of fire hydrants supplied by the Strawberry Canyon water to fight fires.  The Nation provides water through its fire hydrants to local, state, and federal firefighters.  Every firefighting agency in the region connects to the hydrants to fight fires in the area.  Although every fire season and year is different, the Nation estimates that other agencies use the water approximately 4 to 6 times a year.  The County of San Bernardino and the City of San Bernardino have both submitted letters discussing the importance of the Arrowhead property's water in fighting fires in the area (*see* Exhibit 6).  As noted in the County letter, "Without readily available water at the Nation's Arrowhead Springs property, County firefighting operations for our foothill communities would be severely crippled."

**Section 4- The Nation's Willingness to Connect to Other Water Sources and Challenges to Implementing Such Solution:**  Before the termination of BlueTriton's rights to deliver water to the Arrowhead property, the Nation started working with the local municipal water district, the City of San Bernardino Municipal Water District ("CSBMWD"), and the City of San Bernardino to approve the construction of a portion of the infrastructure needed to connect the Arrowhead property and its facilities to a municipal water system for delivery of potable water.  The Nation's experts estimate that such infrastructure will involve at least three years to construct and require extensive capital.  The nearest water connection is over 6,000 linear feet away down the mountain, and so will require the laying of pipe and pumping stations to reach the appropriate elevation for tanks that can store water to be gravity - delivered throughout the property.

SBNF suggested the Nation consult with San Bernardino Valley Municipal Water District ("SBVMWD"); to that end, the Nation has discussed these issues and provided a tour of the Arrowhead property to SBVMWD representatives.  SBVMWD representatives are working with the Nation on determining the feasibility and time and costs of an interim solution to connect to SBVMWD facilities that could deliver untreated non-potable water to the Arrowhead property in above ground pipes, but such pipes would again need to extend over 6,000 liner feet and would require at least one pumping station.  Such water could not be used for drinking unless further treated.

As noted, connecting to a municipal water system will require extensive capital expense and time to construct, and will require the Nation to pay for municipal water –  further burdening the

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

Nation.  Obtaining the entitlements and constructing a permanent connection to a municipal water system to provide potable water to the Arrowhead property is simply impossible to accomplish by the January 15, 2025 – the date the agency set for shutting down the only existing infrastructure that provides the Nation with sufficient water for its Arrowhead property.  The Nation will continue to work with SBVMWD on the interim solution for non-potable water to determine if this is feasible.

The Nation has also continued to explore the use of water wells and is committed to using wells to the extent practicable.  However, the Nation's consultants have determined based on the information obtained to date that it is not practicable to provide all of the property's water needs with wells at this time.  Water quality tests from the existing wells have revealed trace metals that are toxic to vegetation and make filtration difficult for potability.  In addition, many of the wells span over a geothermal field and quickly degrade any infrastructure used for pumping and distribution.  In addition, the capacity and recharge rate of existing wells prohibits meeting existing water demand.

The Nation has relied on the water from Strawberry Canyon for centuries, and as discussed above, there are no alternative sources that can be quickly developed and implemented.  Nevertheless, the Nation remains committed to finding an alternative source of water as soon as practicable.

Exhibit 5, P. 076                                Exhibit 13

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Exhibit 1

JCM/IR  8  9/24/31.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

IN AND FOR THE COUNTY OF SAN BERNARDINO.

DEL ROSA MUTUAL WATER COMPANY,
a corporation,

                 Plaintiff,

          vs.

D. J. CARPENTER, ISABEL C. TURNER,
J. B. JEFFERS, GEORGE S. MASON,
NATIONAL THRIFT CORPORATION OF
AMERICA, a corporation, JOHN DOE
McKASON, MARY GLEASON, G. M. CHRIST,
GREAT VIEW WATER COMPANY, NETTIE
D. PHILLIPS, PACIFIC-SOUTHWEST TRUST
& SAVINGS BANK, a corporation,
ARTHUR R. PECK, CARRIE A. PECK,
ELLEN A. McLAUGHLIN, ARROWHEAD
SPRINGS CORPORATION, a corporation,
ARROWHEAD SPRINGS COMPANY, a cor-
poration, J. N. BAYLIS, CALIFORNIA
CONSOLIDATED WATER COMPANY, a
corporation, CALIFORNIA CONSUMERS
CORPORATION, a corporation, et al.,

                 Defendants.

No. 31798

J U D G M E N T

      The above entitled action coming on regularly to be
heard before the Court without a jury, a trial by jury having been
waived by the respective parties, Messrs. Swing & Wilson and Ralph
E. Swing appearing as attorneys for the plaintiff, Messrs. Lawler &
Degnan appearing for and as attorneys for defendants, California
Consolidated Water Company and California Consumers Company (sued
herein as "California Consumers Corporation"), respectively, and
Messrs. Gibson, Dunn & Crutcher appearing for and as attorneys for
defendants Arrowhead Springs Company and Arrowhead Springs Corpora-
tion, Ltd. (sued herein as "Arrowhead Springs Corporation"), and
Messrs. O'Connor & Findlay appearing for and as attorneys for the
other defendants above mentioned, and this cause being at issue and
the parties having entered into a stipulation in writing for the
entry of this judgment, and findings of fact and conclusions of law,
except as set out and contained in this judgment, having been duly

                -1-

*and oral evidence having been introduced*

waived by the respective parties, and the Court being fully advised

in the premises, and good and sufficient cause appearing therefor;

NOW, THEREFORE, in accordance with said stipulation, *and the evidence*

IT IS HEREBY ADJUDGED:

1.   That plaintiff is, and defendants California Con-
solidated Water Company, Arrowhead Springs Corporation, Ltd. (sued
herein as "Arrowhead Springs Corporation"), Arrowhead Springs Com-
pany and California Consumers Company (sued herein as "California
Consumers Corporation") are corporations duly organized and existing
and duly qualified and authorized to do and transact business within
the State of California.

2.   That neither the California Consumers Company nor
the Arrowhead Springs Company have at this time any right, title or
interest in or to any of the water or in or to the right to take,
divert, use or transport any of the water referred to in the com-
plaint in said action or in this judgment.

3.   That East Twin Creek is a natural stream of water
situated in the County of San Bernardino, State of California, and
has its source in the San Bernardino Mountains lying and being to
the north of the City of San Bernardino.  That all of the waters of
what is known as East Twin Creek watershed, except as diminished by
use by defendant Arrowhead Springs Corporation, Ltd., and its prede-
cessors in interest and by use by defendant California Consolidated
Water Company and its predecessors in interest, and except as the
waters thereof are lost by evaporation, transpiration, seepage and
other natural causes, drain into and become a part of said East
Twin Creek above the point of plaintiff's diversion hereinafter
referred to.  That the principal tributaries of said East Twin Creek
are Strawberry Creek, Coldwater Creek, Hot Springs Creek, and other
named and unnamed tributaries and springs, all of which flow and
percolate into and, except as diminished as aforesaid, become a part
of said East Twin Creek; also waters seep and percolate into said

-2-

East Twin Creek and its tributaries from the adjacent hills and lands draining into said East Twin Creek and its various tributaries and the canyons draining into said stream.  That Strawberry Creek and its tributaries are the easterly branch of East Twin Creek above the junction of Strawberry Creek and Coldwater Creek; Coldwater Creek and its tributaries are the westerly branch of East Twin Creek above the junction of Strawberry Creek and Coldwater Creek;  Hot Springs Creek and its tributaries are the lowest branch of East Twin Creek.  That at the time of the appropriation, as hereinafter set forth, of the waters of said East Twin Creek by plaintiff's predecessors in interest all of the waters of said East Twin Creek and of its tributaries, except that part thereof then being used by defendant Arrowhead Springs Corporation, Ltd. and its predecessors on lands in Section 7, Township 1 North, Range 3 West, S.B.B.& M., and on lands in Sections 11 and 12, Township 1 North, Range 4 West, S.B.B.& M., above the point of plaintiff's intake, and that part lost by evaporation, transpiration, seepage and other natural causes, flowed in a southerly direction in a natural stream to and into the San Bernardino Valley, and at the time of the appropriation of the right to use such water by plaintiff's predecessors in interest none of said water had been appropriated, diverted, or used except by said Arrowhead Springs Corporation, Ltd. and its said predecessors for use upon said lands above plaintiff's point of appropriation.

That subsequent to the time when defendant, Arrowhead Springs Corporation, Ltd., or its predecessors in interest, acquired title to all the lands described in paragraph 4 below, except the north half of the northwest quarter ($N\frac{1}{2}$ of $NW\frac{1}{4}$) of Section 12, Township 1 North, Range 4 West, S.B.B.& M., plaintiff or its predecessors in interest entered into and upon said East Twin Creek at about one mile north of the mouth of said East Twin Creek and appropriated and diverted all of the water of said stream flowing at said point and thereafter, except as hereunder provided, diverted all of the

-3-

water of said stream flowing at said point into a ditch and conduit and conveyed the same away to nonriparian lands for beneficial uses thereon.

That the point on said stream where said appropriation and diversion was so made by plaintiff, or its predecessors in interest, was below the confluence of all of said branches of said East Twin Creek and below where all of the waters of said East Twin Creek watershed converge, except as diminished as aforesaid. That ever since said appropriation and diversion of said stream all of the waters of said stream flowing at said point have been and now are taken and used for irrigation and other beneficial uses and purposes by plaintiff and its predecessors in interest, and by defendants and cross complainants named in paragraph 6 hereof, except as diminished from time to time by the use by defendant Arrowhead Springs Corporation, Ltd. and its predecessors in interest and by natural causes as aforesaid, and except that said California Consolidated Water Company and its predecessors in interest have for more than five years prior to the commencement of this action diverted into reservoirs and tanks and have diverted, taken and transported to Los Angeles and other places for bottling purposes and other commercial uses, water from said watershed adversely to said plaintiff, and to all other defendants, except Arrowhead Springs Corporation, Ltd.

4.   That in the year 1863 David Noble Smith, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., settled on the East half of the Southeast quarter and the Southeast quarter of the Northeast quarter of Section Eleven (11) and the Northwest quarter of the Southwest quarter of Section Twelve (12), Township 1 North, Range 4 West, S.B.B. & M., which lands were then and until 1878 unsurveyed, and thereafter, on the 1st day of February, 1882, patent was issued therefor; that on the 3rd day of April, 1871, pursuant to the Acts of Congress approved July 27, 1866, and March 5, 1871, there was granted to Southern Pacific Railroad Company

-4-

of California, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., all of Section Seven (7), Township 1 North, Range 3 West, S.B.B.& M., and thereafter, on the 1st day of November, 1897, patent was issued therefor (which patent contained no reservation of water rights whatsoever); that on the 3rd day of April, 1871, pursuant to the Acts of Congress approved July 27, 1866, and March 3, 1871, there was granted to Southern Pacific Railroad Company of California, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., the west half of the southeast quarter (W½ of SE¼) and the southwest quarter of the northeast quarter (SW¼ of NE¼) of Section 11, Township 1 North, Range 4 West, S.B.B.& M., and thereafter, on the 9th day of January, 1885, patent was issued therefor (which patent contained no reservation of water rights whatsoever); that on the 3rd day of May, 1877, A.B.Chapman and others, predecessors in interest of the defendant Arrowhead Springs Corporation, Ltd. made application to the United States Land Office to purchase the following described land as timberland:

The northeast quarter of the southwest quarter (NE¼ of SW¼), the north half of the southeast quarter (N½ of SE¼) and the southeast quarter of the northeast quarter (SE¼ of NE¼) of Section 12, Township 1 North, Range 4 West, S.B.B.& M.;

that thereafter, on the 15th day of August, 1889, patent was issued therefor; that in the year 1880 Thomas B. Elder, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., entered into possession of the south half of the northwest quarter (S½ of NW¼) and the west half of the northeast quarter (W½ of NE¼) of Section 12, Township 1 North, Range 4 West, S.B.B.& M., and that thereafter, on the 6th day of October, 1888, patent was issued therefor; that on the 29th day of October, 1891, Herbert J. Royer, predecessor in interest of the defendant, Arrowhead Springs Corporation, Ltd., entered upon the north half of the northwest quarter (N½ of NW¼) of Section 12, Township 1 North, Range 4 West, S.B.B. & M., and that thereafter, on the 12th day of November, 1897, patent was issued therefor; that all

-5-

of the lands described in this paragraph are contiguous and, except
such portions thereof as lie outside of the watershed of East Twin
Creek, are bordering on and have access to, and are riparian to,
said East Twin Creek, and all of said lands are now the property of
defendant, Arrowhead Springs Corporation, Ltd., and all that portion
of said lands which lie within the watershed of said East Twin Creek
are hereinafter referred to as the Arrowhead Springs property.  That
the whole of said land is located above plaintiff's point of ap-
propriation and intake.

That said defendant, Arrowhead Springs Corporation, Ltd.,
is now and it and its predecessors in interest have, for more than
fifty (50) years last past, been conducting and operating on said
Arrowhead Springs property a health and pleasure resort, consisting
of a hotel building, cottages, bungalows and all usual and customary
outbuildings, swimming pools, baths and other accessories, which es-
tablishment is now, and for many years last past has been, known as
"Arrowhead Springs Hotel", and, adversely to the said plaintiff and
said defendants and cross-complainants, has taken and diverted water
from said East Twin Creek and its tributaries above plaintiff's point
of diversion for use in said hotel, cottages, bungalows and out-
buildings for domestic purposes and for baths, swimming pools and other
purposes in connection therewith and for irrigation of said Arrow-
head Springs property, and has also, for more than five (5) years
prior to the commencement of this action, taken and diverted water
from said East Twin Creek and its tributaries, above plaintiff's
point of appropriation and diversion, for use in its steam cave baths
situated in Waterman Canyon adversely to the said plaintiff and de-
fendants and cross-complainants named in paragraph 6 hereof, and has
also, for more than five (5) years prior to the commencement of this
action, used adversely to the said plaintiff and said defendants and
cross-complainants, the waters of Penyugal Spring, Granite Spring and
other hot springs, all of which are located in Hot Springs Canyon on

-6-

said Arrowhead Springs property and are tributary to Hot Springs Creek, which Creek is the lowest branch of East Twin Creek, for the purpose of bottling the same and shipping the same outside of the watershed of East Twin Creek and selling the same in bottles and other containers for human consumption as mineral water, and has the right, except as limited by the provisions of paragraph (i) hereof, as such riparian owner and as appropriator and by prescription to continue so to take and use water from said East Twin Creek and its tributaries and to take and use said water on said Arrowhead Springs property for all beneficial and riparian uses and to whatever extent may be required for such uses and to take and use water from said source for use in its steam cave baths in Waterman Canyon and to take and use water from said Penyugal Spring, Granite Spring and other hot springs and to bottle and ship the same outside of the watershed in East Twin Creek, and to sell the same in bottles and other containers for human consumption as mineral water.

5.    That the defendant, California Consolidated Water Company, now is and it and its predecessors in interest have been engaged in the business of diverting water from East Twin Creek and/or its tributaries into reservoirs and tanks and from thence transporting the same by means of cars and other conveyances to the City of Los Angeles, where said water is bottled for domestic use and used for the manufacture of beverages and other purposes; that said defendant, California Consolidated Water Company, has entered in and upon the springs at the headwaters of said Strawberry Creek and developed the water at said Springs that would not naturally flow to plaintiff's said point of diversion, and diverted the water of said springs including the water so developed into a pipe line and by means thereof conveyed a part thereof to its said tanks and reservoirs and transported said part thereof from such tanks and reservoirs to Los Angeles where such water has been and is now being used by said defendant in its said business. That said defendant has ex-

-7-

pended large sums of money in so developing said springs and convey-
ing said water, and has developed an extensive business dependent
entirely upon such supply of water, and it would be inequitable to
enjoin said defendant from continuing to so take and use said water;
that said defendant requires the use of all the water now flowing
and hereafter developed and flowing from said springs tributary to
said Strawberry Creek lying north of the north line of the south half
of Section 31 and north of the north line of the south half of Sec-
tion 32, both in Township 2 North, Range 3 West, S.B.B.& M., and, ex-
cept as limited by the provisions of paragraph (i) hereof, is entitled
to take and use said water; that the taking of such water will be
injurious to plaintiff's right, but such injury can be compensated
in damages and such damage is hereby determined to be and is the sum
of twenty thousand dollars ($20,000.00).  That such diversion by
defendant, California Consolidated Water Company, will not, subject
to the terms of paragraph (i) hereof, impair any right of any other
party hereto.

6.  That defendants and cross-complainants, D. J.
Carpenter, Isabel C. Turner, J. E. Jeffers, George S. Mason, L. R.
McKesson and National Thrift Company of America, were at the time of
the commencement of this action and they and their successors in
interest now are the owners of the right to take and use the first
ten (10) inches of the flow of the water of East Twin Creek reach-
ing plaintiff's point of diversion; that said ten inch right is part
of the right appropriated by plaintiff's predecessors in interest;
that all of said ten inches, or fraction thereof, when reaching
plaintiff's point of diversion, has been diverted by plaintiff and
its predecessors in interest into its pipe line and delivered to said
defendants at a diversion box at a point about one mile easterly from
plaintiff's said point of diversion, and said defendants and cross-
complainants are hereby determined to be the owners of said first
ten (10) inches of the flow of said creek reaching plaintiff's point

-8-

of diversion and entitled to have said ten (10) inches of water reaching plaintiff's point of diversion delivered to them by plaintiff at the said diversion box, and said plaintiff shall continue to take and divert and deliver the same.

7.    That the taking of such water as set forth in paragraph 5 above may be injurious to the rights of defendants and cross-complainants, D. J. Carpenter, Isabel C. Turner, J. B. E.C. Jeffers (sued herein as John A oe) Jeffers, George S. Mason, L. R. McKesson and National Thrift Company of America, unless said water from said Hot Springs Creek and said East Twin Creek be diverted at a point at or adjacent to the point of confluence of said Hot Springs Creek and East Twin Creek and from thence conveyed into plaintiff's present pipe line, the northerly terminus of which is plaintiff's diversion box located about one mile northerly from the mouth of said East Twin Creek Canyon, and that said defendants and cross-complainants are entitled to have said ten (10) inches thereof belonging to them so diverted and conveyed and delivered to them by plaintiff at the present diversion box located about one mile easterly from plaintiff's said present point of diversion.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

(a)    That defendant, Arrowhead Springs Corporation, Ltd., is, subject to the provisions of subdivision (1) hereof, the owner of the right to take water from said East Twin Creek and its tributaries and to use said water upon its said Arrowhead Springs property riparian to East Twin Creek, to the extent that such water is or may be required for any beneficial or riparian use upon said property, and to use said water to the extent of five (5) miner's inches, measured under a four inch pressure, in its steam cave baths and for domestic purposes in Waterman Canyon during the period from the first day of November to the first day of May of

-9-

each year at all times during said period when the taking thereof
will not reduce the water flowing at plaintiff's intake below
ten (10) inches, and to use said water to the extent of one (1)
miner's inch, measured under a four inch pressure, in its steam
cave baths and for domestic purposes in Waterman Canyon at all
other times, and is also, subject to the provisions of sub-
division (i) hereof, the owner of the right to bottle and ship,
out of the said East Twin Creek watershed, waters of Penyugal
Spring, Granite Spring and other hot springs tributary to Hot
Springs Creek, provided, however, that said defendant, Arrowhead
Springs Corporation, Ltd., shall not so use the waters of Hot
Springs Creek, for shipment, irrigation or otherwise, as to re-
duce the flow of the waters of Hot Springs Creek at the point of
its confluence with East Twin Creek below ten (10) miner's
inches, measured under a four inch pressure, provided further,
however, that no part or portion of any of the water of East Twin
Creek, or any of its tributaries, except as otherwise herein
provided, shall ever be taken to or used upon lands not riparian to
said East Twin Creek.

(b)  That defendant, California Consolidated Water Com-
pany,is, subject to the provisions of subdivision (i) hereof, the
owner of the right to take, impound, divert, transport and carry
away water of that certain spring known as "Indian Spring" and any
and all of the water of all springs situated or obtainable in that
part of East Twin Creek known as "Strawberry Creek and Canyon" and
canyons lateral thereto lying north of a line drawn east and west
through Sections 31 and 32, Township 2 North, Range 3 West, S.B.B.
& M., coincident with the northerly line of the south half of Sec-
tion 31 and the south half of Section 32, Township 2 North, Range
3 West, S.B.B. & M., and it may enter in and upon that portion of

-10-

said Strawberry Creek and Canyon and lateral canyons thereto lying north of said line and develop, by means of tunnels or otherwise, any and all springs or water situated or obtainable from said area north of said line, and may take and divert all of said water flowing and to flow in and from said springs and/or obtainable in said area into a pipe line and divert and carry the same, by and through such pipe line, to tanks and reservoirs upon said Arrowhead Springs property, and may take and transport the same beyond and out of said watershed for bottling or other purposes or uses.

(c)  Defendant, Arrowhead Springs Corporation, Ltd., shall at all times maintain suitable and proper septic and treating tanks upon its lands and shall cause all sewage to pass through such septic and treating tanks and be properly treated before returning the same to or permitting the same to return to or flow into said East Twin Creek, and said tanks shall be so constructed and located that all water flowing from said septic tanks, not used on the premises, shall return and flow into said East Twin Creek above plaintiff's point of diversion.

Defendant, Arrowhead Springs Corporation, Ltd., shall also cause all water that may be diverted for use by said Arrowhead Springs Corporation, Ltd., not actually consumed in the exercise of the rights hereinbefore decreed to Arrowhead Springs Corporation, Ltd., to return and flow into said East Twin Creek above plaintiff's point of diversion.

(d)  That plaintiff have and recover of and from the defendant, California Consolidated Water Company, the sum of fifteen thousand dollars ($15,000.00), and from defendant, Arrowhead Springs Corporation, Ltd., the sum of five thousand dollars ($5,000.00).

(e)  That plaintiff is the owner of the right to have all the water of East Twin Creek and its tributaries which flows to its said intake, subject only to the rights of defendants Arrowhead Springs Corporation, Ltd., California Consolidated Water Company,

-11-

and defendants and cross-complainants designated in paragraph 6, as herein set forth.

(f)  Plaintiff shall have the right to enter in and upon the lands of the defendant, Arrowhead Springs Corporation, Ltd. and construct a diversion weir and box and submerged dam upon said East Twin Creek at a point three hundred (300) feet northerly of the confluence of Hot Springs Creek and East Twin Creek, and also at the confluence of said streams, and may construct a pipe line or conduit from such point to plaintiff's present diversion box and may take and divert all of the water ordinarily flowing in said East Twin Creek at such diversion point subject only to the rights of defendants Arrowhead Springs Corporation, Ltd. and California Consolidated Water Company, and defendants and cross-complainants designated in paragraph 6, as herein set forth.  The right of ingress and egress for construction and maintenance of said diversion weir and box, dam and pipe line or conduit shall be exercised in such a manner as to do the least possible damage to land, improvements, plantings and natural trees and shrubbery upon said Arrowhead Springs property, and said pipe line, if constructed, shall be maintained as free from leaks as possible and shall at all times have a depth of cover of at least two feet over the top of the pipe.

(g)  Cross-complainants, D. J. Carpenter, Isabel C. Turner, E.C. Jeffers (sued herein as John Doe), J. F. Jeffers, George S. Mason, L. R. McKesson and National Thrift Company of America, and their successors in interest, are the owners of the right to take and use the first ten (10) inches of water, or fraction thereof, reaching the point of diversion referred to in paragraph 6 hereof, and diverted by plaintiff into its pipe line from East Twin Creek and may take and divert said first ten (10) inches of water, or fraction thereof, reaching said point of diversion, from plaintiff's said pipe line at the diversion box now in place and used for such purpose.

-12-

That plaintiff shall immediately hereafter, at its own expense and cost, undertake and thereafter diligently prosecute the construction of such pipe line and such diversion dams, weirs, and boxes as may be necessary to divert and convey the water to which plaintiff and/or cross-complainants are entitled hereunder, from Hot Springs Creek and East Twin Creek from a point at or adjacent to the point of confluence of said Hot Springs Creek and East Twin Creek to and into plaintiff's present diversion box and pipe line, and said plaintiff shall complete said construction work on or before the 1st day of May, 1932, and shall thereafter maintain the same at its own expense, and shall thereafter convey through said pipe line and structure at least ten (10) miner's inches of said water of Hot Springs Creek and East Twin Creek if that amount be flowing therein from said point at or adjacent to the confluence of Hot Springs Creek and East Twin Creek to and into its present diversion box and pipe line, and convey such ten (10) inches thereof from thence to the point of the present diversion box of plaintiff from which diversion box defendant and cross-complainants are now taking their said ten (10) inches of said water, it being the intent and purpose hereof that said plaintiff shall deliver the first ten (10) inches of the flow of East Twin Creek at plaintiff's present point of diversion or the first ten (10) inches of water flowing in Hot Springs Creek and East Twin Creek at their point of confluence to defendants and cross-complainants at the present diversion box located at a point on plaintiff's pipe line about one mile easterly from plaintiff's present point of diversion.

(h)  Each of the parties hereto is perpetually enjoined from taking, using or interfering with the use of the waters of East Twin Creek and its tributaries except as herein decreed.

(i)  This judgment shall not in anywise affect, amend, or otherwise impair any contracts now in existence, or which may be

-13-

executed as of the date of this judgment, by and between defendant Arrowhead Springs Corporation, Ltd. and defendant California Consolidated Water Company, relating to the water of East Twin Creek or any of its tributaries.

(j)  That pursuant to said stipulation, this judgment shall be final upon the entry thereof, and not subject to appeal or review in any manner by any of the parties to said ~~cause~~ stipulation.

(k)  Each of the parties hereto shall pay its own costs.

Done in open court this 19th day of October, 1931.

_____
                                                    Judge



THE DOCUMENT TO WHICH THIS CERTIFICATION IS ATTACHED, CONSISTING OF ___ PAGE(S), IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.

ATTEST
Clerk of the Superior Court of the State of California, in and for the County of San Bernardino.

Date _____

By _____ Deputy

-14-



THE DOCUMENT TO WHICH THIS CERTIFICATION
IS ATTACHED, CONSISTING OF _14_ PAGE(S), IS A
FULL, TRUE AND CORRECT COPY OF THE ORIGINAL
ON FILE AND OF RECORD IN MY OFFICE.

ATTEST __CHRISTINA M. VOLKERS__
Clerk of the Superior Court of the State of California,
in and for the County of San Bernardino.

Date __FEB 1 7 2015__

By _____, Deputy
TERRIE JOHNSON

Exhibit 5, P. 092                    Exhibit 13

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Exhibit 2

### GRANT DEED

CARRIE THOMAS, a widow, in consideration of Ten Dollars, to her in hand paid, the receipt of which is hereby acknowledged, does hereby GRANT TO Ethel Thomas, a single woman, all that real property in the County of San Bernardino, State of California, described as:

The South half of Lot 185, in Baldwin Lake Tract No. 1724, as per plat of said Tract of record in the office of the County Recorder of said County in Book 25 of Maps, at page 71 thereof.

SUBJECT TO taxes, assessments, conditions, restrictions, reservations, easements, rights and rights of way of record.

TO HAVE AND TO HOLD to the said grantee, her heirs or assigns forever.

WITNESS my hand this 16th day of October, 1934.

Consideration less than $100.

                                            Carrie Thomas

STATE OF CALIFORNIA   }
                      } SS
COUNTY OF LOS ANGELES }

On this 16th day of October, 1934, before me, the undersigned, a Notary Public in and for said County, personally appeared Carrie Thomas, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same.

WITNESS my hand and official seal.

(NOTARIAL SEAL)

                              Vance C. Kibbe
                              Notary Public in and for said County and State

No. 55.  "Endorsed."  Recorded at Request of Grantee, Dec 3 1934 at 11:12 A. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif.  Fulton G. Feraud, County Recorder, By A. R. Schultz, Deputy.  Fee $1.00.

                              Compared

        F. Cooley               E. Quinn

                    o o o o o

THIS AGREEMENT made and entered into this 26th day of September, 1931, by and between ARROWHEAD SPRINGS CORPORATION, LTD., (formerly Arrowhead Springs Corporation), a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California, (hereinafter called "Arrowhead") and CALIFORNIA CONSOLIDATED WATER COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California, (hereinafter called "Consolidated"),

WITNESSETH:

WHEREAS, on the 6th day of August, 1930, the parties hereto entered into a certain agreement, which agreement was thereafter recorded in the office of the County Recorder of San Bernardino County, California, in Book 648, at page 122 of Official Records of said County; and

WHEREAS, the parties hereto have determined to enter into a new agreement, whereby each will acquire certain rights and will agree to perform certain obligations distinct and different from the rights and obligations existing under or on account of said agreement of August 6, 1930, (which agreement, for convenience, will be hereinafter referred to as the "principal agreement"),

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the parties hereto do agree as follows:

First:  Consolidated agrees that it will forthwith, upon the execution of this agreement, and at its own cost and expense, develop to the fullest reasonable extent all springs,

304

seepages and other sources of water, if reasonably available, existing in Strawberry Canyon and all lateral canyons opening into Strawberry Canyon, lying north of the northerly line of the south half of Section 31 and of Section 32, Township 2 North, Range 3 West, S.B.B. & M., and produce and continue to produce from said sources of water sufficient water to fill the pipe line built by Consolidated, under and in accordance with the terms of said principal agreement, in ordinary seasons of dry weather.

Second:  Consolidated shall hereafter at all times conduct all water developed and saved by it in Strawberry Canyon, and in the lateral canyons northerly of said line established in paragraph First hereof, through the said pipe line, and agrees that all of the water so deveoped, saved and produced by it from said sources of supply shall be conducted through said pipe line, and not otherwise, to the point of delivery hereinafter referred to.  Of all such water so developed and saved and conveyed through said pipe line, Consolidated shall be entitled to eighty per cent (80%) of the constant flow thereof and Arrowhead shall be entitled, without cost, to twenty per cent (20%) of the constant flow thereof. The point of delivery of said 20% of said water to which Arrowhead is entitled (which is the point of delivery referred to hereinabove in this paragraph) shall be a point in the aforesaid pipe line ten (10) feet north of the rectangular reservoir having dimensions of 50 x 100 feet back of the hotel building of Arrowhead.  The method of measurement of said water, so that both Consolidated and Arrowhead shall receive their proportionate part thereof, as hereinabove set out, shall be agreed upon by and between an engineer designated by Arrowhead and an engineer designated by Consolidated. If the two engineers so designated shall fail to agree, then they shall designate a third engineer, who shall be impartial, and the decision of any two of the three engineers thus designated shall be binding upon the parties hereto as to the method of measurement of said water.

Third: Arrowhead grants to Consolidated any and all right, title or interest which Arrowhead now has to develop water from any and all sources whatever, whether surface, subterranean, seepage, or otherwise, in Strawberry Canyon and the lateral canyons northerly of the said northerly line of the said South half of said Sections 31 and 32 above described.

Arrowhead also grants to Consolidated all right, title or interest which it now has or heretofore had in or to the title to, or ownership of, any and all water that Consolidated has heretofore or may hereafter develop from any and all sources whatsoever in Strawberry Canyon and lateral canyons northerly of said northerly line of the south half of said Sections 31 and 32; subject, however, to the right of Arrowhead to have delivered to it by Consolidated at the point of delivery aforesaid, twenty per cent (20%) of all such water developed and saved by Consolidated.

The aforesaid grants are without warranty except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein.

If, within three (3) years from the date of this agreement, Consolidated does not develop a flow of water in Strawberry Canyon and/or canyons lateral to it, southerly of said line above established, additional to the flow of water developed by Consolidated northerly of said established line, then Arrowhead shall be exclusively entitled, so far as Consolidated is concerned, to develop and produce such additional flow of water at any and all places southerly of said established line, provided that such development and production of water shall not affect or impair the right of Consolidated to develop and produce water northerly of said established line.  In the event of the development of any water southerly of said established line, by either party hereto, and northerly of the

south section lines of said Sections 31 and 32, Arrowhead and Consolidated shall each be entitled to an equal one-half part thereof. In the event of the development by Arrowhead of any water southerly of the south section lines of Sections 31 and 32, Arrowhead shall be entitled to the whole thereof, so far as Consolidated is concerned.

Fourth: It is understood and agreed that all of the covenants, terms and conditions of paragraph Fourth of said principal agreement are hereby agreed to and reaffirmed, except that the same shall be deemed to have been amended so as to substitute the words "eighty per cent (80%) of the water flowing through said pipe line" wherever reference is made to the water to which Consolidated is entitled, in lieu of the words "one-half of the water flowing through said pipe line," and except that the same shall be deemed to have been amended so as to substitute the words "twenty per cent (20%) of the water flowing through said pipe line" wherever reference is made to the water to which Arrowhead is entitled, in lieu of the words "one-half of the water flowing through said pipe line."

Fifth: Consolidated agrees that upon the execution of this agreement it will pay to Arrowhead the sum of fifteen thousand dollars ($15,000.00) towards the development by Arrowhead of water in Cold Water Canyon. Arrowhead agrees that said payment of $15,000.00 was induced by its promise, which it hereby obligates itself to perform, to actually commence the development of water in said Cold Water Canyon within one (1) year from the date hereof, and at its own cost (not exceeding said sum of $15,000.00) to diligently prosecute such work to completion; such work to be done in such manner and to involve the construction of such pipe lines, reservoirs and other facilities as Arrowhead may deem advisable.

Sixth: Except as amended hereby, said principal agreement shall not be affected hereby and each and every sentence, clause or paragraph of said principal agreement not amended hereby, and with which this agreement is not inconsistent, and particularly paragraphs Third, Fifth, Sixth, Seventh and Ninth of said principal agreement, are hereby reaffirmed, and the parties hereto agree that said paragraphs shall not in anywise be affected by anything contained in this agreement.

Seventh: Arrowhead does hereby grant, without warranty, to Consolidated the right to use one miner's inch constant flow of the water arising from Penyugal Springs, or from other springs in the vicinity thereof, but not for sale as mineral medicinal water, and does also hereby grant to Consolidated the necessary easement for a pipe line to run from said Penyugal Springs or vicinity to the reservoirs of Consolidated, the exact course and description of such easement to be hereafter agreed upon by the parties hereto. Consolidated does hereby agree that it shall not have any right to the hot water arising on the property of Arrowhead Springs Corporation, Ltd. other than the one miner's inch above described in this paragraph.

Eighth: WHEREAS, Consolidated has stated to Arrowhead that certain false and fraudulent representations were made by Arrowhead and/or by certain of its officers, agents and/or employees prior to and at the time of the purchase by Consolidated and/or California Consumers Company, its predecessor in interest, of the properties and business as set forth and described in that certain agreement of the 4th day of December, 1928, the Amendatory Contract of the same date, the Second Amendatory Contract of the 19th day of December, 1928, and the agreement of February 28, 1929, which agreements are recited in the principal agreement of August 6, 1930, and that Consolidated and California Consumers Company, its predecessor, relied upon such false and fraudulent representations in the making of all of such agreements and in the purchase of said properties; and

WHEREAS, Arrowhead has denied that any of such false or fraudulent representations were so made by it, or any of its officers, employees or agents, and the parties hereto desire to fully release and discharge any and all claims and causes of action arising on

306

account of any such alleged false or fraudulent representations,

NOW, THEREFORE, for and in consideration of the premises and of the covenants, terms and provisions of this agreement, the parties hereto do hereby fully and completely release and discharge each other of and from any and all causes of action, claims, demands or obligations arising out of or on account of any representations, false, fraudulent or otherwise, of any kind or nature, made or alleged to have been made by either party hereto, or any of their respective officers, agents or employes, in connection with or preliminary to, or otherwise affecting or having to do with, the transfer of the business and properties of Arrowhead to Consolidated or to California Consumers Company, a corporation, or in connection with the amount of water developed or to be developed upon the properties of Arrowhead or the amount of water sold by it, or the source of said water, or in connection with the execution of said principal agreement and/or this agreement, and do hereby release and discharge each other from any and all other obligations, causes of action, claims or demands of every kind or nature whatsoever arising out of, or on account of, or in any manner connected with, the sale by Arrowhead to Consolidated, or to California Consumers Company, of its water distribution business and certain water rights, as provided in said agreement of the 4th day of December, 1928, and subsequent agreements hereinbefore designated, except such as are contained in, or arise out of, or on account of the following:

(a) The warranty deed of February 27, 1929, recorded on the 12th day of May, 1929, in Book 476, Page 175 of Official Records of San Bernardino County, California, as amended by said principal agreement of August 6, 1930;

(b) The principal agreement of August 6, 1930, as amended by this agreement;

(c) The agreement dated January 2, 1931, executed by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "Memorandum of Agreement," as amended by agreement of even date herewith.

(d) The agreement dated August 6, 1930, executed by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "Special Distributors Agreement," as amended by agreement of even date herewith.

(e) This agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their respective officers, thereunto duly authorized, and their respective corporate seals to be hereto affixed, the day and year first above written.

(CORPORATE SEAL)

(CORPORATE SEAL)

ARROWHEAD SPRINGS CORPORATION, LTD.

By C. M. Rice, Vice-President

And J. C. Macfarland, Assistant Secretary

CALIFORNIA CONSOLIDATED WATER COMPANY

By S. C. MacPherson, Exec. Vice President

And C. A. Werne, Asst. Secretary

(Prepared by _
(Attorney's Approval
( Pillsbury, Madison & Sutro By _
( Other Attorneys _
( or Lawler Degnan
( Form previously approved by
(Description approved  J. Paul Jones
(R. of W. Approval _
(Approved
(Approved _
(Manager's Approval for Execution _

STATE OF CALIFORNIA    }
                       } SS
COUNTY OF LOS ANGELES  }

On this 28th day of September, 1931, before me, Mary S. Alexander, a notary public in and for the said county and state, residing therein, duly commissioned and sworn, personally appeared C. M. Rice, known to me to be the Vice-President, and J. C. Macfarland, known to me to be the Assistant Secretary of ARROWHEAD SPRINGS CORPORATION, LTD., one of

the corporations that executed the foregoing agreement, known to me to be the persons who executed the foregoing agreement on behalf of such corporation, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                                    Mary S. Alexander
                                    Notary Public in and for the County
(NOTARIAL SEAL)                     of Los Angeles, State of California

    No. 70.  "Endorsed."  Recorded at Request of C. M. Rice, Dec 3 1934 at 1:01 P. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif.  Fulton G. Feraud, County Recorder, By A. R. Schultz, Deputy.  Fee $3.80.

                                    Compared

        F. Cooley                           E. Quinn

                            o o o o o

                            NOTICE

                        NON-RESPONSIBILITY

TO ALL WHOM IT MAY CONCERN:

    NOTICE is hereby given that I, H. H. EASTWOOD, am the owner of certain premises described as follows, to-wit:  Lot 34, Block 50, Tract 2439, of _ recorded in Book 34, page 78 of Official Records of San Bernardino County, State of California; That I have obtained knowledge that building is in course of construction on said property; that ten days have not elapsed since I obtained this knowledge; and that I will not be responsible for the construction of said building, or for the material or labor used or to be used therein, or for any alteration or repair thereof, or for any work done upon said building, or any addition thereto, or which has been performed, furnished or used in any manner or way upon said land, or upon the building thereon, or addition thereto, or which may hereafter be performed, furnished, or used upon said land, or building, or addition thereto, or for the service of any architect.

    THAT HAL WILSON and HORTENCE WILSON are the purchasers of said property under a contract of purchase.

    THAT _ is the lessee of said property.

No. and Street _                        H. H. Eastwood
STATE OF CALIFORNIA    }
                       } SS
COUNTY OF SAN BERNARDINO }

    H. H. Eastwood being duly sworn deposes and says:  That the above and within notice is a true copy of a notice posted on lot 34, block 50, tract 2439,  Records of San Bernardino County, California, on the third day of December, 1934 by H. H. Eastwood and that the facts therein stated are true of his own knowledge.

                                    H. H. Eastwood

    Subscribed and Sworn to before me this 3rd day of December, 1934.

(NOTARIAL SEAL)                     Mae A. C. Fanning
                                    Notary Public in and for said County and State

STATE OF CALIFORNIA    }
                       } SS
COUNTY OF SAN BERNARDINO }

    On this third day of December, A. D., 1934, before me, Mae A. C. Fanning, a Notary Public in and for said County and State, personally appeared H. H. Eastwood known to me to be the person whose name is subscribed to the within Instrument, and acknowledged to me that he executed the same.

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Exhibit 3



Well #: 1, 1A, 8
Telemetry Station (1)
Vault (2)

Helispot (1)
Telemetry Station (1)
Tunnel #2
Vault (1)

Bridge (1)
Telemetry Station (1)
Tunnel #3
Vault (1)

Helispot (1)
Well #: 10, 11, 12
Bridge (1)
Telemetry Station (1)
Telemetry Pad (1)
Vault (1)

Helispot (1)

Helispot (1)
Well #: 7, 7A, 7B, 7C
Telemetry Station (1)
Vault (1)

Trail

The Permit Area covers 4.51 acres or 6.5 miles in Sec. 30,
T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 31,
T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 6,
T. 1 N., R. 3 W., SAN BERNARDINO MERIDIAN,
SE1/4SE1/4 Sec. 1, T. 1 N., R. 4 W., SAN BERNARDINO
MERIDIAN, NE1/4 Sec. 12. T. 1 N., R. 4 W.,
SAN BERNARDINO MERIDIAN

| Use | Code | Acres | Description |
|---|---|---|---|
| Water Trans. Pipeline (4.6 mi) | 915 | 2.8 | 5 ft. wide |
| Access Trails (1.9 mi.) | 753 | 1.4 | 6 ft. wide |
| Helicopter Landing | 715 | 0.25 | 30 ft. radius |
| Wells/Vaults/Telemetry Sta. | 931 | 0.06 | 5 sq. ft |

Appendix A
The Permit Area
**Nestle Waters of America**
Permit #: FCD728501

San Bernardino National Forest
Front Country Ranger District

October 3, 2017
1:24,000

0    ¼    ½ Mile

| ▲ | Well (12) | ■ | Telemetry Station (5) |
|---|---|---|---|
| ◉ | Helispot (4) | ▣ | Telemetry Pad (1) |
| ● | Tunnel (2) | — | Pipeline |
| ● | Valve (27) | ▬ | Bridge(20) |
| ◉ | Vault (8) | ·•· | Trail |

Exhibit 5, P. 100

Exhibit 13

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Exhibit 4

**Arrowhead Springs**

- Village Dorm Complex
- Cultural Grounds
- Arrowhead Bowl
- Water Tanks
- Event/ Meeting Space
- Fire Station
- Administrative Building

● Fire Hydrants

Feet
0  200  400  600  800  1,000

N

SAN MANUEL
BAND OF MISSION INDIANS

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Exhibit 5



CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT
CONSULTATION

# Exhibit 6

385 North Arrowhead Avenue, 5th Floor, San Bernardino, CA 92415-0120  |  Phone: 909.387.4821  Fax: 909.387.5430

*www.SBCounty.gov*



## County Administrative Office
### Governmental & Legislative Affairs

**Bradley Jensen**
Director

August 1, 2024

Daniel Little, Chief Intergovernmental Affairs Officer
Yuhaaviatam of San Manuel Nation
26569 Community Center Drive
Highland, CA 92346

**RE: Loss of Water Supply at Arrowhead Springs Property**

Dear Mr. Little,

On behalf of the San Bernardino County Board of Supervisors, I am greatly concerned about a potential loss of water supply to the Yuhaaviatam of San Manuel Nation (the Tribe). The County depends on the Tribe as a key regional partner to assist our efforts in fighting wildfires and responding to natural disasters. Without readily available water at the Tribe's Arrowhead Springs property, County firefighting operations for our foothill communities would be severely crippled.

The County was not informed by the U.S. Forest Service about the agency's decision to cut the Tribe's Arrowhead Springs water supply. This lack of communication is completely unacceptable, especially at the height of fire season. The County's firefighters and emergency personnel have already fought two major wildfires in July – one near Apple Valley and the other in the mountains north of Rancho Cucamonga – that have burned thousands of acres, required the evacuation of hundreds of residents, and cost the County millions to contain. The snap decision to cut off water to a community in a dangerous fire-prone area is an obvious hazard to the homes and lives of San Bernardino County residents. Wildfires are burning across California and our County needs all available resources – including the Tribe's water at Arrowhead Springs – to quickly respond to these emergencies.

As Chair of the San Bernardino County Board of Supervisors, I ask that the Tribe's Arrowhead Springs water supply be delivered to the property through the end of the year. This will allow the County Fire District to have access to this vital water supply while the legal issues are resolved. If you have any questions about this request, please contact Brad Jensen, Director of Legislative Affairs, at (909) 387-4821 or by email at Bradley.Jensen@cao.sbcounty.gov. He can direct any requests to the appropriate County department or my staff.

Sincerely,

Dawn Rowe
Third District Supervisor
Chair, San Bernardino County Board of Supervisors

**BOARD OF SUPERVISORS**
COL. PAUL COOK (RET.)    JESSE ARMENDAREZ    DAWN ROWE    CURT HAGMAN    JOE BACA, JR.    Luther Snoke
Vice Chairman, First District    Second District    Chair, Third District    Fourth District    Fifth District    Chief Executive Officer

Exhibit 5, P. 106    Exhibit 13



City of
## San Bernardino

**Office of the Mayor | Helen Tran**

August 6, 2024

Daniel Little
Chief Intergovernmental Affairs Officer
Yuhaaviatam of San Manuel Nation
26569 Community Center Drive
Highland, CA 92346

**RE: Loss of water supply at Arrowhead Springs Property**

Dear Mr. Little,

As Mayor of the City of San Bernardino, I am very concerned with the potential loss of water at the Yuhaaviatam of San Manuel Nation's (the "Tribe") Arrowhead Springs property located in the City of San Bernardino. Arrowhead Springs is ideally situated to assist in wildfire suppression measures that benefit the entire region. Many fires throughout the history of San Bernardino have quickly swept across our foothills and destroyed *entire neighborhoods*.

If the Tribe is unable to provide such water because its water supply for Arrowhead Springs is cut-off, the ability to respond to wildfires at Arrowhead Springs and the surrounding area in a timely manner would be reduced. We did not receive any notice of the United States Forest Service's decision to cut off the Tribe's water supply to the Arrowhead Springs property and are deeply concerned about its potential devastating impact it could have should a wildfire occur in the region. Wildfire emergencies are occurring across all of California and San Bernardino County needs all resources, including the Tribe's water at Arrowhead Springs, to be ready to respond.

As Mayor of the City of San Bernardino, I ask that water be allowed to be delivered to the Arrowhead Springs property through the end of the California wildfire season, at a minimum.

Sincerely,

Helen Tran
Mayor, City of San Bernardino

290 North D St, San Bernardino, CA 92401 | P: 909-384-5133 | mayor@sbcity.org

Exhibit 5, P. 107                                                    Exhibit 13