# EXHIBIT 9

**STATE OF CALIFORNIA**
**CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY**
**STATE WATER RESOURCES CONTROL BOARD**

**ORDER WR 2023-0042**

_____

**In the matter of the draft cease and desist order to**

**BlueTriton Brands, Inc.**
**(successor to Nestlé Waters North America, Inc.)**

**issued by the State Water Resources Control Board,**
**Division of Water Rights, Permitting and Enforcement Branch,**
**on April 23, 2021**

Table of Contents

1.0    INTRODUCTION .................................................................................................. 1

2.0    BACKGROUND ................................................................................................... 2

2.1    Summary of Proceeding................................................................................ 2

2.2    General Topography and Hydrogeology ....................................................... 5

2.3    San Bernardino National Forest.................................................................... 7

2.4    Historical Development and Water Use at the Arrowhead Springs Hotel Property....... 8

2.5    1929 Warranty Deed and 1930 and 1931 Agreements for Development of Springs in Strawberry Creek Watershed ............................................................. 11

2.6    Judgment in Del Rosa Mutual Water Company Case .................................. 12

2.7    1930-1931 W. P. Rowe Investigation .......................................................... 13

2.8    Successors to California Consolidated Water Company .............................. 16

2.9    Springs, Tunnels and Boreholes in Strawberry Creek Watershed ............... 17

2.10    Diversions and Uses of Water from Strawberry Canyon Sources ............... 20

    2.10.1    Groundwater Extraction Notices........................................................ 21

    2.10.2    FDA Regulations ............................................................................... 22

    2.10.3    Hydrodynamics Group Reports ......................................................... 23

    2.10.4    Dames & Moore Report ..................................................................... 25

    2.10.5    Nestlé Attorney Letter ....................................................................... 26

2.11    Fully Appropriated Stream Declaration ....................................................... 27

2.12    AHO Hearing .............................................................................................. 28

    2.12.1    AHO Notices and AHO Hearing Officer Orders and Rulings.............. 28

    2.12.2    Site Visit............................................................................................ 32

    2.12.3    AHO Hearing ..................................................................................... 33

        2.12.3.1    Prosecution Team Witnesses' Testimony........................... 35

        2.12.3.2    BlueTriton Witnesses' Testimony ...................................... 39

        2.12.3.3    Story of Stuff Witnesses' Testimony.................................. 44

        2.12.3.4    Center for Biological Diversity Witness's Testimony ......... 46

        2.12.3.5    Other Parties' Testimony.................................................... 46

    2.12.4    AHO Post-Hearing Proceedings ........................................................ 47

2.13    August 11, 2023 BlueTriton Motion............................................................ 48

3.0    DISCUSSION .................................................................................................... 52

3.1    State Water Board's Water-Right Permitting Authority; Legal Classifications of Surface Water and Groundwater........................................................................ 52

3.2     Salvaged and Developed Waters .................................................................................. 55

3.3     General Principles of California Water-Rights Law .................................................... 56

3.4     State Water Board Decisions on Applications for Water-Right Permits to Appropriate Water from Springs and Tunnels .................................................................... 57

3.5     State Water Board's Water-Right Enforcement Authority ........................................... 59

3.6     Applicability of Board's Water-Right Enforcement Authority to BlueTriton's Diversions ............................................................................................................................. 62

    3.6.1     Hypothetical Application of Board's Water-Right Enforcement Authority to Historic, Undeveloped Springs .............................................................................................. 64

    3.6.2     Application of Board's Water-Right Enforcement Authority to BlueTriton's Present Diversions .............................................................................................................. 69

3.7     BlueTriton's Water-Right Claims ................................................................................ 74

    3.7.1     Riparian Right Claims .................................................................................. 74

    3.7.2     Pre-1914 Appropriative Right Claims .......................................................... 75

        3.7.2.1     Chain-of-Title Issues .......................................................... 76

        3.7.2.2     Water Source Issues ............................................................ 80

3.8     Conclusions Regarding Issuance of Cease-and-Desist Order .................................... 84

3.9     Appropriate Cease-and-Desist Order Terms ............................................................. 86

3.10    BlueTriton's Options for Future Water-Right Applications ........................................ 88

4.0     CONCLUSIONS .......................................................................................................... 89

ORDER .................................................................................................................................. 90

CERTIFICATION ................................................................................................................. 92

Appendix A:     Decisions by State Water Board and its Predecessors Involving Board's Water-Right Permitting Authority Over Waters Associated with Springs and Tunnels ..........................

Appendix B:  BlueTriton's Request to Set Aside Proposed Order and Motion to Stay Further Action; Comments on May 26, 2023 Proposed Order ...................................................................

Figure 1: General Area Map ..............................................................................................

Figure 2: Local Area Map .................................................................................................

Figure 3: Map of part of San Bernardino National Forest (part 1) ....................................

Figure 4: Map of part of San Bernardino National Forest (part 2) ....................................

Figure 5: Photograph of Arrowhead Springs Hotel Area, 1915 .........................................

Figure 6: Arrowhead Springs conceptual source figure (figure from  John Mann, Jr. report) ........

Figure 7: Arrowhead Springs site plan (figure from Dames & Moore report) ..............................

Figure 8: Strawberry Canyon water collection infrastructure (figure from Mark Nicholls testimony) ................................................................................................................

Figure 9: Photograph showing locations of BlueTriton's tunnels and boreholes in Strawberry Creek watershed.................................................................................................................................

Figure 10:      Figure showing 2020 annual diversion, delivery and discharge amounts for BlueTriton's Strawberry Canyon diversions ...............................................................................

Figure 11:      Figure showing conceptual model of Arrowhead Springs (figure from Mark Nicholls technical report)...........................................................................................................

Figure 12:      Diagrammatic cross section of completion details at Marco Spring orifice (figure from Ross Grunwald technical report).............................................................................................

Figure 13:      Diagrammatic cross section of completion details at Polo Spring orifice (figure from Ross Grunwald technical report).............................................................................................

Figure 14:      Aerial photograph of Strawberry Creek watershed showing locations of BlueTriton's tunnels and boreholes and flow measurement stations (figure from Mark Nicholls technical report) (first figure)...................................................................................................

Figure 15:      Aerial photograph of Strawberry Creek watershed showing locations of BlueTriton's tunnels and boreholes and flow measurement stations (figure from Mark Nicholls technical report) (second figure)...................................................................................................

Figure 16:      Site map of Lower Spring Complex (figure from Dames & Moore report).............

Table 1: Table of BlueTriton's annual extractions reported in groundwater extraction notices filed with State Water Board...................................................................................................

**STATE OF CALIFORNIA**
**CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY**
**STATE WATER RESOURCES CONTROL BOARD**

**ORDER WR 2023-0042**

_____

**In the matter of the draft cease and desist order to**

**BlueTriton Brands, Inc.**
**(successor to Nestlé Waters North America, Inc.)**

**issued by the State Water Resources Control Board,**
**Division of Water Rights, Permitting and Enforcement Branch,**
**on April 23, 2021**

_____

**COUNTY: San Bernardino**

**STREAM SYSTEM: Strawberry Creek, tributary to East Twin Creek, Warm Creek and the Santa Ana River**

---

**CEASE AND DESIST ORDER**

## 1.0    INTRODUCTION

This matter came to the State Water Resources Control Board (State Water Board, Board or SWRCB) as a proposed order prepared and transmitted by the Senior Hearing Officer in the Board's Administrative Hearings Office (AHO), pursuant to Water Code section 1114, subdivision (c)(1). Pursuant to Water Code section 1114, subdivision (c)(2)(C), the Board adopts the AHO's proposed order with the changes described in section 2.12.4.

As described in this order, this order directs the Respondent, BlueTriton Brands, Inc. (BlueTriton), to cease its diversions through its Tunnels 2, 3 and 7, and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 in the Strawberry Creek watershed in San Bernardino County for its water-bottling operations because BlueTriton does not have any water rights that authorize these diversions and uses.

This order does not prohibit BlueTriton from continuing to divert water through these facilities for deliveries to the San Manuel Band of Mission Indians (San Manuel Band) for beneficial uses at the Arrowhead Springs Hotel property under BlueTriton's contractual obligations to the San Manuel Band, subject to BlueTriton's Special Use Permit from the San Bernardino National Forest and all applicable laws. This order does not prohibit BlueTriton from continuing to divert water through its Boreholes 10, 11 and 12 for its water-bottling operations or deliveries to the San Manuel Band.

## 2.0    BACKGROUND

### 2.1    Summary of Proceeding

Between April 2015 and September 2017, the State Water Board received seven complaints against Nestlé Waters North America (Nestlé) from individuals and organizations, and a petition signed by 500 individuals. (Exh. PT-13, p. 5.)[1] These complaints contained many allegations, including allegations that Nestlé was diverting water without a valid basis of right, was unreasonably using water, was injuring public trust resources, and was not reporting or was incorrectly reporting its diversions. (*Ibid.*)[2]

In May 2016, the Forest Supervisor for the San Bernardino National Forest sent a letter to the State Water Board's Division of Water Rights (Division). (Exh. PT-38.) This letter asked for the State Water Board's assistance in evaluating Nestlé's water-right claims. (*Ibid.*)

---

[1] Unless the context indicates otherwise, references in this order to exhibits are to exhibits introduced during the AHO hearing in this proceeding. These exhibits are filed in a folder titled "Parties' Hearing Exhibits" within the Hearing Documents folder in the administrative record for this proceeding. Within the Parties' Hearing Exhibits folder, there is a separate sub-folder for the exhibits of each party that participated in the AHO hearing.

Unless otherwise indicated, citations in this order to page numbers of exhibits are to the pages of the pdf files of the exhibits. These page numbers often are different from the text page numbers in the exhibits.

[2] Copies of these complaints are filed in a separate folder labeled "Complaints" in the administrative record. Copies of these complaints and this petition also are exhibits PT-102 through PT-110.

Exhibit 9, P. 016

The Division issued a report of investigation on December 20, 2017. (Exh. PT-13.) That report contained several conclusions, including the following:

> While Nestlé may be able to claim a valid basis of right to some water in Strawberry Canyon, a significant portion of the water currently diverted by Nestlé appears to be diverted without a valid basis of right.

(*Id.*, p. 33.)

The Division transmitted a copy of this report to Nestlé's representatives, with copies to representatives of the complainants and other interested parties, on December 20, 2017. (Exh. PT-14.)

After receiving comments from Nestlé, some of the complainants, and several other agencies and organizations, the Division prepared a revised report of investigation, responses to comments and a draft cease-and-desist order (draft CDO) in April 2021. (Exhs. PT-1, PT-3 & PT-4.) If it had gone into effect, the draft CDO would have directed Nestlé to immediately cease all diversions greater than 7.26 acre-feet per year (af/yr) of water that is subject to Division 2 of the Water Code (Wat. Code, §§ 1000-5976) from Nestlé's Tunnels 2, 3 and 7 and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8, based on the conclusion that any diversions exceeding this annual amount would be unauthorized diversions.[3] (Exh. PT-1, p. 10, ¶¶ 13, 1.) The draft CDO would have required Nestlé to submit a report regarding the amounts of diversions at Boreholes 10, 11 and 12 that, if not diverted, would have surfaced naturally at springs. (*Id.*, p. 11, ¶ 7.)

The revised report of investigation concluded that there was not sufficient information to determine if Nestlé's authorized diversions were causing injuries to public trust resources that outweighed the beneficial uses of the diverted water. (Exh. PT-3, p. 51, ¶

---

[3] These tunnels and boreholes are described in section 2.9, and their locations are shown in Figures 7, 8 and 9.  Unless the context indicates otherwise, references to "Figures" and "Table" in this order are to the figures and table that are included as attachments at the end of this order, and references to "sections" are to sections of this order.

9.) Accordingly, the draft CDO did not contain any findings regarding public trust resources, or any orders based on potential impacts to such resources. (Exh. PT-1.)

The Assistant Deputy Director for the Division's Permitting & Enforcement Branch sent a letter transmitting the revised report of investigation, responses to comments and draft CDO to Nestlé and the other interested people, agencies and organizations on April 23, 2021. (Exh. PT-2.) This letter advised Nestlé that, if it wanted a hearing on the draft CDO, then it had to submit a written request for hearing within 20 days. (*Id.*, p. 5.)

On May 11, 2021, an attorney for BlueTriton filed a request for hearing on the revised report of investigation and draft CDO. (2021-05-11 BlueTriton Brands, Inc. Request for Hearing.)[4] This request stated that BlueTriton was Nestlé's "successor by name change." (*Id.*, p. 1.)

Water Code section 1112, subdivision (a)(2), provides that an AHO hearing officer shall preside over hearings on notices of proposed CDOs like the draft CDO issued by the Division in this proceeding. Following this statute, the AHO issued a notice of hearing, held a hearing on 16 days between January 10 and May 23, 2022, and conducted a site visit on February 16-17, 2022.[5]

The following parties participated in the AHO hearing:
-Amanda Frye;
-Anthony Serrano;
-BlueTriton;
-Center for Biological Diversity and Sierra Club;
-Hugh Bialecki (for Save Our Forest Association);
-San Bernardino Valley Municipal Water District (San Bernardino Valley MWD);

---

[4] Unless the context indicates otherwise, citations in this order to files without any exhibit names are to files in the Hearing Documents folder in the administrative record for this proceeding. The names of these files all begin with the date of the document in the file, and these files are arranged chronologically in the Hearing Documents folder. Citations to files in other folders in the administrative record besides the Hearing Documents folder and the exhibit folders list the folder where the file is saved.

[5] The AHO proceedings are described in more detail in sections 2.12.1 through 2.12.4.

-State Water Board's Prosecution Team (consisting of attorneys from the Board's Office of Enforcement and staff from the Division's Permitting & Enforcement Branch);
-Steve Loe; and
-Story of Stuff Project (Story of Stuff).[6]

After completing the hearing and receiving closing briefs and related papers from the parties, the AHO prepared a draft proposed order, and circulated it to the parties for their review and comments on April 21, 2023. The AHO hearing officer then reviewed these comments and prepared responses and rulings (2023-05-30 hearing officer responses and rulings), and the AHO prepared its final proposed order and transmitted it to the Clerk of the Board pursuant to Water Code section 1114, subdivision (c)(1) on May 26, 2023.

### 2.2    General Topography and Hydrogeology

Figure 1 shows the general locations of East Twin Creek and its tributaries, Warm Creek, and the Santa Ana River.[7] As shown in this figure, the channel of East Twin

---

[6] The parties' exhibits are labeled with one of the following abbreviations, followed by the exhibit number:
-Amanda Frye: FR
-Anthony Serrano: Serrano
-BlueTriton: BTB
-Center for Biological Diversity and Sierra Club: CBD
-Hugh Bialecki: Bialecki
-San Bernardino Valley Municipal Water District: SBVMWD
-State Water Board's Prosecution Team: PT
-Steve Loe: Loe
-Story of Stuff Project: SOS

[7] AHO staff prepared Figure 1 using the World Street Map basemap layer from the ArcGIS Map Service database, the U.S. Geological Survey National Hydrography Dataset, and the U.S. Geological Survey topographic maps for the applicable 7.5-minute quadrangles, and adding the boxes depicting the approximate extents of Figures 2 and 7 and the Figure 8 inset. To show the general geographic locations of the channels of East Twin Creek, Warm Creek and the Santa Ana River, AHO staff included dashed blue lines that show the paths of these channels. This order does not address the issue of when there is hydraulic continuity from Strawberry Creek through East Twin Creek and Warm Creek to the Santa Ana River. Nothing in Figure 1 or the references to "tributary to" in the caption of this order should be construed as suggesting any position on this issue.

Creek is connected to the channel of Warm Creek, which is connected to the channel of the Santa Ana River.

The area covered by Figure 2 is shown on Figure 1.[8] Figure 2 shows East Twin Creek and its tributaries. As shown on this figure, the tributaries of East Twin Creek involved in this proceeding are, from west to east, Hot Springs Creek, Coldwater Creek[9] and Strawberry Creek. Waterman Canyon joins East Twin Creek from the west farther downstream.

Strawberry Creek has several branches. Some of the documents in the administrative record refer to the branch of Strawberry Creek depicted in Figures 2, 7 and 8 as "Strawberry Creek," and to the watershed of this creek as "Strawberry Canyon." We use these terms in this order. Another branch of Strawberry Creek is located to the east. Some of the documents in the administrative record refer to this branch as the "East Fork of Strawberry Creek." This order refers to this branch with this name and it has this label in Figure 2. There are no BlueTriton facilities in the watershed of the East Fork of Strawberry Creek.

During the AHO hearing, Mark Nicholls, a certified hydrogeologist who testified for BlueTriton, submitted a technical report regarding the hydrologic characterization of surface water and groundwater resources in Strawberry Canyon. (Exh. BTB-7, p. 1.) This report states:

---

[8] AHO staff prepared Figure 2 using the U.S. Geological Survey National Hydrography Dataset, the U.S. Geological Survey topographic map database and the applicable 7.5-minute quadrangle maps, adding various creek and landmark names, including the creek names shown in exhibit PT-12, p. 5, and the approximate location of the areas covered by Figure 7 and the Figure 8 inset.

[9] Some of the maps that were submitted as exhibits during the AHO hearing label one of the creeks in Coldwater Canyon as the upper reach of East Twin Creek. To avoid confusion with the reach of East Twin Creek that is downstream of the confluence of Coldwater Canyon and Strawberry Creek, we refer to the creek that flows south in Coldwater Canyon to this confluence as "Coldwater Creek." It is labeled with this name in Figure 2.

The San Bernardino Mountains are located within the Transverse Ranges geomorphic province. In the area of Strawberry Canyon, the south facing slopes of the San Bernardino Mountains are composed primarily of crystalline granitic rocks. . . . The San Andreas Fault marks the mountain front boundary at the toe of the south flank of the mountain range approximately 3.5 miles south of the water sources. Many smaller faults are present within the San Bernardino Mountains and several transect the study area and have affected groundwater flow.

. . .

In addition to the fracturing and shearing resulting from tectonic forces, the crystalline rocks have locally been fractured from decompression of the plutonic mass. Granitic rocks are formed at great depth within the earth as magma slowly cools under pressure, allowing mineral crystals to form. As these rocks are later pushed to the surface of the earth, they are depressurized, resulting in the formation of decompression fractures and the slow break down of the crystalline mineral fabric. Fractures resulting from decompression allow water to penetrate the rock mass, further advancing the weathering process.

. . .

Intact crystalline igneous rocks are typically non-water bearing and essentially impervious to infiltration. However, locally intense fracturing within the rock mass in Strawberry Canyon gives these rocks substantial secondary porosity and permeability, resulting in considerable capacity for infiltration and storage of water. . . . The fractured bedrock aquifers of the San Bernardino Mountains discharge naturally to ground surface where fracture networks intersect the surface or are intercepted by fault planes.

(*Id.*, pp. 12-13.)

## 2.3    San Bernardino National Forest

In February 1893, President Benjamin Harrison issued a proclamation setting aside and reserving designated federal lands as the "San Bernardino Forest Reserve," which later became the San Bernardino National Forest. (Exhs. FR-31, FR-33, FR-34.) An 1894 Department of the Interior notice stated that the purposes of the reservation were "for the benefit of the adjoining communities, being created to maintain a permanent supply

of water for irrigation and of wood for local use by a rational protection of the timber thereon." (Exh. FR-33.)

Figures 3 and 4 show the current boundaries of parts of the San Bernardino National Forest. Lands within these boundaries that are depicted with green shading on these figures are National Forest Lands.

### 2.4    Historical Development and Water Use at the Arrowhead Springs Hotel Property

According to a 1999 report prepared by Dames & Moore, a consultant to one of BlueTriton's predecessors, variations in geology and soil conditions in part of the mountain side, and resultant variations in vegetation, formed a near-perfect "Arrowhead" shape on the side of the San Bernardino Mountains. (Exh. PT-23, p. 22.) This natural landmark is the source of the name "Arrowhead" that has been given to many of the developments in this area, including the Arrowhead Springs development (depicted in Fig. 3, in section 12, T1N, R4W, S.B.B.&M as "Arrowhead Springs") and Lake Arrowhead, which is located several miles to the northeast. (*Ibid.*) This natural landmark is located on the east side of the Hot Springs Creek watershed.[10] Figure 5 is a copy of a 1915 photograph of the Arrowhead Springs Hotel area, with the Arrowhead landmark on the mountainside visible in the background.

According to the Dames & Moore report, David Noble Smith, a pioneer from Ohio, purchased land in 1857 at the base of the mountainside with the Arrowhead landmark. (Exh. PT-23, p. 22.) In 1864, he opened a spa on this land. In 1882, the United States issued a patent to Mr. Smith for this land. (Exh. PT-10, pp. 7-8, ¶ 24.) In 1885, the spa was converted into a hotel and resort. (Exh. PT-23, p. 22.) In 1895, a fire destroyed the hotel. (Exh. PT-10, p. 7, ¶ 22.)

---

[10] Text in exh. PT-23, p. 22, states that the Arrowhead landmark is in the southeast corner of section 2, T1N, R4W (S.B.B.&M). Figure 3 shows this section 2 and depicts Arrowhead Peak in the section's northeast corner. The Arrowhead landmark is visible in the aerial photograph in exhibit PT-12, p. 5, to the right of Indian Springs. AHO staff included a depiction of the location of this landmark in Figure 2.

In 1905, Seth Marshall built a new hotel on the property. In 1906, Mr. Marshall began bottling "Arrowhead Springs" water in the hotel basement and began selling spring-fed water that was captured near the hotel. (*Ibid.*) This bottled water was sold exclusively at the hotel. (*Id.*, p. 13, ¶ 37.)

In January 1909, the Arrowhead Hot Springs Company entered into a 10-year contract with James Mumford and C. H. Temple for the sale of water from Coldwater Creek (referred to in the contract as "Cold Creek"), for delivery to the buyers' tank cars at the terminus of the electric car line at Arrowhead Springs. (Exh. PT-152, pp. 20-21, 24.) The contract provided that the buyers could sell the water in bottles with labels approved by the seller. (*Id.*, p. 21.) Mr. Mumford and Mr. Temple assigned their interests in the contract to the Arrowhead Springs Water Company in July 1909. (Exh. FR-27, pp. 121-122.) The Dames & Moore report indicates that the buyers transported this water to a bottling plant in Los Angeles. (Exh. PT-23, pp. 22-23.)[11] The Prosecution Team's closing brief to the AHO asserted that the maximum annual amount of water that was transported to Los Angeles under this contract was 7.26 acre-feet per year (af/yr). (2022-08-05 Prosecution Team closing brief, p. 19:20-20:8.) BlueTriton's closing brief to the AHO asserted that this annual amount may have been as high as 16.8 af/yr. (2022-08-05 BlueTriton closing brief, p. 18:19-19:7.)

In 1912, the Arrowhead Hot Springs Company built a water-bottling plant known as the "Old Arrowhead Factory." The source for this plant was springs near the base of the Arrowhead landmark (exh. PT-10, p. 14, ¶¶ 41-42; exh. PT-52, p. 5), which, as shown in Figure 2, is in the Hot Springs Creek watershed. During the AHO proceedings, a Prosecution Team witness testified that he believed that water deliveries under the 1909 contract described in the preceding paragraph stopped in 1912, that the Old Arrowhead Factory began operations in 1913, and that the maximum annual amount bottled at this

---

[11] A 2005 draft report about the history of the Arrowhead Springs Hotel states that, with the completion of this railroad line, water was brought in from Waterman Canyon to a reservoir at Arrowhead Springs and then loaded into special glass-lined railroad cars for transport to the bottling plant in Los Angeles that had been established in 1915. (Exh. PT-39, p. 7.)

factory did not exceed the maximum 7.26 af/yr rate that had occurred under the 1909 contract. (Exh. PT-10, p. 16, ¶ 46.) BlueTriton's closing brief to the AHO argued that there is no evidence that sales of water under the 1909 contract stopped in 1912, and that the Old Arrowhead Factory had a production capacity of 5.6 af/yr and used an additional 3.9 af/yr in the production process, for total diversions of 9.5 af/yr. (2022-08-05 BlueTriton closing brief, p. 20:9-12, p. 21:13-20.)

In 1917, Arrowhead Hot Springs Company completed a water-bottling plant in Los Angeles that bottled water transported from Indian Springs, a tributary to Hot Springs Creek. (Exh. PT-10, pp. 16-17, ¶¶ 47-49.) During the AHO hearing, a Prosecution Team witness testified that there was no evidence that this plant was planned, conceived of, or noticed before December 19, 1914. (*Id.*, p. 17, ¶ 50.) BlueTriton's closing brief to the AHO argued that this plant was completed in 1916 after "many years" of preparation. (2022-08-04 BlueTriton closing brief, p. 22:17-18.) BlueTriton's closing brief pointed out that the Division's 2017 report of investigation had concluded that planning for this plant had begun in 1912. (*Id.*, p. 22:13-21; see exh. PT-13, p. 23.) BlueTriton's closing brief asserted that this plant had a bottling capacity of 26 af/yr and required an additional 5.9 af/yr for production, and thus required a total of 31.9 af/yr of water from Indian Springs. (2022-08-04 BlueTriton closing brief, p.21:25-22:2.)

According to the Division's revised report of investigation, the names "Arrowhead Hot Springs Company" and "Arrowhead Springs Corporation" both were used in historical newspaper articles and other documents to refer to the same company. (Exh. PT-3, pp. 35-36 & fn. 47.) The following sections of this order refers to this company as "Arrowhead Springs Corp."

### 2.5   1929 Warranty Deed and 1930 and 1931 Agreements for Development of Springs in Strawberry Creek Watershed

California Consolidated Water Company (California Consolidated WC) was incorporated on February 18, 1929. (Exh. FR-116.)

On  February 27, 1929, Arrowhead Springs Corp. signed a warranty deed that granted to California Consolidated WC, among other interests, "all subterranean waters" in Waterman, Strawberry and Coldwater Canyons belonging to grantor, including all water being developed and produced by grantor and such additional subterranean waters that grantee may develop, and the necessary rights of way for pipelines to convey the water to grantee's reservoirs, but excluding all water from surface streams and hot springs. (Exh. BTB-13, p. 26, ¶ 2.) This deed also granted to California Consolidated WC all of Arrowhead Springs Corp.'s rights and interests in "water flowing from Indian Springs and in the tunnels located at and adjoining said springs." (*Id.*, ¶ 3.) This deed was recorded in the official records of San Bernardino County on March 12, 1929. (*Id.*, p. 27.)

In August 1930, California Consolidated WC entered into an agreement with Arrowhead Springs Corp. (Exh. PT-212.) This agreement referred to the 1929 warranty deed described in the preceding paragraph. (*Id.*, p. 2.)[12] Paragraph "Fifth" of the 1930 agreement stated that California Consolidated WC:

> does hereby wholly release, surrender and quitclaim unto Arrowhead [Springs Corp.] any right whatsoever which it may have obtained by virtue of said contracts and/or warranty deed, or otherwise, to any surface or sub-subface water existing in Cold Water Canyon within or outside of the boundaries of the real estate owned by Arrowhead [Springs Corp.]

(*Id.*, p. 3.) Paragraph "Ninth" of this agreement provided that California Consolidated WC released and quitclaimed to Arrowhead Springs Corp. any rights that California Consolidated WC had to "water from Indian Springs and/or tunnels adjacent thereto,"

---

[12] The 1930 agreement states that this warranty deed was recorded on May 12, 1929 in book 476, page 175 of the official records of San Bernardino County.  (Exh. PT-212, p. 2.)  The actual recording date was March 12, 1929. (Exh. BTB-13, p. 27.)

except for any waters from those sources that were surplus to the needs of Arrowhead Springs Corp. for such waters for its hotel and related facilities. (*Id.*, p. 4.)

The 1930 agreement referred several times to an "existing" pipeline in Strawberry Canyon that Arrowhead Springs Corp. had constructed in 1929. (*Id.*, pp. 2-3.) The agreement provided that California Consolidated WC would construct a new pipeline from the intake of that existing pipeline to "the springs located in upper Strawberry Canyon," approximately 12,300 feet to the north. (*Id.*, p. 2.) The agreement further provided that Arrowhead Springs Corp. would be entitled to receive half the water California Consolidated WC developed in Strawberry Canyon, to be delivered to a reservoir at the back of the Arrowhead Springs Hotel building, and California Consolidated WC would be entitled to the other half of this water. (*Ibid.*)

In September 1931, these parties entered into a new agreement that amended the 1930 agreement. (Exh. FR-112.) The new agreement referred to the pipeline that had been constructed by California Consolidated WC, and it amended the prior allocation of water to a new allocation under which California Consolidated WC would receive 80 percent of the water it developed in Strawberry Canyon, and would deliver the remaining 20 percent for free to Arrowhead Springs Corp. (*Id.*, p. 2.)

### 2.6    Judgment in Del Rosa Mutual Water Company Case

On October 19, 1931, the San Bernardino County Superior Court issued a judgment in a civil case the Del Rosa Mutual Water Company (Del Rosa MWC) had brought against various defendants, including Arrowhead Springs Corp. and California Consolidated WC. (Exh. BTB-13, pp. 9-23.) The court entered this judgment following a stipulation by all but one of the parties. (*Id.*, p. 9.) The one non-stipulating party was not Del Rosa MWC, Arrowhead Springs Corp. or California Consolidated WC. (*Ibid.*)

The judgment stated that the plaintiff, Del Rosa MWC, was diverting all the water of East Twin Creek flowing at a point of diversion about one mile north of the creek's mouth into a ditch and was conveying the diverted water to non-riparian lands for beneficial uses. (*Id.*, pp. 11-12.) The judgment referred to the diversions from East Twin

Creek and its tributaries upstream of plaintiff's point of diversion by Arrowhead Springs Corp. and its predecessors for over 50 years for uses at the Arrowhead Springs Hotel, and to its diversions from various springs in Hot Springs Canyon for shipping to outside the East Twin Creek watershed for water bottling. (*Id.*, pp. 12-15.) The judgment stated that California Consolidated WC had, for more than five years before commencement of the action, diverted water, adversely to the plaintiff, from springs at the headwaters of Strawberry Creek for conveyance to Los Angeles, where the water was bottled for domestic use and used to manufacture beverages and for other purposes. (*Id.*, pp. 12, 15-16.)

Following these statements, the judgment concluded that Arrowhead Springs Corp. had the right to divert water from East Twin Creek and its tributaries for uses on the Arrowhead Springs property riparian to East Twin Creek, and to divert specified amounts of water from springs tributary to Hot Springs Creek for shipping outside the watershed for water bottling. (*Id.*, pp. 17-18.) The judgment concluded that California Consolidated WC had the right to the waters of springs in Strawberry Canyon, and to convey that water outside the Strawberry Creek watershed for bottling or other purposes of use. (*Id.*, pp. 18-19.) The judgment provided that plaintiff would recover $15,000 from California Consolidated WC and $5,000 from Arrowhead Springs Corp. (*Id.*, p. 19.)

### 2.7    1930-1931 W. P. Rowe Investigation

During the AHO hearing, attorneys for the Story of Stuff Project introduced copies of a diagram, field notes and reports prepared by W. P. Rowe as part of his investigation of the springs in the Strawberry Creek watershed during 1930-1931. A January 1931 letter from an attorney for California Consolidated WC and Arrowhead Springs Corp. indicates that these entities each were paying half of Mr. Rowe's fees for his investigation. (Exh. SOS-55, p. 20; see *id.*, p. 19.)

Mr. Rowe's field notes indicate that he conducted his investigation between August 4, 1930 and April 18, 1931. (Exh. SOS-48, pp. 2-78.) A diagram that he apparently prepared in connection with his reports shows Springs 1, 2, 3 and 4 at the

head of Strawberry Creek. (Exh. SOS-49; exh. BTB-9, p. 16.)[13] This diagram shows the locations of Weirs 1-5, which are referenced in his reports, and of the Del Rosa Mutual Water Company's pipeline. (Exh. SOS-49.)[14]

Mr. Rowe's May 15, 1931 letter states:

> Strawberry Creek drains a portion of the south slope of the San Bernardino Mountain. It has its source at a group of springs which issue from the side of Strawberry peak. The elevation of the top of Strawberry peak is 6150 feet above sea level and the springs issue from the broken rock between elevation 5400 and 5050 feet above sea level. The flow from these springs being deep seated should be fairly regular, especially during the late summer season. The observations show this to be the case. The dependable supply will aggregate about 10 inches, of which 8 inches are at present diverted from spring # 2 into the pipe line leading to the Arrowhead Hotel and vicinity. The water not so diverted flows down the side hill to a common junction at a narrow bed rock gully lined with alder, sycamore, dogwood and cedar trees together with ferns and thimble berry bushes. The junction of flow from all of the upper springs at the head of Strawberry Creek is at station 123+00, or 12,300 feet upstream from the old intake to the 4" pipe from Strawberry creek to the Arrowhead Hotel which was laid in 1929.

(Exh. SOS-51, p. 1.) [15]

The table that was enclosed with Mr. Rowe's letter lists the flows he measured on various dates between September 29, 1930 and April 18, 1931, at Springs 1, 2, 3 and 4, and at the weirs referenced in his reports. (*Id.*, pp. 5-11.) The reported flow rates are in

---

[13] Mr. Rowe's diagram shows Spring 4 at the confluence of the streams that flowed from Springs 1, 2 and 3. (Exh. SOS-49.) This does not appear to be the Spring 4 depicted in Figure 7, which is located below, but very close to, Spring 1. Mr. Nicholls included an excerpt from this diagram in his slides summarizing his rebuttal testimony. (Exh. BTB-9, p. 16.)

[14] This diagram depicts a reach of "East Twin Creek" southeast of Strawberry Creek. (Exh. SOS-49.)  This is inconsistent with other maps, which depict Coldwater Creek as the upper reach of East Twin Creek. (See section 2.2.)

[15] The first sentence of Mr. Rowe's May 15, 1931 letter refers to his measurements since "September 29, 1931." (Exh. SOS-51, p. 1.) Because September 29, 1931 had not occurred when he signed the letter, and because the tabulation enclosed with the letter refers to measurements between September 29, 1930 and April 18, 1931 (*id.*, pp. 5-7), the "September 29, 1931" in this letter should have been "September 29, 1930."

miner's inches under four inches of pressure. (*Ibid.*) A flow rate of one miner's inch under four inches of pressure equals 9.0 gallons per minute (gpm).[16] The "dependable supply" of 10 inches discussed in Mr. Rowe's letter therefore equaled 90 gpm, and the amount "at present diverted" of 8 inches equaled 72 gpm.

The tables in Mr. Rowe's May 15, 1931 letter indicate that, on the dates on which he made measurements, flows from Spring 1 varied from 0.7 to 1.8 miner's inches (*id.*, pp. 5-7), which equaled flows of 6.3 to 16.2 gpm. Measured flows from Spring 2 (including amounts diverted) varied from 7.9 to 9.2 miner's inches (*id.*), which equaled flows of 71.1 to 82.8 gpm. Measured flows from Spring 3 varied from 0.9 to 1.4 miner's inches (*id.*), which equaled flows of 8.1 to 12.6 gpm.

Mr. Rowe's letter goes on to state:

> About a quarter of a mile downstream from this junction point, the stream enters a little valley caused by faulting along the side of the San Bernardino Mountains. At this valley or cienega the flow is augmented by more springs.

(*Ibid.*)  Mr. Rowe's diagram and his letter indicate that this valley was between his Stations 107 and 84. (*Ibid*; see exh. SOS-49; exh. BTB-9, p. 16.) This valley is about one-half mile downstream of Spring 2. As shown in Figure 7, Springs 10, 11 and 12 are located approximately one-half mile downstream of Spring 2. These approximate distances and the fact that there is no evidence in the record of any other springs in this area indicate that these springs discussed in Mr. Rowe's letter are Springs 10, 11 and 12.

---

[16] A miner's inch of flow is the rate of flow through a one-square-inch orifice under a specified head or pressure. (*Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 762 fn. 12.) In California, there are two different definitions of a miner's inch.

A miner's inch measured under six inches of head equals a flow rate of 1/40 cubic-foot per second (cfs). (*Ibid.*) This is the miner's inch flow rate defined in Water Code section 24 (1/40 cfs = 1.5 ft.$^3$/min.).

A miner's inch measured under four inches of head equals a flow rate of 1/50 cfs. (*Pleasant Valley Canal Co. v. Borror, supra*, 61 Cal.App.4th, p. 762 fn. 12.) This is the miner's inch flow rate referenced in Civil Code section 1415, Mr. Rowe's reports, and this order. This flow rate equals 9.0 gallons per minute. (0.02 ft.$^3$/sec. x 7.481 gal./ft.$^3$ x 60 sec./min. = 9.0 gal./min.)

### 2.8    Successors to California Consolidated Water Company

During the AHO hearing, BlueTriton filed a report that BlueTriton stated described the chain of title for the water rights it stated were assigned to California Consolidated WC by the 1931 judgment in the *Del Rosa Mutual Water Company* case. (Exh. BTB-13, p. 1; see section 2.6.) This report begins by describing the 1929 deed from Arrowhead Springs Corp. to California Consolidated WC and the 1931 judgment. (Exh. BTB-13, pp. 3-4; see section 2.5.) This report then describes a variety of companies that, in succession, held these water-right claims. (Exh. BTB-13, pp. 4-5.) After California Consolidated WC merged into Arrowhead and Puritas Waters, Inc. in 1938 (*id.*, pp. 4, 30-32), all the successor companies had the word "Arrowhead" in their names until 1993 (i*d.*, pp. 4-5). In 1993, Arrowhead Water Corp. and several other water-bottling companies merged into Deer Park Spring Water Inc., which then changed its name to Great Spring Waters of America, Inc. (*Id.*, pp. 5, 85-96.) In 2002, Great Spring Waters of America, Inc. changed its name to Nestlé Waters North America, Inc. (*Id.*, pp. 5, 99.)

BlueTriton's chain-of-title report does not discuss any conveyances to any of BlueTriton's predecessors of any pre-1914 appropriative rights that the Arrowhead Springs Water Company might have perfected through its water-bottling operations under its 1909 contract with Arrowhead Hot Springs Company. (See section 2.4; exh. BTB-13.)

In April 2021, one of BlueTriton's attorneys advised a Prosecution team attorney that an investor group comprised of One Rock Capital Partners, LLC and Metropoulos & Co. acquired Nestlé Waters North America Holdings, Inc. on March 31, 2021, and that, on April 12, 2021, Nestlé Waters North America changed its name to "BlueTriton Brands, Inc." (with no space between "Blue" and "Triton"). (Exh. PT-117, p. 1.)[17]

---

[17] References in this order to "BlueTriton" often are to one or more of BlueTriton's predecessors, and references "BlueTriton's facilities" often are referring to facilities now owned by BlueTriton that previously were owned by one or more of BlueTriton's predecessors.

### 2.9    Springs, Tunnels and Boreholes in Strawberry Creek Watershed

In 1964, John F. Mann, Jr. prepared a geologic and hydrologic report regarding the area of the Arrowhead and Puritas Waters, Inc. springs to the company's production manager. (Exh. PT-317.) This report stated that the rocks in the area "are granitic and metamorphic types of the so-called 'basement complex'," and that "[g]round water in the area . . . occurs mainly in fractures in the basement rocks." (*Id.*, pp. 3-4.)

In 1988, Mr. Mann prepared a report to the director of production and logistics of the Arrowhead Drinking Water Company. (Exh. PT-319.) This report stated:

> The Arrowhead Springs are located in an area of high rainfall. Especially during periods of heavy rainfall, the rain water which falls on the granite slopes enters fractures, follows fracture systems to lower elevations and exits as seeps along the steep south-facing slopes (Figure 2).

(*Id.*, p. 4.) Figure 6 attached to this order is a copy of the figure 2 in Mr. Mann's 1988 report. (*Id.*, p. 5.) It shows a conceptual pathway of water flow from rain through fractures in the basement rocks (fractured granite) to a spring.

Figure 7 shows the locations of the springs and some of the boreholes discussed in the following paragraphs. Figure 8 shows the locations of the tunnels and boreholes in Strawberry Canyon, and associated pipelines, that BlueTriton currently uses to divert water in this watershed and to convey the diverted water to BlueTriton's load station and the split valve from which water is conveyed to the Arrowhead Springs Hotel. Figure 9 is a photograph that shows the locations of these tunnels and boreholes. The following paragraphs discuss the historical development of these facilities.

Spring 2 and Tunnel 2. The 1999 Dames & Moore report states:

> Spring No. 2 is a natural spring that has been improved by the installation of engineered collection facilities consisting of a hand dug tunnel and water collection piping. . . . The tunnel has concrete walls and gravel-lined floors to allow the spring water to enter the collection system from the fractures in the bedrock.

(Exh. PT-23, p. 14.) This tunnel is straight, about three feet wide, four- and one-half feet high, and 37 feet long. (*Id.*, p. 15; exh. BTB-9, p. 6.) This tunnel was constructed in

1930, and BlueTriton's predecessors began diverting water from it then. (Exh. FR-153, p. 5; exh. SOS-51, p. 1; exh. PT-44, p. 3.)

Spring 3 and Tunnel 3. The 1999 Dames & Moore report states:

> Spring No. 3 is a natural spring that, like Spring No. 2, has been improved by the installation of engineered collection facilities. These include a hand dug tunnel, weirs, and water collection piping. . . . The tunnel has concrete walls and gravel-lined floors to allow the spring water to enter the collection system from the fractures in the bedrock.

(Exh. PT-23, p. 15.) This tunnel has five sections that curve to the left from the entrance. (*Id.*, p. 16.) The tunnel is approximately three feet wide, five feet high and 89 feet long. (*Ibid*; exh. BTB-9, p. 6.) This tunnel was constructed in 1933, and BlueTriton's predecessors began diverting water from it then. (Exh. FR-153, p. 5; exh. PT-44, p. 3.)

Spring 4 Complex, Springs 1 and 8, and Boreholes 1, 1A and 8.  The 1999 Dames & Moore report discusses "Spring Complex No. 4" and the three associated boreholes, Boreholes 1, 1A and 8. (Exh. PT-23, p. 16.) The Dames & Moore report states:

> Spring water in the vicinity of Spring No. 4 is harvested from three associated bore holes, Bore Holes No. 1, No. 1A, and No. 8. For convenience, this group of sources is referred to herein as Spring Complex No. 4.
> . . .
> Spring No. 4 . . . issues from the steep granite hillside between Spring No. 2 and Spring Complex No. 7, at an elevation of approximately 5,190 feet above msl. . . . As noted earlier, Spring No. 4 has not been developed by installation of collection facilities, and spring water is not harvested directly from this spring. Spring water from this source is captured by three bore holes, Bore Holes No. 1**,** No. 1A, and No. 8 located approximately 60 feet north (uphill) from Spring No. 4.

(*Ibid.*) The lengths of these boreholes are: 290 feet (Borehole 1), 130 feet (Borehole 1A), and 120 feet (Borehole 8). (*Id.*, pp. 16-17.)  The lengths of the seals from the ground surface along the boreholes are: 126 feet (Borehole 1), 66 feet (Borehole 1A), and 100 feet (Borehole 8). (Exh. BTB-9, p. 6.) These boreholes were constructed by drilling two-and-seven-eighth-inch diameter boreholes and then lining them with two-inch diameter casings and screens. (Exh. PT-45, pp. 5-6.) The portals of all three boreholes are in one block house. (*Id.*, p. 9.)

Mr. Mann's 1988 report states that Spring 1 probably was developed in the 1930s as part of the original group of springs, and that the first recorded measurements of flows from this spring were in October 1948, when flows of 10,000 to 20,000 gallons per day (gpd) were measured. (Exh. PT-319, p. 17.) This report states that flows from this spring declined during the dry years of 1959 through 1961, and that this spring was closed in May 1962, when its flows were less than 5,000 gpd. (*Ibid.*) It was opened in February 1963, but its flows were intermittent after then, and no flows were recorded for ten years leading to May 1976, when the spring was capped and a horizontal hole (presumably new Borehole 1) was developed. (*Ibid.*)

A 1998 report by the Hydrodynamics Group for Perrier Group of America discusses the developments of Springs 1 and 8, states that Borehole 1 originally was developed in the 1930s, and that, after its discharge declined, a new borehole was slant drilled in 1976 from a lower elevation to intercept the original borehole. (Exh. PT-45, p. 5.) This report states that Borehole 8 originally was developed in the 1950s, and that, after its discharge declined, a new borehole was slant drilled in 1993 from a lower elevation to intercept the original borehole. (*Ibid.*) Borehole 1A was constructed in 1993. (*Id.*, p. 6.)

Spring 7, Tunnel 7 and Boreholes 7, 7A, 7B and 7C. The 1999 Dames & Moore report states:

> Spring No. 7 . . . is a natural spring that has been improved by construction of an engineered collection facility, consisting of a short (30-foot) tunnel. . . . The tunnel is concrete lined and has a gravel floor to allow the collection of spring water. Four horizontal bore holes, Bore Holes No. 7, No. 7A, 7B, and No. 7C, have been placed down slope of the spring to harvest spring water from this spring. Since their installation, these bore holes have been used for harvesting of spring water and conveying it into the water supply pipeline at the site, and spring water is no longer harvested directly from Spring No. 7.

(Exh. PT-23, pp. 17-18.) Tunnel 7 is about four feet wide. (Exh. PT-43, p. 10.)

The tunnel developed at Spring 7 was placed into service in 1934. (Exh. SOS-281, p. 19; see exh. PT-43, p. 20.) The original Boreholes 7A and 7B were constructed in 1950, and the original Borehole 7C was constructed in 1961. (Exh. PT-43, p. 20.) New

Boreholes 7, 7A and 7B were constructed in 1992, and new Borehole 7C was constructed in 1993. (*Ibid.*) The enclosure containing the portals of these boreholes is approximately 40 feet from the portal of the original Tunnel 7. (*Id.*, p. 10.) The lengths of these boreholes are: 290 feet (Borehole 7), 230 feet (Borehole 7A), 397 feet (Borehole 7B), and 300 feet (Borehole 7C). (*Ibid.*) The lengths of the seals from the ground surface along the boreholes are: 126 feet (Borehole 7), 95 feet (Borehole 7A), 121 feet (Borehole 7B), and 168 feet (Borehole 7C). (Exh. BTB-9, p. 6.) These boreholes were constructed by drilling two-and-seven-eighth-inch diameter boreholes and then lining them with two-inch diameter casings and screens. (Exh. PT-43, p. 5.) The portals of all four boreholes are in one concrete block enclosure. (*Id.*, p. 10.)

Springs 10, 11 and 12 and Boreholes 10, 11 and 12.

The 1999 Dames & Moore report states:

> Springs No. 10, No. 11, and No. 12 are natural springs that flow from the granitic hillside in the Lower Spring Complex. These springs are discussed as a group as they represent an area of measurable spring flow along this section of hillside.
>
> . . .
>
> Groundwater discharging from Springs No. 10, No. 11, and No. 12 is intercepted by Bore Holes No. 10, No. 11, and No. 12. Bore Hole No. 10 is located about 19 feet southwest of Spring No. 10, about 35 feet north of Spring No. 11, and approximately 60 feet north of Spring No. 12. Bore Holes No. 11 and No. 12 are located about 75 feet north-northwest of Spring No. 10.

(Exh. PT-23, pp. 20-21.) The lengths of these boreholes are: 305 feet (Borehole 10), 310 feet (Borehole 11), and 320 feet (Borehole 12). The construction of these three boreholes is similar to that of the other boreholes discussed above. (*Id.*, p. 21.) The lengths of the seals from the ground surface along the boreholes are: 162 feet (Borehole 10), 67 feet (Borehole 11), and 152 feet (Borehole 12). (Exh. BTB-9, p. 6.)

### 2.10 Diversions and Uses of Water from Strawberry Canyon Sources

All BlueTriton's tunnels and boreholes in Strawberry Canyon are located on San Bernardino National Forest lands. (See Figures 2-4 & 7; exh. BTB-2, p. 27.) Since 1930,

BlueTriton and its predecessors have operated these tunnels and boreholes and associated pipelines under special-use permits issued by the National Forest. (Exh. BTB-2, p. 12, fn. 5.)[18] The locations of these facilities are shown on Figures 8 and 9. The former Arrowhead Springs Hotel now is owned and operated by the San Manuel Band. Water supplied from the BlueTriton facilities to the San Manuel Band under the 1931 agreement between Arrowhead Springs Corp. and California Consolidated WC (see section 2.5) is diverted from the BlueTriton pipeline at the "80/20/ SPLIT VALVE" shown in Figure 8. (See exh. SOS-80.)[19]

Water from BlueTriton's pipeline is loaded into tank trucks at the "LOAD STATION" shown in Figure 8. (Exh. PT-31, p. 34.) From this load station, BlueTriton transports the water to BlueTriton's bottling plants, which are located at several locations in southern California, to be bottled as "ARROWHEAD® BRAND 100% MOUNTAIN SPRING WATER." (Figure 10; Recording, 2022-01-13, afternoon, 1:50:15-1:51:06.)[20]

### 2.10.1    Groundwater Extraction Notices

Since 1957, BlueTriton and its predecessors have filed notices of groundwater extractions pursuant to Water Code sections 4999-5009 for their operations of their tunnels and boreholes in the Strawberry Creek watershed. The AHO compiled copies of

---

[18] Copies of these special-use permits and amendments are in exhibit PT-31, at pp. 35-62.

[19] In response to a request from the AHO hearing officer (see 2022-02-04 A. Lilly ltr. to R. Donlan), BlueTriton provided the AHO with daily data of the amounts of water BlueTriton has delivered to the Arrowhead Springs Hotel property since 2018. AHO staff labeled the files of these data as exhibit AHO-6. These files are in the administrative record in a folder labeled "Historical Diversion Data," in a sub-folder labeled "Hotel property daily volume data."

[20] Newspaper articles submitted and accepted as exhibits during the AHO hearing refer to the following other sources of Arrowhead Mountain Spring Water: an 80-acre site near Running Springs, "mountain springs in San Diego," and "a Sierra Nevada location." (Exh. FR-146, pp. 1, 3.)

all these notices, which cover extractions since 1947, in a folder in the administrative record titled "Groundwater Extraction Notices."[21]

In the first notices of extractions for the sources that BlueTriton's predecessor, Arrowhead and Puritas Waters, Inc., called "Spring Nos. 1, 2, 3, 7, 7A, 7B and 8," a company representative crossed out "well" each place it appeared in each form, and inserted "spring." (See, e.g., exh. PT-98, pp. 1, 4-5.) The initial notice for Spring No. 1 (Notice G360476) states:

> The waters from Springs 1, 2, 3, 7, 7a, 7a and [8] are diverted from said springs by means of a pipe line . . .

(*Id*, p. 7.)

> The Company springs are naturally developed springs . . .

(*Id.*, p. 5.)  At the end of the table listing the annual extraction amounts, the following text was added:

> The Company uses the total aggregate flow from each and all springs for each and every year.

(*Id.*, p. 3.)  These same edits and this same language are in the notices for Spring Nos. 2, 3, 7, 7A, 7B, and 8 (Notices G360477, G360478, G360479, G360480, G360481, G360482). (Exh. PT-93, pp. 1-7, exh. PT-94, pp. 1-7, exh. PT-95, pp. 1-7, exh. PT-99, pp. 1-6, exh. PT-100, pp. 1-7; Groundwater Extraction Notices folder, G360479 Notices, 1947-1957 subfolder, G360479 Notices, 1947-1957, pp. 1-6.)

### 2.10.2    FDA Regulations

BlueTriton bottles all water from its sources in the Strawberry Creek watershed as "spring water" under the federal Food and Drug Administration (FDA) regulations in title

---

[21] Exhibits PT-93 through PT-95 and PT-98 through PT-100 contain the initial notices and annual notices for Spring Nos. 1, 2, 3, 7A, 7B and 8 (Notice Nos. G360476, G360477, G360478, G360480, G360481 and G360482). The "Groundwater Extraction Notices" folder compiled by the AHO contains copies of these notices and the notices for Spring Nos. 7, 7C, 10, 11 and 12 (Notice Nos. G360479, G361986, G362800, G362856, G362857 and G362894). The attached Table 1, prepared by AHO staff, lists all these notices, spring numbers and reported annual extraction amounts.

21 of the Code of Federal Regulations, part 165. (Exh. BTB-2, p. 27; exh. BTB-6, p. 5, ¶ 14.) One of these regulations provides:

> The name of water derived from an underground formation from which water flows naturally to the surface of the earth may be "spring water." Spring water shall be collected only at the spring or through a bore hole tapping the underground formation feeding the spring. There shall be a natural force causing the water to flow to the surface through a natural orifice. The location of the spring shall be identified. . . .

(21 C.F.R., § 165.110, subd. (a)(vi)(2023).)

### 2.10.3    Hydrodynamics Group Reports

In 1997 and 1998, the Hydrodynamics Group prepared three reports for the Perrier Group of America.

One report was titled "FDA Compliance Report: Arrowhead Spring No.'s 2 and 3 San Bernardino National Forest." (Exh. PT-44.) The report stated:

> The objective of this study was to evaluate historical spring flows and chemical test data of Arrowhead Springs No. 2 and No. 3 to determine compliance with FDA regulations.
>
> . . .
>
> Our approach was to inspect the Arrowhead Springs No.'s 2 and 3 to confirm the existence of natural springs, and at the same time inspect the local hydrogeology. We reviewed historical data to confirm that the springs have flowed for a long time.

(*Id.*, p. 2.) After discussing the background geology, history of tunnel construction, and spring flows and spring chemistry (*id.*, pp. 3-5), the report concluded that these springs complied with the FDA regulations regarding spring water sources (*id.*, p. 5).

A second report (discussed in section 2.9) was titled "Investigation of the Arrowhead Complex 1 & 8 for FDA Compliance." (Exh. PT-45.) This report states:

> The objective of this study was to conduct hydraulic and chemical testing of the Arrowhead Springs 1, and 8 and borehole 1A (collectively referred to as the Arrowhead Complex 1 & 8) to establish compliance with FDA regulations. Spring 4 was developed in the course of our compliance studies.

. . .

Our approach was to inspect the springs at Arrowhead Complex 1 & 8, and investigate the local hydrogeology. We reviewed historical data to confirm that the springs have flowed for a long period. Water samples were collected and analyzed to confirm the chemical similarity of water from the springs and bore-holes. As part of our investigation a catchment was constructed at Spring 4.

We performed hydraulic tests during which spring flows were monitored to demonstrate a hydraulic connection between springs 1 and 8 and bore-hole 1A, and another hydraulic test to investigate the hydraulic connection between 1, 1A, 8 and spring 4.

(*Id.*, p. 3.) After discussing the background geology, history of tunnel construction, and spring flows and spring chemistry (*id.*, pp. 3-18), the report reached several conclusions, including the following:

Spring 1 and 8 appear to have been natural springs that were developed by drilling bore-holes horizontally into the mountain at the spring orifices. . . . Later when flow at the original bore-holes declined significantly, slant holes were drilled at a lower elevation to intercept the original bore-holes. Once the slant holes were completed the original bore-holes (the original spring orifices) were plugged. The spring flow is now through the slant bore-holes. It is a matter of interpretation as to whether the original spring orifices (or orifice) exist and continue to flow, as required by the new FDA regulations. We believe Perrier is not in compliance with the new FDA regulations at springs (bore-holes) 1 and 8; these are bore-holes not springs. No natural orifice continues to flow as required by the FDA regulations.

. . .

Further careful testing at the site may qualify spring 4 as a natural orifice that is in hydraulic connection with the bore-holes. Our testing, while not conclusive, is highly suggestive that this is the case. If it can be established that spring 4 is in hydraulic connection with the bore-holes it would meet the FDA criteria that an associated natural spring orifice continues to flow.

(*Id.*, p. 19.)

The third report was titled "FDA Compliance Report: Arrowhead Spring Complex No. 7 San Bernardino National Forest." (Exh. PT-43.) This report states:

The objective of this study was to conduct hydraulic and chemical testing of the Arrowhead No. 7 Spring and bore-holes No. 7, 7A, 7B, and 7C

(collectively referred to as the Arrowhead Complex 7) to determine
compliance with FDA regulations.

. . .

Our approach was to inspect the Arrowhead Complex 7 to confirm the
existence of a natural spring, and at the same time inspect the local
hydrogeology.

(*Id.*, p. 2.) After discussing the background geology, history of tunnel construction, and
spring flows and spring chemistry (*id.*, pp. 3-7), the report concluded that this spring
complex complied with the FDA regulations regarding spring water sources (*id.*, p. 7).
The report also stated the following additional conclusions:

Spring tunnel No. 7 is a natural spring.
. . .
Flow at Spring No. 7 has been recorded since 1945.
. . .
Complex 7 bore-holes are in hydraulic connection to the Spring No. 7.

(*Ibid.*)


### 2.10.4    Dames & Moore Report

In 1999, Dames & Moore prepare a report (discussed in sections 2.4 and 2.9), titled
"Assessment of History and Nature of Arrowhead Springs San Bernardino Mountains
San Bernardino County, California." (Exh. PT-23.) The report quoted the prior versions
of the FDA Regulations discussed in section 2.10.2 (exh. PT-23, pp. 7-8,13-14, 28-29)
and stated that the report discussed Spring Nos. 2 and 3, Spring Complexes Nos. 4 and
7, and the "Lower Spring Complex," which included Spring Nos. 10, 11 and 12 and
Borehole Nos. 10, 11 and 12 (*id.*, pp. 8, 10). The report described these springs and the
developments of the associated tunnels and boreholes in detail. (*Id.*, pp. 11-23.) After
discussing in detail the environmental setting, topography, climate, geology,
groundwater, vegetation, hydraulic connections, hydraulic testing, chemical analyses,
potential influence of surface water and spring classifications (*id.*, pp. 24-61), the report
reached several conclusions, including the following:

Springs No. 2 and No. 3 have been developed by construction of
engineered collection facilities consisting of tunnels and piping that
enhance the flow of spring water and provide protection to these sources.

The other springs have been developed by construction of associated bore holes that enhance the flow of spring water and provide protection to the spring water sources.

All springs and bore holes flow from fracture systems in quartz monzonite bedrock of the San Bernardino Mountains under the natural force of gravity.

There are two separate springs and three spring complexes from which spring water is harvested for bottling. Each spring complex contains one or more springs and multiple bore holes.

Hydraulic connection testing between springs and associated bore holes shows a direct hydraulic connection between Bore Holes No. 7, No. 7A, No.7B and No. 7C and Spring No. 7.

Due to the site limitations, hydraulic testing for connectivity at Spring Complex No. 4 and the Lower Spring Complex was inconclusive. Thus, in accordance with FDA Regulations, hydraulic connectivity at these complexes was demonstrated by water quality comparisons.

**Bore Holes No. 1, No. 1A, and No. 8
are hydraulically connected to Spring No. 4.**

**Bore Holes No. 7, No. 7A, No. 7B, and No. 7C
are hydraulically connected to Spring No. 7**

**Bore Holes No. 10, No. 11, and No. 12 are hydraulically connected to
Springs No. 10, No. 11, and No. 12.**

The water from Bore Holes No. 1, No. 1A, No. 8, No. 7, No. 7A, No. 7B, No. 7C, No. 10, No. 11, and No. 12 and Spring No. 2 and No. 3 meets the FDA and State of California regulatory requirements for *"spring water."*

(*Id.*, pp. 62-64, bolding and italics in original.)

### 2.10.5    Nestlé Attorney Letter

In a February 2018 letter to a staff engineer leading the Division's investigation of Nestlé, one of Nestlé's attorneys stated:

The tunnels and horizontal boreholes at [Nestlé's] collection points in the San Bernardino Mountains were constructed at or adjacent to naturally occurring spring sites for the purposes of capturing spring water and developing additional percolating groundwater from the same underground strata feeding the springs. The tunnels and horizontal

boreholes successfully achieved these purposes. . . . A portion of the water collected may reasonably be assumed to have been intercepted before discharging at the spring site, where it may have flowed to the surface of the Earth becoming surface water. A portion of the water collected has been demonstrated to be groundwater percolating through the same strata feeding the spring, and may be considered to be "developed water" because it represents an increase in flow above the natural spring discharge.

(Exh. BTB-2, p. 28.)

### 2.11 Fully Appropriated Stream Declaration

Water Code section 1205, subdivision (a), authorizes the State Water Board, following notice and hearing, to adopt a declaration that a stream system is fully appropriated. Subdivision (c) of section 1205 authorizes the Board, upon its own motion or the petition of any interested person, to revoke or revise such a declaration.

Water Code section 1206, subdivision (a), provides that, subject to the exceptions stated in any "fully appropriated" declaration, the Board shall not accept for filing any application for a permit to appropriate water from the stream system described in the declaration.

The Board adopted its first fully-appropriated stream declaration in Order WR 89-25.[22] Citing Decision 1070, the Board declared the Santa Ana River in San Bernardino

---

[22] Unless the context indicates otherwise, references to "Decisions" and "Orders" in this order are to reported water-right decisions and orders of the State Water Board and its predecessors. These decisions and orders can be downloaded from the Board's website at https://www.waterboards.ca.gov/board_decisions/adopted_orders/.

In Order WR 96-01, on page 17 in footnote 11, the Board discussed Government Code section 11425.60, which went into effect on July 1, 1997 and authorized State agencies to designate precedent decisions. The Board noted that its practice had been to treat its decisions and orders as precedents, and, in Order WR 96-01, the Board designated all decisions and orders adopted by the State Water Board at public meetings to be precedent decisions, unless a decision or order indicates otherwise or is superseded by later-enacted statutes, judicial opinions or Board actions. The Board also treats water-right decisions of its predecessor agencies as precedent decisions.

County to be fully appropriated from January 1 to December 31 of each year.
(Order WR 89-25, p. 105.)

Order WR 91-07 amended Order WR 89-25. Order WR 91-07 added a new footnote (1) for the table of fully appropriated streams, with the text "including all tributaries where hydraulic continuity exists." (Order WR 91-07, p. 30.) In the entry in this table for the Santa Ana River in San Bernardino County, this order added a reference to Decision 1194, changed the name of the fully-appropriated stream system to the "Santa Ana River Watershed," added text stating that the critical reach was from the confluence of the Pacific Ocean upstream, and added a citation to footnote (1). (*Id.*, p. 73.)

Order WR 98-08 further amended Order WR 89-25 and amended Order WR 91-07. It included text discussing acceptance of applications proposing to develop or salvage water. (Order WR 98-08, pp. 16, 25.) It changed the description of the critical reach of the Santa Ana River watershed to be "from the mouth of the Santa Ana River at the Pacific Ocean upstream." (*Id.*, p. 73.) It retained the reference to footnote (1). (*Ibid.*)

### 2.12    AHO Hearing

#### 2.12.1    AHO Notices and AHO Hearing Officer Orders and Rulings

After receiving BlueTriton's May 11, 2021 request for hearing (see section 2.1), the AHO issued its Notice of Pre-Hearing conference and Public Hearing on July 8, 2021. (2021-07-08 Notice of Hearing and Pre-Hearing Conference.)[23] After holding a pre-hearing conference on August 11, 2021, the AHO hearing officer re-scheduled the previously scheduled hearing days to give the parties time to file briefs regarding BlueTriton's August 5, 2021 motion to dismiss the draft CDO and some other parties' requests for additional hearing issues. (2021-08-16 Pre-Hearing Conference Order.)

---

[23] The AHO notices, orders and rulings discussed in this order are in a separate folder titled "AHO Notices, Orders and Rulings" that is within the Hearing Documents folder in the administrative record for this proceeding.

On November 4, 2021, the AHO hearing officer issued his rulings on BlueTriton's motion and these requests by other parties. (2021-11-04 Hearing Officer's Ruling (BlueTriton.) The rulings denied BlueTriton's motion to dismiss, without prejudice to the rights of BlueTriton and other parties to make the same or similar arguments during the AHO's hearing process. (*Id.*, p. 5.) Regarding the other parties' requests, the rulings explained that the present proceeding was before the AHO under Water Code section 1112, subdivision (a)(2), for a hearing on the Division's draft CDO, and that the issues the AHO could consider during this proceeding therefore were limited to those raised by the draft CDO. (*Id.*, p. 7.) Because the draft CDO did not allege injury to public trust resources or raise any issues regarding unreasonable use or misuse of water, the rulings concluded the AHO could not consider such issues during this proceeding. (*Ibid.*) For similar reasons, the rulings concluded that the AHO could not consider the water-right priority issues raised by San Bernardino Valley MWD. (*Id.*, pp. 7-8.) The rulings noted that any interested party could file a complaint with the Division that may raise any of these issues, and the Division's Enforcement Section then could consider such a complaint and decide whether to take any enforcement actions based on it. (*Id.*, p. 8.)

The AHO issued a revised notice of hearing on November 17, 2021. (2021-11-17 Notice of Public Hearing and Pre-Hearing Conference.) This notice specified the following hearing issues (as amended by the AHO hearing officer's December 8, 2021 orders):

1) Is the Respondent violating, or threatening to violate, the prohibition in Water Code section 1052, subdivision (a) (which is referred to in Water Code section 1831, subdivision (d)(1)) against the unauthorized diversion or use of water subject to Division 2 (sections 1000-5976) of the Water Code? This issue does not include the issue of whether Respondent is violating the judgments in *Western Municipal Water Dist. v. East San Bernardino County Water Dist.*, Riverside Superior Court No. 78426 (April 17, 1969) and *Orange County Water Dist. v. City of Chino*, Orange County Superior Court No. 117628 (April 17, 1969).

2) If any such violations or threatened violations are occurring, then should the State Water Board issue a cease-and-desist order to Respondent under Water Code section 1831?

3)  If the State Water Board decides to issue a cease-and-desist order to
Respondent under Water Code section 1831, then what provisions should be in
the order?

(2021-11-17 Notice of Public Hearing and Pre-Hearing Conference, pp. 3-4; see

2021-12-08 second pre-hearing conference order, p. 2.)

The November 17, 2021 revised hearing notice specified detailed hearing procedures.
(2021-11-17 Notice of Public Hearing and Pre-Hearing Conference, pp. 11-23.) These
procedures included a requirement that parties submit written proposed testimony of the
witnesses they planned to call during the hearing and summary slides. (*Id.*, p. 14, ¶ 6.)
The notice also advised the parties that Government Code section 11513 would apply
to all evidence offered during the hearing. (*Id.*, p. 21, ¶ 11.)

The hearing officer's December 8, 2021 orders gave BlueTriton the opportunity to add
witnesses to its witness list, and to submit additional written proposed testimony or
exhibits, that addressed any new substantial material facts or new substantial
arguments in the Prosecution Team's exhibits that were not in the Draft CDO.
(2021-12-08 second pre-hearing conference order, p. 1.) BlueTriton did not submit any
such additional written proposed testimony or exhibits by this deadline. As discussed in
the following paragraphs, BlueTriton and other parties subsequently had opportunities
to submit rebuttal and sur-rebuttal evidence.

On January 20, 2022, after holding the first five hearing days, the AHO issued a
supplemental notice of hearing, which specified additional hearing days, deadlines for
parties to file rebuttal exhibits, and rebuttal hearing days. (2022-01-20 Supplemental
Notice of Public Hearing.) On February 23, 2022, the AHO issued another supplemental
hearing notice, which specified deadlines for parties to file sur-rebuttal evidence and
hearing days for this evidence. (2022-02-23 Supp. Not. of Pub. Hrg. (BlueTriton).)

On March 25, 2022, the AHO hearing officer issued rulings denying the Prosecution
Team's February 11, 2022 motion for judgment and BlueTriton's February 25, 2022
motion for nonsuit or judgment. (2022-03-25 hearing officer's rulings (BlueTriton).)

On May 26, 2022, the AHO issued a post-hearing order, which specified the detailed issues the hearing officer asked the parties to address in their closing briefs, and the filing deadlines for closing briefs, evidentiary objections, and responses to such objections. (2022-05-26 post-hearing order (BlueTriton Brands, Inc.).)

On June 27, 2022, BlueTriton's attorneys filed a motion for judgment after hearing with the AHO. (2022-06-27 BTB's Motion for Judgment After Hearing.) This motion asked the AHO to prepare a proposed order that would dismiss the draft CDO. (*Id.*, p. 2.) This motion argued that the Prosecution Team had not met its burden of establishing that the State Water Board has permitting authority over the water subject to the draft CDO, and that the AHO therefore should prepare a proposed order for the Board to adopt that would dismiss the draft CDO. (*Id.*, p. 3.)

On June 27, 2022, BlueTriton's attorneys filed a separate motion with the State Water Board. (2022-06-27 BTB's Motion to Stay.) This motion asked the Board to stay the AHO hearing officer's May 26, 2022 post-hearing order and to direct the AHO hearing officer to issue a proposed final order on the issue raised by BlueTriton's motion for judgment to the AHO. (*Id.*, pp. 1-2, 9.) This motion is discussed in footnote 24.

On August 8, 2022, the AHO hearing officer issued a ruling denying BlueTriton's motion for judgment after hearing. (2022-08-08 Hearing Officer's Ruling (BlueTriton).) After discussing BlueTriton's motion and the Prosecution Team's opposition, this ruling concluded:

> As discussed in my November 4, 2021 ruling on BlueTriton's motion to dismiss in this proceeding, and in my March 25, 2022 ruling on BlueTriton's motion for nonsuit and/or judgment, this proceeding involves complex legal issues, many of which are issues of first impression. There also are disputed factual issues. The AHO's hearing process has given the parties opportunities to address these issues in detail through exhibits and testimony and in their closing briefs.

> Exercising my discretion to determine the appropriate post-hearing process for this proceeding, I conclude that I should consider the entire administrative record and all the parties' arguments in their closing briefs as I prepare my proposed order. For these reasons, I deny BlueTriton's

motion for judgment. This ruling will not affect my consideration of the arguments BlueTriton and other parties have made in their closing briefs.

(*Id.*, p. 2.)[24]

On November 4, 2022, the AHO hearing officer issued a notice to the parties that he had determined this proceeding to be a complex proceeding under Water Code section 1114, subdivision (d)(3). (2022-11-04 notice to parties (BlueTriton Brands).)

### 2.12.2    Site Visit

On February 9, 2022, the AHO issued its notice of site visit. (2022-02-09 Notice of Site Visit.)[25] That notice specified the proposed itinerary and schedule. (*Id.*, pp. 2-3.) The AHO held the site visit on February 16-17, 2022. During the site visit, the AHO hearing officer made some amendments to the schedule specified in the notice because of weather conditions.

During the site visit, AHO staff members took photographs and made audio+video recordings.[26] The AHO hearing officer and AHO staff members viewed all of BlueTriton's collection facilities in Strawberry Canyon, viewed some of the related pipes and other infrastructure, and viewed the surrounding topography.

The San Manuel Band did not agree to the AHO hearing officer's request to view the parts of BlueTriton's infrastructure that are located on lands that the Prosecution Team

---

[24] The Board did not issue any ruling on the June 27, 2022 motion to stay that BlueTriton filed with the Board. This is consistent with our conclusion in Order WR 2022-0087 that the Board will not review preliminary or procedural decisions, orders or rulings issued by the AHO, and instead will wait to consider any issues raised by such decisions, orders and rulings that merit Board review until after the AHO has completed its hearing process and presented a proposed order to the Board. (Order WR 2022-0087, pp. 6-12.)

[25] The files regarding the site visit are in a separate folder titled "Site Visit," which is within the Hearing Documents folder for this proceeding. There are various sub-folders within the Site Visit folder.

[26] These photographs and recordings and related logs are in the Site Visit folder in the administrative record for this proceeding.

and BlueTriton have stated are owned by the San Manuel Band. Instead, the San Manuel Band offered a "virtual visit," where a San Manuel Band photographer would take pictures and transmit them to the AHO with descriptions. (2022-02-10 K. Ramirez ltr. to A. Lilly.) After receiving this request, the AHO hearing officer agreed to this offer and withdrew his request to view BlueTriton's infrastructure on San Manuel Band lands. (2022-02-13 A. Lilly ltr. to K. Ramirez.)

The AHO added the San Manuel Band photographs to the administrative record.[27] They show the 80/20 split valve, meters at the split valve, BlueTriton's water tanks and load station depicted on Figure 8, some ground-level views of the lower Coldwater and Strawberry Creek watersheds, and the Arrowhead Springs Hotel. The State Water Board thanks the San Manuel Band for providing these photographs to the AHO.

### 2.12.3    AHO Hearing

The AHO held its hearing on 16 days between January 10 and May 23, 2022. Audio+video recordings of all these hearing days are in the administrative record, in the Hearing Documents folder, in the sub-folder titled "Hearing Recordings and Transcripts." There also are Zoom-generated transcripts of these hearings. These transcripts are computer-generated and have not been checked for accuracy or edited. The audio+video recordings are the official records of these hearing days.

The AHO hearing began on January 10, 2022 with the hearing officer's opening remarks, appearances by the parties and various preliminary rulings. (Recording, 2022-01-10, morning, 0:00:00-1:24:02.)[28] The following attorneys and people entered their appearances:

-Kenneth Petruzzelli and John Prager of the Board's Office of Enforcement, for the Prosecution Team

---

[27] These photographs are within the sub-folder titled "San Manuel Band Mission Indians photos" within the Site Visit folder.

[28] Citations in the order to "Recording" followed by a date, a designation of the morning or afternoon session, and elapsed times are to the hearing recordings, with the date, morning or afternoon session, and start and stop times of the cited part of the recording.

-Robert Donlan, Chris Sanders and Shawnda Grady, of Ellison,
Schneider, Harris and Donlan, LLP, and Rita Maguire, for BlueTriton
Brands, Inc.
-Nancee Murray and Kathleen Miller, for the California Department of Fish
and Wildlife
-Meredith Nikkel and Sam Bivins, of Downey Brand, for the San
Bernardino Valley Municipal Water District
-Rachel Doughty and Jessica Taylor of Greenfire Law, PC, and Michael
O'Heaney, for the Story of Stuff Project
-Steve Loe, for himself
-Larry Silver, for the Sierra Club
-Lisa Belenky, for the Center for Biological Diversity
-Hugh Bialecki, for himself and the Save Our Forest Association
-Amanda Frye, for herself

(*Ibid.*)

After these parties entered their appearances, Mary Ann Dickinson, a Lake Arrowhead
resident and San Bernardino Valley MWD member, and Betsy Starbuck, a
representative of the San Bernardino League of Women Voters, made oral policy
statements. (Recording, 2022-01-10, morning, 1:24:03-1:32:33.)[29]

Each party began the presentation of the party's case-in-chief by having the party's
witness or witnesses take the oath and confirm that their written proposed testimony
was their hearing testimony. The following paragraphs summarize the testimony of the
parties' witnesses.[30]

---

[29] Numerous other parties filed written policy statements at various times during the
AHO pre-hearing, hearing and post-hearing processes. They are in the Hearing
Documents folder for this proceeding, in a sub-folder labeled "Policy Statements."

[30] Files of each party's exhibits are within a separate folder for that party and all these
folders are within the folder titled "Parties Hearing Exhibits," which is within the Hearing
Documents folder in the administrative record for this proceeding. There is an Excel file
within the folder for each party's exhibits that lists each of the party's exhibits with a brief
description, the date and time during the hearing when the party offered the exhibit into
evidence, and the hearing officer's ruling on the offer.

### 2.12.3.1    Prosecution Team Witnesses' Testimony

The Prosecution Team began its presentation with an opening statement by its attorney. (Recording, 2022-01-10, morning,1:51:30-1:56:00.)  The Prosecution Team called two witnesses, Victor Vasquez and Tomas Eggers, who then summarized their written proposed testimony. (*Id.*, 1:56:40-2:46:51; see exhs. PT-7 & PT-10.)

Mr. Vasquez is a Senior Water Resource Control Engineer who supervised the Division's Sacramento Valley Enforcement Unit. (Exh. PT-7, p. 2, ¶ 2.) His testimony described the Division's investigation of the complaints filed against Nestlé (see section 2.1), the collection of data, information and evidence, the Division's field investigation, the Division's analysis used to develop the Division's conclusions, and the drafting and review of the report of investigation. (*Id.*, p. 2, ¶ 3.)

Mr. Vasquez's testimony first described the Division's investigation of BlueTriton's facilities and the Strawberry Canyon topography. (Exh. PT-7, pp. 2-15.) His testimony then provided more details about BlueTriton's tunnels and boreholes, relying largely on the Dames & Moore and Hydrodynamics Group reports. (*Id.*, pp. 15-26; see section 2.9; exhs. PT-23, PT-43, PT-44, PT-45.)

Mr. Vasquez testified that Tunnels 2 and 3 and Boreholes 1 and 8 were constructed at the orifices of Springs 2, 3, 1 and 8, and that the construction of these tunnels and the original boreholes at these locations altered or destroyed the orifices of Springs 2 and 3, and obliterated the orifices of Springs 1 and 8. (*Id.*, pp. 16-17, ¶¶ 45-46, pp. 17-18, ¶¶ 53-54, pp. 21-22, ¶ 75.) He testified that BlueTriton replaced original Boreholes 1 and 8 with new Boreholes 1, 1A and 8, which were constructed near to, but "downgradient" of, the original boreholes. (*Id.*, p. 22, ¶ 77.) He testified that Springs 1, 2, 3 and 8 were adjacent to natural channels and surface water would have flowed from them to these channels under pre-development conditions. (*Id.*, p. 16, ¶ 45, p. 17, ¶ 53, p. 23, ¶ 85.) His summary slides for his testimony contain pictures of these natural channels. (Exh. PT-9, pp. 13, 18.) Based on these and related facts, he concluded that Tunnels 2 and 3 and Boreholes 1, 1A and 8 are "fully subject to the Board's permitting authority." (Exh. PT-7, p. 15:26, p. 17:2, p. 21:25.)

Mr. Vasquez testified that BlueTriton developed Spring 7 by constructing Tunnel 7 at the spring orifice, and that this construction altered or destroyed the natural spring orifice. (*Id.*, pp. 18, ¶¶ 55, 65.) He testified that Spring 7 was adjacent to a natural surface channel and that was "presumptively subject to" the Board's water-right permitting authority. (*Id.*, p. 19, ¶ 64.) He testified that BlueTriton constructed Boreholes 7, 7A, 7B and 7C about 40 feet downgradient from Tunnel 7 "to intercept the tunnel's flows," and that, after this construction, BlueTriton stopped diverting water through Tunnel 7. (*Id.*, p. 18, ¶¶ 56-57.)

Because flows in Tunnel 7 cease when these boreholes are allowed to flow, Mr. Vasquez concluded that "some portion of the water diverted from the boreholes is flow that would have naturally surfaced and flows in a natural surface channel adjacent to Spring Tunnel 7." (*Id.*, p. 19, ¶ 66.) He further concluded that, "[b]ased on extremely limited hydrogeologic data and known precipitation amounts," approximately 52 percent of the water diverted annually by these boreholes "may be water not within the permitting authority of the State Water Board," but that this amount could be as low as zero percent, and that, conversely between 48 percent and 100 percent of the water diverted by these boreholes is subject to the Board's water-right permitting authority. (*Id.*, pp. 20-21, ¶¶ 69-70, 73.) Based on these and related facts, he concluded that "[f]low from the Spring 7 Complex are partially subject to the Board's permitting authority." (*Id.*, p. 18:4.)

Mr. Vasquez testified that Boreholes 10, 11 and 12 were installed near, but not at, the natural orifices of Springs 10, 11 and 12. (*Id.*, pp. 24-25, ¶¶ 91-92.) He testified that hydraulic tests conducted by Dames & Moore were inconclusive on whether flows at these three springs were affected by these three boreholes. (*Id.*, p. 25, ¶ 95.) He also testified that the Division did not have information that these springs discharge natural flow to a stream channel. (*Id.*, p. 25, ¶ 96.) Based on this lack of information, Mr. Vasquez concluded:

> [U]p to 100% of the flow collected from Boreholes 10, 11 and 12 may not be within the Board's permitting authority. However, if information becomes available indicating that the boreholes diminish the flows of Springs 10, 11 and 12, and those affected springs contributed flow to a

natural channel, then some percentage, up to 100%, would be within the Board's permitting authority.

(*Id.*, pp. 25-26, ¶ 97.)

Mr. Eggers is a Water Resource Control Engineer who worked in the Division investigating unauthorized diversions and violations of water-right permit and license terms. (Exh. PT-10, p. 2, ¶ 2.) He testified that he was assigned to take over the Division's investigation of the complaints filed against Nestlé in January 2018, in preparation for the departure of Natalie Stork, who had prepared the December 2017 report of investigation, from the Division. (*Id.*, p. 2, ¶ 3.)

Mr. Eggers testified about the Division's review of interested parties' comments on that report of investigation (*id.*, pp. 2-4), and about BlueTriton's claims of pre-1914 appropriative rights (*id.*, pp. 4-22). He testified about the Special Use Permit the San Bernardino National Forest issued to BlueTriton in June 2018 and the studies and adaptive management measures this permit requires. (*Id.*, p. 23, ¶¶ 67-69.)

Mr. Eggers testified that the Division had received many complaints alleging that BlueTriton's exporting water from the Strawberry Creek watershed violated the public trust doctrine and was an unreasonable use of water in violation of article X, section 2 of the California Constitution. (*Id.*, p. 24, ¶ 70.)  He then stated:

> While the State Water Board has an independent mandate to consider public trust resources, we may defer to State or Federal resource agencies with concurrent public trust responsibilities, especially if such agencies employ local or subject matter experts. We considered the complaints of unreasonable use and violations of the public trust doctrine and decided we had insufficient evidence at this time to pursue formal enforcement.

> Furthermore, after review of the SUP issued by the US Forest Service to the Respondent on August 20, 2018, we concluded that implementation of the AMP outlined in the new SUP would likely prevent violations of the public trust doctrine, while the Respondent conducts studies recommended by the 2021 ROI to evaluate the impacts of its extractions on public trust resources within Strawberry Canyon.

(*Id.*, p. 24, ¶¶ 71-72.)

After Mr. Vasquez and Mr. Eggers summarized their written proposed testimony, they and Natalie Stork, the State Water Board staff member who previously worked for the Division and was the author of the Division's 2017 report of investigation (exh. PT-13), participated in a panel that answered cross-examination questions. (Recordings, 2022-01-10, afternoon, 0:02:45 to 2022-01-11, afternoon, 2:02:00.)

During the March 21, 2022 AHO hearing day, Mr. Eggers and Ms. Stork summarized their written proposed rebuttal testimony. (Recording, 2022-03-21, morning, 0:43:51-1:02:22.) They testified about exhibit PT-314 (revised),[31] which is an excerpt from a 1905 U. S. Geological Survey topographic map, on which they overlayed depictions of the locations of BlueTriton's diversions. (Exh. PT-312, pp. 2-3, ¶¶ 2-6; exh. PT-313, pp. 2-3, ¶¶ 2-4.) They testified that this 1905 map depicts two intermittent streams, one flowing from the area of Tunnels 2 and 3 and Boreholes 1, 1A and 8, and the other flowing from the Spring 7 complex, with the streams meeting just below the area of Springs 10, 11 and 12. (Exh. PT-312, p. 3, ¶¶ 5-6; exh. PT-313, p. 2, ¶ 3; see exh. PT-314.)

Ms. Stork testified that Mr. Mann's 1988 report (see section 2.9; exh. PT-319) lists the August monthly flows from Tunnel 7 in 1946-1949, and the August monthly total flows from Boreholes 7A and 7B in 1953-1957. (Exh. PT-313, pp. 3-5, ¶¶ 5-7.) She testified that these August monthly flows for 1946-1949 averaged 35,500 gpd, and that these August monthly flows for 1953-1957 averaged 34,000 gpd. (*Id.*, pp. 7-8, ¶ 7; see exh. PT-315.) She testified that, because these averages are so close to equal, it is questionable whether the boreholes resulted in any developed water. (Exh. PT-313, pp. 4-5, ¶ 7.)

During the April 25, 2022 AHO hearing day, Mr. Eggers summarized his written proposed sur-rebuttal testimony. (Recording, 2022-04-25, morning, 0:22:45-0:38:55.)

---

[31] The Prosecution Team offered exhibit PT-314 (revised) instead of exhibit PT-314. The only difference is that the revised exhibit has the exhibit number in the upper right corner. (Recording, 2022-03-21, morning, 02:42:35-02:42:41.)

He testified that he reviewed the Division's Electronic Water Right Information System and identified 800 active appropriative water-right permits and licenses for which the listed water source is a spring. (Exh. PT-316, p. 2, ¶ 2.)

Mr. Eggers testified that the 1931 W. P. Rowe letter stated that the flow of Strawberry Creek was augmented by flows from Springs 10, 11 and 12. (*Id.*, pp. 4-5, ¶ 7, citing exh. SOS-51, p. 1.) He testified that the 1964 John Mann report stated that there was "persistent spring flow" in the vicinity of these springs. (Exh. PT-316, p. 5, ¶ 8.) Citing testing conducted by BlueTriton's consultants, Haley & Aldrich, in 2017 and 2021, Mr. Eggers concluded that water collected by Boreholes 10, 11 and 12 "has a measurable effect on surface water expression in the Lower Spring Complex, and Strawberry Creek." (*Id.*, p. 6:9-10, see *id.*, pp. 6-9, ¶¶ 10-15.) He then concluded:

> On balance, evidence indicates Boreholes 10-12 divert water from springs that supply a stream.

(*Id.*, p. 9, ¶ 16.)

### 2.12.3.2    BlueTriton Witnesses' Testimony

BlueTriton began its presentation with an opening statement by its attorney. (Recording, 2022-01-12, morning, 0:50:56-0:56:20.) BlueTriton then called Larry Lawrence, who then summarized his written proposed testimony. (*Id.*, 1:00:15-2:04:22; see exh. BTB-10.)

Mr. Lawrence testified that he is a mechanical engineer with 26 years of experience. (Exh. BTB-10, p. 1, ¶ 2.) He has worked for BlueTriton as its Natural Resource Manager since 2003. (*Id.*, pp. 2-3, ¶¶ 5-8.) Since then, he has worked extensively to maintain BlueTriton's water collection and conveyance system in Strawberry Canyon, including rebuilding the primary pipeline after a fire known as the "Old Fire" burned the area in October 2003 and major erosion followed in December 2003. (*Id.*, pp. 3-4, ¶¶ 10-14.)

Mr. Lawrence testified about BlueTriton's water collection system, which includes two tunnels, ten boreholes, 7.3 miles of four-inch diameter stainless steel and high-density polyethylene pipelines, two stainless steel storage silos, and a facility to load tanker trucks. (*Id.*, p. 5, ¶¶ 20-21.) He testified that there are two points where BlueTriton can

discharge excess water in the system, one that discharges to Strawberry Creek just downstream of Boreholes 10, 11 and 12 and one near the storage silos that discharges into East Twin Creek. (Recording, 2022-01-13, afternoon, 2:17:05-2:19:53.) Until 2021, all BlueTriton's discharges of excess water in the system were to East Twin Creek at the storage silos. At the San Bernardino National Forest's request, BlueTriton began discharging its overflow water at the point just downstream of Boreholes 10, 11 and 12 in 2021. (See exh. BTB-10, p. 6, ¶ 22.)[32] Since then, this has been the primary discharge point for overflow water, and the storage silo discharge point is used only for minor discharges to keep the system clean. (Recording, 2022-01-13, afternoon, 0:18:50-0:19:25.)

Mr. Lawrence testified about exhibit SOS-80, a BlueTriton publication. Figure 10 is a copy of exhibit SOS-80. Mr. Lawrence testified that he was familiar with this exhibit and that the numbers in it are accurate. (Recording, 2022-01-13, morning, 0:43:03-48:45.) This exhibit lists the following annual amounts of diversions, discharges and deliveries for 2018, 2019 and 2020:

> -diversions (collections) of water from BlueTriton's sources in Strawberry Canyon: 45.3, 68.4 and 59 million gallons (mgal.);

> -discharges of overflow water: 19.5, 44.3 and 40.8 mgal.;

> -deliveries to San Manuel Band (Arrowhead Springs property owners): 9.1, 13.7 and 11.8 mgal.; and

> -deliveries to factory for bottling: 16.8, 10.4 and 6.4 mgal.

---

[32] In response to a request from the AHO hearing officer (see 2022-02-04 A. Lilly ltr. to R. Donlan), BlueTriton provided the AHO with daily data of the amounts of water BlueTriton has discharged into Strawberry Creek at the new discharge location since May 24, 2021. AHO staff labeled the files of these data as exhibit AHO-5. They are in the administrative record in a folder labeled "Historical Diversion Data," in a sub-folder labeled "Strawberry Creek daily volume data."

During the AHO's hearing on February 2, 2022, Mr. Lawrence said that there are no records of the discharges from BlueTriton's storage silos into East Twin Creek. (See 2022-02-04 A. Lilly ltr. to R. Donlan, p. 2.)

(Exh. SOS-80.)[33]

Mr. Lawrence testified about the process he uses for preparation of BlueTriton's groundwater extraction notices (see section 2.10.1). (Exh. BTB-10, p. 6, ¶¶ 23-26.) He testified about the August 2018 Special Use Permit the San Bernardino National Forest issued to BlueTriton and BlueTriton's adaptive management plan. (*Id.*, p. 7, ¶ 30.) He testified about BlueTriton's responses to various information requests from the Division and BlueTriton's comments on the Division's 2017 report of investigation. (*Id.*, pp. 7-11, ¶¶ 31-49.)

After Mr. Lawrence completed summarizing his testimony, he answered cross-examination questions from other parties' attorneys and other parties. (Recordings, 2022-01-12, morning, 2:12:20 to 2022-01-13, afternoon, 2:38:12.)

During the rebuttal phase of the AHO hearing, BlueTriton called Mr. Nicholls to testify. (Recording, 2022-03-21, afternoon, 0:28:01-0:39:11.) Mr. Nicholls is a registered geologist and certified hydrogeologist in California, and also has professional registrations in three other states. (Exh. BTB-8, p. 1.) He has practiced hydrogeology in the southwestern United States for 25 years. (Exh. BTB-6, p. 1, ¶ 1.) He has worked on projects related to water collection in Strawberry Canyon regularly since 2001 and has personally visited Strawberry Canyon over 100 times. (*Id.*, p. 1, ¶ 2.)

Figure 11 is a copy of a figure in Mr. Nicholls's technical report that depicts his conceptual site model for Springs 1, 1A, 2, 3, 7, 8, 10, 11 and 12. (Exh. BTB-7, pp. 22, 84.)

Mr. Nicholls testified that water from BlueTriton's facilities in Strawberry Canyon is transported by trucks from the load station on the Arrowhead Springs Hotel property to

---

[33] The amounts that BlueTriton listed in Figure 10 as being diverted during 2018, 2019 and 2020 correspond fairly closely to the total diversion amounts for these years that BlueTriton reported in its groundwater extraction notices. (See Table 1.)

For 2018: 45.3 mgal. x 3.07 af/mgal. = 139.1 af (reported total was 141.0 af)
For 2019: 68.4 mgal. x 3.07 af/mgal. = 210.0 af (reported total was 211.0 af)
For 2020: 59.0 mgal. x 3.07 af/mgal. =181.1 af (reported total was 180.0 af)

bottling facilities: "where it is bottled in accordance with regulations set forth in Code of Federal Regulations Title 21 (21 CFR) Part 165." (Exh. BTB-6, p. 5, ¶ 14.) He testified:

> Criteria defining the relationship between the origin and collection method of spring water is [sic] set forth in 21 CFR Part 165.110. Water collected from BTB boreholes and tunnels is obtained from the same geologic underground strata feeding the springs in accordance with 21 CFR Part 165.110.

(*Id.*, pp. 5-6, ¶ 15.)

Mr. Nicholls testified that "[u]se of the term spring water for FDA purposes does not convey a legal definition of a classification of water for water rights purposes associated with the water source." (*Id.*, p. 5, ¶ 15.) He then discussed the State Water Board's four-part test for determining whether "a subterranean stream flowing through a known and definite channel," as that term is used in Water Code section 1200, is present. (*Id.*, pp. 6-7, ¶ 18; see *id.*, pp. 7-16.)[34] After discussing the water collection infrastructure, the geologic and hydrogeologic setting, and the subsurface geology (*id.*, pp. 7-16), Mr. Nicholls concluded that the water collected by BlueTriton in Strawberry Canyon "does not originate within any geologic feature that may be defined as a subterranean stream flowing through known and definite channels" (*id.*, p. 16, ¶ 53). Instead, he testified that such water "is properly classified as percolating groundwater." (*Id.*, p. 17, ¶ 58.)

Mr. Nicholls testified about his analyses of current conditions in Strawberry Canyon in comparison to those that occurred in 1929-1931 and were described by Mr. Rowe (see section 2.7). (Exh. BTB-6, pp. 23-43.) Mr. Nicholls described the surface-water flow data that he and his colleagues collected in Strawberry Canyon between 2016 and 2021. These included data collected during "shut-in" periods, during which the valves at BlueTriton's boreholes were closed, to hold back the water that otherwise would discharge from the boreholes. (*Id.*, p. 27-28, ¶¶ 87, 90.) They also included "turn-out"

---

[34] The State Water Board's four-part test for determining the presence of subterranean streams flowing through known and definite channels is discussed in section 3.1.

periods, during which the boreholes were opened and equilibrated to low piezometric pressure conditions. (See, *id.*, pp. 28-29, ¶¶ 91, 94.)

Based on his review of Mr. Rowe's papers and the data collected by Mr. Nicholls and his colleagues, Mr. Nicholls concluded:

> The description of the upper Strawberry Creek watershed offered in the Rowe Papers reflects an intermittent stream system. An intermittent stream system does not flow continuously through the year and may not flow over the same spatial extent from season to season or year to year. An intermittent stream system is distinguished from an ephemeral stream which flows only in response to precipitation.

(*Id.*, p. 35, ¶ 115.)

> It is not possible for any of the pre-development spring orifices that may have existed in Strawberry Canyon, to have been fed by a solitary fracture flow path that exactly matches the width and orientation of any one of the boreholes. . . . Consequently, advancing the boreholes did not obliterate or seal the subsurface flow path feeding pre-development spring orifices.

(*Id.*, p. 41, ¶ 131.)

> It is scientifically unsound to assume that the maximum flows from boreholes that collect water at points between 66 and 320 feet beneath ground surface, or tunnels that collect water between 23 feet and 89 [sic] beneath ground surface, are equal to pre-development surface water flows. The boreholes and tunnels are larger in diameter than any natural flow path in the subsurface and serve to connect individual fractures that may have had no previous discharge to the ground surface. Consequently, the volume of water flowing from each of the BTB water collection facilities is greater than any flow that might occur at a natural surface water expression.

(*Id.*, p. 42, ¶ 134.)

During subsequent AHO hearing days, Mr. Nicholls presented sur-rebuttal testimony on a variety of topics, including: (a) the differences in the U.S. Geological Survey's mapping objectives and practices between 1905 and subsequent mapping years (exh. BTB-38; exh. BTB-46), (b) the locations of natural spring orifices during the pre-development period (exh. BTB-42, p. 2, ¶ 5), and (c) responses to other witnesses' testimony about Mr. Nicholls's analyses of Mr. Rowe's reports and the field data Mr. Nicholls and his colleagues collected during 2017-2021 (*id*, pp. 2-15).

BlueTriton also called Ross Grunwald, a California professional geologist and hydrogeologist, to testify. (Recording, 2023-05-23, afternoon, 33:00-34:00.) Mr. Grunwald conducted a study of the Marco and Polo Springs that are discussed in Order WR 2019-0149 and prepared a report of this study, which BlueTriton offered as an exhibit. (Exh. BTB-40; exh. BTB-45; see section 3.5.)

### 2.12.3.3    Story of Stuff Witnesses' Testimony

The Story of Stuff Project began its presentation with an opening statement by its Executive Director, Michael O'Heaney. (Recording, 2022-01-31, afternoon, 0:35:40-0:42:35.)  Story of Stuff then called three witnesses, Rachel Doughty, Amanda Frye and Steve Loe. (*Id.*, 45:00-1:23:13.)

Ms. Doughty is Story of Stuff's lead attorney. Her testimony authenticated many Story of Stuff exhibits. (Exh. SOS-29.)

Ms. Frye testified about her extensive research over the past seven years regarding the diversions of water by BlueTriton and its predecessors. (Exh. SOS-30.) During her research, she reviewed records of the U.S. Geological Survey, the U.S. National Archives, the State Water Board's website, the Water Resources Institute at California State University, San Bernardino, BlueTriton's website, the Automobile Club of Southern California, the U.S. Forest Service, the Santa Ana Watershed Project Authority, the American Presidency Project at the University of California, Santa Barbara, Newspapers.com, the San Bernardino County Recorder's Office, the San Bernardino County Archives, and the Desert Sun. (*Ibid.*) Her testimony authenticated many Story of Stuff exhibits. (*Ibid.*)

Steve Loe is a retired wildlife and fisheries biologist who worked for the Forest Service for 40 years, including 30 years at the San Bernardino National Forest. (Exh. SOS-31, p. 2, ¶¶ 2, 4.) He testified about Mr. Rowe's papers (see section 2.7) and his personal observations of physical conditions in Strawberry Canyon. (Exh. SOS-31, pp. 7-9, ¶¶ 22-31, pp. 13-14, ¶¶ 44-52.)

Story of Stuff submitted sur-rebuttal testimony by these three witnesses. (Recording, 2022-04-25, afternoon, 1:10:50-2:00:00.) Ms. Frye's sur-rebuttal testimony presented additional historical information about the various sources of Arrowhead Springs water, which explained that neither Arrowhead Springs Hotel nor any of BlueTriton's predecessors diverted any water from Strawberry Canyon before 1930. (Exh. SOS-280, pp. 1-12.) Mr. Loe's sur-rebuttal testimony presented additional information about historical hydrologic conditions in Strawberry Canyon (exh. SOS-282, pp. 1-9), and explained that neither the Arrowhead Springs Hotel nor any of BlueTriton's predecessors diverted any water from Strawberry Canyon before 1930 (*id.*, pp. 9-10). Ms. Doughty's testimony authenticated another Story of Stuff exhibit. (Exh. SOS-287.)

Story of Stuff also called Gregory Allord to provide sur-rebuttal testimony. (Recording, 2022-05-23, morning, 1:30:00-1:48:20.) Mr. Allord is a cartographer who worked for the U.S. Geological Survey for over 30 years. (Exh. SOS-289.) He testified about the procedures the Geological Survey has used since 1879 to prepare its topographic maps, citing several historical Geological Survey publications. (Exh. SOS-288, pp.1-5.) He testified that the methods used by the Geological Survey in the late 19th century "were sophisticated and accurate." (*Id.*, p. 5, ¶ 11.)

Mr. Allord testified that the misalignments between the streams depicted on the 1905 topographic map (exh. PT-314, revised) and the curves in the topographic contours depicting where watercourses would be expected to be were the result of misalignments of the printing plates used to create the 1905 map, and that these misalignments do not appear on the 1901 base map from which the 1905 map was created. (Exh. SOS-288, pp. 6-7, ¶ 15; compare exh. PT-314, revised, with exh. SOS-291 (1901 base map) and exh. SOS-295, p. 22 (excerpt from 1901 base map).) A comparison of the 1901 and 1905 map excerpts also indicates that the locations of Boreholes 1 and 8 and the Spring 7 complex depicted on the 1905 map excerpt are on, or very close to, the forks of Strawberry Creek depicted as blue-line streams on the 1901 map excerpt. (Compare exh. PT-314, revised (excerpt from 1905 map showing these borehole and spring locations), with exh. SOS-295, p. 22 (showing the blue-line streams on excerpt from 1901 map).)

### 2.12.3.4        Center for Biological Diversity Witness's Testimony

The Center for Biological Diversity called one witness, Anthony Zdon, to provide sur-rebuttal testimony. (Recording, 2022-04-27, 16:14-30:03.) Mr. Zdon has 34 years of professional experience as a certified hydrogeologist in California, and also has professional registrations in other states. (Exh. CBD-2.) He testified that, based on his professional experience and his review of the relevant historical documents, his opinion was that "springs with substantial surface discharge have historically been present in the Strawberry Creek watershed." (Exh. CBD-1, p. 3, ¶ 7.)  He testified:

> The changes in the hydraulics of the fractured rock springs … providing preferential pathways in the subsurface fractured granitic bedrock (i.e., acting as a drain), which was not present in pre-development conditions. Therefore, hydraulic testing conducted such as that noted by Mr. Nicholls [citation] were conducted on an altered hydrologic regime different than was present during predevelopment condition.

(*Id.*, p. 4, ¶ 9.) For these reasons, Mr. Zdon's opinion was that the shut-in and related tests conducted by Mr. Nicholls and his colleagues "do not provide insight into predevelopment flow characteristics at those locations and to the Strawberry Creek hydrologic regime." (*Id.*, pp. 6-7, ¶ 15; see ¶ 16.)

### 2.12.3.5        Other Parties' Testimony

Besides testifying for the Story of Stuff Project, Amanda Frye also submitted an opening statement and testimony on behalf of herself. (Recording, 2022-01-31, morning, 1:04:19-2:08:49; see exh. FR-151.) This testimony provided more details about her historical research and authenticated additional exhibits. (Exh. FR-151.)[35]

Mr. Loe submitted an opening statement and testimony on behalf of himself. (Recording, 2022-02-02, morning, 0:19:21-0:30:20; exh. Loe-1.) Mr. Loe also submitted

---

[35] Some of the exhibits Ms. Frye submitted also were submitted by the Prosecution Team or the Story of Stuff Project. In response to the AHO hearing officer's request, Ms. Frye prepared and submitted a table listing all her exhibits and which of her exhibits are duplicates of PT or SOS exhibits. This table is in the administrative record, in the folder for Ms. Frye's exhibits, with the filename "Amanda Frye cross-indexed - SOS exhibit list."

rebuttal testimony (Recording, 2022-03-21, afternoon, 4:47-11:32; see exh. Loe-2), and sur-rebuttal testimony (Recording, 2022-04-26, 0:04:28-0:18:17).

Hugh Bialecki testified on behalf of himself and for the Save Our Forest Association. (Recording, 2022-01-14, 51:00-1:03:05; see exh. Bialecki-11.) He presented several photographs and one video of BlueTriton's facilities and surrounding topography. (Exhs. Bialecki-1 through Bialecki-10.)

Anthony Serrano testified on behalf of himself. (Recording, 2022-01-14, 1:18:40-1:23:45.) He offered some exhibits regarding appropriative water rights and related topics. (Exhs. Serrano-1 through Serrano-7.)

### 2.12.4   AHO Post-Hearing Proceedings

As discussed in section 2.1, after completing the hearing and receiving closing briefs and related papers from the parties, the AHO hearing officer prepared a draft proposed order, and circulated it to the parties for their review, comments and objections on April 21, 2023. Eight parties submitted comments and objections on May 8, 2023. The AHO hearing officer reviewed these comments and objections and prepared his responses. (2023-05-27 hearing officer's rulings with App. A (BlueTriton).) The AHO hearing officer then prepared the AHO's final proposed order and transmitted it to the Clerk of the Board pursuant to Water Code section 1114, subdivision (c)(1) on May 26, 2023.

On June 2, 2023, BlueTriton's attorneys filed a "Request to Set Aside Proposed Order" and a "Motion to Stay Further Action on Proposed Order." On June 23-26, 2023, parties to this proceeding and other interested parties filed comments on the May 26, 2023 proposed order.

On July 7, 2023, the AHO transmitted to the Clerk of the Board and the parties to this proceeding "Change Sheet # 1," which contained the AHO's recommended edits to the AHO's May 26, 2023 proposed order. On July 10, 2023, BlueTriton's attorney filed a letter with the Board, which, among other things, asked for 30 days for interested parties to submit comments on the May 26 proposed order with the July 7 proposed changes.

On July 12, 2023, the AHO hearing officer and the Board's Chief Counsel sent a letter to BlueTriton's attorney. This letter stated that the AHO had decided to withdraw its transmittal of the May 26 proposed order to the Clerk of the Board, and to submit the May 26 proposed order with the changes in the July 7 Change Sheet # 1 as the "July 7, 2023 Revised Proposed Order." This letter stated that the Clerk of the Board would remove the item regarding the May 26 proposed order from the agenda for the Board's July 18 meeting, and that the deadline for submitting comments on the July 7, 2023 Revised Proposed Order was August 11, 2023.

The Office of Chief Counsel (OCC) and we have considered the comments submitted on or before the August 11 deadline and prepared and circulated Change Sheet # 1 to the July 7, 2023 Revised Proposed Order. This order contains the changes in that change sheet.

All of these changes were technical or other minor changes to the July 7, 2023 revised proposed order, and none of these changes materially changed any of the factual or legal bases of the proposed order. We were authorized by Water Code section 1114, subdivision (c)(2)(C) to make these changes to the proposed order before we adopted this order.

### 2.13   August 11, 2023 BlueTriton Motion

On August 11, 2023, BlueTriton filed a motion to disregard and strike the July 7, 2023 amended proposed order. We have reviewed the arguments in that motion and have concluded that we should deny the motion.

BlueTriton argues that the July 7, 2023 revised proposed order is unauthorized under the Water Code and the Administrative Procedure Act, and that the AHO's submission of the July 7, 2023 revised proposed order to the Board deprived BlueTriton of a fair and impartial consideration by the Board of its motions and comments on the May 26, 2023 proposed order. BlueTriton asks the Board to disregard the July 7, 2023 revised proposed order and strike it from the record in this proceeding. (BTB Motion to Disregard and Strike [BTB Motion], p. 6.)

BlueTriton asserts that the AHO hearing officer violated Water Code section 1114, subdivision (c), and provisions of the Administrative Procedure Act that require separation of functions by withdrawing the May 26, 2023 proposed order and submitting the July 7, 2023 revised proposed order to the Board. BlueTriton characterizes the AHO hearing officer's inclusion in the July 7, 2023 revised proposed order of responses to BlueTriton's comments on the May 26, 2023 proposed order as an "attempt[ ] to assume the role of legal advisor to the [Board]" and "advocate" for the Board to approve the proposed order. (BTB Motion, p. 8.) BlueTriton argues that the AHO hearing officer should not "offer[ ] responses to [BlueTriton's] comments and motions," which were "clearly directed to the [Board]." (*Id.,* pp. 8-9.)

Nothing in Water Code section 1114, subdivisions (c)(2) and (c)(4), or the Administrative Procedure Act prohibits an AHO hearing officer from withdrawing a proposed order and transmitting a revised proposed order to the Board. Furthermore, under general principles of administrative law, hearing officers have "wide latitude as to all phases of the conduct of the hearing, including the manner in which the hearing will proceed," and administrative agencies are "free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (*Mileikowsky v. Tenet Health System* (2005) 128 Cal.App.4th 531, 560-561.)

It is appropriate and efficient, and it complies with principles of due process and fairness, for the AHO hearing officer to prepare responses to comments or motions the Board receives on a proposed order, particularly when those comments or motions are lengthy and complex. The Board then can consider those responses before it decides how to proceed. The Board often addresses significant comments received on a draft order in its final order so the Board's order will explain the Board's consideration of the comments received and the bases either for revisions to the order or for a decision not to change provisions of the order as a result of the comments.

A primary role of the AHO hearing officer is to prepare a proposed order in an adjudicative proceeding over which the hearing officer presides in a form that may be adopted as a final order by the Board. (Wat. Code, § 1114, subd. (c)(1).) The AHO

hearing officer has the authority to prepare changes to a proposed order that was submitted to the Board for the Board's consideration as a result of comments received by the Board or motions by the parties. This authority is inherent in the hearing officer's function of preparing proposed orders that may be adopted as final orders.

The AHO hearing officer may address comments or motions the Board receives by preparing revisions to a proposed order either through a change sheet that the Board may consider with the proposed order, for technical or minor changes, or by withdrawing the proposed order and submitting a revised proposed order that includes responses to the comments or motions. When the AHO hearing officer decides to withdraw a proposed order and submit a revised proposed order to the Board, interested parties have an additional thirty days to comment on that revised proposed order and to request particular actions by the Board under Water Code section 1114, subdivision (c)(4).

It was appropriate for the AHO hearing officer in this proceeding to prepare Appendix B, which addresses the 41 pages of comments submitted by BlueTriton on the May 26 proposed order, and other parties' comments, and then to withdraw the May 26 proposed order and transmit the July 7 revised proposed order, which incorporates Appendix B, to the Board for the Board's consideration. By preparing and submitting a revised proposed order, the AHO hearing officer was not exercising prosecutorial or advocacy functions. Rather, he was taking actions similar to those that trial court judges take under California Rules of Court, Rule 3.1590, in response to arguments on the judges' tentative decisions and proposed statements of decision. (See Cal. Rules of Court, rule 3.1590 (a) [tentative decision not binding]; (g) [any party may object to proposed statement of decision].) This process allowed the AHO hearing officer to use his familiarity with the extensive administrative record to provide responses to BlueTriton's detailed arguments, and it allowed the Board members to consider these responses before the Board decided how to proceed. Interested parties had a fair opportunity to comment on the July 7 revised proposed order in writing by the August 11 deadline, and the Board considered those comments before adopting this final order.

Contrary to BlueTriton's argument in its motion, any communications by the AHO hearing officer with the Board, Office of Chief Counsel, or non-enforcement staff of the Division of Water Rights did not violate the prohibitions against ex parte communications in Government Code sections 11425.10, subdivision (a)(8), and section 11430.10. Government Code section 11430.30 allows communications to the presiding officer from an employee or representative of an agency that is a party if the communication is for the purpose of assistance and advice and is from a person who has not served as investigator, prosecutor, or advocate in the proceeding. No staff of the AHO, Office of Chief Counsel, or the Division of Water Rights outside of the enforcement branch have served in an investigative, advocacy, or prosecutorial role in this proceeding. Therefore, no communications among the AHO hearing officer, the Board, Office of Chief Counsel, and non-enforcement staff of the Division of Water Rights violated these provisions of the Administrative Procedure Act.

BlueTriton also argues that the July 7 proposed order was untimely because the AHO hearing officer did not prepare a hearing management plan under Water Code section 1114, subdivision (d)(3). (BTB Motion, p. 12.) At the time the AHO hearing officer determined that the matter was complex, the hearings in the proceeding had already concluded and the matter had been deemed submitted to the hearing officer for preparation of a proposed order. A hearing management plan was unnecessary because there were no additional submittals by the parties that required deadlines. BlueTriton does not include any explanation in its motion about what information or deadlines it asserts should have been included in a hearing management plan established by the hearing officer.

Finally, BlueTriton argues that the Board should have considered its June 2 Motion to Stay and Request to Set Aside the AHO's May 26 Proposed Order in a separate order, before acting on the May 26 proposed order or the July 7 revised proposed order, to address the question of the Board's authority to take enforcement actions against the diversions of water by BlueTriton. (BTB Motion, p. 14.)

None of the reported court decisions BlueTriton cited for its argument would require the Board to act on BlueTriton's motion in a separate order that would address the Board's

water-right permitting and enforcement authorities before the Board acted on the entire proposed order the AHO hearing officer prepared. The Board has the discretion to consider all the relevant evidence and arguments in this proceeding at one time, and to address BlueTriton's jurisdictional arguments as part of its consideration of the July 7 revised proposed order in its entirety. This order addresses BlueTriton's jurisdiction arguments in sections 3.1 through 3.6.

For these reasons, we conclude that we should deny BlueTriton's August 11 motion to disregard and strike the July 7, 2023 revised proposed order.


## 3.0    DISCUSSION

### 3.1    State Water Board's Water-Right Permitting Authority; Legal Classifications of Surface Water and Groundwater

Surface Water Flowing in Natural Channels

Water Code section 1200 provides:

> Whenever the terms stream, lake or other body of water, or water occurs in relation to applications to appropriate water or permits or licenses issued pursuant to such applications, such term refers only to surface water, and to subterranean streams flowing through known and definite channels.

Water Code section 1201 provides:

> All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the State and subject to appropriation in accordance with the provisions of this code.

Water Code section 1202 provides:

> The following are hereby declared to constitute unappropriated water:

> (a) All water which has never been appropriated.

> (b) All water appropriated prior to December 19, 1914, which has not been in process [of being put to beneficial use, or which has ceased to be put to beneficial use].

(c) All water appropriated pursuant to the Water Commission Act or this code which has ceased to be put to [beneficial use or which has not, with due diligence, been put to beneficial use].

(d) Water which having been appropriated or used flows back into a stream, lake or other body of water.

Groundwater in Subterranean Streams Flowing Through Known and Definite Channels

In Decision 1639, the State Water Board ruled that, for groundwater to be classified as a subterranean stream flowing through a known and definite channel, as those terms are used in Water Code section 1200, the following physical conditions must exist:

1. A subsurface channel must be present;
2. The channel must have relatively impermeable bed and banks;
3. The course of the channel must be known or capable of being determined by reasonable inference; and
4. Groundwater must be flowing in the channel.

(Decision 1639, p. 4.) The Board applied this same four-part test in Order WR 2003-0004. (Order WR 2003-0004, p. 13.) In *North Gualala Water Co. v. State Water Resources Control Bd.* (2006) 139 Cal.App.4th 1577, the court upheld Order WR 2003-0004.

Diffused Surface Waters

Citing several reported court decisions in cases involving flood damages, the 1956 treatise on California water-rights law by Wells Hutchins stated: "[d]iffused surface waters consist of surface drainage falling upon and naturally flowing from and over land before such waters have found their way into a natural watercourse." (Hutchins, The California Law of Water Rights, p. 372 (1956).)

In *City of Los Angeles v. Pomeroy* (1899) 124 Cal. 597, 626, the court quoted the following jury instruction from the trial court's proceeding:

Waters, whether under or above ground, having no certain general course or definite limits, such as those merely percolating through the strata of

the earth and those diffused over its surface, are not water courses, and
are not subject to the rules of law applicable to water courses.[36]

In Decision 879, the State Water Rights Board held that "diffused water from adjacent lands which is recovered by the construction of drainage ditches . . . does not fall within the classification of unappropriated water as set forth in Section 1202 of the Water Code . . ."

In Order WR 88-04, the State Water Board held that "[u]nder the Water Code, the collection of sheet flow or diffused surface flow does not require an appropriative permit from the Board." (Order WR 88-04, p. 10.)

Percolating Groundwater

"Groundwater which is not part of a subterranean stream is classified as 'percolating groundwater'." (Decision 1639, p. 3.) The State Water Board "does not have water-right permitting authority over percolating groundwater." (*Ibid.*)

Summary

Under these statutes and court and Board decisions, any person or entity that seeks to divert and beneficially use surface water flowing in a natural channel or groundwater in a subterranean stream flowing through a known and definite channel, where the water is not already being diverted and beneficially used under an existing water right, may apply for a water-right permit under the applicable provisions of the Water Code. This order, when discussing applications for permits to appropriate such water, refers to the water as being within the "Board's water-right permitting authority."[37] The Board's water-

---

[36] In *North Gualala Water Co. v. State Water Resources Control Bd., supra,* 139 Cal.App.4th, p. 1605 fn. 18, the court quoted some of this text in the *Pomeroy* decision.

[37] The Board's water-right permitting authority also extends to applications for permits to divert and use water flowing in artificial channels. (See *Modesto Properties Co. v. State Water Rights Bd.* (1960) 179 Cal.App.2d 856; Decision 1241 (1966).) No party has taken the position in this proceeding that this part of the Board's water-right permitting authority applies to any of BlueTriton's tunnels or boreholes in Strawberry Canyon.

right permitting authority does not extend to diffused surface waters or percolating groundwater.

### 3.2    Salvaged and Developed Waters

"[S]alvaged waters are parts of a particular stream or other water supply that are saved from loss from the supply by reason of artificial work, and therefore are retained within the supply and so made available for use." (Hutchins, *supra*, p. 383.) "[D]eveloped waters are new waters that are added to a stream or other source or area by means of artificial work." (*Ibid.*) "[A]lthough the physical situations and the processes differ, both salvaged and developed waters are made available as the result of artificial work and artificial devices." (*Ibid.*) "The general rules governing rights to the use of salvaged and developed waters are the same, viz., that the person who by his own efforts makes such waters available is entitled to use them, provided that in doing so he is not infringing the prior rights of others." (*Ibid.*)

The principles of salvaged and developed water affect relative priorities of appropriative rights and availability of such water for appropriation. They do not directly affect the legal classifications of types of water as surface water flowing in natural channels, groundwater in subterranean streams flowing through known and definite channels, diffused surface waters, or percolating groundwater, all discussed in section 3.1.

In Decision 1194, the State Water Rights Board considered two applications for permits to appropriate water in the Santa Ana River watershed. (Decision 1194, pp. 1-2.) Although no unappropriated water was available in that watershed when the applications were filed, the applicants sought permits to appropriate water that would be salvaged by eliminating existing non-beneficial consumptive uses created by phreatophytes along a 15-mile reach of the river. (*Id.*, p. 4.) The Board concluded that unappropriated water potentially was available through applicants' salvage operations,

---

Some prior decisions of the Board and its predecessors use the term "jurisdiction" when referring to the Board's water-right permitting authority.

and therefore approved the applications, but limited to the amounts of water that could be appropriated to the amounts of water that would be salvaged. (*Id.*, pp. 7-8, 10-11.)

In Order WR 98-08, the revision to the Board's fully-appropriated stream declaration (see section 2.11), the Board concluded that applications for permits to appropriate developed and salvaged water from stream systems that the Board otherwise had declared to be fully appropriated under Water Code section 1205 should be accepted and considered, and not be barred under Water Code section 1206, subdivision (a). (*Id.*, pp. 16, 24.)

### 3.3    General Principles of California Water-Rights Law

For rights to divert and use surface waters flowing in natural channels:

> California maintains a "dual system" of water rights, which distinguishes between the rights of "riparian" users, those who possess water rights by virtue of owning the land by or through which flowing water passes, and "appropriators," those who hold the right to divert such water for use on noncontiguous lands. For historical reasons, California further subdivides appropriators into those whose water rights were established before and those after 1914. Post-1914 appropriators may possess water rights only through a permit or license issued by the Board, and their rights are circumscribed by the terms of the permit or license. Riparian users and pre-1914 appropriators need neither a permit nor other governmental authorization to exercise their rights.

(*Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 888-889, footnote and citations omitted.)

These water-right rules also apply to rights to divert and use groundwater in subterranean streams flowing in known and definite channels. (Wat. Code, § 1200; Order WR 2003-0004, p. 10.)

There are two primary types of rights to divert or pump and use percolating groundwater, overlying rights and groundwater appropriative rights.[38] "An overlying

---

[38] In some situations, pueblo rights, federal reserved rights or prescriptive rights may authorize the pumping and use of percolating groundwater. No party to this proceeding has asserted that it has any pueblo rights or federal reserved rights. The prescriptive-

right, 'analogous to that of the riparian owner in a surface stream, is the owner's right to take water from the ground underneath for use on his land within the basin or watershed; it is based on the ownership of the land and is appurtenant thereto.'" (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1240, internal citation omitted.) In contrast, a groundwater appropriative right "depends upon the actual taking of water." (*Id.*, p. 1241.)

"Any [percolating ground] water not needed for the reasonable beneficial use of those having prior rights is excess or surplus water and may rightly be appropriated on privately owned land for non-overlying use, such as devotion to public use or exportation beyond the basin or watershed." (*Ibid.*) Any pumping and use of percolating groundwater that is not authorized by overlying rights normally is made pursuant to groundwater appropriative rights. (See *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 925-926.)

No water-right permit or license from the State Water Board is required to exercise an overlying right, or to perfect a groundwater appropriative right, to pump and use percolating groundwater. No water-right permit or license from the Board is required to collect and use diffused surface waters.

### 3.4    State Water Board Decisions on Applications for Water-Right Permits to Appropriate Water from Springs and Tunnels

"'Water rising to the surface of the earth from below, and either flowing away in the form of a small stream or standing as a pool or small lake,' is the definition of a spring given by the Century Dictionary." (*Wolfskill v. Smith* (1907) 5 Cal.App. 175, 181.)

> The term "spring" in its common acceptation, at least in California, is a term which in general usage has been applied to a damp, marshy or boggy area, usually of small but definite extent, wherein underground waters from a larger tract of land find their way to the surface thereof and make their presence known either by a definite outflow or by the surface presenting such a quantity thereof as will render practicable their assembling in such receptacles as those described in the record herein as Box A and Box B; * * *

rights claims of some of the parties to the judgment in the Del Rosa Mutual Water Company case are discussed in sections 3.7.2.1 and 3.7.2.2.

(Hutchins, *supra*, p. 402, quoting *Harrison v. Chaboya* (1926) 198 Cal. 473, 476.)

> Springwater is water that naturally percolates to the surface from an underground aquifer to become the source of a river or stream. The spring itself is the point where the water reaches the surface.

(*Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 229.)

The State Water Board and its predecessors have issued numerous decisions involving the Board's water-right permitting authority over waters associated with springs and tunnels. These decisions are listed and briefly summarized in Appendix A to this order.

Section A1.0 of Appendix A lists the decisions that involved applications for water-right permits for diversions from springs through spring boxes and similar devices at the ground surface. The 12 decisions listed in subsection A1.1 approved the applications. The two decisions listed in subsection A1.2 denied the applications. These denials both were because no water was available for appropriation.

Section A2.0 of Appendix A lists the decisions that involved applications for water-right permits for diversions from springs through pipes and tunnels that had been developed below the ground surface. The five decisions listed in subsection A2.1 approved the applications. The two decisions listed in subsection A2.2 denied the applications. Decision 802 denied the application because the mining claim owners could divert and use the spring water under riparian rights. Decision 915 denied the application because the water associated with the additional spring production for which applicant sought a permit all would be developed percolating groundwater.

Section A3.0 of Appendix A lists the decisions that involved applications for water-right permits for diversions from tunnels that had been developed below the ground surface and were not associated with any springs. The four decisions listed in subsection A3.1 approved the applications. The two decisions listed in subsection A3.2 denied the applications. Decision 986 denied the application because the water for which applicant sought a permit all was developed percolating groundwater that had not been abandoned and was being taken and applied to beneficial use by the entity that had

developed it. Decision 1157 denied the application because no water was available for appropriation.

Decision 1482, discussed in section A4.0 of Appendix A, involved an application for a permit to appropriate water from four streams that were supplied by springs. The Board found that the waters for which applicant sought a permit were: (a) surface runoff collected in the streams during storms; (b) natural flows from the springs, and (c) flows from the springs that occurred through artificial improvements (that is, developed water). (Decision 1482, p. 13.) The Board approved the application for a permit to appropriate all three types of water, concluding that this approach was the best way to accomplish the goal (in article X, section 2 of the California Constitution) of assuring that the State's water resources are put to beneficial use to the fullest extent of which they are capable. (*Id.*, p. 14.)[39]

### 3.5    State Water Board's Water-Right Enforcement Authority

Water Code section 1052, subdivisions (a) and (c), provide:

(a) The diversion or use of water subject to this division other than as authorized in this division is a trespass.

(c) Any person or entity committing a trespass as defined in this section may be liable in an amount not to exceed the following: [listing various amounts for various circumstances]

Water Code section 1831, subdivisions (a) and (d)(1), provide:

(a) When the board determines that any person is violating, or threatening to violate, any requirement described in subdivision (d), the board may issue an order to that person to cease and desist from that violation.

(d) The board may issue a cease and desist order in response to a violation or threatened violation of any of the following:

(1) The prohibition set forth in Section 1052 against the unauthorized diversion or use of water subject to this division.

---

[39] In several decisions, the State Water Board and some of its predecessors denied applications for permits to appropriate groundwater that was not associated with any springs and that would be pumped by wells, based on conclusions that the water to be pumped was percolating groundwater. (See Decision 724 (State Engineer 1951); Decision 968 (State Water Rights Board 1960); Decision 1327 (State Water Board 1969); Decision 1337 (State Water Board 1969).)

Exhibit 9, P. 073

The diversion and use of surface water flowing in a natural channel or of groundwater in a subterranean stream flowing in a known and definite channel normally are not allowed unless they are authorized by a riparian right, a pre-1914 appropriative right, or a post-1914 water-right permit or license. (See generally Wat. Code, §§ 1200-1202, 1225; *Young v. State Water Resources Control Bd.* (2013) 219 Cal.App.4th 397, 406; *Millview County Water Dist. v. State Water Resources Control Bd., supra,* 229 Cal.App.4th, pp. 894-895; Order WR 2003-0004, p. 21.)

Considering Water Code sections 1200-1202, the term "water subject to this division" in Water Code section 1052 includes surface waters flowing in natural channels and groundwater in subterranean streams flowing in known and definite channels, and does not include diffused surface waters or percolating groundwater.

Water Code section 1052 authorizes the Board to impose administrative civil liability on any person who diverts or uses surface waters flowing in natural channels and groundwater in subterranean streams flowing through known and definite channels without a right authorizing the diversion and use. Section 1831 authorizes the Board to issue a cease-and-desist order to any person who is diverting or using, or threatening to divert or use, such water without a water right that authorizes the diversion and use. This order, when discussing enforcement actions involving such water, refers to the water as being within the "Board's water-right enforcement authority."[40]

---

[40] The Board's water-right enforcement authority also includes the authorities: (a) to issue cease-and-desist orders regarding violations and threatened violations of water-right decisions, orders, regulations, permits and licenses (Water Code, ¶ 1831, subd. (d)(2), (3) & (4)); (b) to take actions to prevent waste, unreasonable uses, unreasonable methods of use, and unreasonable methods of diversion (Water Code, § 275); and (c) to adopt regulations to implement that authority (Water Code, §§ 1058, 1058.5). These parts of the Board's water-right enforcement authority are not applicable in this proceeding. They are not necessarily limited to surface waters flowing in natural channels and groundwater in subterranean streams flowing through known and definite channels.

The proceeding that led to Order WR 2019-0149 was a water-right enforcement action (to impose administrative civil liability and a cease-and-desist order) for unauthorized diversions of water from various springs, two of which were called the "Marco Spring" and the "Polo Spring." (Order WR 2019-0149, pp. 36-37.) The Board previously had issued two water-right permits for diversions and use of water from the springs (*id.*, pp. 36-39), and Order WR 2019-0149 concluded that some of respondent's diversions during 2014 and 2015 were not authorized by these permits (*id.*, pp. 46-73).

During the AHO's hearing in this proceeding, BlueTriton called Ross Grunwald, a California professional geologist and hydrogeologist, to testify about the technical report he had prepared about the Marco and Polo Springs. (See section 2.12.3.2.) His report stated that these springs were developed by excavating backhoe pits at the apparent sources of the springs. (Exh. BTB-40, pp. 9-10.) The water-bearing fracture from which spring water had issued at the Marco Spring was exposed at approximately 25 feet below the ground surface. (*Id.*, p. 11.) A three-inch diameter, solid HDPE pipe was installed as far as possible into the spring orifice to divert the spring flow. (*Ibid.*) Then, to isolate the spring orifice and prevent any surface water from entering the pipe, three to four feet of bentonite chips were placed over the bottom of the excavation up to the interface between the unweathered and weathered bedrock, and a two-to-three-foot-thick layer of concrete was poured on top of the bentonite. (*Ibid.*) Figure 12 (figure 7 in the report) shows a diagrammatic cross-section of the completion details at the Marco Spring orifice. (*Id.*, p. 23.) The Polo Spring was developed in a similar manner. (*Id.*, p. 11.) Figure 13 (figure 9 in the report) shows a diagrammatic cross-section of the completion details at the Polo Spring orifice. (*Id.*, p. 25.)[41]

The respondent in the proceeding that led to Order WR 2019-0149 argued that his 2014-2015 diversions were diversions of percolating groundwater or developed water

---

[41] Even though Order WR 2019-0149 does not discuss these details of the developments of the Marco and Polo Springs, we may consider the evidence of these details that BlueTriton submitted during the AHO hearing in this proceeding as we consider the actions the Board took when it adopted Order WR 2019-0149.

(greater than the springs' natural outputs) and therefore were lawful even if not authorized by the respondent's water-right permits. (Order WR 2019-0149, p. 73.) The Board found that there was not sufficient evidence in the record to support a finding that Respondent's 2014-2015 diversions were diversions of developed water or percolating groundwater. (*Id.*, pp. 74-75, 77-78.) The Board then stated:

> California law presumes that a spring tributary to a stream is part of the stream and is therefore subject to the dual doctrines of riparian rights and prior appropriation. The Board's permitting and licensing authority over water in a stream is not abrogated or limited by the fact that, in many cases, some of the flow in a stream or from a spring is supported by hydrologically interconnected groundwater.

(*Id.*, p. 75, citation omitted.)

> Even if the effect of diversion from a surface water body, subterranean stream, or spring is to increase the amount of hydrologically interconnected groundwater flowing into the surface water body, subterranean steam, or spring, the diversion still is subject to the Board's water right permitting and licensing authority and subject to the prohibition against unauthorized diversion or use of water under section 1052 of the Water Code.

(*Id.*, p. 76.)[42]

### 3.6 Applicability of Board's Water-Right Enforcement Authority to BlueTriton's Diversions

The parts of the Board's water-right permitting and enforcement authorities that concern surface waters flowing in natural channels and subterranean streams flowing in known and definite channels both are based on Water Code sections 1200-1202, and both authorities apply to both types of water. Board decisions regarding this part of the

---

[42] BlueTriton's closing brief to the AHO argued that the Prosecution Team's reliance on Order WR 2019-0149 in this proceeding was "misplaced," because "the legal character of the source water was not at issue in the SWRCB's final order." (2022-08-05 BlueTriton closing brief, p. 14:6-17.)

We disagree. The respondent in that proceeding argued that the water he had diverted was percolating groundwater and therefore was not within the Board's water-right permitting authority, and Order WR 2019-0149 rejected this argument. (Order WR 2019-0149, pp. 73, 75-76.) This argument and this ruling concerned the issue of the legal classification of the source water, and whether it was subject to the Board's water-right permitting and enforcement authorities.

Board's water-right permitting authority therefore are precedents relevant to Board proceedings like this one, that concern the scope of this part of the Board's water-right enforcement authority. These Board decisions are discussed in section 3.4 and Appendix A, and the applications of them to the Board's water-right enforcement authority are discussed in the following sections 3.6.1 and 3.6.2.

In its closing brief to the AHO, BlueTriton argued:

> Although the SWRCB has, at times, accepted permit applications for groundwater hydrologically connected to surface expressions, which would not otherwise be within the SWRCB's permitting authority, it did so only "'to establish a public record of the initiation of the use of the water.'" (Sax Report at p. 45, fn. 145 [quoting *Third Biennial Report of the State Water Commission of California, 1919-1920* (Sacramento State Printing Office, 1921[]), at p. 17.].)

(2022-08-05 BlueTriton closing brief, p. 7, fn. 5, italics and first set of brackets in original, second set of brackets added.)[43]

The statement of the State Water Commission that is quoted in this footnote in the Sax report states:

> Applications are occasionally received for waters to be developed from wells or other works drawing from a body of broadly diffused percolating water. In such instances, if the applicant desires, the application is allowed in order to establish a public record of the initiation of the use of the water.

(Sax report, p. 45, fn. 145.)

BlueTriton's argument mischaracterizes this statement, by referring to "groundwater hydrologically connected to surface expressions," while the statement actually refers to "waters to be developed from wells or other works drawing from a body of broadly diffused percolating water." The actual statement thus focused on wells pumping diffused percolating groundwater, and not on springs or tunnels and boreholes that

---

[43] The Sax report, titled "Review of the Laws Establishing the SWRCB's Permitting Authority over Appropriations of Groundwater Classified as Subterranean Streams and the SWRCB's Implementation of Those Laws" (2002) (Sax report), is posted on the State Water Board's website at https://www.waterboards.ca.gov/waterrights/water_issues/programs/hearings/groundwater_classification/docs/substreamrpt2002jan20.pdf.

intercept water that otherwise would have flowed out of springs. Also, neither the Sax report nor BlueTriton's closing brief cites or describes any decisions by any Board predecessors that implemented this alleged policy, or any documents that discussed this issue after 1921.

We conclude that it is appropriate for us to consider, as precedents applicable to this proceeding, prior Board decisions on applications for permits to appropriate water from springs, including applications where tunnels and pipes intercepted the water that otherwise would have flowed out of springs.

### 3.6.1    Hypothetical Application of Board's Water-Right Enforcement Authority to Historic, Undeveloped Springs

After the AHO completed its hearing, the AHO hearing officer directed the parties to file closing briefs. One of the issues he asked the parties to brief was:

> Hypothetically, if no one had constructed Tunnels 2, 3 and 7, and Boreholes 1, 1A, 7, 7A, 7B, 7C, 7D, 8, 10, 11 and 12 (collectively referred to as the "existing collection facilities"), and if Respondent now were to divert water for water-bottling purposes from unimproved springs in the vicinities of any of the existing collection facilities (through spring boxes or similar facilities located where the spring water flows from underground to the ground surface), would such diversions and uses be diversions and uses of surface water or water in subterranean streams flowing through known and definite channels, as those terms are used in Water Code section 1200, or diversions and uses of percolating groundwater?

(2022-05-26 post-hearing order (BlueTriton Brands, Inc.), pp. 1-2, ¶ 1.a.) Analyzing this issue is an appropriate first step in our analysis of whether the Board's water-right enforcement authority applies to BlueTriton's collections of water in Strawberry Canyon and its beneficial uses of this water. (See section 3.1.)

In its closing brief to the AHO, the Prosecution Team argued that, if no one had constructed BlueTriton's existing collection facilities, then the State Water Board would have concluded that diversions and uses of water from unimproved springs at these locations through spring boxes or similar structures would have been diversions and uses of surface water under Water Code section 1200. (2022-08-05 Prosecution Team closing brief, p. 7:17-21.) For this argument, the Prosecution Team cited some of the

Board decisions discussed in section 3.4, Order WR 2019-0149 (see section 3.5), and the over 800 water-right permits and licenses the Board has issued for diversions from springs (see section 2.12.3.1). (2022-08-05 Prosecution Team closing brief, p. 8:1-9:2.) The Story of Stuff Project, the Center for Biological Diversity and the Sierra Club, Amanda Frye, Steve Loe and Anthony Serrano made similar arguments in their closing briefs. (2022-08-05 Story of Stuff closing brief, p. 18:2-22; 2022-08-05 Center for Bio Diversity closing brief, pp. 4-5; 2022-08-05 A. Frye closing brief, pp. 21-22; 2022-08-04 S. Loe closing brief, pp. 1-12; 2022-08-05 A. Serrano closing brief, pp. 1-2.)

In its closing brief to the AHO, BlueTriton argued that, under this hypothetical question, BlueTriton's diversions and uses of water from the springs through spring boxes or similar structures would have been diversions and uses of diffused surface waters, and "would not be subject to the SWRCB's permitting authority." (2022-08-05 BlueTriton closing brief, p. 17:4-22.) BlueTriton referred to Mr. Nicholls's testimony that, if all the water in BlueTriton's collection facilities were "turned out" at the borehole and tunnel boxes, the water would "simply seep[] down the hillside and [would] not discharge as a watercourse." (*Id.*, p. 17:17-20, citing exh. BTB-6, p. 43, ¶ 136, p. 33:17-19 (referring to Mr. Nicholls's "turn-out" tests), and pp. 36-37, ¶ 118 (referring to Mr. Rowe's Oct. 1, 1930 report).)

Discussing the definition of a "channel," to which the "law of watercourses applies," Hutchins stated:

> The channel may be worn deep by the action of water, or may follow a natural depression without any marked erosion of soil or rock; or it may be distinguished by a difference in vegetation or otherwise may be rendered perceptible.

(Hutchins, *supra*, p. 24, citing *Lux v. Haggin* (1886) 69 Cal. 255, 419.)

Springs 1, 2, 3, 7 and 8

As shown in Figure 14, ravines are adjacent to: (a) the portals of Boreholes 1, 1A and 8 (near the sites of Springs 1 and 8), (b) the portal of Tunnel 3 (the site of Spring 3), and (c) the portals of Boreholes 7, 7A, 7B and 7C, which are approximately 40 feet from the portal of Tunnel 7 (the site of Spring 7) (see section 2.9). If no tunnels, boreholes or

other facilities ever had been constructed at Springs 1, 3, 7 and 8, and no water had been diverted from these springs, then water flowing out of these springs would have flowed down these ravines. Figure 14 also shows that there also are breaks in the surrounding vegetation at these ravines. These ravines also are depicted in Appendix D to the Division's 2021 revised report of investigation, which is discussed in Mr. Vasquez's testimony. (Exh. PT-3, pp. 157-161; exh. PT-7, pp. 7-13, 15-24.) The locations of Boreholes 1 and 8 and the Spring 7 complex also are on the blue-line streams depicted on the 1901 topographic map, which Mr. Allord discussed in his testimony. (See exh. PT-314, revised; exh. SOS-295, p. 22; section 2.12.3.3.) Water from these springs therefore would have flowed into natural channels, as that term is used in Water Code section 1201.

Figure 14 does not clearly depict a natural channel from Tunnel 2 (the site of Spring 2). However, the existence of a historical flow path from Spring 2 is demonstrated by Mr. Rowe's October 1, 1930 letter. (Exh. SOS-53.) It discussed the flows he observed during times when diversions from Spring 2 into the pipeline were stopped and "turned into the creek." (*Id.*, p. 1.) This first occurred on August 6, 1930, when diversions into the pipeline were stopped while concrete was being poured in the tunnel. (*Ibid.*) After these diversions stopped and the spring's discharges started going into the creek, the extra flow "washed out the newly installed Weir # 1." (*Ibid.*) His letter states that "the flow from Spring # 2 undoubtedly continued to enter the creek and was not diverted until after August 11 when the forms in the tunnel had been stripped." (*Ibid.*) On August 24, 1930, "Spring # 2 was turned into the creek at the head of the side hill draw leading from the spring to the canyon and 43 hours elapsed before this flow reach Weir # 1 only 800 feet from Spring # 2." (*Id.*, p. 2.) On September 20, 1930, the flow from Spring 2 was "turned into the stream," and the flow reached Weir # 1 20 minutes later. (*Id.*, p. 3.)

Based on these findings, we conclude that, if Springs 1, 2, 3, 7 and 8 had not been developed with tunnels and boreholes, and if water now were diverted from these springs through spring boxes or similar diversion facilities at the ground surface, then such diversions would be diversions of surface water flowing in natural channels, and

these diversions and associated beneficial uses would be subject to the Board's water-right permitting and enforcement authorities. (See *State v. Hansen* (1961) 189 Cal.App.2d 604, 610 (water-right permit required for appropriation of water from a spring).)

This conclusion is consistent with the decisions of the State Water Board and its predecessors that are discussed in section A1.1 of attached Appendix A. These decisions all approved applications for permits to appropriate water from springs through spring boxes or similar devices at the ground surface. This conclusion also is consistent with the decisions discussed in section A1.2 of Appendix A. While those decisions denied the requested applications, they did so because no unappropriated water was available, not because the Board lacked water-right permitting authority.

We disagree with BlueTriton's argument that the water flowing from these springs before development of the tunnels and boreholes was diffused surface water. (See 2022-08-05 BlueTriton closing brief, p. 17:4-13.) As discussed in section 3.1, diffused surface waters are derived from "surface drainage falling upon and naturally flowing from and over land before such waters have found their way into a natural watercourse." (Hutchins, *supra*, p. 372.) In contrast, the evidence in the record indicates that Springs 1, 2, 3, 7 and 8 each historically discharged into a natural channel or flow path.

BlueTriton's closing brief to the AHO referred to Mr. Nicholls's testimony on this issue. (2022-08-05 BlueTriton closing brief, p. 17:17-20.) Part of Mr. Nicholls's testimony on this issue refers to Mr. Rowe's report about the release of water from Tunnel 2 on August 24, 1930, which did not appear at Weir # 1 for 43 hours. (Exh. BTB-7, p. 36, ¶ 118, referring to exh. SOS-53, p. 2.) But Mr. Nicholls's testimony does not discuss other parts of Mr. Rowe's report, which discuss the conditions when Tunnel 2 diversions were stopped on August 6 and September 20, 1930 and flows promptly appeared downstream at Weir # 1. (See exh. SOS-53, pp. 1-3.)

The other part of Mr. Nicholls's testimony that BlueTriton's closing brief cited on this issue referred to when the full flows of Boreholes 7, 7A, 7B and 7C "were turned out to the ground surface at the vault . . . and did not generate contiguous surface water flow

in any ravine tributary to Strawberry Creek." (Exh. BTB-6, p. 43, ¶ 136.) But a contiguous surface flow is not required for a natural channel to be present. Flows in many, perhaps most, creeks in California often at times have reaches where there is surface water and reaches without any surface water, particularly under low-flow conditions. Such creeks still flow in natural channels.

Moreover, even if these springs did not historically flow into natural channels, diversions from them for beneficial uses still would have been subject to the Board's water-right permitting and enforcement authorities. (See *State v. Hansen, supra,* 189 Cal.App.2d, at pp. 606-607, 610 (water-right permit required for appropriation of water from spring that "merely moistened the ground thereabouts; and was not the source of any water course"); Decision 1022 (1961) (approving application for water-right permit for diversions from spring where, before applicants developed the spring, "all spring water had been consumed by vegetation within about 100 feet of the spring").)

Springs 10, 11 and 12

The evidence in the record regarding the existence of natural channels at historic Springs 10, 11 and 12 is conflicting.

Mr. Rowe's May 15, 1931 letter referred to the area where these springs were located as a "valley or cienega." (Exh. SOS-51, p. 1; see section 2.7.) According to the WordSense Online Dictionary, "cienega" means "[a] marshy spring where groundwater bubbles to the surface." (https://www.wordsense.eu/cienegas/, accessed on April 10, 2023.) This definition suggests water surfacing over an area, rather than water discharging at a specific point into a specific channel. Also, Mr. Rowe's letter did not refer to any specific discharges or flows from these springs, but instead just stated that the flow of Strawberry Creek was "augmented by more springs" in this area. (Exh. SOS-51, p. 1.)

On the other hand, a figure in the Dames & Moore report depicts specific locations for these three springs, at locations approximately 10 to 30 feet from Strawberry Creek.

(See Figure 16.) This figure is consistent with Figures 14 and 15, which show the portals of Boreholes 10, 11 and 12 to be very close to the channel of Strawberry Creek.

In section 3.8, we conclude that, for procedural reasons, we may not issue a cease-and-desist order regarding BlueTriton's diversions through Boreholes 10, 11 and 12 in this proceeding. We therefore do not need to decide the issue of whether, if these boreholes never had been developed, diversions from Springs 10, 11 and 12 through spring boxes or similar structures at the ground surface for beneficial uses would have been subject to the Board's water-right permitting and enforcement authorities. The Division may investigate this issue and decide whether or not to prepare a new draft CDO against BlueTriton regarding BlueTriton's diversions through these boreholes.

### 3.6.2    Application of Board's Water-Right Enforcement Authority to BlueTriton's Present Diversions

Having concluded that diversions for beneficial uses from historic Springs 1, 2, 3, 7 and 8 through spring boxes or similar devices at the ground surface would have been subject to the State Water Board's water-right permitting and enforcement authorities, the next step in our analysis is to determine whether BlueTriton's diversions through the tunnels and boreholes associated with these springs for beneficial uses also are subject to these authorities.

No party contends that any natural or artificial subterranean streams flowing through known and definite channels are present at or in the vicinity of any of these tunnels or boreholes. (2022-08-05 Prosecution Team closing brief, pp. 15-16; 2022-08-05 BlueTriton closing brief, pp. 4-6; 2022-08-05 Story of Stuff closing brief, pp. 18-19; 2022-08-05 A. Frye closing brief, pp. 26-27; 2022-08-04 S. Loe closing brief, pp. 13-15; 2022-08-05 A. Serrano closing brief, p. 2.)

In section 3.6.1 we concluded that none of the water that historically flowed from the springs was diffused surface water. While BlueTriton argued to the AHO that hypothetical diversions of water from springs through spring boxes or similar structures at the ground surface would have been diversions of diffused surface water (see section 3.6.1), neither BlueTriton nor any other party argued to the AHO that BlueTriton's

present diversions of water through its tunnels and boreholes are diversions of diffused surface water.

The question here therefore is whether we should treat BlueTriton's present diversions by Tunnels 2 and 3 and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 as diversions of surface water, over which the State Water Board has water-right permitting and enforcement authorities, or as diversions of percolating groundwater, to which these authorities would not apply in this proceeding.

The Prosecution Team's closing brief to the AHO noted that BlueTriton has acknowledged that it constructed its tunnels and boreholes "for the purposes of capturing spring water and developing additional percolating groundwater from the same underground strata feeding the springs." (2022-08-05 Prosecution Team closing brief, p. 10:6-9.) The Prosecution Team's brief cited several Board decisions that approved applications for permits to appropriate water from springs as precedents for the conclusion that BlueTriton's diversions are within the Board's water-right permitting authority (*id.*, pp. 13:7-14:2), and this brief discussed the conclusion in Order WR 2019-0149 that the Board retains its water-right permitting authority when a diverter uses a borehole to divert water from a spring (*id*, p. 13:15-14:2; see section 3.5.) The Prosecution Team's closing brief concluded:

> The Respondent's PODs are all installed into or adjacent to the springs and divert surface water from the springs. Using tunnels and boreholes does not exempt the Respondent's diversions from the rules of appropriation, or from the State Water Board's permitting authority.

(*Id.*, p. 15:7-9.)

The Story of Stuff Project, Center for Biological Diversity, Amanda Frye, Steve Loe, Hugh Bialecki and Anthony Serrano all also argued in their closing briefs to the AHO that BlueTriton's diversions are diversions of surface water subject to the Board's water-right authorities. (2022-08-05 Story of Stuff closing brief, p. 18; 2022-08-05 Center for Bio Diversity closing brief, pp. 4-8; 2022-08-05 A. Frye closing brief, pp. 21-22; 2022-08-04 S. Loe closing brief, pp. 13-14; 2022-08-04 H. Bialecki closing brief, p. 1; 2022-08-05 A. Serrano closing brief, p. 2.)

BlueTriton's closing brief to the AHO argued that BlueTriton's facilities capture percolating groundwater. (2022-08-05 BlueTriton closing brief, p. 3:7.) BlueTriton's brief stated "BTB collects water deep underground through horizontal boreholes and tunnels." (*Id.*, p. 3:16-17.) BlueTriton's brief noted that Ms. Stork testified that "BTB collects water from underground sources from fractures in bedrock formations" (*id.*, p. 4:9-10), and that Mr. Eggers testified that "water from BTB's boreholes is collected from beneath the surface of the ground," at depths between 66 and 397 feet below the ground surface (*id.*, p. 4:11-14).

We conclude that, for water-right purposes, we should treat BlueTriton's present diversions through Tunnels 2 and 3, and its historical diversions through Tunnel 7, as diversions of surface water at the tunnels' portals, which are the points where Springs 2, 3 and 7 historically discharged water. We conclude that, for water-right purposes, we should treat BlueTriton's diversions through Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 as diversions of surface water at the points where the springs associated with these boreholes historically discharged water. We reach these conclusions even though BlueTriton now intercepts this water through these underground facilities before the water reaches the ground surface.

The State Water Board and its predecessors almost always have treated applications for permits to appropriate water by diversions through pipes and tunnels below the ground surface that intercept water that otherwise would have discharged from springs as applications for permits to divert surface water. (See Appendix A, sections A2.1 and A2.2.) While none of these decisions explicitly discussed Water Code sections 1200-1202 or the Board's water-right permitting authority, they still are precedents supporting the conclusion that the Board's water-right permitting authority, and thus also the parts of the Board's water-right enforcement authority involved in this proceeding, extend to underground pipes and tunnels that intercept water that otherwise would discharge from springs.

The only decision concluding that the water-right rules that apply to springs did not apply to diversions of groundwater that otherwise would have discharged from a spring

is Decision 915. (See Appendix A, section A2.2.) In Decision 915, the State Water Rights Board denied the pending application, based on a finding that the entire natural flow of the spring already was being diverted and used under existing water rights, and the conclusion that the application was for a new permit that would be solely to appropriate percolating groundwater that applicants would develop through a tunnel. (See section 3.4.)

The facts involved in Decision 915 are distinguishable from the present proceeding, because they involved an application for a permit to appropriate only percolating groundwater that would be developed, and not to appropriate any water that naturally would have discharged, from the spring involved in that proceeding. (Decision 915, pp. 5-6 (1958).) In contrast, at least some of the water subject to each of BlueTriton's diversions involved in this proceeding is water that would have discharged from the historic springs under natural conditions.

In Decision 1482, the State Water Board considered a situation where waters from natural flows at springs were commingled with waters developed at the springs through artificial improvements. (Decision 1482, p. 13 (1978).) In that decision, the Board concluded that it should extend the water-right rules that apply to springs to the waters that were developed through improvements at the springs. (*Id.*, p. 14.) The Board recognized that a developer of such waters should have a priority right to divert and use the waters, but concluded that the developer still needed a permit to appropriate these waters. (*Ibid.*)

In Order WR 2019-0149, the Board concluded that the Board's water-right permitting and enforcement authorities extended to waters associated with natural springs that were developed through pipes extending from the ground surface near the sites of the springs into the underlying bedrock formations where they intercept water flowing in fractures in the bedrock. (See section 3.5.)

Consistent with Decision 1482 and Order WR 2019-0149, we conclude that the Board's water-right permitting and enforcement authorities apply to diversions of water

associated with springs through underground tunnels, boreholes or pipes, even if the diverted water contains both water that otherwise would discharge naturally from the springs and additional developed water. For water-right purposes, the Board should treat these diversions as diversions being made at the historic springs that were located at or near the portals of the tunnels, boreholes and pipes, even though the tunnels, boreholes or pipes now intercept that water before it can discharge from the historic springs.[44] Otherwise, anyone seeking to divert and use spring water could evade the water-right rules that apply to the water flowing from the spring by installing an underground tunnel, borehole or pipe to intercept the water that otherwise would discharge from the spring.[45]

The conclusion that, for water-right purposes, the Board should treat BlueTriton's diversions as diversions being made at the sites of the historical springs is consistent with the initial groundwater extraction notices filed by one of BlueTriton's predecessors.

_____

[44] The Board and its predecessors normally have approved or denied applications for permits to appropriate water from tunnels not associated with springs based solely on whether water was available for appropriation. (See Appendix A, sections A3.1 and A3.2.) The only exception is Decision 986. In Decision 986, the State Water Rights Board denied the application based on the finding that all the water for which the applicant sought a water-right permit was percolating groundwater that applicant had developed through a tunnel. (See section A3.2.) That tunnel was not associated with any spring or former spring.

All of BlueTriton's tunnels and boreholes in Strawberry Canyon are associated with former springs. We are not deciding in this proceeding whether the Board's water-right permitting and enforcement authorities could extend to water diverted by tunnels not associated with springs.

[45] Our conclusion that the water-right rules that apply to springs also apply to diversions of water associated with springs through underground tunnels, boreholes or pipes is based on all the relevant factors described in this order, including evidence that water discharging from Springs 1, 2, 3, 7, and 8 historically discharged into natural channels. This conclusion is not based solely on the fact that BlueTriton's diversions impact surface-water flows, and this conclusion does not address surface waters that are not associated with springs that historically flowed into natural channels, or other diffused surface waters. (Cf. *North Gualala Water Co. v. State Water Resources Control Bd., supra,* 139 Cal.App.4th, p. 1606 (["impact" test alone is not appropriate test for determining legal classifications of groundwater].)

These notices referred to the sources of the water reported in the notices as "Spring Nos. 1, 2, 3, 7, 7A, 7B and 8," had "wells" crossed out each place it appeared in each form and had "spring" inserted, and stated that the water reported in the notices was diverted from these springs, that the springs were "naturally developed springs," and that "[t]he Company uses the total aggregate flow from each and all springs for each and every year." (See section 2.10.1.) Neither these notices nor any subsequent annual notices referred to the underground fractures in the bedrock formations as sources of this water or as points of diversion for this water.

This conclusion also is consistent with the positions taken by BlueTriton, its predecessors and its consultants that the water BlueTriton extracts through these facilities and bottles for sale is "spring water" under the FDA regulations. (See sections 2.10.2, 2.10.3 and 2.10.4.)

Based on our conclusion that we should treat BlueTriton's diversions through Tunnels 2 and 3, and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 as diversions of surface water at the historic springs associated with these tunnels and boreholes, we conclude that the diversions of water by these tunnels and boreholes and associated beneficial uses of the diverted water are subject to the State Water Board's water-right permitting and enforcement authorities.

### 3.7    BlueTriton's Water-Right Claims

#### 3.7.1    Riparian Right Claims

For a parcel to have riparian rights to a stream: (a) the land in question must be contiguous to or abut on the stream, and (b) the land must be within the watershed of the stream. (*Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 528-529.) For such lands, "[t]he riparian right extends only to the smallest tract held under one title in the chain of title leading to the present owner." (*Id.*, p. 529.)

The holder of a riparian right to divert and use water from a surface water stream may divert water from the stream at a point of diversion that is not on the right holder's

parcel, and then convey the diverted water to the parcel for beneficial use there, provided the diversion does not injuriously affect other riparian rights. (*Turner v. James Canal Co.* (1909) 155 Cal. 82, 92; see *Holmes v. Nay* (1921) 186 Cal. 231, 240.)

The Prosecution Team and BlueTriton have taken the position in this proceeding that the San Manuel Band, who they state is the present owner of the Arrowhead Springs Hotel property, has riparian rights to East Twin Creek that authorize the diversion of water through BlueTriton's facilities in the Strawberry Creek watershed and the conveyance of this water to the Hotel property for beneficial uses there. (2022-08-05 Prosecution Team closing brief, p. 17:10-24; 2022-08-05 BlueTriton closing brief, p. 28:3-10.) Their position on this issue is supported by Mr. Eggers's testimony. (Exh. PT-10, pp. 8-9, ¶¶ 25-26.)

Based on the Prosecution Team's and BlueTriton's position on this issue, this order does not prohibit BlueTriton from diverting water from Tunnels 2 and 3 and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 for deliveries to the San Manuel Band under BlueTriton's contractual obligations to the San Manuel Band. Such diversions and deliveries are subject to BlueTriton's Special Use Permit from the San Bernardino National Forest and all applicable laws. This order does not adjudicate the San Manuel Band's land ownership or riparian right claims, and this order does not limit the Board or any other regulatory agency or court from taking any future actions regarding these claims.

### 3.7.2    Pre-1914 Appropriative Right Claims

In its closing brief to the AHO, the Prosecution Team discussed the historical diversions of water for conveyance to water-bottling facilities. These included diversions from a spring or springs in the Coldwater Creek watershed for conveyance to Arrowhead Springs Water Company's factory in Los Angeles for bottling there, and diversions from a spring in the Hot Springs Creek watershed for bottling at the Old Arrowhead Factory. (2023-08-05 Prosecution Team closing brief, pp. 18:1--21:13; see section 2.4.)

BlueTriton's closing brief to the AHO also discussed these diversions and water-bottling operations. (2022-08-05 BlueTriton closing brief, p. 17:23--22:28.) BlueTriton's brief

argued that BlueTriton's predecessors perfected pre-1914 appropriative rights through: (a) the purchases of water from Coldwater Creek by James Mumford and C.H. Temple, who later assigned their interests to the Arrowhead Springs Water Company, from Arrowhead Hot Springs Company under a 10-year contract entered into in 1909, and the Arrowhead Springs Water Company's water-bottling operations using this water (*id.*, p. 18:19--20:7); (b) Arrowhead Hot Springs Company's water-bottling operation at the Old Arrowhead Factory, which used water from springs in the Hot Springs Creek watershed (pp. 20:8--21:24); and (c) Arrowhead Hot Springs Company's operations at its Los Angeles water-bottling plant, which began in 1917 and used water from Indian Springs, a tributary to Hot Springs Creek (*id.*, pp. 21:25--22:24). (See section 2.4.)

The Prosecution Team and BlueTriton agree that these diversions and water-bottling operations may have resulted in the perfection of pre-1914 appropriative rights, but they disagree about the amount of the authorized annual diversion rates for such rights and whether diversions for water bottling at the Los Angeles factory constructed in 1917 perfected any pre-1914 rights. (2023-08-05 Prosecution Team closing brief, pp. 19:5--21:13; 2022-08-05 BlueTriton closing brief, pp. 17:23--22:28.)[46]

### 3.7.2.1    Chain-of-Title Issues

As discussed in section 2.8, the chain-of-title report that BlueTriton provided for the water rights it stated were assigned to California Consolidated WC by the 1931 judgment in the *Del Rosa Mutual Water Company* case does not discuss any conveyance to any of BlueTriton's predecessors of any pre-1914 appropriative rights for diversions and use of Coldwater Creek water that the Arrowhead Springs Water

---

[46] For water-right purposes, the place of use of water-bottling operations is the place where the water is placed into the bottles that then are sold to retail customers. (See 2022-08-05 Prosecution Team closing brief, p. 6:23-25.) The Old Arrowhead Factory was located on a parcel that apparently was not riparian to East Twin Creek. (See exh. PT-10, pp. 14-15, ¶ 43.) Water-bottling operations at this factory therefore probably were not authorized by riparian rights, and therefore may have resulted in the perfection of pre-1914 appropriative rights. (See 2023-08-05 Prosecution Team closing brief, pp. 19:13-19; 2022-08-05 BlueTriton closing brief, p. 20:8-28.)

Company may have perfected through its water-bottling operations under its 1909 contract with Arrowhead Hot Springs Company. These are the only historical water-bottling operations that used Coldwater Creek water for which there is evidence in the administrative record for this proceeding.

Also, paragraph "Fifth" of the 1930 agreement stated that California Consolidated WC:

> does hereby wholly release, surrender and quitclaim unto Arrowhead [Springs Corp.] any right whatsoever which it may have obtained by virtue of said contracts and/or warranty deed, or otherwise, to any surface or sub-subface water existing in Cold Water Canyon within or outside of the boundaries of the real estate owned by Arrowhead [Springs Corp.]

(*Id.*, p. 3.)

Because BlueTriton has not provided any evidence of any conveyance to any of BlueTriton's predecessors of any pre-1914 rights that the Arrowhead Springs Water Company may have perfected through its water-bottling operations, and because California Consolidated Water Company, in the 1930 agreement, expressly released, surrendered and quitclaimed to Arrowhead Springs Corp. any water rights California Consolidated WC may have had to water in the Coldwater Creek watershed, we conclude that BlueTriton may not now claim any pre-1914 appropriative right based on historical diversions and use of water from this watershed.

As discussed in section 2.4, the historical water-bottling operations at the Old Arrowhead Factory and at the water-bottling plant Arrowhead Springs Corp. completed in Los Angeles in 1917 both used water from springs in the Hot Springs Creek watershed. As discussed in section 2.5, the 1930 agreement between Arrowhead Springs Corp. and California Consolidated WC limited California Consolidated WC's rights to receive water from springs in the Hot Springs Creek watershed to amounts that were surplus to Arrowhead Springs Corp.'s needs of water from these sources for uses at the Arrowhead Springs Hotel and related facilities. BlueTriton did not present any evidence during the AHO hearing regarding the historical amounts of any such surpluses. Also, it is uncertain whether there was any plan of development for the Los Angeles water-bottling plant that was in place before the effective date of the Water Commission Act of 1914, and thus whether any pre-1914 appropriative right ever was

perfected for diversions of water from springs in the Hot Springs Creek watershed for this plant.

For these reasons, there is not sufficient evidence in the administrative record for this proceeding for us to determine the amount, if any, of any pre-1914 appropriative right to water in the Hot Springs Creek watershed that Arrowhead Springs Corp. may have conveyed to California Consolidated WC. Based on our conclusions in section 3.7.2.2, we do not need to resolve this issue.

BlueTriton's closing brief to the AHO argued that the stipulated judgment in the Del Rosa Mutual Water Company case (see section 2.6) provided that the Arrowhead Springs Corp. and California Consolidated WC "established prescriptive rights to [Del Rosa Mutual MWC's] pre-1914 rights to the tributaries of East Twin Creek based on long-standing California law." (2022-08-05 BlueTriton closing brief, p. 25:9-11.) BlueTriton also argued that the stipulated judgment provided for either a taking by BlueTriton's predecessors of an existing pre-1914 right from Del Rosa MWC or a transfer of this right for consideration. (Id., p. 25:15-18.)

To perfect a prescriptive water right, "the use of the water must be: (1) actual, (2) open and notorious, (3) hostile and adverse to the original owner's title, (4) continuous and uninterrupted for the statutory period, and (5) under a claim of title in the claimant, and not by virtue of another right." (*Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 784.) The effect of obtaining a prescriptive right is to elevate the water-right priority of the holder of the prescriptive right. (See, e.g., *Antelope Valley Groundwater Cases* (2021) 62 Cal.App.5th 992, 1024; *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 297.)

We have considered these required elements for prescriptive rights, the effects of prescriptive rights, and the provisions of the stipulated judgement in the Del Rosa Mutual Water Company case discussed in section 2.6. We conclude that this judgment provided that, in return for payments of the listed amounts of compensation to Del Rosa MWC, Del Rosa MWC would not object to the prescriptive-rights claims of Arrowhead Springs Corp. and California Consolidated WC, and would agree that their rights to

divert and use water at the rates specified in the judgment from the sources specified in the judgment would have priority over Del Rosa MWC's rights.

We disagree with BlueTriton's argument that this stipulated judgment took or transferred a pre-1914 appropriative right from Del Rosa MWC to California Consolidated WC. Nothing in this judgment stated or implied that there was any taking or transfer of any Del Rosa MWC water right to Arrowhead Springs Corp. or California Consolidated WC. Also, nothing in this judgment discussed any conveyances of any water rights from Arrowhead Springs Corp. to California Consolidated WC, or any changes in points of diversion or sources of any appropriative rights.

We have considered the stipulated judgment's clear statements about prescriptive rights, the required elements for such rights, and the effects of obtaining such rights. We also have considered the lack of any discussion in the judgment about any perfection of appropriative water rights by California Consolidated WC, any conveyances of any appropriative water rights to California Consolidated WC, or any changes in points of diversion or sources of any appropriative rights.

Based on these considerations, we conclude that the judgment's description of California Consolidated WC's "right to take, impound, divert, transport and carry away water of that certain spring known as 'Indian Spring' and any and all of the water of all springs situated or obtainable in that part of East Twin Creek known as 'Strawberry Creek and Canyon' and canyons lateral thereto . . ." (exh. BTB-13, p. 18:23-27) was a description of the prescriptive rights claims of California Consolidated WC to which Del Rosa MWC did not object. We conclude that this description was not a description of any appropriative right.

The judgment in the *Del Rosa Mutual Water Company* case did not create any new, post-1914 appropriative water rights. To obtain such new rights, California Consolidated WC or one of its predecessors had to comply with the procedures specified in Division 2 of the Water Code (Wat. Code, §§ 1000-5976). (See Wat. Code, § 1225.) As the court stated in *People v. Shirokow* (1980) 26 Cal.3d 301:

> The rights not subject to the statutory appropriation procedures are
> narrowly circumscribed by the exception clause of the statute and include
> only riparian rights and those which have been otherwise appropriated
> prior to December 19, 1914, the effective date of the statute. Any use
> other than those excepted is, in our view, conditioned upon compliance
> with the appropriation procedures of division 2 [of the Water Code].

(*Id.*, p. 309, footnote omitted.) Neither California Consolidated WC nor any of its predecessors ever complied with these procedures for their diversions in Strawberry Canyon or their uses of the diverted water.

### 3.7.2.2    Water Source Issues

The Prosecution Team's closing brief to the AHO argued that, even if BlueTriton's predecessors perfected pre-1914 appropriative rights through their diversions of water from the Coldwater Creek and Hot Springs Creek watersheds for water bottling, and even if these rights were assigned to BlueTriton's predecessor, such rights do not authorize BlueTriton's present diversions from springs in the Strawberry Creek watershed, because these springs are different water sources. (2023-08-05 Prosecution Team closing brief, pp. 21:18--22:16.)

BlueTriton's closing brief argued that Water Code section 1706 authorized BlueTriton's predecessors to change the authorized points of diversion for these alleged pre-1914 rights from their original points to new points in Strawberry Canyon. (2023-08-05 BlueTriton closing brief, p. 26:10-17.)

In *Johnson Rancho County Water Dist. v. State Water Rights Bd.* (1965) 235 Cal.App.2d 863, 879, the court held that an appropriative water right may not be changed to authorize the taking of water "from a different river system." In Order WR 2009-0061, the State Water Board, following the *Johnson Rancho* decision, stated that an appropriator may not expand an existing right through various listed actions, including using water from a different source. (Order WR 2009-0061, pp. 5-6.)

In Decision 1651, the Board, following *Johnson Rancho* and Order WR 2009-0061, confirmed that an appropriative right may not be changed to start using a different source of water. (Decision 1651, p. 33.) The Board stated:

> The source of water is a fundamental attribute of a water right that cannot be changed; thus, the diversion of water from a different source of supply results in an entirely new appropriation. [Citations.] What constitutes a new or different source of water requires a factual analysis by the State Water Board that may need to address various factors, including whether the existing and proposed points of diversion are hydrologically connected, and thus involve a common source of supply, and the geographic scale of the proposed change.

(*Id.*, pp. 33-34.)

In the proceeding that led to Decision 1651, the water-right permittee sought to change the authorized points of diversion in permits for three reservoirs. Two of these reservoirs were on the Little Truckee River and the third was on a tributary of that river, Independence Creek. (*Id.*, p. 34.) The Board stated:

> In this case, however, the analysis is relatively simple. We find that the proposed changes in the points of diversion do not involve a potential change in source of supply that warrants further analysis. [footnote 23.] Independence Lake is located on Independence Creek, which is tributary to the Little Truckee River, on which Boca and Stampede Reservoirs are located. Thus, the proposed changes involve adding diversion points along the same stream system and the same source of supply as the original diversion points. [Citation.] The proposed changes do not involve a different source of supply.

(*Ibid.*) Footnote 23 to the decision stated:

> For example, a proposed change in point of diversion from one tributary to another tributary above the confluence of the two tributaries may raise a potential issue regarding a change in the source of supply.

(Decision 1651, p. 34, fn. 23.)

The present proceeding raises the issue discussed in footnote 23 of Decision 1651. Here, the sources of any pre-1914 rights that may have been perfected through the historical water-bottling operations were springs in the watersheds of Coldwater Creek and Hot Springs Creek, two tributaries of East Twin Creek. BlueTriton now argues that these alleged pre-1914 rights could be changed to authorize BlueTriton to divert water from springs in the watershed of Strawberry Creek, a third tributary of East Twin Creek.

Water Code section 1706 authorizes a change in the authorized point of diversion of a pre-1914 appropriative right where the change involves moving the point of diversion upstream along a watercourse, including moving upstream along both a stream and one of its tributaries. In such a case, water diverted at the new point of diversion otherwise would have flowed downstream to the old point of diversion. The water diverted at the new point of diversion therefore would be part of the source for the old point of diversion, so there would not be a change in source.

Water Code section 1706 also authorizes a change in the authorized point of diversion of a pre-1914 appropriative right where the change involves moving the point of diversion downstream along a watercourse, including moving downstream along both a tributary stream and the stream into which the tributary flows. In such a case, some of the water diverted at the new point of diversion otherwise would have been diverted at the old point of diversion. Even though the water that flowed at the old point of diversion would be commingled with other water, the water diverted at the new point of diversion could be accounted for as having come from the old point of diversion. Thus, there would not be a change in source.

In both cases, the changes in points of diversion are authorized by Water Code section 1706 only to the extent that the change would not result in an increase in the amount of water that could be diverted, and only if no other water user would be injured by the change.

In this order, we resolve the issue that was noted in Decision 1651 footnote 23, but not decided. We conclude that the holder of a pre-1914 appropriative right may not move the authorized point of diversion from one tributary of a stream to another tributary of the same stream. For such a change, none of the water at the new point of diversion could have been diverted at the old point of diversion. Rather, the tributary containing the new point of diversion is a new source, so diversions of water from it for beneficial uses are a new appropriation.

Water in Strawberry Creek never flows into Coldwater Creek or Hot Springs Creek, and

waters in Coldwater Creek and Hot Springs Creek never flow into Strawberry Creek. These creeks, and springs in their watersheds, therefore are different sources for appropriative water rights.

BlueTriton's present diversions from springs in the Strawberry Creek watershed therefore are not authorized by any appropriative rights that may have been perfected by the prior water-bottling operations that used water from Coldwater Creek or Hot Springs Creek. Even if such rights were perfected and then conveyed to one of BlueTriton's predecessors, they were for diversions from different sources, and the sources for these rights could not be changed to springs in Strawberry Canyon.

As discussed in sections 2.5 and 2.7, construction of the diversion facilities of BlueTriton's predecessors in the Strawberry Creek watershed did not begin until 1929, and there is no evidence in the administrative record that there was any pre-1914 plan of development for these facilities. BlueTriton's predecessors therefore did not perfect any pre-1914 appropriative rights for the diversions by these facilities for beneficial uses.

As discussed earlier in this section, we conclude that the judgment in the *Del Rosa Mutual Water Company* case confirmed the parties' agreements regarding Arrowhead Springs Corp.'s and California Consolidated WC's prescriptive rights claims against Del Rosa MWC, did not effect any changes in any appropriative rights, and did not effect any conveyances of any appropriative rights to California Consolidated WC. Also, neither the State Water Board nor any of its predecessors was a party to this judgment, and the judgment is not binding on the Board. (See *Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1462; *Newcomb v. City of Newport Beach* (1936) 7 Cal.2d 393, 404.) For both these reasons, this judgment does not bar us from reaching the conclusions we reach in this section regarding BlueTriton's pre-1914 appropriative right claims.

During the AHO hearing, BlueTriton did not argue that any of the diversions from its facilities in the Strawberry Creek watershed are authorized by riparian rights, and Mr.

Lawrence testified that none of the plants where water diverted by BlueTriton's facilities in the Strawberry Creek watershed is bottled are located on parcels that are riparian to the Santa Ana River. (Recording, 2022-01-13, afternoon, 1:50:15-1:51:23.)

BlueTriton therefore does not have any water rights that authorize these diversions.

### 3.8    Conclusions Regarding Issuance of Cease-and-Desist Order

As discussed in section 3.6.2, we conclude that BlueTriton's diversions through Tunnels 2 and 3 and Boreholes 1,1A, 7, 7A, 7B, 7C and 8 for beneficial uses are within the State Water Board's water-right permitting and enforcement authorities because the diversions are of water closely associated with historical springs. Our conclusion that BlueTriton's tunnels and boreholes in Strawberry Canyon divert water closely associated with historical springs is based on: (1) the physical proximity of the tunnels and boreholes to the locations of these historical springs (see section 2.9 [The entrances to Tunnels 2, 3, and 7 are in the same locations where Springs 2, 3, and 7 historically discharged. Boreholes 1, 1A, and 8 are located approximately 60 feet from the location where Spring 4 historically discharged and Boreholes 7, 7A, 7B, and 7C are located approximately 40 feet from the location where Spring 7 historically discharged]); (2) evidence that the tunnels and boreholes intercept water that would have discharged from the springs (see section 2.9), including the characterizations in the 1999 Dames & Moore report of the diversions through the tunnels and boreholes as diversions from springs or from sources of the springs (Exh. PT-23); (3) identification by BlueTriton's predecessors and consultants of the springs as the sources of the water diverted through the tunnels and boreholes in engineering reports (see section 2.9), groundwater extraction notices (see section 2.10.1), and reports prepared for compliance with FDA regulations governing "spring water" (see sections 2.10.2, 2.10.3, and 2.10.4); and (4) BlueTriton's representations to consumers that the bottled water is "spring water" (see section 2.10).

As discussed in section 3.7.2, we conclude that BlueTriton does not have any water rights that authorize these diversions and uses. We therefore conclude that we should

issue a cease-and-desist order (CDO) directing BlueTriton to stop these diversions. The terms of this CDO are discussed in section 3.9.

As discussed in section 2.1, the Division's draft CDO would not have directed BlueTriton to stop its diversions at Boreholes 10, 11 and 12. Instead, the draft CDO would have required BlueTriton to submit a report "more precisely determining the amount of flow at Boreholes 10, 11 and 12 that if not diverted would have otherwise surfaced naturally at a spring." (Exh. PT-1, p. 11, ¶ 7.)

In its closing brief to the AHO, the Prosecution Team stated:

> The draft CDO did not propose restricting diversions from Boreholes 10, 11, and 12, because information available at the time could not rule out the possibility that up to 100 percent of the water diverted and used from these PODs was developed water, and therefore not subject to the permitting authority of the State Water Board.

(2022-08-05 Prosecution Team closing brief, p. 28:8-11.) The Prosecution Team's closing brief then discussed the testimony and evidence presented during the AHO hearing, which the Prosecution Team argued demonstrated that no water diverted through these boreholes is developed water. (*Id.*, p. 28:12-24.) Arguing that BlueTriton had notice of the issue of whether these boreholes are subject to the Board's water-right permitting authority, and that this issue was "within the general scope of the Draft CDO's allegations of unauthorized diversions from springs," the Prosecution Team argued that the Board may include provisions regarding these boreholes in its CDO. (*Id.*, pp. 28:7-8, 29:2-3.)

BlueTriton's closing brief to the AHO argued that, because the Division's draft CDO did not propose any limitations on BlueTriton's diversions from Boreholes 10, 11 and 12, it would violate BlueTriton's due process rights if the AHO were to propose a CDO regarding these diversions. (2022-08-05 BlueTriton brief, p. 29:14-23.)

Water Code section 1834, subdivision (a), provides that, if a violation of a requirement described in Water Code section 1831, subdivision (d), is occurring, the Board shall give notice to the person allegedly engaged in the violation. This statute then states that:

> The notice shall contain a statement of facts and information that would tend to show the proscribed action, . . .

The Division's Enforcement Section provided this notice in this proceeding by transmitting the draft CDO and revised report of investigation to BlueTriton. (See section 2.1.)

Because this statute uses the language "would tend to show," the required notice does not need to provide every detail about the Division's factual and legal analyses, and the Board may adopt a final CDO that contains different factual and legal analyses. Nevertheless, this statute does require the Division to notify the respondent of the basic facts of each alleged violation that the Board's final CDO then will address.

In this proceeding, the Division's draft CDO and revised report of investigation did not allege that BlueTriton's diversions through Boreholes 10, 11 and 12 were unauthorized diversions. Absent such allegations, these documents did not provide sufficient notice to BlueTriton under Water Code section 1834, subdivision (a), for us to be authorized to issue a CDO to BlueTriton regarding these diversions. We therefore deny the request in the Prosecution Team's closing brief for us to issue such a CDO. This denial is without prejudice to the Division's rights to conduct further investigations regarding these diversions, or to issue a new draft CDO regarding them.

### 3.9    Appropriate Cease-and-Desist Order Terms

As discussed in section 3.8, we conclude that we should issue a CDO directing BlueTriton to stop its diversions through Tunnels 2 and 3 and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 for its beneficial uses. As discussed in section 3.7.1, we accept the position of the Prosecution Team and BlueTriton that the San Manuel Band has riparian rights that authorize diversions through these facilities for beneficial uses on the Arrowhead Springs Hotel property. As discussed in section 3.8, we conclude that we

should not issue a CDO regarding BlueTriton's diversions through Boreholes 10, 11 and 12.[47]

Based on these conclusions and the position of the Prosecution Team and BlueTriton on the San Manuel Band riparian rights issue, our CDO limits the amount of BlueTriton's total diversions from Tunnels 2 and 3 and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 during each day to the amount BlueTriton delivers to the San Manuel Band on the same day. The CDO also contains provisions requiring BlueTriton to report its daily diversions and deliveries to the Division's Enforcement Section each month, and to include copies of these reports in BlueTriton's annual groundwater extraction notices.[48]

Citing Water Code section 1051, the Prosecution Team's closing brief to the AHO argued that the Board may order BlueTriton to conduct technical studies and to provide additional information regarding the amounts of developed water, if any, BlueTriton diverts and uses. (2022-08-05 Prosecution Team closing brief, p. 29:13-22.) BlueTriton argued that the State Water Board does not have authority to require BlueTriton to conduct such studies. (2022-08-05 BlueTriton closing brief, pp. 29:24--30:5.)

The Prosecution Team did not specifically ask the AHO to include any requirements for such studies in this order. (See 2022-08-05 Prosecution Team closing brief, p. 29:13-

---

[47] BlueTriton's groundwater extraction statements indicate that, during 2018-2020, BlueTriton diverted 23, 32 and 30 af from Spring 10, and diverted 1, 11 and 8 af from Spring 12. (See Table 1.) These amounts total 24, 43 and 38 af. These totals equal 7.8, 14.0 and 12.4 mgal. (24 mgal./(3.07 af/mgal. = 7.8 mgal.; 43 mgal./(3.07 af/mgal.) = 14.0 mgal.; 38 af/(3.07 af/mgal.) = 12.4 mgal.)

[48] During the AHO hearing, Mr. Lawrence testified that BlueTriton presently files its reports under Water Code sections 4999-5009 with the San Bernardino Valley MWD. (Exh. BTB-10, p. 6, ¶ 24.)

The Division should investigate whether, considering this order, these reports will satisfy the requirements of Water Code sections 5100-5107. (See Wat. Code, § 5101, subd. (a)(5).) If the Division concludes that these reports do not satisfy these requirements, then the Division shall notify BlueTriton of this conclusion and direct BlueTriton to begin to file statements of water diversion and use under these statutes. Our order includes a provision that will apply if BlueTriton begins filing such statements and stops filing reports under Water Code sections 4999-5009.

22.) Also, while Water Code section 1051, subdivision (a), authorizes the Board to investigate stream systems, it does not expressly authorize the Board to require other parties to conduct such investigations. For these reasons, we are not directing BlueTriton to conduct any technical studies. If the Division decides to further investigate BlueTriton's diversions through Boreholes 10, 11 and 12, then the Division may use its investigation powers to require BlueTriton to produce relevant information and documents.

### 3.10    BlueTriton's Options for Future Water-Right Applications

As discussed in section 2.11, the Board, through Orders WR 89-25, WR 91-07 and WR 98-08, has issued a declaration under Water Code section 1205 that the Santa Ana River watershed, including all tributaries where hydraulic continuity exists, is fully appropriated from January 1 to December 31 of each year. Order WR 98-08 contains an exception to this declaration for applications proposing to develop or salvage water. (Order WR 98-08, pp. 16, 25.)

Under Water Code section 1206, subdivisions (a) and (b), the Board may not accept for filing any application for a permit to appropriate water from a stream system described in this declaration, except where the declaration specifies conditions for acceptance of such applications. Considering the provisions of the orders discussed in the preceding paragraph, section 1206 does not prohibit the Board from accepting applications by BlueTriton for permits to appropriate water through Tunnels 2 and 3 and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8, if the applications are for permits for which diversions would be limited to times when BlueTriton can demonstrate there is no hydraulic continuity between Strawberry Creek and the Santa Ana River. Section 1206 also does not prohibit the Board from accepting applications by BlueTriton for permits to appropriate water that BlueTriton can demonstrate is developed water.

If BlueTriton decides to file any such applications, then BlueTriton should file separate applications for each source for which BlueTriton seeks a permit. If BlueTriton contends, for any such source, that there are flows based on pre-development conditions at the spring associated with the source, and additional flows due to developed water, then

BlueTriton should file separate applications for permits to appropriate each type of water from that source. Specifically, for each such source, BlueTriton should file: (a) one application for a permit to appropriate the water that BlueTriton contends is based on pre-development flows and is available during times when BlueTriton contends there is no hydraulic continuity between Strawberry Creek and the Santa Ana River, and (b) a separate application for a permit to appropriate the water that BlueTriton contends is developed water.

These applications will be subject to all the statutes, regulations and procedures that apply to applications for permits to appropriate water. As the Division processes these applications, and, if necessary, when the Board considers these applications, they will evaluate any issues that arise regarding the amounts of water that are based on pre-development flows, the conditions under which there is no hydraulic continuity between Strawberry Creek and the Santa Ana River, and the amounts of developed water. The Division and, if necessary, the Board, may include terms and conditions in the permits to address these issues.

As authorized by Water Code section 1205, subdivision (c), BlueTriton may file a petition to revoke or revise the fully appropriated declaration for the Santa Ana River watershed.

## 4.0    CONCLUSIONS

1. BlueTriton's diversions of water through its Tunnels 2 and 3, and its Boreholes 1, 1A, 7, 7A, 7B, 7C and 8, for its beneficial uses are subject to the State Water Board's water-right permitting and enforcement authorities.
2. BlueTriton does not have any water rights that authorize such diversions or beneficial uses.
3. Because the Prosecution Team and BlueTriton both have taken the position in this proceeding that the San Manuel Band has riparian rights that authorize BlueTriton to divert water through its facilities for deliveries to the San Manuel Band for riparian uses on the Arrowhead Springs Hotel property, this order does not prohibit BlueTriton from diverting water from Tunnels 2 and 3 and Boreholes

1, 1A, 7, 7A, 7B, 7C and 8 for deliveries to the San Manuel Band under BlueTriton's contractual obligations to the San Manuel Band, subject to BlueTriton's Special Use Permit from the San Bernardino National Forest and all applicable laws. This order does not adjudicate the San Manuel Band's land or riparian right claims, and this order does not limit the Board or any other regulatory agency or court from taking any future actions regarding these claims.

4. We should issue a cease-and-desist order that prohibits BlueTriton from diverting water through these facilities for any purpose besides delivering water to the San Manuel Band for its beneficial uses on the Arrowhead Springs Hotel property.

5. Our cease-and-desist order should require BlueTriton to file records of its daily diversions and deliveries that are sufficient to demonstrate its compliance with this order.

6. Because the Division of Water Rights Enforcement Section's draft cease-and-desist order did not contain any provisions that would have prohibited BlueTriton from diverting water through its Boreholes 10, 11 and 12, this order does not contain any such prohibitions. The Enforcement Section may investigate such diversions and, if it deems it appropriate, prepare a new draft cease-and-desist order regarding those diversions.

7. We should deny BlueTriton's August 11, 2023 motion to disregard and strike the July 7, 2023 amended proposed order.

# ORDER

**IT IS HEREBY ORDERED THAT:**

1. Pursuant to Water Code sections 1831-1836, the Respondent, BlueTriton Brands, Inc., and any successor owner of any of the facilities in the Strawberry Creek watershed in San Bernardino County that are described in this order (collectively referred to in the following paragraphs as "BlueTriton"), shall comply with the following orders, beginning on the first day of the second month following the month during which the Board adopted this order:

   a. BlueTriton shall limit its diversions through its Tunnels 2, 3 and 7, and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8, so that the total amount diverted through these

facilities during each day will not exceed the total amount of water BlueTriton delivers to the San Manuel Band of Mission Indians (San Manuel Band) for its riparian uses during the same day. If necessary to account for time lags between the times of these daily diversions and the times of these daily deliveries, BlueTriton may provide for an appropriate difference between the times of the daily accountings of these diversions and the times of the daily accountings of these deliveries. BlueTriton shall bypass at the portal of each tunnel or borehole, and not divert into its water-conveyance pipeline at that portal, any flow from the tunnel or borehole at the portal that exceeds the amount that BlueTriton is diverting at the portal into its water-conveyance pipeline for deliveries to the San Manuel Band.

b. On or before the 15th day of each month, BlueTriton shall provide the Division of Water Rights (Division) Enforcement Section (Enforcement Section) with separate accountings of: (i) the daily amounts of diversions at each of the facilities described in the preceding paragraph; (ii) the total daily amounts of diversions by all these facilities; (iii) the daily amounts of deliveries to the San Manuel Band for its riparian uses; (iv) the daily amounts of water diverted at each of Boreholes 10, 11 and 12; (v) the daily amounts of the total diversions at Boreholes 10, 11 and 12; (vi) the daily amounts of water delivered to tank trucks from BlueTriton's facilities described in this order; (vii) the daily amounts of water discharged to Strawberry Creek through BlueTriton's discharge facility near Boreholes 10, 11 and 12; and (viii) the daily amounts of water discharged or delivered anywhere else, with a description of each point of discharge and each point of delivery. These accountings of daily diversions, deliveries and discharges shall be sufficient to account for all diverted water. If there are any differences between the total amounts diverted on any day and the total amounts delivered and discharged on the same day, then BlueTriton shall explain the reason or reasons for the differences. BlueTriton and the Division may agree in writing to change the reporting frequency for these accountings, or to amend or terminate the requirements of this paragraph.

c.  BlueTriton shall maintain totalizing flow meters and meter records sufficient to create the daily records of diversions, deliveries and discharges described in the preceding paragraph.

d.  BlueTriton shall include copies of the accountings described in paragraph b. with each annual groundwater extraction notice it files pursuant to Water Code sections 4999-5009 for any of the facilities described in the preceding paragraphs. If BlueTriton begins filing statements of water diversion and use under Water Code sections 5100-5107 and stops filing groundwater extraction notices under Water Code sections 4999-5009, then BlueTriton and the Division may agree in writing to change the requirements of this paragraph so they will provide for BlueTriton to file copies of these accountings with its statements of water diversion and use.

e.  Upon request from the Enforcement Section to determine compliance with this order, BlueTriton: (i) shall provide any information or documents that the Enforcement Section requests to investigate BlueTriton's compliance; and (ii) shall provide reasonable access to Enforcement Section personnel to inspect BlueTriton's facilities and records.

f.  We deny BlueTriton's August 11, 2023 motion to disregard and strike the July 7, 2023 amended proposed order.

## CERTIFICATION

The undersigned, Clerk to the Board, does hereby certify that the foregoing is a full, true, and correct copy of an order duly and regularly adopted at a meeting of the State Water Resources Control Board held on September 19, 2023.

AYE:        Chair E. Joaquin Esquivel
                Board Member Sean Maguire
                Board Member Laurel Firestone
                Board Member Nichole Morgan
NAY:        None
ABSENT:   Vice Chair Dorene D'Adamo
ABSTAIN:  None

*Courtney Tyler*

Courtney Tyler
Clerk to the Board

# APPENDICES, FIGURES AND TABLES

Appendix A:  Decisions by State Water Board and its Predecessors Involving Board's Water-Right Permitting Authority Over Waters Associated with Springs and Tunnels

Appendix B:  BlueTriton's Request to Set Aside Proposed Order and Motion to Stay Further Action; Comments on May 26, 2023 Proposed Order

Figure 1:    General Area Map
Figure 2:    Local Area Map
Figure 3:    Map of part of San Bernardino National Forest (part 1)
Figure 4:    Map of part of San Bernardino National Forest (part 2)
Figure 5:    Photograph of Arrowhead Springs Hotel Area, 1915
Figure 6:    Arrowhead Springs conceptual source figure (figure from John Mann, Jr. report)
Figure 7:    Arrowhead Springs site plan (figure from Dames & Moore report)
Figure 8:    Strawberry Canyon water collection infrastructure (figure from Mark Nicholls testimony)
Figure 9:    Photograph showing locations of BlueTriton's tunnels and boreholes in Strawberry Creek watershed
Figure 10:   Figure showing 2020 annual diversion, delivery and discharge amounts for BlueTriton's Strawberry Canyon diversions
Figure 11:   Figure showing conceptual model of Arrowhead Springs (figure from Mark Nicholls technical report)
Figure 12:   Diagrammatic cross section of completion details at Marco Spring orifice (figure from Ross Grunwald technical report)
Figure 13:   Diagrammatic cross section of completion details at Polo Spring orifice (figure from Ross Grunwald technical report)
Figure 14:   Aerial photograph of Strawberry Creek watershed showing locations of BlueTriton's tunnels and boreholes and flow measurement stations (figure from Mark Nicholls technical report) (first figure)
Figure 15:   Aerial photograph of Strawberry Creek watershed showing locations of BlueTriton's tunnels and boreholes and flow measurement stations (figure from Mark Nicholls technical report) (second figure)
Figure 16:   Site map of Lower Spring Complex (figure from Dames & Moore report)
Table 1:     Table of BlueTriton's annual extractions reported in groundwater extraction notices filed with State Water Board

# Appendix A

## Decisions by State Water Board and its Predecessors Involving Board's Water-Right Permitting Authority Over Waters Associated with Springs and Tunnels

A1.0    <u>Decisions Involving Applications for Water-Right Permits for Diversions from Springs Through Spring Boxes and Similar Devices at the Ground Surface</u>

A1.1    <u>Applications Approved</u>

Decision 320 (State Engineer 1932). Decision approved application for permit to appropriate water from spring that was being collected by a wooden box at spring and conveyed by pipe to place of use. (*Id.*, p. 4.)

Decision 542 (State Engineer 1946). Decision approved application for permit to appropriate water through several ditches that conveyed water from a "seepage area" into a wooden header box, from which water was conveyed through a pipe to a tank. (*Id.*, p. 5.)

Decision 607 (State Engineer 1949). Decision approved applications for permits to appropriate water from two springs. (*Id.*, pp. 2, 5.)

Decision 610 (State Engineer 1949). Decision approved application for permit to appropriate water from "spring group" through collections into a wooden box. From there, water would be conveyed by pipeline to a small reservoir. (*Id.*, p. 2.)

Decision 625 (State Engineer 1949). Decision approved application for permit to appropriate water from spring, to be collected in a 4' x 6' x 4' concrete box, and then conveyed by pipe to place of use. (*Id.*, p. 2.)

Decision 677 (State Engineer 1950). Decision approved applications for permits to appropriate water from spring through pipeline that would convey water to places of use. (*Id.*, pp. 1-2.)

Decision 1238 (State Water Rights Board 1965). Decision approved application for permit to appropriate water from spring through a timber spring box and two regulatory storage tanks. (*Id.*, p. 2.)

Decision 1149 (State Water Rights Board 1963). Decision approved application for permit to appropriate water from spring that was to be conveyed from a redwood box that enclosed spring through pipe to a tank. (*Id.*, pp. 1-2.)

Decision 1352 (State Water Resources Control Board, 1970). Decision approved application for permit to appropriate water from spring that was to be collected in a spring box and conveyed by hose to a tank. (*Id.*, p. 2.)

Decision 1451 (State Water Resources Control Board, 1975). Decision approved application for permit to appropriate water from spring that was to be diverted by spring box. (*Id.*, p. 2.)

Decision 1494 (State Water Resources Control Board, 1979). Decision approved application for permit to appropriate water from spring that had been developed into a small pond. (*Id.*, p. 8.)

Decision 1595 (State Water Resources Control Board, 1983). Decision approved application for permit to appropriate water from spring that had been diverted into a pipeline. (*Id.*, p. 9; see *id*, p. 11.)

A1.2    Applications Denied

Decision 1 (Dept. Pub. Wks., Div. Water Rights 1924). Decision denied application for permit to appropriate water from spring that had been developed by two ditches conveying water from spring to places of use. (Id., pp. 2-3.) Department denied application because there already were pre-1914 appropriative rights for these diversions and uses, and no unappropriated water was available for a new appropriation. (*Id.*, pp. 4-5.)

Decision 1246 (State Water Rights Board, 1966). Decision denied application for permit to appropriate water from unnamed spring that was being diverted by a spring box into a pipeline. (*Id.*, pp. 1-2.) Because spring did not produce any water surplus to quantity necessary to satisfy applicant's rights under his existing water-right license, Board denied application for new water-right permit. (*Id.*, pp. 2-3.)

A2.0    Decisions Involving Applications for Water-Right Permits for Diversions from Springs Through Pipes and Tunnels Developed Below the Ground Surface

A2.1    Applications Approved (or License Directed to be Issued)

Decision 259 (State Engineer, 1930). Decision discussed several applications for permits to appropriate water from various springs. (*Id.*, p. 1.) Decision approved Application 5955, which was for a permit to appropriate water from 17 springs, including seven (E-2 and F-3 through F-8) that were "developments of underground water proposed by applicant through the construction of tunnels, etc." (*Id.*, p. 8; see *id.*, pp. 13-14.)

Decision 337 (State Engineer, 1932). Decision approved request for water-right license to replace water-right permit to appropriate water from springs. (*Id.*, pp. 1-2.) Water "had been developed by means of a tunnel driven into

A2

the hillside . . . The tunnel was round to be timbered and 4 feet by 6 feet in cross section and 155 feet long." (*Id.*, p. 3.)

Decision 681 (State Engineer, 1950). Decision approved application for permit to appropriate water from spring. (*Id.*, pp. 1-2.) Diversion was "to be effected by means of a shored tunnel extending 20 to 50 feet into a water bearing spring area". (*Id.*, p. 2.)

Decision 1022 (State Water Rights Board, 1961). Decision approved application for permit to appropriate water from spring. (*Id.*, p. 1.) Applicants had "developed most of the water in the source by excavating a shallow hole and driving some pipes into the side of a hill to collect water from what is probably seepage through a seam of fractured granite. (*Id.*, p. 2.)

Decision 1209 (State Water Rights Board, 1965). Decision approved application for a permit to appropriate water from spring. (*Id.*, p. 2.) Spring had been developed by digging down 4 feet in a green, mossy meadow approximately 300 feet in diameter and constructing a small dam about 1½ feet high, which created a regulatory reservoir with a surface area of approximately 100 square feet. Water was diverted from reservoir into a pipeline and conveyed to place of use. (*Id.*, pp. 1-2.)

## A2.2    Applications Denied

Decision 802 (State Engineer, 1954). Decision denied application for permit to appropriate water from spring that would be developed by a tunnel 4 feet wide by 7 feet high by about 100 feet long that tapped a fracture line. (*Id.*, pp. 2, 5, 7-9.) Water would be diverted by a concrete dam and then conveyed through a pipeline. (*Id.*, p. 2.) Decision denied application because owners of the mining claim within which spring was located could divert and use the spring water under riparian rights. (*Id.,* p. 11.)

Decision 915 (State Water Rights Board 1958). Decision denied application for permit to appropriate water from two springs through diversions by spring boxes and conveyed by pipelines to place of use. (*Id.*, pp. 1-2.) Springs had been developed by short tunnels into the hillside and the entire production of the springs was being used, apparently under pre-1914 appropriative rights. (*Id.*, pp. 2, 4.) Applicants proposed to increase production of springs by further development and to appropriate the increased flow. (*Ibid.*) Board concluded that water applicants "seek to develop in excess of the natural flow of the springs would be percolating groundwater over which the Board has no jurisdiction," citing Water Code section 1200. (*Id.*, p. 6.)

A3.0    <u>Decisions Involving Applications for Water-Right Permits for Diversions from
Tunnels Developed Below the Ground Surface and Not Associated with Any
Springs</u>

A3.1    <u>Applications Approved</u>

Decision 932 (State Water Rights Board, 1959). Decision approved
application for permit to appropriate water from a tunnel that was 180 feet
long, "driven into decomposed granite," 5.5 feet wide and 6 feet high.
(*Id.*, pp. 1, 3.)

Decision 1263 (State Water Rights Board, 1966). Decision approved
application for permit to appropriate water "from a spring in [a mine] tunnel."
(*Id.*, pp. 1-2.)

Decision 1325 (State Water Resources Control Board, 1969). Decision
approved application for permit to appropriate water from a mine tunnel by
diverting water "in a cut leading to the mine entrance." (*Id.*, pp. 1-2.)

Decision 1363 (State Water Resources Control Board, 1970). Decision
approved application for permit to appropriate water from a mine tunnel.
(*Id.*, p. 1.)

A3.2    <u>Applications Denied</u>

Decision 986 (State Water Rights Board 1960). Decision denied application
for permit to appropriate water developed in the Tecolote Tunnel in Santa
Barbara County. (*Id.*, pp. 1, 3.) Tunnel was 7 feet in diameter and 6.4 miles
long. (*Id.*, p. 2.) Board concluded that water intercepted by the tunnel "is
percolating groundwater at the point of interception." (*Id.*, p. 4.) Board further
concluded that "where the percolating water developed in a tunnel is not
abandoned, but is directly taken and applied to beneficial use by the person
who developed it, the tunnel water is no more subject to the jurisdiction of the
Board than is any other percolating water." (*Id.*, p. 5.)

Decision 1157 (State Water Rights Board 1963). Decision denied application
for permit to appropriate water from an unnamed stream "just below the point
where the stream emerges from the Saratoga Mine Tunnel." (*Id.*, p. 2.) Board
concluded that there was no unappropriated water available to supply
applicants, and therefore denied the application. (*Id.*, pp. 3-4.)

A4.0    <u>Decision Involving Application for Permit to Appropriate Water from Surface
Stream that was Derived from Developed Percolating Groundwater Associated
with Springs</u>

Decision 1482 (State Water Resources Control Board 1978). Application
24804 was for a permit to appropriate water from four unnamed streams

A4

supplied by springs. (*Id.*, pp. 2, 6, 8, 11-12.) Surface flow from springs was largely attributed to a lateral pipe system applicant installed in the springs. (*Id.*, p. 12.) Applicant contended that springs were percolating waters, not subject to Board's water-right permitting authority. (*Id.*, pp. 11-12.) Citing Water Code sections 1200-1201, Board found that waters for which applicant sought a permit originated from: (1) surface runoff collected in the unnamed streams during storms, (2) natural flows from the springs, and (3) "flow from the springs to the unnamed streams that occurs solely from the man-made improvements" (developed waters). (*Id.*, p. 13.) Board noted that the State has a substantial interest in assuring that water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that this goal can be best accomplished through the administration of water rights under the Water Code (that is, by including such developed waters within the Board's water-right permitting authority). (*Id.*, p. 14.)

A5

# Appendix B

# BlueTriton's Request to Set Aside Proposed Order and Motion to Stay Further Action;
# Comments on May 26, 2023 Proposed Order

Introduction

On June 2, 2023, BlueTriton's attorneys filed a Request to Set Aside Proposed Order (2023-06-02 BlueTriton Request) and a Motion to Stay Further Action on the Proposed Order and First Address the State Water Resources Control Board's Lack of Permitting Authority Over Groundwater (2023-06-02 BlueTriton Motion).  On June 23-26, parties to this proceeding and other interested entities filed comments on the AHO's May 26, 2023 proposed order.  Files with this motion, this request and these comments are in the "Comments on 2023-05-26 Proposed Order" sub-folder within the "State Water Board meetings" folder in the administrative record.

The following paragraphs summarize BlueTriton's request and motion, and the comments of parties to this proceeding and other parties, and contain our responses.

Comments Supporting May 26, 2023 Proposed Order

Comments:  On June 25-26, 2023, the Prosecution Team, the Story of Stuff Project, the Center for Biological Diversity and the Sierra Club, Amanda Frye, Steve Loe, Hugh Bialecki (for Save Our Forest Association, Inc.) and Anthony Serrano filed comments on the May 26, 2023 proposed order.  The Story of Stuff Project also filed a petition that indicated it was on behalf of numerous listed individuals.

These comments all urged the Board to adopt the proposed order without any changes.

Some of these comments also urged the Board to direct its staff to investigate Strawberry Canyon public trust resources and BlueTriton's diversions through its Boreholes 10, 11 and 12, and to investigate pursuing an administrative civil liability action against BlueTriton.

Response:  As discussed in section 3.8, we deny the Prosecution Team's request for a CDO regarding Boreholes 10, 11 and 12.  This denial is without prejudice to the Division's authority to conduct further investigations regarding these diversions, or to issue a new draft CDO regarding them.  The Division also may, in its discretion, decide to prepare and file an administrative civil liability complaint against BlueTriton under Water Code section 1055, subdivision (a) (under its authority delegated from the Board's Executive Director).

B1

<u>BlueTriton's Request, Motion and Arguments</u>

The following paragraphs discuss the arguments in BlueTriton's June 26, 2023 Request to SWRCB to Reject Proposed Order and Dismiss Draft Cease and Desist Order.[B1] We refer to this document as the "2023-06-26 BlueTriton Request." (BlueTriton uses the acronym "BTB" for its name and the acronym "SWRCB" for the State Water Board. We retain these acronyms in our quotations from the 2023-06-26 BlueTriton Request.)[B2]

The following paragraphs also discuss the arguments in BlueTriton's June 2, 2023 Request to Set Aside Proposed Order, which we refer to as the "2023-06-02 BlueTriton Request," and BlueTriton's June 2, 2023 Motion to Stay Further Action on the Proposed Order and First Address the State Water Resources Control Board's Lack of Permitting Authority Over Groundwater, which we refer to as the "2023-06-02 BlueTriton Motion."

    1.  <u>Argument</u>:  "BTB's Boreholes and Tunnels Collect Percolating Groundwater, Which is Not Subject to the SWRCB's Permitting and/or Enforcement Authority."(2023-06-26 BlueTriton Request, p. 5:4-5.)  "The point where water is physically diverted and taken under control establishes its legal character and classification for purposes of determining the scope of the SWRCB's jurisdiction." (*Id.*, p. 6:17-18, quoting Wells A. Hutchins, <u>Water Rights Laws in the Nineteen Western States</u>, Vol. 1, pp. 23-24 (1971).)[B3] "Moreover, the Proposed Order does not cite any authority to support a conclusion that groundwater collections that are not from a subterranean stream can be treated as diversions of surface water flowing in a natural channel." (*Id.*, p. 7:9-11.)

<u>Response</u>:  As stated in section 3.6.2:

The question here therefore is whether we should treat BlueTriton's present diversions by Tunnels 2 and 3 and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8 as diversions of surface water, over which the State Water Board has water-right permitting and enforcement authorities, or as diversions of

---

[B1] On June 26, 2023, BlueTriton's attorneys filed one file with a six-page cover letter and the 41-page request cited here. (2023-06-26 BTB ltr.)  Because the cover letter does not contain any arguments that are not also in the request, we just address the arguments in the request.

[B2] Consistent with the text of our order, citations to exhibits in this Appendix B are to pdf page numbers, which often are different from the text page numbers. (See footnote 1 of our order.)  We cite to the text page numbers in the 2023-06-26 BlueTriton Request. These text page numbers are different from the pdf page numbers of the file that contains this request.

[B3] This Hutchins treatise discusses water-right law in the nineteen western states. We cite it here as "Hutchins, Western States Water Laws."  It is different from the Hutchins treatise cited in section 3.1, which discusses only California laws and court decisions. Unless the context indicates otherwise, citations in this Appendix B to "Hutchins" are to Hutchins, <u>The California Law of Water Rights</u> (1956).

B2

percolating groundwater, to which these authorities would not apply in this proceeding.

For its argument that the water diverted by these tunnels and boreholes is percolating groundwater, BlueTriton cites *City of Los Angeles v. Pomeroy* (1899) 124 Cal. 597, and *North Gualala Water Co. v. State Water Resources Control Board* (2006) 139 Cal.App.4th 1577. However, neither of these cases involved diversions of water associated with springs.

The chapter of the Hutchins Western States Water Laws treatise that BlueTriton quotes contains general definitions derived from reported court decisions from nineteen western states. This introductory chapter of the treatise does not contain any citations.

These definitions apply to issues regarding rights to use water, and do not necessarily apply to questions of the scope of the State Water Board's water-right permitting and enforcement authorities. (See 2022-08-05 BlueTriton closing brief, p. 13:15--14:5 (Prosecution Team's reliance on reported court decisions on water-right issues associated with springs was incorrect, because these decisions "do not address the SWRCB's permitting authority under Division 2 of the Water Code").)

These definitions also do not specifically address diversions of water associated with springs, and they refer to water that is "captured and brought to the surface by means of a pumping plant" (Hutchins, Western States Water Laws, p. 23). All BlueTriton's diversions involved in this proceeding are associated with springs, and none of these diversions is made by a pumping plant.

BlueTriton omitted from its quotation the sentence in this treatise that states "However, a watercourse flow, or a ground water reservoir, may contain undivided segments of commingled waters to which different rights of use may attach." (*Id.*, pp. 23-24.) This sentence recognizes that different states may have different rules regarding various types of rights of use of surface water and groundwater. Different states also may have different rules regarding the water-right permitting and enforcement authorities of their state regulatory agencies. Our order is based on the specific rules that have been enunciated by California courts and the State Water Board and its predecessors.

No party has cited, and we are not aware of, any reported court decision that addressed the specific issue of whether the Board's water-right permitting and enforcement authorities extend to water diverted by an underground tunnel, borehole or pipe that intercepts the water that otherwise would discharge from a spring, where the discharged water would be subject to these authorities.

Because there are no reported court decisions that address this specific issue, we consider the prior decisions of the State Water Board and its predecessors on applications for permits to appropriate water through pipes and tunnels below the ground surface that intercept water that otherwise would have discharged from springs. Those decisions are discussed in Appendix A, sections A2.1 and A2.2. While none of the decisions in section A2.1 explicitly discussed Water Code sections 1200-1202 or the

Board's water-right permitting authority, they still are precedents supporting the conclusion that the Board's water-right permitting authority, and thus also the parts of the Board's water-right enforcement authority involved in this proceeding, extend to underground pipes and tunnels that intercept water that otherwise would discharge from springs.

In contrast, most of the decisions of the State Water Board and its predecessors that BlueTriton cites for its argument did not involve applications for permits to appropriate water through pipes or tunnels that would intercept water that otherwise would have discharged from springs. (See Decisions 724, 968, 986, 1327, 1337 and 1357, cited by 2023-06-26 BlueTriton Request, p. 7:4-5.) Decision 225, also cited by BlueTriton's Request, involved an application for a permit to appropriate water from a well developed in a cienega that did not have any clear flow channel.

Decision 915 involved an application for a permit to appropriate water that would be developed by tunnels associated with two springs. However, the facts involved in that proceeding are distinguishable from the present proceeding because they involved an application for a permit to appropriate only percolating groundwater that would be developed, and not to appropriate any water that naturally would have discharged, from the spring involved in that proceeding. (Decision 915, pp. 5-6.) In contrast, at least some of the water subject to each of BlueTriton's diversions involved in this proceeding is water that would have discharged from the historic springs under natural conditions. (See section 3.6.2.) Also, in a subsequent decision, Decision 1482, the State Water Board concluded that it should extend the water-right rules that apply to springs to waters that were developed through improvements at the springs. (Decision 1482, p.14; see section 3.6.2)

In reaching our conclusion on this issue, we also consider Order WR 2019-0149, in which the Board concluded that the Board's water-right permitting and enforcement authorities extended to waters associated with natural springs that were developed through pipes extending from the ground surface near the sites of the springs into the underlying bedrock formations where they intercept water flowing in fractures in the bedrock. (See sections 3.5 and 3.6.2, Figures 12 and 13.)

Considering the decisions discussed in Appendix A, section A2.1, Decision 1482 and Order WR 2019-0149, we conclude that the Board's water-right permitting and enforcement authorities apply to diversions through underground tunnels, boreholes and pipes of water associated with historic springs, where the water that discharged from these springs would have been subject to these authorities. For water-right purposes, the Board should treat these diversions as diversions being made at the sites of the historic springs, even though the tunnels, boreholes or pipes now intercept that water before it can discharge from the historic springs. Otherwise, anyone seeking to divert and use spring water could evade these authorities by installing an underground tunnel, borehole or pipe to intercept the water that otherwise would discharge from the spring. (See section 3.6.2.)

B4

This conclusion is consistent with the initial groundwater extraction notices filed by one of BlueTriton's predecessors. These notices described the locations of the historic springs, not any underground points of interception, and they referred to the sources as "naturally developed springs." (See, e.g., exh. PT-98, pp. 1-2, 5.) This conclusion also is consistent with the positions taken by BlueTriton and its predecessors that the water BlueTriton diverts through these facilities is "spring water" under the FDA regulations. (See section 3.6.2.)

2.  Argument: "The Proposed Order's New Hypothetical Surface Water Test is Unsupported by Any Facts or Legal Authority, and Misrepresents the Evidentiary Record." (2023-06-26 BlueTriton Request, p. 7:12-13.) "As the hypothetical facts and questions posed in the May 26, 2022 Post-Hearing Order ("Hypothetical") were neither included in the Draft CDO, nor presented during the course of the hearing, it is improper to rely of (sic) them as the principle (sic) basin (sic) for resolving this matter." (Id., p. 7:17-20, bolding and footnote in original omitted.) "The Prosecution Team and intervening parties did not allege that BTB collects groundwater that discharges to a 'surface stream flowing in a natural channel' or a 'subterranean stream flowing in a known and definite channel,' and indeed there is no evidence of streams or subsurface channels in the vicinity of the boreholes and tunnels." (Id., p. 9:3-6.)

Response:  As discussed in section 3.6.1, one of the issues the AHO hearing officer directed the parties to address in their closing briefs was:

Hypothetically, if no one had constructed Tunnels 2, 3 and 7, and Boreholes 1, 1A, 7, 7A, 7B, 7C, 7D, 8, 10, 11 and 12 (collectively referred to as the "existing collection facilities"), and if Respondent now were to divert water for water-bottling purposes from unimproved springs in the vicinities of any of the existing collection facilities (through spring boxes or similar facilities located where the spring water flows from underground to the ground surface), would such diversions and uses be diversions and uses of surface water or water in subterranean streams flowing through known and definite channels, as those terms are used in Water Code section 1200, or diversions and uses of percolating groundwater?

Numerous reported California appellate court decisions have affirmed the use of hypothetical questions to expert witnesses. Discussing the rules for hypothetical questions, the California Supreme Court stated in *People v. Vang* (2011) 52 Cal.4th 1038, 1046:

A hypothetical question need not encompass all of the evidence. "It is true that 'it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question.' [Citation] 'On the other hand, the expert's opinion may not be based 'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors. . .'"

B5

In *People v. Busch* (1961) 56 Cal.2d 868, 874-875, the court stated:

While each hypothesis contained in the question should have some evidence to support it, it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question.'

In *In re Jacobson's Guardianship* (1947) 30 Cal.2d 312, 324, the court stated:

It is not essential to the propriety of a hypothetical question that the facts assumed should be undisputed. The question is proper if it recites only facts within the possible or probable range of the evidence and if it is not unfair or misleading. A large discretion relating to the form of the question rests with the trial court.

The California Supreme Court stated these rules in decisions discussing hypothetical questions that had been presented to expert witnesses during trial to aid the triers of fact in reaching their decisions. In the context of briefings of legal issues, the AHO hearing officer had at least the same amount of discretion to ask the parties and their attorneys to answer hypothetical questions. Such answers were not evidence, but they assisted the AHO hearing officer and us as we evaluated and answered the relevant legal questions.

Analyzing the AHO hearing officer's hypothetical question is an appropriate first step in our analysis in this order of whether the Board's water-right permitting and enforcement authorities apply to BlueTriton's collections of water in Strawberry Canyon and its beneficial uses of this water. (See sections 3.1 and 3.6.2.)

The facts regarding the pre-development flows from Springs 1, 2, 3, 7 and 8 into natural channels, the construction of tunnels and boreholes at the sites of these springs, and the associated water-right issues were discussed in detail in the draft CDO. (Exh. PT-1, pp. 6-9.) During the AHO hearing, Division of Water Rights Senior Water Resource Control Engineer Victor Vasquez testified in detail about these topics. (Exh. PT-7, pp. 7-24; see section 2.12.3.1.) Mr. Nicholls also testified about pre-development conditions. (See section 2.12.3.2.)

Considering this discussion in the draft CDO, this testimony, and the legal issues involved in this proceeding, the AHO hearing officer did not abuse his discretion when he directed the parties to brief this issue. Our findings related to this issue in section 3.6.1 are based on facts in the administrative record, and our conclusions on this issue are relevant to our analyses of the legal issues. These conclusions are not "advisory opinions," and they are not based on "conjecture or speculation" or "nonexistent evidence." (Cf. 2023-06-26 BlueTriton Request, pp. 8:3-4, 9:14, 9:18.)

Contrary to BlueTriton's argument, the reference to spring boxes in this issue did not ask about a hypothetical seep, marsh or bog. (See *id.*, p. 8:16.) Instead, the reference was to a standard type of facility for diversions from springs that the parties could discuss in their closing briefs in the context of the facts in the administrative record regarding the historic springs at the locations of BlueTriton's tunnels and boreholes.

Although BlueTriton argues that "there is no evidence of streams or subsurface channels in the vicinity of the boreholes and tunnels," citing Mr. Nicholls's testimony (*id.*, p. 9:5-6), this argument is incorrect. Section 3.6.1 discusses the evidence in the administrative record that supports the finding that water that discharged from Springs 1, 2, 3, 7 and 8 flowed into and through natural channels.

Also, as discussed in section 3.6.1, *State v. Hansen* (1961) 189 Cal.App.2d 604, 606-607, 610 held that a water-right permit was required for an appropriation of water from a spring that "merely moistened the ground thereabouts; and was not the source of any water course." Under this precedent, water-right permits would have been required for appropriations of water from Springs 1, 2, 3, 7 and 8, whether or not water that historically discharged from them flowed into and through natural channels.

    3.  <u>Argument</u>: "The plain language of Water Code sections 1200 and 1201 preclude the conclusion that BTB is diverting surface water." (2023-06-26 BlueTriton Request, p. 10:18-19.)

<u>Response</u>:  As discussed in section 3.6.2 and in our response to Argument 2, we conclude that, for water-right purposes, the Board should treat diversions of water associated with springs that are made through tunnels, boreholes or pipes as diversions being made at the historic springs that were located at or near the portals of the tunnels, boreholes and pipes, even though the tunnels, boreholes and pipes now intercept that water before it can discharge from the historic springs. Based on this conclusion and the conclusion in section 3.6.1 that diversions from these historic springs would be subject to the Board's water-right permitting and enforcement authorities, Water Code sections 1200 and 1201 do not preclude, and instead support, the conclusion that BlueTriton's diversions are subject to these Board authorities.

    4.  <u>Argument</u>: "The Proposed Order improperly relies on prior SWRCB decisions." (2023-06-26 BlueTriton Request, p. 11:15.)

<u>Response</u>: While none of the decisions discussed in section A2.1 explicitly discussed Water Code sections 1200-1202, they still are precedents supporting the conclusion that the Board's water-right permitting authority, and thus also the parts of the Board's water-right enforcement authority involved in this proceeding, extend to underground pipes and tunnels that intercept water that otherwise would discharge from the springs. This reliance on these decisions as precedents is appropriate because there are no other Board decisions or reported court decisions that address the specific issue of whether the Board's authorities that apply to a spring still apply when a diverter constructs and uses a tunnel, borehole or pipe to intercept water that otherwise would discharge from the spring.

B7

BlueTriton argues that the respondent in the proceeding that led to Order WR 2019-0149 "did not challenge the legal classification of the source water at issue." (2023-06- 26 BlueTriton Request, p. 12:25 fn. 19.)

This argument is incorrect. Order WR 2019-0149, referring to the respondent, Mr. Fahey, states: "Fahey's case-in-chief included expert witness testimony by Dr. Grunwald to further support his argument that he diverts groundwater or developed water." (Order WR 2019-0149, p. 74.) The reference to "groundwater" here is to percolating groundwater. After discussing the relevant facts and legal authorities, the order concludes: "[f]or the foregoing reasons, we find that there is not sufficient evidence in the record to support a finding that Fahey diverts developed water or percolating groundwater." (*Id.*, p. 78.)

BlueTriton also argues that Order WR 2019-0149 is not an applicable precedent here because of "dissimilar hydrogeologic and physical conditions." (2023-06-26 BlueTriton Request, p. 12:26 fn. 19.) BlueTriton does not explain what conditions it contends are "dissimilar." The diversions involved in the proceeding that led to Order WR 2019-0149 were through pipes that intercepted water in fractures in bedrock formations, and at least some of this water otherwise would have discharged from the Marco and Polo Springs. (See section 3.5 and Figures 12-13.) The conclusion in Order WR 2019-0149 that diversions of water by these pipes were subject to the Board's water-right permitting and enforcement authorities therefore is a precedent that applies to this proceeding.

BlueTriton also is incorrect in arguing that "the Proposed Order does not cite a single SWRCB decision or order or court decision in which the SWRCB based its permitting authority on a hypothetical diversion location and not on the actual or proposed diversion location." (2023-06-26 BlueTriton Request, p. 12:4-6.) All the decisions described in Appendix A, section A2.1, involved applications to appropriate water from the springs listed in those applications. The authorized points of diversion were at the locations of the historic springs, even though the applicants' tunnels and pipes intercepted the water before it discharged from the springs.

BlueTriton repeats its citations to numerous decisions by the Board and its predecessors that denied applications for permits to appropriate percolating groundwater. (2023-06-26 BlueTriton Request, p. 12:6-11.) These decisions are discussed in our response to Argument 1. That discussion is not repeated here.

BlueTriton argues that none of the prior decisions of the State Water Board and its predecessors were designated as precedent decisions in accordance with the specific requirements of Government Code section 11425.60. (2023-06-26 BlueTriton Request, p. 12:12-14.) BlueTriton recognizes that the Board's Order WR 96-01 designated these decisions as precedential, but BlueTriton argues that this designation was improper because the Board has not published a list of these decisions in the California Regulatory Notice Register, and that Board decisions must be designated as precedential for a specific legal or policy principle that is likely to recur. (2023-06-26 BlueTriton Request, p. 12:15-22.)

B8

In Order WR 96-01, the Board stated:

Recent legislation provides for the designation of precedent decisions, so that
persons participating in adjudicatory proceedings before an agency have access
to decisions which may be relied on as precedent.  (See Cal. Gov. § 11425.60.
added by Stats. 1995, Ch. 938, § 21 p. 5538, eff.
July 1, 1997.)  It has been the SWRCB's practice to treat its decisions and orders
as precedent.  Of course, a prior decision or order may be distinguished or
overturned by a later decision or order.  Nevertheless, the treatment of SWRCB
decisions and orders as precedent helps provide greater consistency and
predictability in agency decision making.  Recent decisions and orders are readily
accessible, including availability on the SWRCB Internet site
(http://www.swrcb.ca.gov) and the Lexis and Westlaw databases.  Accordingly,
the SWRCB designates all decisions or orders adopted by the SWRCB at a
public meeting to be precedent decisions, except to the extent that a decision or
order indicates otherwise, or is superseded by later enacted statutes, judicial
opinions, or actions of the SWRCB.

(Order WR 96-01, p. 17, fn. 11.)

The State Water Board continues to maintain an index of all of its water-right decisions
and orders on its public website.  (See
https://www.waterboards.ca.gov/board_decisions/adopted_orders/)  These decisions and
orders also continue to be available and searchable through the Westlaw and LEXIS
databases.  Consistent with the statement in Order WR 96-01, treatment of prior
decisions and orders adopted by the State Water Board and its predecessors as
precedents will continue to help provide greater consistency and predictability in the
Board's decision making.

Contrary to BlueTriton's argument, nothing in Government Code section 11425.60
requires that the index of decisions must index and designate decisions for specific legal
or policy principles.  Rather, subdivision (b) authorizes the Board to designate as
precedential decisions that contain such principles.  In Order WR 96-01, the Board
concluded that all of its decisions and orders contain such principles and therefore
should be designated as precedent decisions (subject to the exceptions stated in Order
WR 96-01).

Considering that Board decisions and orders are available through the Board's website
and these databases, that Government Code section 11425.60, subdivision (b), does not
contain any specific procedural requirements for how an agency like the Board may
designate its precedent decisions, and that this statute provides that such designations
are not subject to judicial review, we conclude that the State Water Board has
substantially complied with the requirements for designating precedential decisions.[B4]

BlueTriton argues that the proposed order contains "surprise use" of prior Board
decisions and orders "to craft a new legal theory" "without notice or opportunity to
rebut," which it argues "constitutes a denial of due process."  (2023-06-26 BlueTriton
Request, p. 13:1-4.)

This argument is incorrect.  A memorandum by an Office of Enforcement attorney that was Appendix B to the Division's 2017 report of investigation cited many of these Board decisions and noted that the State Water Board had issued permits to appropriate water from springs using artificial methods.  (Exh. PT-13, p. 74 and fn. 5.)  The 2021 revised report of investigation also cited and discussed these decisions.  (Exh. PT-3, p. 33 and fn. 42.)  The Prosecution Team submitted copies of many of these Board decisions and Order WR 2019-0149 as exhibits for the AHO hearing.  (Exhs. PT-58 through PT-80, PT-84.)  The Prosecution Team's closing brief to the AHO cited these Board decisions and some additional Board decisions.  (2022-08-05 Prosecution Team closing brief, p. 11:2-4.)  All or almost all of the decisions discussed in Appendix A to this order were cited in these Prosecution Team documents.

Also, just as the AHO may independently research statutes and reported court decisions and cite them in its proposed order, the AHO also may independently research prior State Water Board decisions and cite them in its proposed orders.

    5.  <u>Argument</u>:  "The Proposed Order improperly ignores the SWRCB's long-held position regarding the SWRCB's limiting permitting authority over groundwater."  (2023- 06-26 BlueTriton Request, p. 13:5-10, citing exhs. BTB-23, BTB-24, BTB-28 and BTB- 31 through BTB-35.)

<u>Response</u>:  The exhibits BlueTriton cites contain State Water Board staff and Board member communications on various dates between 1993 and 2016.  None of them contain any detailed analyses, and they all pre-date the Division's 2017 report of investigation.  Those communications did not limit the Division from conducting its detailed investigation and preparing the detailed analyses stated in its 2017 and 2021 reports.  The AHO properly focused on the detailed analyses in these two reports,

---

[B4] Although Board decisions have not been publicized annually in the California Regulatory Notice Register, (see Gov. Code, § 11425.60, subd. (c)), Board decisions and orders have been readily available on the Board's website and searchable through the Westlaw and LEXIS databases, and BlueTriton has demonstrated that it has full access to these decisions and orders through its citations to them throughout this proceeding, including numerous citations in the 2023-06-26 BlueTriton request.  BlueTriton therefore has not been prejudiced by any lack of publications of these decisions and orders in this register.

Exhibit 9, P. 122

rather than on the brief statements in the prior communications, when it conducted its hearing and prepared its proposed order.

During our proceedings, we seriously consider relevant prior statements of our staff and prior Board members. However, such prior statements are not precedential decisions, and we retain the discretion to decide the issues before us in the manner we deem appropriate, based on all evidence in the administrative record and all arguments presented to us.

6. Argument: "Groundwater extraction notices of BTB's predecessors compel the conclusion that BTB is collecting groundwater, not surface water." (2026-06-26 BTB Request, p. 14:8-9.) "[T]he SWRCB is estopped from issuing the Proposed Order because the SWRCB allowed BTB to reasonably rely on the SWRCB's acceptance of these filings for several decades, without question that the subject water is groundwater that is not subject to the SWRCB permitting authority." (Id., p. 15:3-6.)

Response: The Division of Water Rights receives tens of thousands of water-right reports (groundwater extraction notices, statements of water diversion and use, permittee progress reports, licensee reports and registrations of small domestic uses, small irrigation uses and stockpond uses) each year. It is not feasible for the Division to evaluate each one of these annual filings, and the Division's acceptance of any report for filing is not an act on which an estoppel claim may be based.

The first paragraph Water Code section 5007 specifies a process under which a person may apply to the Board to investigate the facts stated in a groundwater extraction notice. There is no evidence in the administrative record for this proceeding that BlueTriton ever filed such an application with the Board.

The second paragraph of section 5007 provides:

In any action or proceeding hereafter pending in which the facts, or any of them, contained in the notices so filed are material, such notices shall not be evidence of any fact stated therein, but such determination by the board shall be prima facie evidence of said facts.

Under the first part of this paragraph, the groundwater extraction notices filed by BlueTriton shall not be prima facie evidence of any facts stated in the notices. The second part of this paragraph does not apply here, because the Board had not made a determination under this statute regarding BlueTriton's facilities in Strawberry Canyon.

7. Argument: "Even if the Hypothetical Surface Water Test was Appropriate, No Evidence Exists That Water from the Springs Ever Flowed in a Natural Surface Water Channel." (2023-06-26 BlueTriton Request, p. 15:15-16.) The statement in section 3.6.1 of the proposed order that diffused surface waters "do not originate at any specific point source" is inconsistent with the statement in Hutchins that diffused surface waters "may also have their origin in springs." (Id., p. 15:19-26, citing Hutchins, p. 371.)

B11

<u>Response</u>:  The following text in Hutchins states the salient description of "diffused surface waters":

Diffused surface waters consist of surface drainage falling upon and naturally flowing from and over land before such waters have found their way into a natural watercourse.

Such waters are spread over the surface of the ground without being collected into a definite body of water, or into a definite channel having the characteristics of a watercourse.  But it is not necessary that they be spread broadly over the land at all times.  They may include errant water while passing through a low depression, swale or gulley.

(Hutchins, p. 372, footnotes omitted.)

The key points from this text are that, to be diffused surface water, the water may not be in a definite body of water or a definite channel, and instead is "spread over the surface of the ground."  Consistent with the concept of "water spread over the surface of the ground," the proposed order stated in section 3.6.1 that diffused surface waters "do not originate at any specific point source."  However, because it is theoretically possible that water could originate at a point source and then spread broadly over the land and become diffused surface water, the AHO deleted this sentence from the May 26, 2023 proposed order.

The Hutchins statement that diffused surface waters "may also have their origin in springs" (Hutchins, p. 371) does not mean that all waters originating from springs are diffused surface waters.  To be diffused surface waters, such waters, whether originating directly from precipitation or from springs, must "spread over the surface of the ground without being collected into a definite body." (*San Gabriel Valley Country Club v. Los Angeles County* (1920) 182 Cal. 392, 398 (one of the court decisions cited by Hutchins for this point, see Hutchins, p. 371 fn. 89).)

In section 3.6.1, we concluded that the water that historically discharged from Springs 1, 2, 3, 7 and 8 under pre-development conditions flowed into and through natural channels, and were not spread over the surface of the ground.  Such waters therefore were not diffused surface waters.[B5]

---

[B5] In the above quotation, Hutchins refers to "gulley" in a phrase that also includes "low depression" and "swale." Considering this context and his text regarding diffused surface waters quoted above, we conclude that his reference to gullies is intended to refer to surface features through which water may flow over the surface of the ground without being in a definite channel.  To avoid any confusion in our order with the use of "gullies" in this part of Hutchins, the AHO edited the first paragraph of the part of section 3.6.1 on page 61 of the proposed order to refer to "ravines" instead of "gullies." "Ravine" was the term used by both Mr. Vasquez and Mr. Nicholls in their testimonies. (See, e.g., exh. PT-7, p. 9, ¶¶ 22-24; exh. BTB-6, p. 43, ¶ 136.

8.  Argument: "The Proposed Order misrepresents BTB's legal arguments and the testimony and evidentiary record regarding the surface expression of groundwater in the vicinity of BTB's collection facilities." (2023-06-26 BlueTriton Request, p. 16:5-7.)  "Mr. Nicholls testified that even if the entire flow of BTB's tunnels and boreholes – that is, the groundwater collected inside the mountain – are 'turned out' at the portals, that discharged water simply seeps down the hillside but does not discharge as a watercourse. [Citations.]  Under these factual circumstances, even if BTB collected water at the ground surface, the hypothetical spring boxes would collect diffused surface water and would not be subject to the SWRCB's permitting authority." (*Id.*, p. 17:8-14.)

Response:  The parts of Mr. Nicholls's testimony cited by BlueTriton state that the discharges from the tunnels and boreholes during "turn out" tests did not produce "contiguous surface water flow in any ravine tributary to Strawberry Creek." (See, e.g., exh. BTB-6, p. 43:9-12, ¶ 136.)

However, the existence of contiguous surface water flow is not a requirement under Water Code sections 1200-1201 for surface water to be flowing in a natural channel. Rather, such water only needs to be in a "defined channel" (see Hutchins, p. 373), as opposed to being "spread over the surface of the ground without being collected into a definite body of water, or into a definite channel having the characteristics of a watercourse" (*id.*, p. 372, footnotes omitted).  As we state in section 3.6.1:

> But a contiguous surface flow is not required for a natural channel to be present. Flows in many, perhaps most, creeks in California often at times have reaches where there is surface water and reaches without any surface water, particularly under low-flow conditions.  Such creeks still flow in natural channels.

9.  Argument:  "The Proposed Order cites no evidence to support the hypothetical diversion of "flowing water" or a "channel". (2023-06-26 BlueTriton Request, p. 17:15-16.)

Response: The proposed order cites the following evidence to support its findings regarding the historical channels into which water that discharged from Springs 1, 2, 3, 7 and 8 flowed (see section 3.6.1):

-Figure 14 shows that ravines are adjacent to the portals of Boreholes 1, 1A and 8, the portal of Tunnel 3, and the portals of Boreholes 7, 7A, 7B and 7C, which are approximately 40 feet from the portal of Tunnel 7.

-The Division's 2021 revised report of investigation, exhibit PT-3, pages 157-161, contain photographs showing these ravines in relation to these boreholes and tunnels.  These photographs are described in the testimony of Victor Vasquez, exhibit PT-7, page 9, paragraphs 22-24, and page 23, paragraph 83.

-The 1901 topographic map, exhibit SOS-295, page 22 shows the historical, pre-development creeks that flowed adjacent to the current

B13

locations of Boreholes 1 and 8 and the Spring 7 complex. The locations of Boreholes 1 and 8 are shown by the green circles above the second "n" in "Inn" in exhibit PT-314, revised. The location of the Spring 7 complex is shown by the two green circles in this exhibit, to the right of "Inn." Considering the depictions of the historic creeks in exhibit SOS-295, page 22 and the depictions of the locations of the boreholes in exhibit PT-314, revised, these two figures together show that Boreholes 1 and 8 and the Spring 7 complex are immediately adjacent to these historic creeks.

Although Mr. Nicholls questions these old topographic maps, we find, based on the testimony of Mr. Allord, that they are reliable evidence of pre-development conditions.

-Mr. Rowe's October 1, 1930 letter, exhibit SOS-53, describes flows that were turned into the creek from Tunnel 2, which was located at the site of Spring 2. Although Mr. Nicholls argues that these flows may have been augmented by the Tunnel 2 development, it still is reasonable for us to find that, based on the evidence in the record, that water would have flowed from Spring 2 down the flow path described in Mr. Rowe's letter under pre- development conditions.

We have edited the text at the beginning of the part of section 3.6.1 that discusses Springs 1, 2, 3, 7 and 8 so it states that the ravines are "adjacent to" the portals of the listed boreholes and tunnels. This replaces the proposed order text that stated that these ravines "begin" at these locations.

10. Argument: "Springwater classification for labeling purposes is irrelevant." (2023-06-26 BlueTriton Request, p. 18:15.)

Response: Our order states that the conclusion that, for water-right purposes, the Board should treat BlueTriton's diversions as diversions being made at the sites of the historic springs is consistent with the positions taken by BlueTriton, its predecessors and its consultants, that the water BlueTriton extracts through its facilities and bottles for sale as "spring water" under the FDA regulations. This is a correct statement. BlueTriton's classification of its bottled water as "spring water" under FDA regulations is a fact we may consider as part of our decision making process in this proceeding.

11. Argument: "The Proposed Order's Novel Hypothetical Surface Water Test Would Substantially Expand the SWRCB's Permitting Authority. (2023-06-26 BlueTriton Request, p. 18:23-24.) "[A]ny groundwater diversions that are hypothetically hydrologically connected to a surface watercourse or a subterranean stream would be illegal without first obtaining a water-right permit from the SWRCB." (*Id.*, p. 19:7-9.) "The hypothetical surface water test would make production from wells with any hydrological connection to surface watercourse and most storm water and diffuse storm collection systems subject to the SWRCB's water rights permitting authority." (*Id.*, p. 19:11-13.)

B14

<u>Response</u>:  We disagree with BlueTriton's speculative arguments.  Our order's analyses and conclusions follow logically from prior Board decisions regarding applications for permits to appropriate water associated with springs.  They do not reflect a significant change in the Board's exercise of its water-right permitting and enforcement authorities.  The State Water Board will continue to evaluate the relevant facts in each proceeding and make appropriate findings of fact and conclusions of law.

12. <u>Argument</u>:  "The AHO rejects the findings of the 1931 Del Rosa Judgment." (2023-06-26 BlueTriton Request, p. 19:26.)  "The AHO's Proposed Order incorrectly concludes that because the SWRCB has 'concurrent jurisdiction over water,' the decades-old judgment issued by the San Bernardino superior court in the Del Rosa case is not binding on the SWRCB."  (*Id.*, p. 19:28--20:1.)

<u>Response</u>:  BlueTriton's Response refers to "concurrent jurisdiction" with quotation marks and a citation to pages 77-78 of the proposed order, implying that the proposed order used this term.  But the proposed order never referred to this term.

BlueTriton is incorrect in arguing that the proposed order would "set aside" the judgment in the Del Rosa Mutual Water Company case.  (See *id.*, p. 20:22.)  The proposed order would not have done this and our order does not do this.  Nothing in this order alters any provisions of that judgment.

The AHO edited the text on pages 74 and 77-78 of the proposed order so that it better characterizes the relevant provisions of the Del Rosa judgment.

13. <u>Argument</u>:  "The AHO ignored critical facts in the record that support BTB's pre-1914 water rights claim."  (2023-06-26 BlueTriton Request, p. 21:3-4.)

<u>Response</u>:  This part of BlueTriton's Request repeatedly argues that BlueTriton's predecessors were diverting water from Strawberry Creek before 1914.  To support this argument, BlueTriton's Request states:

> One of the original notices of water appropriation was filed in 1887 by A. F. Coulter, President of Arrowhead Hot Springs Hotel Company, that "claims the water here flowing or to flow in this Strawberry Canon (sic) . . . of one hundred and forty inches measured under a four-inch pressure for irrigation, domestic, mechanical, manufacturing, oatning (sic) and medical purposes upon its lands . . . " (BTB-2_153.)  Undoubtedly, water from Strawberry Canyon was put to use at the Hotel prior to 1914 to support the Hotel and also the growing bottling business to customers in and around the Los Angeles area.

(*Id.*, p. 22:6-13, each "(sic)" and each " . . ." in original.)

The first text that is omitted from this quotation at " . . . " states: "being the North west fork of Twin Creeks in Township one North Range four West San Bernardino Base and Meridian to the extent of".  (Exh. BTB-2, p. 153.)

B15

As shown in Figure 2 to this order, Strawberry Creek is the easternmost fork of East Twin Creek, not the "North west fork" referred to in this notice. Also, as shown in Figures 3 and 4 to this order, Township 1 North, Range 4 West, San Bernardino Base and Meridian, includes the watersheds of Waterman, Hot Springs and Coldwater Creeks. It does <u>not</u> include the watershed of Strawberry Creek, which is in Townships 1 and 2 North, Range <u>3</u> West. This notice therefore incorrectly referred to "Strawberry Canon," when it actually was intended to refer to one of the creeks to the west.

This section of BlueTriton's request does not cite any other evidence supporting BlueTriton's argument that there were any diversions from Strawberry Creek before 1929. The weight of the evidence in the administrative record for this proceeding supports our finding that the first facilities to divert water from Strawberry Creek were constructed in 1929. (See section 2.5.)

14. Argument: "The holdings and findings of Del Rosa support BTB's spring water diversions from its Arrowhead facilities as pre-1914 rights." (2023-06-26 BlueTriton Request, p. 23:21-22.) "[T]he Del Rosa court concluded that BTB's predecessor had acquired rights from [Del Rosa MWC] either through acquisition or prescription." (*Id.*, p. 24:19-20.) "BTB's predecessor, either by acquisition or prescription to these rights, steps into the shoes of [Del Rosa MWC]," (*Id.*, p. 25:1-2.)

Response: These arguments are incorrect.

As discussed in section 3.7.2.1, nothing in the Del Rosa MWC judgment stated or implied that there was any taking or transfer of any Del Rosa MWC water right to Arrowhead Springs Corp. or California Consolidated WC. Thus, there was no "acquisition" of rights by California Consolidated WC from Del Rosa MWC as a result of this judgment.

We conclude that the parties that stipulated to this judgment intended for it to provide that Del Rosa MWC would not challenge California Consolidated WC's claim of a prescriptive right against Del Rosa MWC. While an upstream diverter may obtain a prescriptive right "against" a downstream diverter, the upstream diverter does not obtain a prescriptive right "from" a downstream diverter, as BlueTriton argues. (See, e.g., *City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 293 (discussing a party's obtaining a prescriptive right "against" another party); *Armstrong v. Payne* (1922) 188 Cal. 585, 591 (defendants may have obtained prescriptive rights "against" one property, but not "against" another property).) Thus, even if the judgment had provided that California Consolidated WC obtained a prescriptive right against Del Rosa MWC, California Consolidated WC did not "step in the shoes of" Del Rosa MWC.

BlueTriton's Request cites Water Code section 1706 and *Orange County Water Dist. v. City of Riverside* (1959) 173 Cal.App.2d 137, 192 for the argument that the holder of a pre-1914 appropriative right could have changed the point of diversion from Hot Springs Creek to Strawberry Creek. (2023-06-26 BlueTriton Request, p. 25:6-22.)

B16

The part of the *Orange County Water District* decision cited by BlueTriton concerned quantifications of prescriptive rights that the defendants Cities of Riverside, Colton, San Bernardino and Redlands had perfected against downstream water users in the "Lower" Santa Ana River Basin in Orange County. (173 Cal.App.2d, pp. 158, 162-163, 190- 192.) The trial court had computed each city's prescriptive right by totaling the separate amounts of water the city had produced from each well or other facility for the relevant five-year period. (*Id.*, p. 191.) The Court of Appeal reversed this part of the trial court's decision, stating that the proper calculation was "to take the whole of [each city's] production from all its wells and other municipal facilities used in producing appropriated water, including discontinued wells and wells in service for less than five years, and to use as the final result the highest total production shown to have been continuously maintained through the necessary five years." (*Id.* pp. 192-193.)

In this discussion, the Court of Appeal cited Water Code section 1706 and stated: "All of the appropriations by appellant cities, except to a very limited extent that of the city of Redlands, are of percolating waters, and so far as we know, not even in the exceptional case of diversions by the city of Redlands, has the appropriation been made under the statutory provisions referred to. Accordingly there appears to be no legal impediment to their changing the points of diversion at will provided no one else is injured thereby." (*Id.*, p. 192.)

The Court of Appeal thus concluded that each city's prescriptive right should be determined from the city's total production of water during the prescriptive period, and that the trial court erred by considering the separate production by each well. The Court of Appeal's calculation method was appropriate because the production of each well had the same adverse effect on Santa Ana River flows to the downstream users, which was the critical question for quantification of prescriptive rights.

As the Court of Appeal noted, no water-right permit is required for appropriations of percolating groundwater. (*Ibid.*; s*ee People v. Shirokow* (1980) 26 Cal.3d 301, 304 fn. 2.) The defendant cities therefore did not need any water-right permits from the State Water Board for their well pumping, and they could change wells without Board approval.

Although the Court of Appeal cited Water Code section 1706 for the proposition that the points of diversion could be changed for the cities' groundwater appropriative rights, and, in this context, stated that "[t]he source of supply remains the same—the Santa Ana River System" (173 Cal.App.2d, p. 192), the decision did not discuss any details of any of these appropriative rights. The court also did not discuss whether any of the cities changed the subbasins from which they produced the water – that is, the sources of water for their groundwater appropriative rights. The court's prescriptive-right analysis would have been the same if the cities were deemed to have pumped the new wells under new appropriative rights, with tacking of the prescriptive periods under the old and new rights. (Cf. *Alpaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 765-766 (place or character of use under a prescriptive right may be changed, provided vested rights are not injured thereby).)

B17

We conclude that the Court of Appeal's statement about source of supply should be treated as a rule that may apply when the courts are considering prescriptive-right issues. We conclude that this statement should not be treated as a broader rule that would apply to the issue of when, or whether, a source of supply may be changed under a pre-1914 appropriative right. The analysis and conclusions in section 3.7.2.2 about potential changes in sources for pre-1914 appropriative rights are necessary and appropriate for efficient administration of such rights.

15. <u>Argument</u>: "The AHO refused to determine its jurisdiction in a timely manner." (2023-06-26 BlueTriton Request, p. 27:5; see 2023-06-02 BlueTriton Motion, pp. 7-10.)

<u>Response</u>: Section 2.12.1 describes the AHO's hearing notices and rulings in this proceeding. As discussed in the AHO hearing officer's August 8, 2022 ruling, the AHO's hearing process gave the parties opportunities to address the hearing issues, including issues involving application of the State Water Board's permitting and enforcement authorities to BlueTriton's diversions in detail through exhibits and testimony and in their closing briefs. For these reasons, the AHO hearing officer denied BlueTriton's June 27, 2022 motion for judgment and BlueTriton's prior motions to dismiss, for nonsuit and for judgment.

None of the reported court decisions cited by BlueTriton support its argument that the AHO was required to prepare a proposed order on BlueTriton's jurisdictional arguments before proceeding with the hearing, or that the Board was required to issue such an order. Rather, the AHO hearing officer had the discretion to proceed as he did.

As discussed in Order WR 2022-0087, the Board normally will not review preliminary or procedural decisions, orders or rulings issued by the AHO, and instead will wait to consider any issues raised by such decisions, orders and rulings that merit Board review until after the AHO has completed its hearing process and presented a proposed order to the Board. (Order WR 2022-0087, pp. 6-12.) We did not abuse our discretion by following that approach in this proceeding.

16. <u>Argument</u>: "The AHO crafted a new legal test for implementing the SWRCB's permitting authority over groundwater without notice." (2023-06-26 BlueTriton Request, p. 28:26-27.) "The AHO improperly created new issues to address beyond the scope of the original hearing notice." (*Id.*, p. 30:15-16.) "Nor could the AHO expressly rely on non-precedential SWRCB decisions in crafting this new test." (*Id.*, p. 31:3-4.)

<u>Response</u>: See the responses to Arguments 2 and 4 above.

17. <u>Argument</u>: "The AHO disregarded the burden of proof and shifted it to BTB." (2023-06-26 BlueTriton Request, p. 32:10.) "The AHO required BTB to defend against the Prosecution Team's Motion for Judgment, which requested the AHO decide the case on the record *before* providing BTB the opportunity to rebut the Prosecution Team's and other parties' cases against it." (*Id.*, p. 32:18-20, italics in original.)

<div align="center">B18</div>

Response:  The AHO hearing officer did not abuse his discretion when he directed BlueTriton to file a response to the Prosecution Team's motion.  After considering BlueTriton's response to this motion, the AHO denied the motion.  (2022-03-25 hearing officer's rulings, pp. 1-2.)

18.  Argument:  "The AHO and the SWRCB hosted prohibited ex parte communications."  (2026-06-26 BlueTriton Request, p. 33:9.)  (See 2023-06-02 BlueTriton Request, pp. 2-4

Response:  BlueTriton cites Government Code section 11430.10, subdivision (a).  This statute prohibits *ex parte* communications between the presiding officer and employees or representatives of an agency that is a party, or with an interested person outside the agency.  The AHO complied with this statute by avoiding any *ex parte* communications about this proceeding with any members of the Prosecution Team or any outside parties.

BlueTriton also cites Government Code section 11430.80, subdivision (a).  This statute prohibits *ex parte* communications between the presiding officer and the agency head or other person or body to which the power to hear or decide in the proceeding is delegated.

BlueTriton does not cite or discuss subdivision (b) of section 11430.80.  It provides that section 11430.80 does not apply . . . "where the presiding officer does not issue a decision in the proceeding."  As stated in the Law Revision Commission Comments on section 11430.80, the limitation in subdivision (a) "does not apply where the presiding officer does not issue a decision to the parties, but merely prepares a recommended decision for the agency head or other person or body to which the power to decide is delegated."

This is precisely the process involved here.  The AHO prepared a proposed order for the Board to consider.  For proceedings like this one, for which the AHO proceeds under Water Code section 1114, subdivision (c)(1), it is appropriate and efficient for the AHO hearing officer to confer in closed session with Board members and Board attorneys to discuss the AHO's proposed order, and to receive their input, before the AHO completes its proposed order and formally transmits it to the Clerk of the Board.
Such proceedings contrast proceedings under Water Code section 1114, subdivision (b).  In such proceedings, the AHO hearing officer will prepare final orders without Board member input.

The 2023-06-02 BlueTriton Request asserts that closed sessions in which the AHO hearing officer, Board members and the Board's counsel participated were improper under the Bagley-Keene Act.  (2023-06-02 BlueTriton Request, p. 3.)  This assertion is incorrect.  Government Code section 11126, subdivision (c)(3), authorizes such closed sessions.

B19

Exhibit 9, P. 131

BlueTriton's June 2, 2023 Request asserted that the provision in Water Code section 1110, subdivision (a), that designates the AHO as an "independent organizational unit" prohibits AHO staff from having confidential communications with Board members or other members of the Hearing Team.  (2023-06-02 BlueTriton Request, p. 4.)

We disagree with this argument.  The first sentence of Water Code section 1110, subdivision (a), states that the AHO "is within the board."  Considering this statement, we construe the phrase "independent organizational unit" in the second sentence of this statute to mean that the AHO is independent of the other divisions and offices within the Board, like the Division of Water Rights and the Office of Enforcement, not that the AHO is independent of the Board itself.  The AHO therefore could have confidential communications with Board members and attorneys representing the Board in this proceeding.  The AHO was required to avoid any *ex parte* contacts with any members of the Prosecution Team, and there is no evidence of any such communications.[B6]

BlueTriton also objects to the fact that State Water Board engineering geologist Natalie Stork is a member of the AHO's Hearing Team in the AHO's proceeding on the court's reference to the Board in *City of Marina v. RMC Lonestar*, Monterey County Superior Court No. 20CV001387.  (2023-06-26 BlueTriton Request, p. 34:4-15.)

On November 4, 2022, the AHO hearing officer advised the parties in the present proceeding that Ms. Stork would be participating in the AHO hearing team in the *City of Marina* proceeding.  (2022-11-04 notice to parties (BlueTriton Brands).)

Before adding Ms. Stork to the AHO hearing team in the City of Marina proceeding, the AHO hearing officer conferred with the Board's Chief Counsel regarding her participation as a member of the AHO hearing team in that proceeding.  The Board's Chief Counsel confirmed that, based on *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, Ms. Stork could work on this hearing team, provided that she did not have "any communications or interactions with AHO personnel about the BlueTriton matter, including access to AHO internal, deliberative materials pertaining to BlueTriton."

Based on this direction, the AHO hearing officer confirmed that AHO staff would not give Ms. Stork or her colleague any general access to the AHO's internal files.  The AHO has filed a file of the 2022-08-03 e-mail chain reflecting these communications in the AHO Notices, Orders and Rulings subfolder within the Hearing Documents folder in the administrative record for this proceeding.  (2022-08-03 e-mail chain between A. Lilly and M. Lauffer.)

---

[B6] The independence of the AHO from the Division of Water Rights, Enforcement Section is demonstrated by Orders WR 2020-0111, WR 2020-0112, WR 2021-0001, WR 2021-0094 and WR 2023-0009.  In the proceedings that led to all these orders, the AHO prepared proposed orders with cease-and-desist order provisions or administrative liability amounts that were different from those recommended by the Division of Water Rights, Enforcement Section.

In the *Morongo* decision, the California Supreme Court considered the issue of whether it would violate a license holder's constitutional right to due process of law for a Board attorney prosecuting a matter before the Board to simultaneously serve as an advisor to the Board on an unrelated matter.  (45 Cal.4th, p. 734.)

The court concluded that such an arrangement would not violate the license holder's due process rights.  (*Ibid.*)  The court stated that "any tendency for the agency adjudicator to favor an agency attorney acting as a prosecutor because of that attorney's concurrent advisory role in an unrelated matter is too slight and speculative to achieve constitutional significance."  (*Id.*, p. 737.)  The court noted that the Administrative Procedure Act requires internal separation of prosecutorial and advisory functions on a case-by-case basis, and "does not prohibit an agency employee who acts in a prosecutorial capacity in one case from concurrently acting in an advisory role in an unrelated case." (*Id.*, p. 738.)

BlueTriton argued that the *Morongo* decision is distinguishable from the present proceeding, because it involved a Board attorney while the present proceeding involves a person who was a witness in the BlueTriton proceeding while being an advisor in the *City of Marina* proceeding. (2022-12-07 S. Grady ltr. to A. Lilly.)  However, the above quotation from *Morongo* refers to "an agency employee," which encompasses more than just attorneys.  The Board's Chief Counsel and the AHO hearing officer properly relied on the *Morongo* decision when they concluded that Ms. Stork could participate in the hearing team in the *City of Marina* proceeding, even though she had appeared as a witness for the Prosecution Team in the present proceeding.

     19. Argument:  "The AHO crossed the line into investigative and advocacy roles." (2023-06-26 BlueTriton Request, p. 34:16; see 2023-06-02 BlueTriton Request, pp. 5-7.)

Response:  This argument lists five types of AHO actions that BlueTriton asserts were "procedural irregularities."  (2023-06-26 BlueTriton Request, p. 35:14.)  Each type of action and our response is listed here:

     (a)   "Researched information from private websites for the record not offered by the parties."  (*Id.*, p. 35:21-22.)

Response:  This argument referred to footnote 20 on page 21 of the proposed order. This footnote referred to a webpage at www.arrowheadspringwater.com that discusses the sources for Arrowhead Spring water.

The two court decisions cited by BlueTriton held that information on websites that "plainly was subject to interpretation" could not be judicially noticed.  (*L.B. Research and Education Foundation v. UCLA Foundation* (2005) 130 Cal.App.4th 171, 180 fn. 2; *Ragland v. U.S. Bank Nat. Assn.* (2012) 209 Cal.App.4th 182, 194.)  On the other hand, the court in *In re Gilbert R.* (2012) 211 Cal.App. 4th 514, 519 fn. 1, took judicial notice of information on a private website that did not appear to be subject to interpretation.

Here, the information on the Arrowhead Spring water website that was discussed in footnote 20 of the proposed order was not subject to interpretation, and therefore was subject to judicial notice under Evidence Code section 452, subdivision (h), and thus to official notice under California Code of Regulations, title 23, section 648.2. However, this information was just background information that was not necessary for the findings in our order, so the AHO edited this footnote to remove the citation to this website and we have deleted the related text in the proposed order.

    (b)  "Researched 'groundwater recordations' for the record without party involvement." (2023-06-26 BlueTriton Request, p. 35:23.)

<u>Response</u>: The Prosecution Team submitted most of the groundwater extraction notices discussed in section 2.10.1 as exhibits. (See exhs. PT-93 through PT-98 and PT-100.) During the AHO proceeding, AHO staff compiled these notices and some additional notices into the Groundwater Extraction Notices folder in the administrative record, which it then designated as exhibit AHO-1. AHO staff obtained some of the additional notices from Division of Water Rights files and the others from responses to requests the AHO hearing officer made to BlueTriton and the San Bernardino Valley Municipal Water District, which now compiles these notices.

The AHO hearing officer offered exhibit AHO-1 into evidence and no party objected. The AHO hearing officer then received it into evidence. (Recording, 2022-03-24, 00:48:50-00:58:00.)[B7] These records also were subject to judicial notice under Evidence Code section 452, subdivision (h), and to official notice by the Board under California Code of Regulations, title 23, section 648.2.

    (c)  "Augmented the record with its own figures not prepared or offered by the parties." (2023-06-26 BlueTriton Request, p. 35:24.)

<u>Response</u>: This argument apparently refers to Figures 1 and 2 to this order. The Story of Stuff Project and Amanda Frye submitted a map of the Santa Ana River watershed that encompassed the areas covered by Figure 1 and its inset as exhibits during the AHO hearing. (Exhs. SOS-89, FR-14.) Rather than including that map as a figure to this order, the AHO decided to prepare Figures 1 and 2. They contain similar information, but are more focused on the topographical features involved in this proceeding, and Figure 2 shows the areas depicted by Figures 7 and 8.

As discussed in footnotes 7 and 8 to this order, AHO staff prepared Figures 1 and 2 using U.S. Geological Survey datasets, and, AHO staff added a rectangle to Figure 2 to show the locations of Figures 7 and 8. Courts may take official notice of U. S. Geological Survey topographic maps (*Union Transportation Co. v. Sacramento County*

---

[B7] During the part of the AHO hearing when the AHO hearing officer offered exhibits AHO-1 through AHO-4 into evidence, BlueTriton's attorneys objected to the parts of exhibit AHO-3 that contained oral statements, but they did not object to exhibit AHO-1. (Recording, 2022-03-24, 00:48:50-58:00.)

(1954) 42 Cal.2d 235, 239; *Planned Parenthood Shasta-Diablo, Inc. v. Williams* (1995) 10 Cal.4th 1009, 1021 fn. 2), so the State Water Board may take official notice of these maps (Cal. Code Regs., tit. 23, § 648.2). It was appropriate for AHO staff to use its expertise to prepare Figures 1 and 2 and to add the rectangle to Figure 2. While Figures 1 and 2 are not essential to the findings in this order, they provide useful information regarding the setting and the locations of Figures 7 and 8.

   (d)  "Without a request from any party, directed BTB to host (and pay expenses of) a site visit for the AHO, all parties, and the press, including transportation via helicopter which required expert witnesses and BTB employees to conduct a tour, from which the AHO took statements and photographs for the record." (2023-06-26 BlueTriton Request, p. 35:25--36:2.)

Response:  Code of Civil Procedure section 651 authorizes a court, on its own motion, to order a view of the property that is the subject of the litigation, the place where any relevant event occurred, or any object, the view of which is relevant and admissible in evidence and which cannot with reasonable convenience be viewed in the courtroom. The AHO's site visit in this proceeding was consistent with this statute and was appropriate so the AHO hearing officer and AHO staff could see the relevant topography and facilities in person.

Following the AHO hearing officer's request, the parties developed a proposed site visit itinerary and schedule. (2021-12-15 proposed site visit itinerary and schedule.)  During the AHO hearing process, BlueTriton's attorneys raised some questions about the logistics and timing of the site visit, and they required people being transported by helicopter to sign waivers. But they did not argue that the AHO should not conduct the site visit. Also, BlueTriton has not demonstrated that it was prejudiced by the AHO hearing officer's decision to conduct the site visit.

Because Boreholes 10, 11 and 12 could not feasibly be accessed any way besides by helicopter, BlueTriton offered to provide helicopter transportation to this location.  The AHO did not direct BlueTriton to do this but accepted BlueTriton's offer.  The State Water Board appreciates BlueTriton's providing this transportation during the site visit.

The AHO did not direct the press to attend the site visit.  Because the site visit was on U. S. Forest Service property and the properties the AHO visited on the first day were accessible from public roads, the AHO did not have any authority to exclude the press from this part of the site visit.

   (e)  "Researched non-precedential SWRCB decisions from its database after the close of the proceeding without party involvement and made prejudicial factual findings, legal conclusions, and new legal rules from those decisions." (2026-06- 26 BlueTriton Request, p. 36:3-5.)

Response:  See response to Argument 4 above.

20. Argument: "The AHO unfairly granted party status to various groups adverse to
BTB." (2023-06-26 BlueTriton Request, p. 36:12.)

Response:  BlueTriton objects to the AHO's decision to allow Anthony Serrano and the
Center for Biological Diversity to participate in the AHO hearing as parties under California
Code of Regulations, title 23, section 648.1, even though Mr. Serrano and the Center for
Biological Diversity did not submit statements demonstrating why the AHO hearing officer
should allow them to do so.  (Id., p. 37:3-6.)

BlueTriton does not cite to any provision of the administrative record indicating that it
objected to any of the additional parties participating as parties in the hearing, and
BlueTriton does not demonstrate that it was prejudiced by these parties' participations.

BlueTriton does not discuss the provisions of the AHO's hearing notice that designated
the Center for Biological Diversity as a party, and that stated that "[t]he hearing officer also
may designate persons or entities that do not file timely Notices of Intent to Appeal as
parties, for good cause shown and subject to appropriate conditions" and that "[t]he
hearing officer may amend these procedures before, during or after the hearing as he or
she deems appropriate." (2021-11-17 Notice of Public Hearing and Pre-Hearing
Conference, p. 11, and p. 12, ¶ 3.)

For these reasons, the AHO hearing officer did not abuse his discretion when he
allowed these additional parties to participate in the AHO hearing as parties.

BlueTriton also objects to the AHO hearing officer's decision "to allow the Sierra Club,
San Bernardino Valley Municipal Water District and the Department of Fish and Wildlife
to file briefs that sought to expand the issues before the AHO. . . .  Consequently, the
proceedings went far beyond the scope of the hearing on the draft CDO requested by
BTB in accordance with Water Code section 1834(b)." (Id., p. 37:6-12.)

BlueTriton does not discuss the AHO hearing officer's ruling that denied these requests,
and thus did not allow expansions in the scope of the proceedings.  (2021-11-04 Hearing
Officer's Ruling (BlueTriton), pp. 5-8.)

BlueTriton argues that "[t]here was no legal basis" for the AHO to allow the Story of Stuff
Project and Amanda Frye to participate in the AHO hearing, and complains that they
submitted too many exhibits. (2023-06-26 BlueTriton Request, p. 37:19-26.)  This
argument is incorrect.  Both these parties filed statements demonstrating that there was
good cause for their participation in the hearing. (2021-08-03 A. Frye Good Cause
Statement; 2021-08-05 SOS Good Cause Statement.)  The AHO hearing officer did not
abuse his discretion when he allowed these parties to submit hearing exhibits.  He gave
BlueTriton an opportunity to object to each of these exhibits, and he ruled on these
objections before deciding which exhibits to accept into evidence.

Water Code section 102 provides that "[a]ll water within the State is the property of the
people of the State, but the right to the use of water may be acquired by appropriation in

the manner provided by law." Considering this statute, the Board's normal practice is to allow people and organizations with interests in a particular proceeding to participate as parties in the proceeding when they demonstrate good cause for their participation. The AHO hearing officer did not abuse his discretion when he allowed interested people and organizations to appear as parties in this proceeding.

21. Argument: "The AHO improperly allowed Steve Loe and Amanda Frye to serve as expert witnesses." (2023-06-26 BlueTriton Request, p. 37:27-28.)

Response: Evidence Code section 720, subdivision (a), authorizes a person to testify as an expert if he has "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." Steve Loe worked for over 30 years as a fisheries biologist for the San Bernardino National Forest. Amanda Frye conducted extensive research over seven years regarding the history of water development in the watersheds of East Twin Creek and its tributaries. They therefore each had "special knowledge, skill and experience" sufficient to allow them to testify as experts under the standard in Evidence Code section 720.

Government Code section 11513, subdivision (c), the statute that applies to admissibility of evidence during AHO hearings, provides that the hearings do not need to be conducted according to "technical rules relating to evidence and witnesses, except as hereinafter provided," and that "[a]ny relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely on in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions." Mr. Loe's and Mr. Frye's opinions were admissible under this statute.[B8]

BlueTriton argues that the AHO hearing officer should not have allowed Ms. Frye and Mr. Loe to testify both as witnesses for themselves and as witnesses for the Story of Stuff Project. (2023-06-26 BlueTriton Request, p. 38:21-28.) The AHO hearing officer had discretion to decide how to conduct the hearing, and he did not abuse his discretion when he allowed these witnesses to testify in both these capacities.

22. Argument: "The AHO unfairly denied BTB access to documents repeatedly cited and relied on by the Prosecution Team under the guise of confidentiality." (2023-06-26 BlueTriton Request, p. 39:1-2.)

Response: The AHO hearing officer considered this argument and issued a detailed ruling on it. (2022-06-28 Hearing Officer's Ruling (BlueTriton).) The hearing officer did not abuse his discretion when he made this ruling.

---

[B8] Subdivision (d) of Government Code section 11513 specifies the rules for the use of hearsay evidence. The AHO hearing officer issued a detailed ruling on BlueTriton's objections to hearsay evidence. (2023-05-27 hearing officer's rulings with App. A (BlueTriton).)

B25

23. <u>Argument</u>: "The AHO improperly admitted evidence resulting in an improper record." (2023-06-26 BlueTriton Request, p. 40:20.)

<u>Response</u>: The general statements in this part of BlueTriton's Request do not refer to or cite any specific AHO hearing officer rulings. We therefore cannot review or evaluate BlueTriton's argument. We are not aware of any AHO hearing officer rulings for which the hearing officer abused his discretion.

For these reasons, we deny the 2023-06-02 and 2023-06-26 BlueTriton Requests and the 2023-06-02 Blue Triton motion.

<u>Other Comments Opposing May 26, 2022 Proposed Order</u>

The Association of California Water Agencies, the Northern California Water Association, the California Water Association, the California Farm Bureau and the California Chamber of Commerce submitted letters on June 23 and June 26, 2023. Their letters all urged the Board not to adopt the May 26, 2023 Proposed Order. Almost all their arguments repeated arguments made by BlueTriton and discussed above. We incorporate our prior responses to those arguments and do not repeat them here.

The California Chamber of Commerce letter argues that, if the Board were to adopt the Proposed Order, "the ruling would call into question essentially every other groundwater user or groundwater right holder." (2023-06-26 Cal. Chamber of Commerce ltr., p. 2.) The Northern California Water Association letter argues that "[i]f adopted as written, the Proposed Order may be used to commandeer tens of thousands of subsurface water wells into the Board's limited authority. (2023-06-26 A. Hitchings – NCWA ltr., p. 2.)

These arguments are incorrect. As discussed in footnote 39 at the end of section 3.4, several decisions of the State Water Board and some of its predecessors denied applications for permits to appropriate water that was not associated with any springs and that would be pumped by wells, based on conclusions that the water to be pumped was percolating groundwater. The Board will consider precedents in those decisions during future proceedings involving pumping and use of percolating groundwater that is not associated with springs. Such proceedings, and proceedings regarding water associated with springs that did not historically flow into natural channels, or other diffused surface waters will involve different issues from those addressed in this order, and any Board order in such a proceeding will involve different legal analyses.

The letter from an attorney for the San Bernardino Valley Municipal Water District argues that we should designate this order as non-precedential. (2023-06-26 SBVMWD ltr.) We disagree. Our normal practice is for our water-right decisions and orders to be precedential. Consistent with that practice, this order is a precedential order.

# Figure 1
# General Area Map



| Description:  General Area Map | |
| --- | --- |
| Date:  April 14, 2023 | Scale:  1: 200,000 |
| Office:  Administrative Hearings Office | Author:  Kyle Wooldridge |

Exhibit 9, P. 139

# Figure 2
# Local Area Map



| | | |
|---|---|---|
| Description: Local Area Map | | |
| Date: April 14, 2023 | Scale: 1: 40,000 | |
| Office: Administrative Hearings Office | Author: Kyle Wooldridge | |



Figure 3

Source: Exh. PT-194, p. 2

Exhibit 9, P. 141

PT-194 - Page 2 of 3

Figure 4



Source: Exh. PT-194, p. 3

# Figure 5



ARROWHEAD SPRINGS HOTEL AREA, 1915

California Water Boards

Source: Exh. PT-12, p. 15, from PT-127, p. 11

000026

# Figure 6



THE ARROWHEAD SPRINGS

Mann, Figure 2

## Source: Exh. PT-319, p. 5

# Figure 7



**Figure 1-1**
**Site Plan**
Arrowhead Springs
San Bernardino Mountains, California

DAMES & MOORE
A DAMES & MOORE GROUP COMPANY

Source: Exh. PT-23, p. 12

# Figure 8



Source: Exh. BTB-9, p. 3

# Figure 9



Source: Exh. BTB-9, p. 4

Exhibit 9, P. 147

Figure 10

ARROWHEAD SPRING WATER

# THE JOURNEY FROM STRAWBERRY CANYON

THE WATER SYSTEM THAT SUPPLIES ARROWHEAD® BRAND 100% MOUNTAIN SPRING WATER IS A SMALL PART OF A LARGE WATERSHED IN SAN BERNARDINO COUNTY.

OUR OPERATIONS AT ARROWHEAD SPRINGS HAVE ALWAYS BEEN ONE PART OF A MUCH BIGGER SYSTEM, AND THE AMOUNT OF WATER WE COLLECT IS BASED ON WHAT FLOWS NATURALLY FROM THE SPRINGS – AND ONLY A PORTION OF THAT GETS BOTTLED.

During 2020, nearly 70 percent of the total amount of water we collected (**59 million gallons**) was returned to the watershed (**approx. 40.8 million gallons**). In keeping with a decades-old agreement, another portion of that water (**approx. 11.8 million gallons**) went to the Arrowhead Springs property owners. Only the remaining approx. **6.4 million gallons** – or approx. 11 percent of the total water collected – went to one of our facilities for bottling.

HOW IS YOUR WATER COLLECTED AND MEASURED?

Since we only collect spring water that flows naturally, and the water we collect is measured at the top of the mountain before it enters our pipeline, our collection amounts vary depending on how wet or dry it is in any given year.

WHERE DOES THE WATER GO AND HOW IS IT USED?

Spring water flows down the mountain through a four inch, stainless steel pipe to our water storage silo at the base of the mountain. Based on consumer demand, water is retrieved from the storage silo as our bottling facilities need it (**6.4 million gallons in 2020**).

When the silo fills up faster than water is needed for bottling, the excess water is returned back to nature (**approx. 40.8 million gallons in 2020**).



IN 2020, APPROXIMATELY **THREE-FOURTHS** OF OUR SPRING WATER **SOURCED IN CALIFORNIA** WAS **DISTRIBUTED IN CALIFORNIA**



ARROWHEAD® BRAND 100% MOUNTAIN SPRING WATER HAS BEEN RESPONSIBLY SOURCED IN THE SAN BERNARDINO MOUNTAINS FOR MORE THAN **125 YEARS**



STRAWBERRY CANYON
SAN BERNARDINO COUNTY

PRECIPITATION

**59 MILLION GALLONS 2020**

COLLECTED WATER IS RECORDED AT THE SPRING SITE IN STRAWBERRY CANYON

THE AMOUNT WE COLLECT IS BASED ON WHAT FLOWS NATURALLY FROM THE SPRING, WHICH VARIES DEPENDING ON PRECIPITATION

**40.8 MILLION GALLONS 2020**

OVERFLOW IS RETURNED TO STRAWBERRY CANYON WATERSHED

**6.4 MILLION GALLONS 2020**

**11.8 MILLION GALLONS 2020**

A PORTION GOES TO THE FACTORY TO BE BOTTLED

THE SPRING WATER – HAVING BEEN SAFELY TRANSPORTED THROUGH A FOUR INCH STAINLESS STEEL PIPELINE – ARRIVES AND IS STORED IN A WATER SILO

A PORTION GOES TO THE ARROWHEAD SPRINGS PROPERTY OWNERS

SOS 080 001

Exhibit 9, P. 148

Source: Exh. SOS-80

# Figure 11

**LEGEND:**

Qoa / Qog — OLDER SURFICIAL SEDIMENT
Qoa - ALLUVIAL FAN GRAVEL AND SAND
Qog - ALLUVIAL FAN DEPOSITS OF BOULDER GRAVEL

Tsa — SANTA ANA FORMATION
Tsa - SANDSTONE, LT GRAY, MASSIVE, ARKOSIC

gr — PLUTONIC ROCKS
gr - GRANITIC ROCKS

INFERRED FAULT LINE

ESTIMATED FAULT LINE

**NOTES:**

1. ALL LOCATIONS AND DIMENSIONS ARE APPROXIMATE.

HALEY ALDRICH

NESTLE WATERS NORTH AMERICA, INC.
SAN BERNARDINO, CALIFORNIA

CONCEPTUAL MODEL
ARROWHEAD SPRINGS

SCALE: AS SHOWN
JULY 2021

FIGURE 17

BTB-7_084

Source: Exh. BTB-7, p. 84

# Figure 12



Figure 7. Diagrammatic Cross Section of Completion Details at Marco Spring Orifice



Source: Exh. BTB-40, p. 23

# Figure 13



Figure 9.  Diagrammatic Cross Section of Completion Details at Polo Spring Orifice



Source: Exh. BTB-40, p. 25

GIS FILE PATH: C:\Users\bzanco\Documents\ArcGIS\AHS_Report\128313_004_0001_SAMPLE_POINTS_NORTH_Report_A_Fig8.mxd — USER: bzanco — LAST SAVED: 2/13/2022 8:21:09 PM

# Figure 14

CA-18
Streamflow - USFS Diversion (GPM)
USFS PIEZOMETER
HORIZONTAL USFS BORING
UNNAMED FAULT
TUNNEL 2
TUNNEL 3
HORIZONTAL BORINGS 1, 1A, & 8
SPRING 4
FL-1
Streamflow - Spring 4 (GPM)
FL-2
Streamflow - FL-2 (GPM)
FL-4
Streamflow - FL-4 (GPM)
RIM FOREST FAU
HORIZONTAL BORINGS 7, 7A, 7B, & 7C
Streamflow-FL-1 (GPM)
FL-5
Streamflow - FL-5 (GPM)
Date
MEADOWS NORTH PIEZOMETER
HORIZONTAL BORINGS 10, 11, & 12
WATERMAN CANYON FAULT (NORTH STRAND)
MEADOWS SOUTH PIEZOMETER

**Legend**

- DEVELOPED SPRING VAULT

**SAMPLE TYPE**

- CROSS-SECTION
- FLOW
- PIEZOMETER
- POOL
- APPROXIMATE FAULT TRACE

**NOTES**

1. ALL LOCATIONS AND DIMENSIONS ARE APPROXIMATE.
2. GPM = GALLONS PER MINUTE
3. DATA COLLECTION ENDS AT CONFLUENCE OF STRAWBERRY AND EAST STRAWBERRY CREEK.
4. AERIAL IMAGERY SOURCE: ESRI

N

0 300 600
SCALE IN FEET

HALEY ALDRICH

ARROWHEAD

STRAWBERRY CANYON STREAM CONDITION INVENTORY
BLUETRITON BRANDS

SURFACE FLOW MONITORING LOCATIONS - STRAWBERRY CREEK - NORTH AREA

JULY 2021

FIGURE 8

Source: Exh. BTB-7, p. 75



GIS FILE PATH: C:\Users\bzanco\Documents\ArcGIS\AHS_Report\128313_004_0002_SAMPLE_POINTS_SOUTH_Report_Fig9 — USER: BZanco — LAST SAVED: 7/7/2021 11:41:37 AM

# Figure 15

**LEGEND**

- CROSS-SECTION
- FLOW
- PIEZOMETER
- POOL
- DEVELOPED SPRING VAULT
- APPROXIMATE FAULT TRACE

**NOTES**

1. ALL LOCATIONS AND DIMENSIONS ARE APPROXIMATE.
2. GPM = GALLONS PER MINUTE
3. DATA COLLECTION ENDS AT CONFLUENCE OF STRAWBERRY AND EAST STRAWBERRY CREEK.
4. AERIAL IMAGERY SOURCE: ESRI

N

0 330 660
SCALE IN FEET

HALEY ALDRICH

ARROWHEAD

STRAWBERRY CANYON STREAM CONDITION INVENTORY
BLUETRITON BRANDS

SURFACE FLOW MONITORING LOCATIONS - STRAWBERRY CREEK - SOUTH AREA

JULY 2021

FIGURE 9

Source: Exh. BTB-7, p. 76

Exhibit 9, P. 153

BTB-7_076

# Figure 16

replaced by the current group of bore holes located near Spring No. 7. The locations of the four currently used horizontal bore holes are shown on Figure 1-9.

The bore holes are constructed of schedule 40 galvanized steel casing and schedule 40 galvanized steel screen at the end of each casing. Bore Holes No. 7, No. 7A, No. 7B, and No. 7C are protected inside a single concrete block enclosure shown in Figure 1-10.



**Figure 1-10.  Bore Hole Enclosure at Spring No. 7**



**Figure 1-11.  Site Map of Lower Spring Complex**

Access to the surface piping connected to these bore holes is provided through a locking steel door. Bore Hole No. 7 is about 290 feet long, and is oriented N23°E.  Bore Hole No. 7A is approximately 230 feet long, and is oriented N19°W.  Bore Hole No. 7B is approximately 397 feet long, and is oriented N37°E.  Bore Hole No 7C is approximately 300 feet long, and is oriented N50°W.  A sampling port and totalizing flow meter are connected to the bore hole pipes where they extend to the surface.  From the enclosure, water flows from the totalizing flow meter, through above-ground, ductile iron pipe to the storage tanks located above the loading station.  Pertinent data for the bore are presented in Table 1-2.

Source: Exh. PT-23, p. 19

**Table 1**

BlueTriton Brands, Inc. -- Nestle Waters North America, Inc. -- Arrowhead and Puritas Waters, Inc.
Reported Annual Extractions

(reported annual extraction amounts in acre-feet)

| | G360476 | G360477 | G360478 | G360479 | G360480 | G360481 | G360482 | G361986 | G362800 | G362856 | G362857 | G362894 | Total Reported Diversions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Source Year | Spring No. 1 | Spring No. 2 | Spring No. 3 | Spring No. 7 | Spring No. 7A | Spring No. 7B | Spring No. 8 | Spring # 7C | Spring # 10 | Spring # 12 | Spring # 7 | Spring # 11 | |
| 1947 | 0.00 | 112.06 | 24.65 | 41.46 | NR | NR | NR | NR | NR | NR | NR | NR | 178.17 |
| 1948 | 3.39 | 82.02 | 11.24 | 26.97 | NR | NR | NR | NR | NR | NR | NR | NR | 123.62 |
| 1949 | 13.45 | 100.85 | 19.05 | 29.13 | NR | NR | NR | NR | NR | NR | NR | NR | 162.48 |
| 1950 | 12.33 | 88.52 | 14.57 | 18.87 | 7.52 | 9.39 | 8.24 | NR | NR | NR | NR | NR | 159.44 |
| 1951 | 5.60 | 49.30 | 7.84 | NR | 13.45 | 16.81 | 16.81 | NR | NR | NR | NR | NR | 109.81 |
| 1952 | 17.93 | 107.57 | 48.18 | NR | 26.89 | 32.50 | 56.03 | NR | NR | NR | NR | NR | 289.10 |
| 1953 | 7.87 | 64.05 | 8.99 | NR | 21.35 | 22.47 | 26.97 | NR | NR | NR | NR | NR | 151.69 |
| 1954 | 8.96 | 72.84 | 20.17 | NR | 21.29 | 23.53 | 38.10 | NR | NR | NR | NR | NR | 184.89 |
| 1955 | 7.84 | 64.99 | 15.69 | NR | 19.05 | 21.26 | 34.74 | NR | NR | NR | NR | NR | 163.57 |
| 1956 | 5.60 | 49.30 | 12.33 | NR | 15.69 | 17.93 | 33.62 | NR | NR | NR | NR | NR | 134.47 |
| 1957 | 5.48 | 62.05 | 14.68 | 0.00 | 15.91 | 17.84 | 34.74 | NR | NR | NR | NR | NR | 150.70 |
| 1958 | 7.65 | 89.03 | 28.26 | NR | 36.27 | 36.55 | 51.38 | NR | NR | NR | NR | NR | 249.13 |
| 1959 | 5.28 | 57.51 | 18.81 | NR | 27.32 | 22.53 | 31.59 | NR | NR | NR | NR | NR | 163.04 |
| 1960 | 3.62 | 43.39 | 11.63 | NR | 19.25 | 12.62 | 18.41 | NR | NR | NR | NR | NR | 108.91 |
| 1961 | 1.96 | 29.96 | 8.86 | NR | 3.75 | 3.82 | 10.23 | 27.02 | NR | NR | NR | NR | 85.59 |
| 1962 | 1.20 | 49.02 | 16.40 | NR | 7.21 | 6.39 | 6.69 | 6.82 | NR | NR | NR | NR | 93.73 |
| 1963 | 1.52 | 34.38 | 9.88 | NR | 0.91 | 2.68 | 5.74 | 32.23 | NR | NR | NR | NR | 87.34 |
| 1964 | 0.59 | 32.88 | 8.90 | NR | 0.00 | 0.00 | 14.69 | 20.82 | NR | NR | NR | NR | 77.88 |
| 1965 | 1.08 | 58.33 | 30.71 | NR | 8.03 | 7.15 | 36.60 | 7.57 | NR | NR | NR | NR | 149.46 |
| 1966 | 0.69 | 77.72 | 36.44 | NR | 35.77 | 10.46 | 88.66 | 0.00 | NR | NR | NR | NR | 249.75 |
| 1967 | 0.04 | 83.62 | 55.21 | NR | 49.69 | 0.00 | 67.23 | 0.00 | NR | NR | NR | NR | 255.59 |
| 1968 | 0 | 67.76 | 15.72 | NR | 49.88 | 0.00 | 80.88 | NR | NR | NR | NR | NR | 214.24 |
| 1969 | 0 | 132.96 | 82.14 | NR | 56.27 | 0.00 | 90.78 | NR | NR | NR | NR | NR | 362.15 |
| 1970 | 0 | 75.06 | 15.03 | NR | 33.04 | 9.70 | 64.65 | NR | NR | NR | NR | NR | 197.48 |
| 1971 | 0 | 62.72 | 14.22 | NR | 0.00 | 9.31 | 40.80 | 28.06 | NR | NR | NR | NR | 155.11 |
| 1972 | 0 | 51.34 | 14.52 | NR | 0.00 | 0.00 | 20.98 | 36.16 | NR | NR | NR | NR | 123.00 |
| 1973 | 0 | 80.28 | 23.78 | NR | 26.24 | 13.75 | 11.51 | 3.72 | NR | NR | NR | NR | 159.28 |
| 1974 | 0 | 74.77 | 20.80 | NR | 15.40 | 15.60 | 18.90 | 0.00 | NR | NR | NR | NR | 145.47 |
| 1975 | 0 | 72.05 | 18.39 | NR | 15.80 | 15.90 | 14.40 | 7.42 | NR | NR | NR | NR | 143.96 |
| 1976 | 9.37 | 64.48 | 11.37 | NR | 0.00 | 1.72 | 28.47 | 20.57 | NR | NR | NR | NR | 135.98 |
| 1977 | 20.52 | 56.58 | 9.40 | NR | 0.00 | 0.00 | 33.85 | 20.68 | NR | NR | NR | NR | 141.03 |
| 1978 | 0 | 89.92 | 37.60 | NR | 27.04 | 0.00 | 2.00 | 14.08 | NR | NR | NR | NR | 170.64 |
| 1979 | 0 | 101.24 | 21.16 | NR | 19.81 | 0.00 | 24.48 | 21.46 | NR | NR | NR | NR | 188.15 |
| 1980 | 0 | 112.70 | 48.40 | NR | 1.20 | 2.00 | 15.10 | 3.30 | NR | NR | NR | NR | 182.70 |
| 1981 | 10.02 | 84.16 | 15.01 | NR | 4.06 | 18.00 | 26.10 | 30.00 | NR | NR | NR | NR | 187.35 |
| 1982 | 13.60 | 58.90 | 25.40 | NR | 6.60 | 10.70 | 23.30 | 28.20 | 22.30 | NR | NR | NR | 189.00 |
| 1983 | 0.00 | 99.60 | 96.20 | NR | 44.90 | 1.30 | 11.70 | 4.40 | 6.60 | NR | NR | NR | 264.70 |
| 1984 | 25.90 | 78.40 | 24.60 | NR | 24.60 | NR | 29.10 | 44.20 | 15.30 | NR | NR | NR | 242.10 |
| 1985 | 28.09 | 62.30 | 18.88 | NR | NR | NR | 18.65 | 13.48 | 37.11 | NR | NR | NR | 178.51 |
| 1986 | 20.03 | 64.23 | 28.78 | NR | NR | NR | NR | NR | 38.91 | 29.93 | 22.56 | NR | 204.44 |
| 1987 | 18.18 | 55.21 | 14.87 | NR | 6.87 | 6.27 | 10.00 | 46.16 | 40.62 | 9.39 | 1.24 | 1.68 | 210.49 |
| 1988 | 19.64 | 63.70 | 18.34 | NR | 0.00 | 0.00 | 9.18 | 51.46 | 36.08 | 2.94 | 0.00 | 1.61 | 202.95 |
| 1989 | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR | NR | 0.00 |
| 1990 | 14.48 | 48.72 | 13.43 | NR | 0.00 | 0.00 | 5.80 | 36.08 | 24.88 | 0.00 | 0.00 | 0.00 | 143.39 |
| 1991 | 16.19 | 49.03 | 16.51 | NR | 0.00 | 0.00 | 10.24 | 37.89 | 25.43 | 5.33 | 0.00 | 0.99 | 161.61 |
| 1992 | 26.90 | 76.00 | 42.30 | NR | 6.60 | 2.80 | 27.50 | 32.90 | 31.30 | 6.90 | 6.10 | 1.30 | 260.60 |
| 1993 | 37.70 | 120.30 | 80.90 | NR | 36.00 | 24.10 | 19.70 | 13.40 | 31.30 | 6.90 | 36.80 | 1.30 | 408.40 |
| 1994 | 52.30 | 61.20 | 17.70 | NR | 29.10 | 17.20 | 59.70 | 18.30 | 13.70 | 10.00 | 33.60 | 10.00 | 322.80 |
| 1995 | 38.60 | 76.50 | 36.60 | NR | 24.00 | 17.90 | 55.30 | 23.90 | 12.20 | 10.00 | 28.10 | 10.00 | 333.10 |
| 1996 | 55.80 | 66.60 | 29.70 | NR | 26.30 | 16.80 | 54.30 | 17.60 | 12.00 | 10.00 | 28.80 | 10.00 | 327.90 |
| 1997 | 70.42 | 84.90 | 48.20 | NR | 43.10 | 27.10 | 69.80 | 27.50 | 18.00 | 10.00 | 49.00 | 10.00 | 458.02 |
| 1998 | 98.20 | 79.52 | 49.46 | NR | 51.79 | 32.48 | 66.52 | 37.86 | 12.12 | 10.00 | 57.52 | 10.00 | 505.47 |
| 1999 | 39.23 | 47.54 | 19.43 | NR | 23.06 | 13.95 | 50.60 | 8.75 | 20.99 | 10.00 | 37.53 | 10.00 | 281.08 |
| 2000 | 24.10 | 38.50 | 14.11 | NR | 10.00 | 10.00 | 36.12 | 10.00 | 21.05 | NR | 18.06 | 10.00 | 192.24 |
| 2001 | 21.00 | 35.20 | 15.20 | NR | 1.00 | 7.00 | 35.00 | 1.00 | 13.30 | 2.00 | 31.60 | 4.00 | 166.30 |
| 2002 | 56.00 | 66.60 | 29.70 | NR | 26.30 | 16.80 | 54.30 | 17.60 | 12.00 | 10.00 | 28.80 | 10.00 | 328.10 |
| 2003 | 56.00 | 66.60 | 29.70 | NR | 26.30 | 16.80 | 54.30 | 17.60 | 12.00 | 10.00 | 28.80 | 10.00 | 328.10 |
| 2004 | 1 | 1.27 | 0.55 | NR | 1.14 | 0.01 | 0.26 | 0.05 | 1.27 | 0.48 | 0.68 | 0.68 | 7.15 |
| 2005 | 20.6 | 34.40 | 14.90 | NR | 30.80 | 0.30 | 7.00 | 1.40 | 34.40 | 13.00 | 18.40 | 18.40 | 193.60 |
| 2006 | 16.8 | 28.12 | 12.18 | NR | 25.17 | 0.25 | 5.72 | 1.14 | 28.12 | 10.62 | 15.04 | 15.04 | 158.24 |
| 2007 | 13.7 | 22.91 | 9.93 | NR | 20.52 | 0.20 | 4.66 | 0.93 | 22.91 | 8.66 | 12.26 | 12.26 | 128.96 |
| 2008 | 11.7 | 19.55 | 8.47 | NR | 17.50 | 0.17 | 3.98 | 0.80 | 19.55 | 7.39 | 10.45 | 10.45 | 110.01 |
| 2009 | 11.2 | 18.65 | 8.08 | NR | 16.70 | 0.16 | 3.79 | 0.76 | 18.65 | 7.05 | 9.97 | 9.97 | 104.95 |
| 2010 | 22.0 | 37.00 | 16.00 | NR | 33.00 | 1.00 | 8.00 | 2.00 | 37.00 | 14.00 | 20.00 | 20.00 | 210.00 |
| 2011 | 21.0 | 36.00 | 15.00 | NR | 32.00 | 1.00 | 7.00 | 1.00 | 36.00 | 14.00 | 19.00 | 19.00 | 201.00 |
| 2012 | 28.0 | 47.00 | 21.00 | NR | 42.00 | 1.00 | 10.00 | 2.00 | 47.00 | 18.00 | 25.00 | 25.00 | 266.00 |
| 2013 | 17.0 | 28.00 | 12.00 | 0.00 | 25.00 | 1.00 | 6.00 | 1.00 | 28.00 | 10.00 | 15.00 | 15.00 | 158.00 |
| 2014 | 9.0 | 15.00 | 7.00 | 0.00 | 14.00 | 1.00 | 3.00 | 1.00 | 15.00 | 5.00 | 8.00 | 8.00 | 87.00 |
| 2015 | 9.0 | 27.00 | 12.00 | 0.00 | 12.00 | 4.00 | 16.00 | 1.00 | 21.00 | 3.00 | 6.00 | 1.00 | 112.00 |
| 2016 | 4.5 | 25.51 | 11.32 | NR | 9.68 | 2.30 | 14.76 | 0.10 | 19.86 | 2.11 | 8.81 | 0.12 | 99.07 |
| 2017 | 15.00 | 26.00 | 11.00 | 0.00 | 23.00 | 1.00 | 5.00 | 0.00 | 34.00 | 15.00 | 14.00 | 0.00 | 144.00 |
| 2018 | 22.00 | 29.00 | 14.00 | NR | 9.00 | 5.00 | 22.00 | 1.00 | 23.00 | 1.00 | 15.00 | 0.00 | 141.00 |
| 2019 | 15.00 | 68.00 | 52.00 | NR | 9.00 | 2.00 | 1.00 | 1.00 | 33.00 | 15.00 | 15.00 | 5.00 | 211.00 |
| 2020 | 4.00 | 47.00 | 27.00 | NR | 21.00 | 9.00 | 5.00 | 0.00 | 30.00 | 8.00 | 29.00 | 0.00 | 180.00 |

"NR" means no report is on file for the listed notice and year.

Source: notices in Groundwater Extraction Notices folder in administrative record.

Note: For G360480, G360481, G361986, and G362894, the reported amounts for the year 2000 were "less than 10 acre-feet".