TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

TYLER M. ALEXANDER (CA 313188)
MAGGIE C. WOODWARD (MD #2212130001)
Trial Attorneys
Natural Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| BLUETRITON BRANDS, INC., | |
| Plaintiff, | 2:24-cv-09720-JGB-DTB |
| v. | **DEFENDANTS' OPPOSITION TO YUHAAVIATAM OF SAN MANUEL NATION'S MOTION FOR PRELIMINARY INJUCTION** |
| UNITED STATES FOREST SERVICE, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

FACTUAL BACKGROUND ..........................................................................3

LEGAL STANDARDS ...................................................................................3

    I.    Preliminary Injunctions .....................................................3

    II.    The NHPA Section 106 Process .........................................4

    III.    The National Forest Management Act ................................5

    IV.    Judicial Review of NFMA and NHPA Challenges Under the APA ........................................................................................5

ARGUMENT ...................................................................................................6

    I.    The Nation Lacks Standing to Challenge the Denial of BlueTriton's permit .............................................................6

    II.    The Nation's Claims Lack Merit ........................................7

        A.    The Nation is not likely to succeed on its NFMA claim ...........7

        B.    The Nation is not likely to succeed on the merits of its NHPA claim .................................................................9

        C.    The Nation is not likely to succeed on its breach of trust claims ..........................................................................15

    III.    The Nation has Not Demonstrated it Will Suffer Irreparable Harms Absent an Injunction ...........................................17

    IV.    A Preliminary Injunction is Not in the Public Interest .......................22

CONCLUSION ..............................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................ 4, 22

*Arizona v. Navajo Nation*,
  599 U.S. 555 (U.S. 2023) ....................................................... 15, 16, 17

*Chugach Alaska Corp. v. U.S. Forest Serv.*,
  No. A99-414 CV (JWS), 1999 WL 33946351 (D. Alaska Dec. 14, 1999) ........13

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
  341 F.3d 961 (9th Cir. 2003) ....................................................................5

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ...............................................................................12

*Drake v. Tucker*,
  43 Cal. App. 53 (1st Dist. 1919).............................................................18

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ..................................................................4

*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) ....................................................................8

*Gros Ventre Tribe v. United States*,
  469 F.3d 801 (9th Cir. 2006) ............................................................ 15, 16

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir.2013) .................................................................17

*Hopi Tribe v. United States EPA*,
  851 F.3d 957 (9th Cir. 2017) ..................................................................15

*In re Big Thorne Project*,
  857 F.3d 968 (9th Cir. 2017) ....................................................................8

*Kerr Corp. v. North American Dental Wholesalers, Inc.*,
  No. SACV 11–0313 DOC, 2011 WL 2269991 (C.D. Cal. June 9, 2011) ..........21

*Lands Council v. McNair*,
  629 F.3d 1070 (9th Cir. 2010) ...............................................................8, 9

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ...........................................................22

*Lujan v. Defs. of Wildlife*, 504 555, 562 (1992)
    504 555, 562 (1992) .........................................................................7

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984)........................................................20

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) .........................................................5

*Nken v. Holder*,
    556 U.S. 418 (2009) .........................................................................4

*Norton v. S. Utah Wilderness,*
    *All.*, 542 U.S. 55 (2004) ...................................................................8

*Paulina Lake Historic Cabin Owners Ass'n v. U.S. Forest Serv.*,
    577 F. Supp. 1188 (D. Or. 1983)....................................................13

*Portland Audubon Soc. v. Endangered Species Comm.*,
    984 F.2d 1534 (9th Cir. 1993).........................................................6

*Pres. Coalition, Inc. v. Pierce*,
    667 F.2d 851 (9th Cir. 1982)...........................................................4

*Real USFL, LLC v. Fox Sports, Inc.*,
    No. CV 22-1350 JFW, 2022 WL 1134487 (C.D. Cal. Apr. 14, 2022) ......... 20, 21

*Sabow v. United States*,
    93 F.3d 1445 (9th Cir. 1996)...........................................................8

*San Carlos Apache Tribe v. United States*,
    417 F.3d 1091 (9th Cir. 2005)......................................................4, 6

*Seattle Audubon Soc. v. Evans*,
    771 F. Supp. 1081 (W.D. Wash. 1991).........................................22

*Sheridan Kalorama Historical Ass'n v. Christopher*,
    49 F.3d 750 (D.C. Cir. 1995) .........................................................13

*Te-Moak of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010)...........................................................4

*Terbush v. United States*,
    516 F.3d 1125 (9th Cir. 2008).........................................................8

*Turner v. James Canal Co.*,
   155 Cal. 82 (Cal. 1909) ...................................................................................18

*Tyler v. Cuomo*,
   236 F.3d 1124 (9th Cir. 2000) .........................................................................4

*United States v. 0.95 Acres of Land*,
   994 F.2d 696 (9th Cir. 1993) ...........................................................................4

*United States v. Jicarilla Apache Nation*,
   564 U.S. 162 (2011) ................................................................................. 15, 16

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (U.S., 2008) ........................................................................ 3, 4, 17

*Yerger v. Roberston*,
   981 F.2d 460 (9th Cir. 1992) .........................................................................13

**Statutes**

16 U.S.C. § 1604(a) ..........................................................................................5

16 U.S.C. § 1604(i) ................................................................................... 5, 22

16 U.S.C. § 475 ..............................................................................................24

16 U.S.C. § 528 ..............................................................................................24

5 U.S.C. § 558 ................................................................................................11

5 U.S.C. § 702 ..................................................................................................7

5 U.S.C. § 706(2)(A) ........................................................................................6

5 U.S.C. §§ 701-706 .........................................................................................6

54 U.S.C. § 300320 ...........................................................................................4

54 U.S.C. § 302706(b) ......................................................................................4

54 U.S.C. § 306108 ................................................................................... 4, 10

**Regulations**

35 C.F.R. § 251.50(a) .....................................................................................22

36 C.F.R. § 251.54 ................................................................................... 11, 12

36 C.F.R. § 251.64(c) .............................................................................. 12, 22

36 C.F.R. § 251.64(d) .....................................................................................12

36 C.F.R. § 800.16 ................................................................................15

36 C.F.R. § 800.16(i) ............................................................................13

36 C.F.R. § 800.16(*l*)(1) .........................................................................5

36 C.F.R. § 800.16(y) ...........................................................................10

36 C.F.R. pt. 800 ....................................................................................5

# EXHIBIT INDEX

| Exhibit | Name |
|---|---|
| 1 | Declaration of Forest Supervisor Danelle D. Harrison |
| 2 | Land Management Plan: Part 1 Southern California National Forests Vision (September 2005) ("Forest Plan Part 1") |
| 3 | Land Management Plan: Part 2 San Bernadino National Forest Strategy (September 2005) ("Forest Plan Part 2") |
| 4 | San Bernadino National Forest Heritage Resources Screened Undertaking Form and Letter to the Nation |

# INTRODUCTION

The Yuhaaviatam of San Manuel Nation owns the Arrowhead Springs Hotel property adjacent to the San Bernadino National Forest.  Under a private contractual arrangement, the Arrowhead Springs Hotel property receives deliveries of water from Plaintiff BlueTriton Brands, Inc., sourced from the San Bernardino National Forest and transported through a pipeline BlueTriton maintains on the Forest.  Following BlueTriton's failure to provide information to the Forest Service to support its application for a new pipeline permit, the Forest Service denied BlueTriton's application and ordered the corporation to begin planning for the removal of the pipeline.  Neither the Nation nor its predecessors have ever possessed an authorization from the Forest Service to make diversions on the San Bernadino, yet the Nation contends that the Forest Service was required to consult with the Nation before denying BlueTriton's permit application.  The Nation now seeks a preliminary injunction that would force the Forest Service to allow the pipeline to remain in place and deliver water solely to the Arrowhead Springs Hotel property.  Because the Nation's claims lack merit, this Court should decline that invitation.  More, the Nation has not shown that irreparable harm is likely to result absent an injunction or that an injunction would be in the public interest.

Rather than holding BlueTriton to account under their contract, the Nation attempts to blame the Forest Service for ending water deliveries via the pipeline. But the Nation's arguments on the merits are unpersuasive.  The Nation alleges the Forest Service violated the National Forest Management Act and the relevant Forest Plan by failing to consult with the Nation when denying BlueTriton's application for a permit.  Neither the Act nor the Plan, however, require consultation before denying a permit application.  The Nation next alleges the Forest Service violated the National Historic Preservation Act by failing to consult with the Nation and by not considering impacts on historically and culturally

significant properties.  But again, the denial of a permit application is not an action that triggers that statute's provisions.  And any consultation requirement for the termination provisions of the expired permit was satisfied during the review performed when the permit was issued.  Finally, the Nation alleges the Forest Service violated a trust obligation to the Nation.  But the Nation identifies no authority establishing a trust obligation here nor has it identified an asset the United States holds in trust for the Nation.  The record shows that is not the Forest Service who has failed to uphold an obligation to the Nation; it is BlueTriton.  None of the claims the Nation asserts are likely to succeed on the merits and therefore cannot sustain preliminary relief.

The Nation's allegations of harm also do not withstand scrutiny.  The Nation has not explained why, absent delivery of the water through the pipeline, it will suffer irreparable harm.  The water the Nation receives from the pipeline would otherwise reach its hotel property via natural surface flows.  And though the Nation alleges removing the pipeline will cause further harms, it has not shown that the threats to environmental, cultural, and historic interests it alleges are likely to occur.

Finally, the Nation has not shown that maintaining pipeline deliveries is in the public interest.  As with the considerations of irreparable harm, the Nation has not explained why water must reach Arrowhead Springs by pipeline to be useful for fire suppression.  And the Nation's private interest in continuing to rely on water delivery via pipeline does not outweigh the public interests in maintaining the Forest Service's lawful, reasoned decision and restoring surface water flows through a unique Forest ecosystem.  The Nation's request for a preliminary injunction should be denied.

**FACTUAL BACKGROUND**

Defendants incorporate by reference the factual background in their opposition to BlueTriton's motion for a preliminary injunction and their opposition to the Nation's motion for intervention. *See* ECF No. 15 at 4-9. But in brief summary, and as relevant here: following a multi-year investigation of BlueTriton's diversions and uses of water from Strawberry Creek, the California State Water Resources Control Board ordered BlueTriton to cease and desist its diversions because BlueTriton has no water rights that authorize them. *See generally* ECF No. 15-6. Later, because BlueTriton failed to provide information necessary to process its application, the Forest Service denied BlueTriton's request for a new Special Use Permit. ECF No. 15-3. The Forest Service is now reviewing BlueTriton's proposed plan to decommission and remove the pipeline.

The Board was explicit that its decision did not adjudicate any of the Nation's claims. *Id*. at 90. For the purposes of the Board's proceedings, the Board's prosecution team and BlueTriton took the position that the portion of water diverted through the pipeline for delivery to the Nation was authorized by the Nation's riparian rights to East Twin Creek, which runs through the Arrowhead Springs Hotel property. *See* ECF No. 15-6 at 75-76. The Nation has not sought its own permit to for diversions to access those rights, nor has the Forest Service taken any action purporting to decide or circumscribe the Nation's water rights.

**LEGAL STANDARDS**

**I.    Preliminary Injunctions**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits; (2) an irreparable injury if the injunction were not granted; (3) that the balance of

hardships favors immediate relief; and (4) that an injunction is in the public interest.  *See id.* at 11.  In the Ninth Circuit a preliminary injunction may also be awarded where a plaintiff demonstrates "serious questions" going to the merits and a balance of hardship that tips *sharply* in favor of the plaintiff, so long as the plaintiff satisfies the remaining two prongs of the *Winter* test.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).  When the government is a party, the balance of harms and public interest merge.  *See Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014) (*citing Nken v. Holder*, 556 U.S. 418, 435 (2009).

## II.    The NHPA Section 106 Process

Section 106 of the National Historic Preservation Act "is a procedural statute requiring government agencies to 'stop, look, and listen' before proceeding with agency action." *Te-Moak of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 610 (9th Cir. 2010).  Section 106 requires federal agencies to consider the potential effects of federal agency "undertakings" on historic properties, which includes properties of cultural or religious significance to Indian tribes. 54 U.S.C. §§ 306108, 302706(b); *see also United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993).  An "undertaking" is defined broadly to include any "project, activity, or program" that requires a federal permit.  54 U.S.C. § 300320. Section 106 "requires that whenever a federal agency has 'direct or indirect jurisdiction' over a project or program that could affect historic properties, the federal agency must study ways to avoid or mitigate any adverse impacts to those properties." *Tyler v. Cuomo*, 236 F.3d 1124, 1128 (9th Cir. 2000).  Section 106 does not prohibit harm to historic properties but creates obligations "that are chiefly procedural in nature." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (citing *Pres. Coalition, Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982).

The Advisory Council on Historic Preservation has promulgated regulations under Section 106 to govern federal agency compliance with the NHPA.  *See* 36 C.F.R. Part 800.  Under those regulations, a "historic property" is defined as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places," which "includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria." 36 C.F.R. § 800.16(*l*)(1).

### III.    The National Forest Management Act

The National Forest Management Act (NFMA) provides for National Forest System management at two levels: the forest-wide level and individual project level. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  At the forest level, NFMA directs the Forest Service to develop land and resource management plans, which are commonly known as forest plans.  *See* 16 U.S.C. § 1604(a); *see also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003) (describing forest plans as general planning tools that establish overall management direction).  In this case, the Land Management Plan for the San Bernadino is part of a larger plan for several Southern California National Forests.  *See* Ex. 2, Forest Plan Part 1; Ex. 3, Forest Plan Part 2.  At the project level, the Forest Service implements a forest plan through site-specific actions, and each site-specific action must be consistent with forest plan.  *See* 16 U.S.C. § 1604(i).  In developing site-specific actions, the Forest Service is entitled to substantial deference in interpreting the terms of a forest plan, particularly in cases of ambiguity.  *See, e.g.*, *Weldon*, 697 F.3d at 1056.

### IV.    Judicial Review of NFMA and NHPA Challenges Under the APA

Neither the NFMA nor the NHPA contain a private right of action, so the Court's review of the Nation's case is circumscribed by the limited judicial review

provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  *See San Carlos Apache Tribe*, 417 F.3d at 1099.  The Court's review is of the "whole record . . . that was before the agency pertaining to the merits of its decision."  *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) (citation omitted).  The APA provides that this Court must uphold the Forest Service's decision unless the plaintiff proves that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## **ARGUMENT**

## I.    **The Nation Lacks Standing to Challenge the Denial of BlueTriton's permit**

As an initial matter, as discussed more thoroughly in Defendants' Opposition to the Motion to Intervene, the Forest Service's action here did not directly injure the Nation.  The Nation is not the permit applicant, nor has it ever had a special use permit from the Forest Service to divert water from the Forest.  BlueTriton's expired permit allowed BlueTriton to occupy the San Bernardino National Forest with a pipeline, taking water from the Forest under an alleged appropriative right.  Neither the expired permit nor the denied application says anything about the Nation's claimed water rights or water deliveries to the Arrowhead Springs Hotel property.  The permit's terms explicitly state that there are no third-party beneficiaries.  Special Use Permit FCD728503 ¶ IV.C, ECF No. 15-4.  As such, the Nation is neither a permit holder, a permit applicant, or a third-party beneficiary of the previous permits.  It relied on BlueTriton's permit and assumed the risk that BlueTriton would not be able to deliver water under that permit. *See, e.g.*, ECF No. 65-8 at 2.  It should therefore not be allowed to challenge the Forest Service's denial of BlueTriton's permit.

Given that, the Nation cannot demonstrate the causation element of standing. *See Lujan v. Defs. of Wildlife*, 504 555, 562 (1992) (noting that when a plaintiff's asserted injury stems from regulation of someone else, causation and redressability are "ordinarily 'substantially more difficult' to establish"). To the extent that the Nation is injured by the Forest Service's denial of the permit application, that injury stems from BlueTriton's action. BlueTriton failed to submit an adequate permit application that complied with the Land Management Plan, state law, and the previous permit's terms, and failed to provide adequate information when requested. Notice of Denial 3, ECF No. 15-3. If the Nation is injured from that failure, the fault is with BlueTriton, not the Forest Service. Whatever contractual rights exist between the Nation and BlueTriton, the Forest Service is not a party to that contract, has no rights or obligations under that contract, and has no duty to facilitate that contract. Any remedy the Nation may have under its agreement with BlueTriton would be against the company, not the Forest Service.

Similarly, the APA does not provide jurisdiction over the Nation's claims because the Nation is not "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" as defined in 5 U.S.C. § 702.

## II.   The Nation's Claims Lack Merit
### A. The Nation is not likely to succeed on its NFMA claim.

The Forest Service complied with the Forest Plan, and thus NFMA, in issuing the July 2024 Notice of Denial to BlueTriton and directing BlueTriton to prepare a plan to remove the pipeline.[1] *See generally* Ex. 1 Decl. of Forest

---

[1] Contrary to the Nation's mischaracterization, the Notice of Denial was *not* a "federal decision to terminate the Nation's water supply" but rather a decision to deny BlueTriton's permit application based on inadequate information. Nation's Mot. 14, ECF No. 64-2.

Supervisor Danelle Harrison (explaining Forest Service's steps before issuing the Notice); *see also* ECF No. 15-1 (same).  Nonetheless, the Nation claims that the Forest Service violated NFMA by not consulting with the Nation before denying a permit to BlueTriton.  The Nation's NFMA claim is fatally flawed because the Nation fails to identify any Forest Plan provision that requires consultation in this instance.  Nor does the Nation identify any of the "required steps" on which the Nation bases its claim.  Memo. of Law in Support of Pl.-Intervenor's Mot. for Prelim. Inj. ("Nation's Mot.") 14, ECF No. 64-2.

Instead, the Nation attempts to conjure a consultation obligation from a series of unenforceable, and inapplicable aspirational statements in the Forest Plan. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) (provisions of a land management plan are not enforceable "absent clear indication of binding commitment in the terms of the plan"); *In re Big Thorne Project*, 857 F.3d 968, 974 (9th Cir. 2017) (discretionary language does not obligate Forest Service); *Lands Council v. McNair*, 629 F.3d 1070, 1078 (9th Cir. 2010) (Forest Plan objective was to be used "as a guide for planning purposes"); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009) (concluding plan language was suggestive but not mandatory); *Terbush v. United States*, 516 F.3d 1125, 1139 (9th Cir. 2008) ("The presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.") (quoting *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996)).

First, the Nation misinterprets the Forest Plan by arguing that forest managers are "challenge[d]" to consult with tribes for every decision.  Nation's Mot. 13, ECF No. 64-2.  But the cited section of the Forest Plan merely identifies a list of the difficulties, or "challenges," that managers must navigate as they balance competing interests in managing the Forest.  The list does not mandate particular

actions or create enforceable duties.  *See* Ex. 2 at 17-19 (describing complications
with the "rapidly increasing population of southern California, and the resulting
effects on the national forests").

Second, the Nation asserts that the Forest Service *must* maintain the Forest
for tribes' connections to land.  *See* Nation's Mot. 13, ECF No. 64-2.  But here the
Nation cites "a discussion of forest *goals* and desired conditions for resources"
rather than mandatory or enforceable provisions. Ex. 2 at 27, 43 (emphasis added).
Third, the Nation relies on Forest Plan strategies about developing relationships
with tribes.  *See* Nation's Mot. 13-14, ECF No. 64-2.  But the Forest Plan
expressly notes that the Forest Service "may choose" to implement the strategies—
the precise discretionary language that the Ninth Circuit has found to be
unenforceable.  *See, e.g.*, *Lands Council*, 629 F.3d at 1078; Ex. 3 at 131-32.

Even if the Forest Plan created a "consultation mandate," the Forest Service
complied by considering the Nation's position in meetings in the Fall of 2023 and
Spring of 2024.  *See* Ex. 1, Harrison Decl. ¶ 7.  Indeed, the Forest and the Nation
are in near constant communication, and the Nation fails to explain why this
ongoing dialogue does not satisfy the consultation obligations allegedly created by
Forest Plan.

In sum, while the Nation is plainly unhappy with the denial of BlueTriton's
permit application, there is no Forest Plan provision that obligated the Forest
Service to consult with the Nation before denying BlueTriton's permit application.
And to the extent there is such an obligation, the record shows the Forest Service
satisfied it.  The Nation's NFMA claim fails and so cannot justify preliminary
relief.

**B. The Nation is not likely to succeed on the merits of its NHPA claim.**

Section 106 requires that "prior to the *approval* of the expenditure of any
Federal funds on the undertaking or prior to the issuance of any license," federal

agencies should "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108 (emphasis added). Here, the agency action being challenged is the Forest Service's *denial* of BlueTriton's application for a new Special Use Permit authorizing continued occupancy of National Forest System land. *See* Proposed Compl.-in-Intervention of Pl.-Intervenor Yuhaaviatam of San Manuel Nation for Decl. & Inj. Relief ¶ 28, ECF No. 64-1; Compl. ¶ 2, ECF No. 1. The Forest Service did not authorize any activity to take place and the NHPA thus does not come into play.

Further, the NHPA regulations define "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y). The permit application denial is not "a project, activity, or program funded in whole or in part under" the Forest Service's jurisdiction, or an action requiring a federal permit, license, or approval. The denial of the application does not authorize any activity to take place and thus does not qualify as an "undertaking" under the NHPA.[2]

---

[2] Had the application been granted, that decision may have qualified as a federal undertaking because the Forest Service would be allowing an action that requires a federal approval. Indeed, in 2018, when the Forest Service issued a special use permit to BlueTriton's predecessor, it engaged in the Section 106 process and found that the "undertaking" — issuing the special use permit — "may be treated as a Screened Undertaking" with "no to little potential to cause effects to historic properties if they are present in an Area of Potential Effects" under a Programmatic Agreement entered into between the Forest Service, the California State Historic Preservation Officer, the Nevada State Preservation Office, and the Advisory Council on Historic Preservation. *See* 2018 Decision Memo 14, ECF No. 15-7: Ex. 4. At that time, the Forest Service invited the Nation to participate in the environmental review of the proposed special use permit through government-to-government consultation. Ex. 4 at 4.

In addition, the denial of the permit was not an "undertaking" because it did not change the status quo. By its terms, BlueTriton's most recent permit expired in August 2023 and was not renewable. *See* ECF No. 15-4 ¶ I.D. The permit remained active under the APA during the time that the Forest Service was considering BlueTriton's timely application for a new permit, but terminated upon the Forest Service's denial of the application. *See* 5 U.S.C. § 558. The Forest Service's denial of the application for the special use permit therefore put BlueTriton back in the position it would have otherwise been in without a valid permit. The Court should reject the Nation's attempts to frame the agency action as an affirmative action that cut off the water supply to the Nation's property because that happened solely due to a lapse of the previous permit by its own terms.

In reaching a different conclusion, the Nation fails to acknowledge the plain language of the expired permit. Each of BlueTriton's permits was for a set term and was non-renewable. *See, e.g.*, ECF No. 15-4 ¶ I.D; ECF No. 15-7 at 3 (noting maximum permit term of 5 years). Issuance of the permits was at the sole discretion of the authorized officer. *See* ECF No. 15-4 ¶ I.D. The permits were revocable and subject to amendment. *Id*. ¶ I.E; IV.A. In fact, the permit contains a termination clause that states that termination of the permit "shall not require notice, a decision document, or any environmental analysis of other documentation." *Id*. ¶ VII.D. And the permit explicitly did not create any third-party beneficiaries. *Id*. ¶ IV.C. The Nation's portrayal of the permit denial as cutting off "a physical water supply to a historically and culturally significant property that has flowed continuously for over a century" is wrong, given the temporary nature of the permits and the discretionary approval process.

The conclusion that the denial of the permit is not an undertaking is in keeping with the Forest Service's regulations for reviewing applications for special

use permits.  *See* 36 C.F.R. § 251.54.  The regulations set out a two-level screening process, where the Forest Service first conducts an initial screening to determine whether the proposed use meets minimum requirements, including whether the proposed use is consistent with applicable state laws and with standards and guidelines in the applicable forest management plan.  *Id.* § 251.54(e)(1)(ii).  If the proposed use does not comply with the minimum requirements, it does not receive any further evaluation or processing.  *Id.* § 251.54(e)(2).  Here, the Notice of Denial found that BlueTriton had not provided sufficient information to demonstrate compliance with either the current Land Management Plan or "California law regarding water rights and uses."  ECF No. 15-3.  Thus, the proposed use application did not comply with the minimum requirements and no further evaluation, including NHPA analysis, was due.  It would make no sense for the Forest Service to go through the Section 106 process (and other analysis, including under the National Environmental Policy Act) for applications that have not met the minimum requirements and would be rejected for that reason.  *See, e.g.*, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (holding that an agency was not required to prepare an environmental review when it would serve "no purpose").

The regulations also provide that "[i]ssuance of a new special use authorization upon expiration of any other type of special use authorization is at the sole discretion of the authorized officer."  36 C.F.R. § 251.64(c).  "Appropriate environmental analysis must accompany the decision to reauthorize the special use."  *Id.* § 251.64(d).  In other words, environmental analysis would take place *if* the authorized officer intends to issue the special use authorization.  Therefore, it stands to reason that if the authorized officer in her sole discretion does not reauthorize the special use, no environmental analysis is required.  The same logic applies to Section 106 analysis.

In a similar situation, "the Ninth Circuit held that Forest Service's refusal to renew a special use permit for operation of a resort in a national forest did not implicate NHPA because the 'assumption of title or control over an eligible site is not a "federal undertaking" for purposes of [the Act].'" *Chugach Alaska Corp. v. U.S. Forest Serv.*, No. A99-414 CV (JWS), 1999 WL 33946351, at *3 (D. Alaska Dec. 14, 1999) (quoting *Yerger v. Roberston*, 981 F.2d 460, 465 (9th Cir. 1992)). The Ninth Circuit found that the decision not to renew the "use permit was nothing more than the [Forest Service's] reassumption of control over" the resort site and that the "mere exercise of ownership rights does not affect the historic character of the site." *Id.; Yerger*, 981 F.2d at 465.[3] As such, it was not a "federal undertaking" for purposes of the NHPA. *Chugach Alaska Corp.*, 1999 WL 33946351, at *3; *see also Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 756 (D.C. Cir. 1995) (citing *Yerger* with approval); *Paulina Lake Historic Cabin Owners Ass'n v. U.S. Forest Serv.*, 577 F. Supp. 1188, 1193 (D. Or. 1983) (concluding that decision to require removal of structures after denial of renewal of special use permit was not "undertaking" under the NHPA). *Yerger* controls here and compels a finding that the Forest Service's decision not to renew the special use permit was not an undertaking under the NHPA.

Further, the NHPA is concerned with impacts that would change the eligibility of historic properties to be listed on the National Register. *See* 36 C.F.R. § 800.16(i) ("Effect means alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register."). The Nation identifies "Arrowhead Springs" generally as eligible for listing, although it is

___

[3] In *Yerger*, the Forest Service initiated NHPA procedures to determine whether the resort facilities to be removed, which were built in the 1930s, were eligible for listing on the National Register of Historic Places. *See* 981 F.2d at 462. There is no such suggestion here that BlueTriton's infrastructure might qualify for inclusion on the National Register, and thus no NHPA process has been initiated.

unclear whether the Nation asserts that the entire 2,000-acre property is eligible or some smaller portion.  The Nation's briefing does not identify with more specificity the characteristics that make the property eligible for listing.  Nor does it allege that the denial of the special use permit would alter those characteristics such that the property's eligibility for the National Register would be compromised.  The Declaration of Alexandra McCleary states her opinion that the Arrowhead Springs area in general is significant for cultural and religious purposes and that the hotel is significant because it embodies the distinctive characteristics of "two widely celebrated masters of design who defined the glamorous Hollywood Regency style of the era." *See* ECF No. 65-9 ¶ 10. The declaration fails, however, to identify how the denial of a special use permit to BlueTriton would alter the characteristics that would qualify the property for listing on the National Register. *Id.*  The harms the Nation identifies focus on harms such as firefighting in surrounding communities.  Nation's Mot. 20, ECF No. 64-2.  The Proffered Complaint also asserts that the Nation uses the water for use in the hotel, event spaces, administrative offices, to irrigate the property, to support native plant propagation, and to sustain a greenbelt.  *See* Nation's Compl. ¶ 15.  None of these harms are related to the characteristics that would qualify the property for inclusion on the National Register and thus are not cognizable under the NHPA.   As such, the Nation's Section 106 claim is not likely to succeed on the merits.

To the extent the Nation suggests that the removal of the infrastructure itself may have an impact on historic properties, that argument should be disregarded. First, the plan for decommissioning the infrastructure has not been approved by the Forest Service and thus allegations about the potential impacts of decommissioning are speculative and premature.  Second, the permit's terms—approved following a thorough review process in 2018—require the removal of the infrastructure.  *See* ECF No. 15-4 ¶ VII.E.  In addition, environmental damage and safety risks are not

cognizable injuries under the NHPA, which focuses on impacts that may affect a historic property's eligibility for listing on the National Register. *See* 36 C.F.R. § 800.16. The Nation's conclusory statements that Arrowhead Springs and the hotel may be impacted in undefined ways, *see* ECF No. 65-10, are insufficient to demonstrate that the Nation is likely to succeed on the merits of its NHPA claim.

Finally, because the denial of the permit was not an undertaking, the Forest Service was not required to consult with the Nation under the NHPA. There is no general duty to consult with tribes simply because a tribal interest may be involved. *See, e.g.*, *Hopi Tribe v. U.S. EPA*, 851 F.3d 957, 960 (9th Cir. 2017) (holding that general trust relationship with tribes did not lead to duty to consult). Nor is the United States required to regulate off-reservation resources in a manner that is consistent with the Nation's best interests. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 811 (9th Cir. 2006). Compliance with generally applicable statutes and regulations is sufficient to comply with the United States' trust duties. *See id.*; *see also Hopi Tribe*, 851 F.3d at 960 (noting that United States does not have a duty to place tribal interests above all others). The Nation also has not identified a right to be consulted in the permit process, given that it is not the applicant, does not hold the permit, and the permit does not confer any rights upon third parties.

For the foregoing reasons, the Nation is unlikely to succeed on its NHPA claims and so those claims cannot warrant interim relief.

**C. The Nation is not likely to succeed on its breach of trust claims.**

"The Federal Government owes judicially enforceable duties to a tribe 'only to the extent it expressly accepts those responsibilities.'" *Arizona v. Navajo Nation*, 599 U.S. 555, 564 (2023) (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011). The general trust relationship between the United States and federally recognized tribes is insufficient to support a breach of trust claim. *Id.*;

*Jicarilla*, 564 U.S. at 174.  Instead, "[t]o maintain [a breach of trust] claim here, the [Nation] must establish, among other things, that the text of a treaty, statute, or regulation imposed certain duties on the United States."  *Id.* at 563–64; *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006).  And "unless Congress has created a conventional trust relationship with a tribe as to a particular trust asset" by imposing specific statutory duties, courts will not infer any additional common law trust duties.  *Id.* at 566.

The Nation has not identified a specific duty in a treaty, statute, or regulation that the United States failed to carry out.  Indeed, their breach of trust claim focuses on alleged violations of the NHPA and NFMA and thus is solely a restatement of those causes of action.  The Nation generically alludes to "numerous federal laws" and "regulations" that Defendants have purportedly violated.  But the Nation's failure to identify specific duties in those federal laws and regulations, or even to name the specific statutes and regulations beyond the NHPA and NFMA, however, is fatal to their claim.  *Arizona*, 599 U.S. at 564.  The Nation also asserts that Defendants have violated executive orders and other policies, but neither executive orders nor policies can form the basis of a valid breach of trust claim.  *See id.* (stating that breach of trust claim "'must train on specific rights-creating or duty-imposing' language in a *treaty, statute, or regulation.*" (emphasis added)).

In addition, this case does not involve trust assets or resources because the United States does not hold the Nation's Arrowhead Springs Hotel property in trust for the Nation; the Nation purchased the property in 2016.  There is therefore no common law trust relationship at issue.  *See id.* (noting the lack of a conventional trust relationship with the tribe).  Thus, the Nation has not asserted a valid breach of trust claim and is not likely to succeed on its breach of trust claim.

Finally, the Nation asserts that the Forest Service is attempting to prioritize its own water rights and uses over those of the Nation.  This argument is not

supported by the decision, which denied the application because it did not provide
sufficient information to demonstrate either that the special use complies with the
current Land Management Plan, the prior authorization, or with state law.  Compl.
Ex. 1 at 3, ECF No. 1-1.  In addition, the Nation has not stated a valid breach of
trust claim because it does not point to a statute or regulation that requires the
United States to protect the Nation's asserted water rights.  The United States does
not hold water rights at issue in this case in trust for the Nation's benefit.  As such,
there is no trust corpus to which trust duties would attach.  Nor is the water going
to the Nation's reservation such that the United States might have duties relating to
reserved water rights.  *See, e.g.*, *Arizona*, 599 U.S. at 563 (holding that treaty
reserved water for purposes of reservation but United States did not have duty to
take affirmative steps to secure water for tribe).  The Nation's breach of trust
claims therefore are not likely to succeed on the merits.

***

In making a determination on BlueTriton's application for a permit to
maintain their pipeline on the Forest, the Forest Service had no duty to the Nation
under NFMA, the NHPA, or a tribal trust obligation.  The Nation has not advanced
a cause of action on which it is likely to succeed on the merits.  This alone is
sufficient reason to deny the Nation's request for a preliminary injunction.

### III.    The Nation has Not Demonstrated it Will Suffer Irreparable Harms Absent an Injunction

To obtain a preliminary injunction, the Nation must demonstrate that
irreparable harm is likely to result absent the injunction; the possibility of
irreparable harm is not sufficient.  *Winter*, 555 U.S. at 375.  That showing must be
grounded in evidence and cannot rely on unsupported and conclusory statements.
*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249, 1250–51
(9th Cir.2013).   The Nation claims it will be irreparably harmed by the Notice of

Denial in two ways: (1) an unquantified risk of property damage and loss of life from wildfires and (2) alleged negative impacts to environmental, cultural, and historical resources on the San Bernardino National Forest from removal of BlueTriton's pipeline infrastructure. *See* Nation's Mot. at 19-20,64-2. But the Nation has not provided adequate support to meet its burden on either alleged harm.

First, the Nation offers no explanation as to why water deliveries from BlueTriton are essential to its firefighting needs. During the Water Resources Control Board's investigation of BlueTriton's alleged rights in Strawberry Canyon, the Board's prosecution team and BlueTriton took the position that the Nation has riparian rights at the Arrowhead Springs Hotel property, and those rights provided the state-law authorization for deliveries to the Nation by BlueTriton of water from diversion which are upstream up of the Nation's property but on the same stream. *See* ECF No. 15-6 at 87. The Nation appears to take the same position here. *See, e.g.*, Nation's Mot. at 3, 19 (referencing ECF No. 15-6 at 87). But if the Nation's entitlement to the eight million gallons per month that BlueTriton has delivered to the Nation in recent months comes from the Nation's riparian rights on East Twin Creek, that water would flow to the Arrowhead Springs Hotel property were the pipeline to be turned off. *See Turner v. James Canal Co.*, 155 Cal. 82 (Cal. 1909) (a riparian diverting water upstream of their riparian property may take no more than their reasonable share of water for use on their riparian land); *Drake v. Tucker*, 43 Cal. App. 53 (1st Dist. 1919) (recognizing that the holder of a riparian right is not entitled to take more water from an upstream point than reaches their land as natural flow). The Nation does not explain why the water it now receives from BlueTriton cannot be diverted from East Twin Creek as it passes the Arrowhead Springs Hotel property, or elsewhere, and used for the same fire protection purposes.

Further, the Nation states that water delivered by BlueTriton is "in addition
to" the broad riparian, groundwater, and pre-1914 appropriate rights the Nation
claims to possess from sources in the vicinity of Arrowhead Springs.  *See* Nation's
Mot. at 3.  In its declaration, the Nation says that its existing water supplies *include*
wells, but that the existing water supplies are unlikely to meet the Nation's needs,
including fire protection.  Decl. of Paul Hamai Ex. 10 ¶ 10, ECF No. 65-10.
According to the Nation's declarant, "several" wells are unsuitable for potable or
irrigation uses without treatment, and "some" wells cannot be connected to the
Nation's water system before January 15.  Absent from these allegations, however,
is any explanation of why non-potable water cannot be used for firefighting, how
long connections to the water system would take, or the viability of non-well water
supplies for firefighting.

The Nation also has not demonstrated that the removal of the pipeline is
likely to cause irreparable harm to the Nation.  As required by the Notice of
Denial, BlueTriton submitted its plan to remove the pipeline from the Forest on
October 18, 2024.  *See* ECF No. 34.  BlueTriton may not perform any removal
work until the plan has been approved by the Forest Service.  *See* Defs.' Opp'n to
Pl.'s Mot. Ex. 3 at 3, ECF No. 15-3.  Presently, the Forest Service is continuing to
review BlueTriton's plan and is consolidating comments from subject matter
experts to provide to BlueTriton.  Ex. 1 at ¶ 11.  The Forest Service anticipates that
it will take several months of coordination with BlueTriton to finalize the plan.  *Id.*
Removal of the pipeline is not imminent, and the Forest Service has committed to
providing notice to the Parties and the Court at least 30 days in advance of the date
when any removal work would be approved to start.  *See* Suppl., ECF No. 73.  In
sum, the future removal of the pipeline is far enough out that it does not warrant
immediate emergency relief from this Court.

The Nation states that it has not had sufficient time to review BlueTriton's plan and further analysis is needed to avoid the harms it alleges. The Nation's declarant states that "removing the BlueTriton System *may* cause environmental damage and safety risks, including, but not limited to, destroyed habitat, erosion and sedimentation, landslides, hydrologic impacts, and other irreparable harm" (emphasis added) and that it would be appropriate for the agency to analyze these potential impacts. *See* Hamai Decl. Ex. 10 ¶¶ 13, 14, ECF No. 65-10. That is exactly what the Forest Service is doing now: analyzing the removal plan. If the Nation wishes to provide its own analysis of the removal plan to aid in the Forest Service's decision making, the Nation is welcome to do so. But the mere possibility that harms could result absent further analysis of a plan, when the plan is not approved, analysis is ongoing, and enactment of the plan is not imminent, falls short of the Nation's burden to show irreparable harm is more likely than not.

Finally, delay in seeking emergency relief is a relevant factor for the Court to consider in evaluating irreparable injury. *See The Real USFL, LLC v. Fox Sports, Inc.*, No. CV 22-1350 JFW(MARx), 2022 WL 1134487, at *11 (C.D. Cal. Apr. 14, 2022) (*citing Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984)) (holding that "ongoing conversations" with the defendant to resolve the dispute did not prevent a finding that delay in bringing the action demonstrated a lack of irreparable harm). The Nation's delay in arranging alternative means of obtaining water undermines their request for emergency relief. Following the Water Resources Control Board's cease and desist order, the Nation and BlueTriton modified their agreement apportioning the water transported by BlueTriton's pipeline. *See* ECF No. 68-8. The modification, signed in December 2023, plainly acknowledges that pipeline deliveries may be suspended by an order from the Forest Service, the State, or a court. *Id.* ¶ 10. In addition, the modification suggests options for the Nation to obtain water if BlueTriton is

required to reduce deliveries to the Arrowhead Springs Hotel property. *Id.* at 13. These alternatives include the Nation seeking a special use permit from the Forest Service and the Nation negotiating an agreement to use BlueTriton's infrastructure. The Forest Service, too, has proposed to the Nation that it seek its own authorization for diversions on the Forest, and the Nation has refused. *See* Ex. 1, Harrison Decl. ¶ 10. The Nation was aware of the dialogue between BlueTriton and the Forest Service regarding the deficiencies in BlueTriton's application starting in April 2024. *See* Decl. of Daniel. J Little ¶¶ 10-12, ECF No. 65. After denying BlueTriton's application the Forest Service allowed deliveries to the Nation via the pipeline to continue for nearly five months. ECF No. 27.

Knowing that their contractual deliveries would end January 15, the Nation could have used that time to seek a permit, put other diversions in place, or establish infrastructure to make use of its wells. Instead, the Nation waited until the eve of the shutoff date to seek intervention in this case. Where the Nation has not demonstrated that it is interested in pursuing its own authorization from the Forest Service or any means of exercising its riparian rights other than through this present action, "'delay necessarily suggests that a lack of urgency exists' for purposes of irreparable harm." *The Real USFL, LLC*, 2022 WL 1134487 at \*11 (quoting *Kerr Corp. v. North American Dental Wholesalers, Inc.*, No. SACV 11–0313 DOC, 2011 WL 2269991 at \*3 (C.D. Cal. June 9, 2011) (holding that the denial of a preliminary injunction was a consequence of plaintiff's own litigation strategy of delaying seeking an injunction while attempting to resolve the matter through conversations and conducting investigations).

The information the Nation has provided at present is insufficient to show that it is likely to suffer irreparable harm because of the loss of water deliveries through BlueTriton's pipeline and from the removal of the pipeline infrastructure. These unsupported conclusions cannot sustain a preliminary injunction.

**IV.    A Preliminary Injunction is Not in the Public Interest**

For an injunction to issue, the public interests in favor of a preliminary injunction must outweigh the public interests of not issuing an injunction. *All. for the Wild Rockies*, 632 F.3d at 1138. The interest in having government officials act in accordance with the law is "a public interest of the highest order[.]" *Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), aff'd, 952 F.2d 297 (9th Cir.1991); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'").

As the Forest Service explained in opposition to BlueTriton's motion, enjoining the Notice of Denial interferes with the Forest Service's ability to abide by its statutory and regulatory duties. *See* Def.'s Opp. to Pl.'s Mot. at 22-27, 34-36, 15. Maintaining improvements, such as a water pipeline, on a National Forest is a special use and requires a special use authorization from the Forest Service. 35 C.F.R. § 251.50(a). For a new authorization to be granted upon the expiration of a previous authorization, the Forest Service must determine that the expiring authorization complied with all applicable laws, the relevant Forest Plan, the purposes of the use previously authorized, and the terms of the expiring authorization. 36 C.F.R. § 251.64(c); *see also* 16 U.S.C. § 1604(i) (requiring the Forest Service to ensure "permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."). BlueTriton, as the applicant, refused to provide sufficient information to allow the Forest Service to conduct that review. So the Forest Service could not grant BlueTriton a new authorization.

The Nation receives water from BlueTriton's pipeline by contract. *See* Little Decl., ECF 65-7; ECF No. 65-8. The Nation has asked this Court to enjoin the

Forest Service from "enforcing the Notice of Denial as related to the Nation." But the Nation has never held an authorization to maintain diversionary infrastructure on the Forest. And BlueTriton's expired permit was for commercial water bottling, not deliveries to the Arrowhead Springs Hotel property. *See* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 3 at 2, ECF 15-3.[4] Requiring the Forest Service to allow the pipeline to remain on the Forest under an authorization granted to BlueTriton solely to maintain contractual deliveries beyond the purpose identified in the expired permit frustrates the Forest Service's ability to carry out its statutory and regulatory obligations.

The Forest Service reasonably denied BlueTriton's request for authorization to maintain their pipeline infrastructure on the Forest. *See* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. at 22-29, ECF No. 15. The Forest Service's denial letter explained the grounds for denying BlueTriton's application, and the Nation's assertion that the Forest Service has not justified its reasoning is unsupported. As addressed above, the Forest Service has complied with NFMA, the NHPA, and had no tribal trust obligations to the Nation here. *Supra* Section II. The Nation's equitable argument that the Forest Service's actions will disrupt the status quo without proper review, consultation, or explanation is without merit. Because the Forest Service acted in accordance with the law in denying BlueTriton's application and because enjoining the denial would require the Forest Service to maintain a use of the Forest in violation of its own regulation, the Nation's request for a preliminary injunction should be denied.

---

[4] "The 2018 Decision Memo signed by Ranger Joseph Rechsteiner documented that 'Nestlé's project purpose is to continue to operate and maintain the existing system to supply bottled drinking water for retail sale.' Similarly, [BlueTriton's] most recent application explicitly described the purpose of the requested 'Business Facilities' as being 'to supply bottled drinking water for retail purposes.'" Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. Ex. 3 at 2, ECF No. 15-3.

The public also benefits from a thriving and natural ecosystem in the San Bernadino National Forest.  Congress provided for the establishment of national forests to improve and protect forests and watersheds and to provide a source of timber, and requires forests to be administered for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes."  16 U.S.C. § 475; 16 U.S.C. § 528.  The San Bernadino has a diverse landscape, and offers visitors a wide array of opportunities, including hiking, biking, camping, horseback riding, wildlife viewing, fishing, and seasonal snow sports.  *See* Decl. of Forest Supervisor Danelle Harrison Ex. 1 ¶ 3, ECF No. 15-1.  But the ecosystem in Strawberry Canyon is impaired by a lack of water and is unable to support a robust tree canopy or sustain native fish populations.  *See* Decl. of Forest Hydrologist Noel Ludwig Ex. 2 ¶¶ 13-16, ECF No. 15-2.  An injunction that requires the Forest Service to allow far upstream diversions of water from Strawberry Creek into a pipeline, rather than reaching the Nation through natural flow, will continue to impair this unique habitat and prevent its restoration for the health of the environment and the enjoyment of the public.

Though the Nation cites the need to maintain fire suppression facilities as a public interest in their favor, the Nation has not explained why fire suppression needs can only be met though continued deliveries of water to the Arrowhead Springs Hotel property through BlueTriton's pipeline.  As discussed above, the Nation has riparian rights to surface water resources that cross the Arrowhead Springs property, which are the very same rights it alleges to have to water transported through BlueTriton's pipeline.  *See* Nation's Mot. 3, ECF No. 64-2.  The Nation has not explained why the water cannot be diverted once on the Nation's own property and used for fire suppression.  Further, restoring flows within the San Bernadino National Forest can aid in mitigating fire risks.  *See* Ludwig Decl. ¶ ¶ 13, 17, ECF No. 15-2.  Natural stream flows support native

riparian vegetation which is less fire-prone than the invasive grass species that proliferate under the current conditions in Strawberry Creek.  *Id.*

The laws and regulations that govern the Forest Service serve to ensure that San Bernadino National Forest is preserved and maintained for the benefit of the United States.  Here, where the Forest Service has adhered to its statutory and regulatory duties, and where the outcome of the Forest Service's decision-making serves to enhance the Forest, the public interest weighs strongly against an injunction.

## CONCLUSION

The water in Strawberry Creek, if not diverted, would flow through the San Bernadino National Forest to the Nation's Arrowhead Springs Hotel property.  BlueTriton's pipeline delivers water to the Arrowhead Springs Hotel property by short-circuiting this natural water course.  The Nation seeks a preliminary injunction to maintain its preferred delivery system.  But the Nation has not explained why pipeline deliveries are critical to averting fire risks, nor has it alleged anything more than speculative harms from removal of the pipeline infrastructure.  The Forest Service fulfilled with its duties under NFMA and NHPA when it denied BlueTriton's application to maintain the pipeline without engaging in government-to-government consultation with the Nation, and the Forest Service had no tribal trust obligation to the Nation when evaluating the corporation's application.  There is thus no reason to set aside the Forest Service's decision on the merits.  A preliminary injunction that allows pipeline deliveries to the Arrowhead Springs Hotel property to continue—particularly when the Nation and its predecessors have never been the entities authorized to maintain infrastructure on the Forest—overrides the Forest Service's compliance with its statutory and regulatory duties.  Therefore, the Nation's motion should be denied.

Submitted this 10th day of January 2025,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Tyler M. Alexander*
TYLER M. ALEXANDER (CA 313188)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0238
tyler.alexander@usdoj.gov

MAGGIE C. WOODWARD (MD #2212130001)
Trial Attorney
Natural Resources Section
Maggie.woodward@usdoj.gov
(202) 305-4224
P.O. Box 7611
Washington, D.C. 20044-7611

*Attorneys for Defendants*

# **CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Defendants certifies that this brief is 25 pages, which complies with the page limit in this Court's standing order dated March 24, 2016, ECF No. 57.

 /s/ *Tyler M. Alexander*
TYLER M. ALEXANDER
*Attorney for Defendants*