Rachel S. Doughty (Cal. Bar No. 255904)
Jennifer Rae Lovko (Cal. Bar No. 208855)
GREENFIRE LAW, PC
2478 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: RDoughty@greenfirelaw.com
        RLovko@greenfirelaw.com

*Attorneys for Amicus Curiae*
*SAVE OUR FOREST ASSOCIATION, INC.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION – RIVERSIDE**

| | |
|---|---|
| BLUETRITON BRANDS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES FOREST SERVICE, *et al.*, <br><br> Defendants. | Case No.: 2:24-cv-09720-JGB-DTB <br><br> **SAVE OUR FOREST ASSOCIATION, INC. OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (ECF 64-2)** <br><br> Date: January 13, 2025 <br> Time: 9:00 a.m. <br> Courtroom: 1 <br> Judge: Hon. Jesus G. Bernal <br><br> Action Filed: August 6, 2024 |

## TABLE OF CONTENTS

I.  Relevant Factual Background ......................................................................... - 1 -

   A.  BTB Diversion History and Effect .............................................................. - 1 -

   B.  USFS-Issued SUPs ...................................................................................... - 2 -

      1.  Pre-2018 SUPs ..................................................................................... - 2 -

      2.  2018 Decision to Issue SUP to Nestlé .................................................. - 2 -

      3.  Nestlé 2018 SUP .................................................................................. - 2 -

      4.  BTB 2022 & 2023 SUPs ...................................................................... - 3 -

      5.  Termination of the SUP ....................................................................... - 4 -

   C.  The Nation's interest in BTB's infrastructure is as a successor in interest with purchase
       of the Arrowhead Hotel Property ............................................................... - 4 -

   D.  The Nation has declined to engage with the SWRCB or the USFS ............ - 5 -

   E.  There is no evidence of impact to cultural resources ................................. - 5 -

   F.  There is overwhelming evidence of harm to natural resources from BTB's diversion - 6 -

II.  Law ...................................................................................................................... - 7 -

   A.  The USFS may not allow occupancy of public lands without proper findings to protect
       public trust resources ................................................................................. - 7 -

      1.  The USFS's Cannot Allow Water to be Diverted to a Third Party ........ - 11 -

      2.  Tribe has not established its right to any water, a precondition of any SUP ....... - 11 -

      3.  The *Winter*'s Doctrine does not excuse the Nation from submitting an application or
          the USFS from the laws governing SUPs. ........................................... - 12 -

   B.  The Public will be harmed if preliminary relief is granted the Nation ...................... - 14 -

SAVE OUR FOREST ASSOCIATION, INC. OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION (ECF 64-2)
2:24-cv-09720-JGB-DTB

# TABLE OF AUTHORITIES

**Cases**

*Cappaert v. United States*, 426 U.S. 128 (1976) ................................................ - 12 -, - 13 -

*Holmes v. Nay*, 186 Cal 231 (1921) ........................................................................ - 12 -

*In re Water of Hallett Creek Stream System,* 44 Cal. 3d 448 (1988) ...................... - 11 -

*Nevada v. United States*, 463 U.S. 110 (1983) ........................................................ - 12 -

*Sturgeon v. Frost*, 139 S. Ct. 1066 (2019) ......................................... - 12 -, - 13 -

*Turner v. James Canal Co.*, 155 Cal. 82 (1909) ..................................................... - 11 -

*United States v. Jicarilla Apache Nation*,  564 U.S. 162 (2011) ...................... - 12 -, - 13 -

*Winters v. United States*, 207 U.S. 564 (1908) ...................................................... - 13 -

**Statutes**

16 U.S.C. § 1600 ......................................................................................................... - 7 -

16 U.S.C. § 1604 ......................................................................................................... - 7 -

43 U.S.C. § 1701 ......................................................................................................... - 7 -

43 U.S.C. § 1761 ......................................................................................................... - 7 -

43 U.S.C. § 1766 ......................................................................................................... - 7 -

43 U.S.C. §1765 .......................................................................................................... - 7 -

**Regulations**

36 C.F.R. § 219 ........................................................................................................... - 8 -

36 C.F.R. § 251 ..................................................................................... - 7 -, - 8 -, - 10 -

1    Save Our Forest Association, Inc. joins the Defendants in opposing the Motion for

2    Preliminary Injunction filed by the Yuhaaviatam of San Manuel Nation ("**Nation**") (ECF 64-2).

3    **I.    Relevant Factual Background**

4         **A.    BTB Diversion History and Effect**[1]

5         Since around 1930 BTB and its predecessors in interest, have operated and maintained water

6    diversion structures in the **Strawberry Creek Watershed** (also referred to as **Strawberry Canyon**)

7    within the SBNF. **Strawberry Creek** is tributary to **East Twin Creek** and the Santa Ana River.

8    The West Fork of Strawberry Creek originates in the San Bernardino National Forest ("**SBNF**")

9    with its headwaters in Township 2 North Range 3 West (T2N R3W) ("**Headwaters Springs**").

10   Strawberry Creek flows approximately three miles, into Township 1 North Range 3 and 4 West

11   (T1N R3W and R4W), which is where the Arrowhead Hotel (the Nation's predecessor in interest) is

12   located.

13        BTB's present-day spring diversions are from the Headwaters Springs and from a complex

14   of springs (10, 11, 12) which are located, like the Headwaters Springs, in the drainage area of a

15   tributary of Strawberry Creek, but at a lower elevation (the "**Cienega Springs**"). Both the

16   Headwaters Springs and the Cienega Springs are located entirely within the SBNF. All of the water

17   at issue in this case is diverted from the West Fork of Strawberry Creek Watershed, which is within

18   the Strawberry Creek Watershed, and all within the SBNF.

19        The present-day engineering of the water diversion system in Strawberry Canyon started in

20   1929 and 1930. The system expanded over the years with the addition and deepening of boreholes,

21   larger pipes, and more points of diversion. The only present-day diversion structure in Strawberry

22   Canyon is BTB. Only BTB and its predecessors have ever held a Special Use Permit ("**SUP**") to

23   divert water from Strawberry Canyon. *See* Doughty Declaration, filed herewith, Exhs. 4 to 7, Loe

24   Declaration, filed herewith, Exhs. A to D.

25

26   _____

27   [1] Greater detail regarding the history of diversion of water from Strawberry Canyon is provided in Doughty Decl. Exh. 4.

28                                            - 1 -

BTB is party to a contract, originating from a water rights dispute in the early 1930s, that requires BTB to deliver 20% of whatever water it diverts off of federal land to the party owning the Arrowhead Springs Hotel. Doughty Decl, Exh. 4, The Hotel Property is presently owned by the San Manuel Band of Mission Indians (the "**Nation**"), which acquired it in 2016. Doughty Decl. ¶8.

### B.    USFS-Issued SUPs

#### 1.    Pre-2018 SUPs

USFS first issued an SUP to divert water in Strawberry Canyon in 1931 to Arrowhead & Puritas Waters Inc. and Arrowhead Springs Corporation (collectively "**Arrowhead**") for the purpose of "constructing and maintaining pipelines." There is no evidence of water diversion from Strawberry Canyon by anyone prior to 1929. Doughty Decl. Ex. 4, pp. 17-24.

#### 2.    2018 Decision to Issue SUP to Nestlé

On July 27, 2018, Forest Ranger Joseph Rechsteiner signed a decision memo ("**2018 Decision Memo**"), Doughty Decl., Exh , memorializing his decision to issue a new SUP to the public company Nestlé, a subsidiary of public company Nestlé, S.A., to operate and maintain existing diversion structures in Strawberry Canyon. The 2018 Decision Memo allowed issuance of an SUP of 3 years' term with two one-year discretionary renewals. The 2018 Decision Memo also stated that "[i]f the Land Management Plan requirements can be met, and the applicant has a valid state water right, then the access and infrastructure that facilitates water extraction can be authorized."

The California Department of Fish and Wildlife ("**CDFW**") commented in scoping preceding the 2018 Decision Memo that "[f]or any activity that will divert . . . the natural flow. . . of a river or stream. . . the project applicant (or "entity") must provide written notification to CDFW." Doughty Decl. Exh. 4.

#### 3.    Nestlé 2018 SUP

On August 24, 2018, Nestlé's representative and Ranger Rechsteiner signed the three-year SUP authorized by the 2018 Decision Memo, which SUP would expire on August 24, 2021

("**Nestlé 2018 SUP**") (FCD728501). On January 22, 2021, Nestlé asked the FS to renew the Nestlé 2018 SUP for one year, expiring on August 24, 2022. This request was granted, without modification to the 2018 Nestlé SUP. The contents of the Nestlé 2018 SUP specified that the permit was not renewable, assignable, or transferable. The 2018 SUP stated: "Any change in control of the business entity [holding the permit] shall result in termination of this permit."

The contents of the Nestlé 2018 SUP stated "[t]his permit does not confer any water rights on the holder. . . . The United States reserves the right to place any conditions on installation, operation, maintenance, and removal of facilities to . . . divert, store, or convey water on National Forest System lands covered by this permit that are necessary to protect public property, public safety, and natural resources on National Forest System lands in compliance with applicable law."

On March 31, 2021, the privately held private equity firm of One Rock Capital Partners, LLC, in partnership with the also-privately-held Metropoulos & Co., acquired Nestlé in a leveraged buyout. This sale operated to terminate the Nestlé 2018 SUP. Accordingly, on April 1, 2021, Nestlé filed with the USFS a "Request for Revocation" of the August 24, 2018, Nestlé 2018 SUP, on the basis that Nestlé had "conveyed all my (our) right, title, and interest in and to the improvements," the diversion infrastructure, to BTB.

### 4.    BTB 2022 & 2023 SUPs

On August 18, 2022, Acting Ranger Joseph Jordan signed a SUP for BTB. This SUP expired six days later on August 24, 2022 ("**BTB 2022 SUP**"), FCD728502. On February 21, 2023, the Forest Service and BTB executed a second SUP ("**BTB 2023 SUP**"), FCD728503. The BTB 2023 SUP contained similar recitations and entries regarding water rights as the BTB 2022 SUP.

The BTB 2023 SUP, by its own terms, expired on August 24, 2023, with a provision that "[a]pplications for a new permit must be submitted at least 6 months prior to expiration of this permit." It also states the holder "shall" comply with state environmental laws. Upon termination, it is BTB's responsibility to "remove all structures and improvements [. . .] within a reasonable period

1   prescribed by the authorized officer and shall restore the site to the satisfaction of the authorized

2   officer."

3        **5.**     **Termination of the SUP**

4        BTB requested renewal of the BTB 2023 SUP some time in 2024 ("**2024 Renewal**

5   **Application**"). The USFS demanded certain information from BTB, which it was not forthcoming

6   in providing. *See* Doughty Decl. ¶¶16-20. On May of 2024, BTB provided information the USFS

7   making clear that (1) it delivered part of its water to the Tribe, and (2) that the Tribe was not a party

8   to the SUP. In response to questions from the USFS regarding the 2024 Renewal Application, BTB

9   sent the USFS a statement of the Nation, including the sentence: "The Tribe is not a party to, nor is

10  it bound by the terms of the [BTB 2023 SUP] or the [SWRCB Order]." Doughty Decl. Exh. 22, p.

11  15.

12       On July 26, 2024, the USFS sent BTB a "Notice of Denial of Application for Use and

13  Occupancy of National Forest Lands; Termination of Special Use Permit FCD728503 [the BTB

14  2023 SUP]" ("**Termination Letter**"), which notified BTB that "all use of Forest System lands,

15  including the operation and maintenance of a water collection/water transmission system on USFS

16  lands, must stop immediately," block flows through the pipeline within seven days, and prepare an

17  infrastructure removal plan within 12 weeks.

18      **C.**    **The Nation's interest in BTB's infrastructure is as a successor in interest with
19            purchase of the Arrowhead Hotel Property**

20       The Nation purchased the former Arrowhead Hotel in 2016. Doughty Decl. ¶8. The

21  Arrowhead Hotel property is not state or federal reservation land. *Id.* ¶8. BTB delivered some

22  portion of the water it diverts from federal land to the Arrowhead Hotel Property pursuant to an

23  agreement from the 1930s, when BTB's predecessor in interest first diverted water from Strawberry

24  Canyon and first obtained a SUP from the USFS. Doughty Decl., Exh. 4, pp. 23-24. This delivery

25  has continued to the present. *See* Doughty Decl. Exh. 22, p. 13.

26

27

28

SAVE OUR FOREST ASSOCIATION, INC. OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION (ECF 64-2)
2:24-cv-09720-JGB-DTB

**D.    The Nation has declined to engage with the SWRCB or the USFS**

At multiple times the Nation has been made aware of the controversy surrounding the water it receives from BTB by virtue of having acquired the Arrowhead Springs Hotel:

1.  In 2016, the Tribe purchased the Arrowhead Springs Hotel, which was on offer for $60 million.[2] Doughty Decl. ¶8. Presumably due diligence performed in that transaction would have unearthed LAFCO documents and entitlements discussing water sources other than Strawberry Canyon as those identified for development of the property. Doughty Decl. ¶, Bialecki Decl. ¶¶ 13-14. In 2016, the validity of BTB's (then Nestlé's) occupation was being challenged in federal court. (ECF 3).

2.  In 2021, a representative of the Nation declined to comment to the Desert Sun regarding delivery of water to the Nation through the BTB infrastructure. Doughty Decl. Exh. 21.

3.  On February 10, 2022, the Nation declined to engage in the hearing of the SWRCB regarding the water BTB diverts from the SBNF. Bialecki Decl. ¶ 11.

4.  A December 11, 2023, agreement between the Nation and BTB made clear that BTB might lose its right to occupy USFS land. (ECF 65-8) In May 2024, BTB wrote to the USFS, with a statement from the Nation attached, which included the sentence: "The Tribe is not a party to, nor is it bound by the terms of the [BTB 2023 SUP] or the [SWRCB Order]." Doughty Decl. Exh. 22, p. 15.

5.  The Nation has never submitted an application for its own SUP to the USFS. Doughty Decl. ¶21.

**E.    There is no evidence of impact to cultural resources**

There is no evidence that decommissioning the BTB infrastructure or restoring Strawberry Canyon's riparian ecosystem will harm culture resources. Gary Earney, a certified Paraprofessional

---

[2] Also in 2016, the Tribe acquired water all remining shares of the Del Rosa Mutual Water Company, identified as the source of water for the entitlements it obtained with purchase of the Arrowhead Springs Hotel Property. Doughty Decl. ¶9.

1  Archaeologist with the USFS, who was also responsible for managing the SUPs for the diversion

2  structures in Strawberry Canyon from 1982 to 2007 states:

> Cultural resource presence is unlikely, from the headwaters down to
> the Forest property line at Arrowhead Springs Resort/Coldwater
> Canyon due to the steep terrain on both sides of the creek, thick and
> almost impassable vegetation on both sides of the
> creek, and the dynamic nature of the stream flows during heavy
> rain/snow melt events that I personally saw be intense enough to
> lower the stream bottom by a good 10 feet in one afternoon--
> removing trees at the same time. Isolated hunting, fishing and
> gathering would have been conducted along the actual stream bottom,
> but camps would have been restricted to milder terrain down around
> the hot springs areas of the Resort, off Forest. The creek flushed
> almost annually from winter rains, which would have
> removed/destroyed isolated artifacts or evidence of human
> use/habitation along the creek bottom, which would have been highly
> unlikely anyway due to the aforementioned reasons.

12  Earny Decl. ¶ 5.

13  **F.    There is overwhelming evidence of harm to natural resources from BTB's
          diversion**

15      The SBNF was founded on February 25, 1893, with the primary purpose of protecting the

16  watershed and timber supply for the surrounding communities. Prior to BTB's diversions, the

17  United States Geological Survey ("**USGS**") and other sources documented that Strawberry Creek

18  and its tributary springs were historically perennial, flowing even in the dry months and supporting

19  fish and a lush riparian fauna and flora. Strawberry Creek is a tributary to the Santa Ana River and

20  part of the Santa Ana River Watershed. The USGS documented that Strawberry Creek is a recharge

21  source for the Bunker Hill Basin. The dry and diminished Strawberry Creek has led to impaired

22  riparian fauna and flora and a creek that cannot support fish, like the native Speckled Dace, as fish

23  need water to survive. BTB's diversions have left Strawberry Creek with only intermittent pooling

24  water and fractured habitats. Water-dependent flora like alders and willows no longer line the upper

25  reaches of Strawberry Creek. Because BTB has withdrawn so much water, the species observed in

26  the 1920s are gone from the Canyon. The USFS has rated each stretch of the Headwaters and

27  Cienega Springs–public resources on public lands set aside for the protection of watersheds and

28

habitat–as in poor condition as a direct result of BTB's diversions. Loe Decl. ¶¶2-17; Doughty Decl.
Exh 4; Bialecki Decl. ¶¶4-7, 12.

## II.    Law

### A.    The USFS may not allow occupancy of public lands without proper findings to protect public trust resources

The USFS is constrained by multiple laws and regulations in allowing access to public
lands. The Federal Land Policy Management Act, 43 U.S.C. § 1701 et seq. ("**FLPMA**"):

> [r]equires that public land be managed in a manner that will protect
> the quality of scientific, scenic, historical, ecological, environmental,
> air and atmospheric, water resource, and archaeological values; that,
> where appropriate, will preserve and protect certain public land in
> their natural condition; that will provide food and habitat for fish and
> wildlife and domestic animals; and that will provide for outdoor
> recreation and human occupancy and use. Also states that the United
> States shall receive fair market value of the use of the public land and
> their resources unless otherwise provided for by law.

Doughty Declaration, Exh. ***, San Bernardino National Forest Land and Resource Management
Plan ("**SBNF LRMP**"), Part 3, p. 27.

The USFS is authorized under FLPMA to grant or renew rights of way upon USFS lands for
various special uses, including "pipes, pipelines ... and other facilities and systems for the
impoundment, storage, transportation, or distribution of water." 43 U.S.C. §§ 1761-66; 36 C.F.R. §§
251.50-65. However, SUPs for such rights of way must be subject to terms and conditions that,
*inter alia*, ensure compliance with federal and state laws regarding air and water quality and
environmental protection, and that "minimize damage to scenic and aesthetic values and fish and
wildlife habitat and otherwise protect the environment." 43 U.S.C. §1765.

The National Forest Management Act, 16 U.S.C. §1600 et seq. ("**NFMA**") requires the
USFS to develop, maintain, and, as appropriate, revise a land and resource management plan
("**LRMP**") for each unit of the National Forest System. The LRMP must "provide for … watershed,
wildlife, and fish" and "provide for diversity of plant and animal communities." 16 U.S.C. §
1604(g)(3)(A) & (B). All projects within a national forest *must* comply with that forest's LRMP. 36

C.F.R. § 219.15(c). Here, the USFS must comply with the SBNF LRMP, which was adopted in 2005. See Doughty Decl., Exh. 9.

LRMPs must include enforceable design criteria—"the rules"—that managers legally must operate within to achieve desired conditions set forth in the LRMP's "vision." 36 C.F.R. § 219.15(d)(2). For the SBNF LRMP, these rules are presented as standards.

> Standards are mandatory requirements that come into play as site-specific activities are planned for implementation, and are designed to be consistent with achieving the objectives and desired conditions. The standards act as thresholds or constraints for management activities or practices to ensure the protection of resources.

SBNF LRMP, Part 1, p. 3.

SUPs must include terms and conditions "which will . . . Require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance if those standards are more stringent than applicable Federal standards." 36 C.F.R. § 251.56(a)(1)(i). Additionally, fair market value must be charged for "the rights and privileged authorized, as determined by appraisals or other sound business management principles." 36 C.F.R. § 251.57(a)(1).

Issuance of a new special use authorization for an existing use is subject to the holder being in compliance with all the terms of existing authorization and must be accompanied by "appropriate environmental analysis." 36 C.F.R. §251.64(c), (d). All proposals for special use also must provide information demonstrating the proposal's compliance with applicable laws, regulations, and orders. 36 C.F.R. § 251.54(d)(4).

In keeping with NFMA's mandates, the SBNF LRMP requires that for surface water development projects, "instream flows favorable to the maintenance and restoration of riparian dependent and aquatic resources and channel conditions will be required." SBNF LRMP, Part 3, p. 11, S48. It also requires that surface water diversions and groundwater extractions, including well and spring developments, may only be authorized upon demonstration that the water extracted is in excess to the current and reasonably foreseeable future needs of forest resources; approved

1  extractions must provide for the "long-term protection and reasonable use of surface water and

2  groundwater resources." SBNF LRMP, Part 3, p. 10, S46.

3       The LRMP's mandates are intended to implement the overarching goals set forth in Part 1 of

4  the SBNF LRMP. One of those goals is that "[w]atersheds, streams, groundwater recharge areas,

5  springs, wetlands and aquifers are managed to assure the sustainability of high quantity and quality

6  water. Where new or re-authorized water extraction or diversion is allowed, those facilities should

7  be located to avoid long-term adverse impacts to national forest water and riparian resources."

8  SBNF LRMP, Part 1, Goal 5.1 p. 41. The LRMP asks the "outcome evaluation question" for Goal

9  5.1: "Is the national forest making progress toward sustaining Class 1 watershed conditions while

10  reducing the number of Condition Class 2 and 3 watersheds?" SBNF LRMP, Part 1, pp. 40-41.

11       The SBNF LRMP incorporates the Forest Service Handbook regarding Soil and Water

12  Conservation Practices specific to the San Bernardino National Forest, FSH 2509.22 ("**FSH**")

13  (Doughty Decl., Exh. 10). For riparian conservation areas ("**RCAs**"), activities are limited, and

14  watersheds are to be managed to improve degraded riparian areas for native populations of riparian-

15  dependent species. RCAs include perennial and intermittent springs, seeps, springs, and inner

16  gorges. FSH 2509.22.2.5. The FSH directs that:

17
18
19
> Existing uses, activities, or occupancy within RCA's should be evaluated for risks or impacts and mitigated during special use renewal or re-issuance. If mitigation measures are not effective, reassess with the option to modify or eliminate the use, activity or occupancy when impacts are unacceptable.

20
21  FSH 2509.22.3.21. Additionally,

22
23
24
25
> Review new special use permit applications for surface and ground water extraction and for transport of water across National Forest System lands and assess the potential impacts on aquatic and riparian ecosystems on or off the forest. Proponents should demonstrate that proposed development would meet the riparian management objectives. Apply forest plans standards S45, S46, S47, and S48 as applicable.

26
27
28

FSH 2509.22.3.25. The FSH further directs the USFS to manage watersheds to "improve or restore degraded riparian areas to proper functioning condition for native populations of riparian-dependent species." FSH 2509.22.1.1.

The FSH describes the affirmative duty of the USFS to ensure that "proof of water right is established prior to issuing or re-issuing [SUPs]" and that the applicant has complied with "applicable environmental laws. … Where water use . . . is evident [the USFS must] ensure that all SUP applicants have secured the appropriate … California Department of Fish and Game 1602 Stream Alternation [sic] Agreement … before issuing a SUP that would result in channel alteration."

Applications for special uses by a private corporation also require a demonstration of technical and financial capability:

> Technical and financial capability. The proponent is required to provide sufficient evidence to satisfy the authorized officer that the proponent has, or prior to commencement of construction will have, the technical and financial capability to construct, operate, maintain, and terminate the project for which an authorization is requested, and the proponent is otherwise acceptable.

36 C.F.R. § 251.54(d)(3).

When improvements authorized by a SUP are transferred, "the new owner of the authorized improvements must apply for and receive a new special use authorization. The new owner must meet requirements under applicable regulations of this subpart and agree to comply with the terms and conditions of the authorization and any new terms and conditions warranted by existing or prospective circumstances." 36 C.F.R. § 251.59.

At issue in this case is whether *BTB* provided this information or sufficient information for the USFS to make the affirmative findings that must be made to issue a permit; the USFS decided BTB did not. The *Nation* has never even submitted an application to the USFS for an SUP. Doughty Decl. ¶ 21 and has otherwise declined to stand up to assert any right it might have before the SWRCB or by assisting BTB in responding to application questions.

1      **1.    The USFS's Cannot Allow Water to be Diverted to a Third Party.**

The Land and Resource Management Plan ("**LRMP**") for the San Bernardino National Forest incorporates a Supplement of the Forest Service Handbook for the San Bernardino National Forest which describes the affirmative duty of the U.S. Forest Service ("**USFS**") to "[e]nsure that proof of water right is established prior to issuing or re-issuing [SUPs]" and that the **applicant** has complied with "applicable environmental laws." Doughty Decl. Exh 10 (FSH 2509.22.3.31 (emphasis added).) "Where water use . . . is evident [the USFS must] ensure that all S.U.P. **applicants** have secured the appropriate . . . California Department of Fish and Game 1601 Stream Alternation [sic] Agreement . . . before issuing a S.U.P. that would result in channel alteration." *Id.*(emphasis added). The Nation has not even attempted to comply with these requirements, having never submitted an application.

**2.    Tribe has not established its right to any water, a precondition of any SUP**

The Order of the SWRCB notes that BTB is delivering water to the San Manuel Band to which the tribe *may* be entitled as a riparian owner. Riparian parcel *ownership* by the Tribe was not established by the Order. Riparian rights may be lost by severing a riparian parcel from continuity with a stream. Hutchins, *The California Law of Water Rights* (1956), pp. 193-194, 284-285. Nor was riparian *use* proven. When asked about use, the Tribe has offered no comment. *See* above, I.D.

Additionally, there is no right of a riparian owner to draw water from a point on the land of another—here the USFS—except with permission of the upstream owner. And, as the California Supreme Court explained: "the riparian water rights of the United States on its reserved national forest lands in California are as fully immune from defeasance as the riparian rights of a private owner." *In re Water of Hallett Creek Stream System,* 44 Cal. 3d 448, 470, 458 (1988).

Finally, no matter where diverted, a riparian diverter can take no more than their reasonable share, and the diversion must not cause unreasonable water losses or be detrimental to other riparian diverters. *Turner v. James Canal Co.*, 155 Cal. 82, 92 (1909), *Holmes v. Nay*, 186 Cal 231, 240

1    (1921). Having not applied for an SUP or sought transfer of a point of diversion, the Nation has

2    given the USFS no opportunity to even consider these constraints.

3

4              **3.    The *Winter*'s Doctrine does not excuse the Nation from submitting an
                        application or the USFS from the laws governing SUPs.**

5

6              The Tribe argues that it holds an implied reservation of rights over the Subject Water—

7    water deliveries from BTB—because it uses this water for an off-reservation property held in fee by

8    the Tribe, the Hotel Property. The Tribe acquired the Hotel Property in 2016 in fee. The Tribe

9    contemplates future development on this land and it maintains it has implied reservation of rights as

10   the successor in interest to the prior owner's contract with BTB. While the Supreme Court has long

11   recognized the "implied- reservation-of-water-rights doctrine," *Cappaert v. United States*, 426 U.S.

12   128, 141 (1976), also known as the  "*Winters* doctrine," *Nevada v. United States*, 463 U.S. 110, 116

13   n.1 (1983), the doctrine applies only to unappropriated water "to accomplish the purpose of the

14   reservation." *Cappaert v. United States*, 426 U.S. 128, 141 (1976).

15             The implied rights and historical significance of the Hotel Property and water delivered by

16   BTB to that property that the Tribe alleges are not—and cannot be—the source of affirmative,

17   judicially enforceable duties that the government has "expressly accept[ed]." *United States v.*

18   *Jicarilla Apache Nation*,  564 U.S. 162, 177 (2011) (quotations omitted). The Hotel Property is not

19   the Tribe's reservation land. Thus, while reservation land reserves certain water rights "by

20   implication," *Cappaert* at 138, and those rights become part of the reservation by operation of law

21   when the reservation is established, just as the land itself does, the existence of implied reserved

22   water rights appurtenant to a reservation and privately owned by a Tribe gives rise only to a limited

23   or bare trust. The Agency must balance this limited or bare trust along with all other public trust

24   rights. *See, id*.

25             Moreover, the *Winters* doctrine did not create affirmative duties for USFS. Any "reserved

26   right, by its nature, is limited." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1079 (2019). It is a right held by

27   the United States—for federal reservations or in trust for the benefit of Indian tribes—as against

28

1   other users of a particular water source. *See Cappaert*, 426 U.S. at 138 (explaining that the right "is

2   superior to the rights of future appropriators"). And, as against those other users, it is "merely" a

3   right "to take or maintain the specific 'amount of water'—and 'no more'—required to 'fulfill the

4   purpose of [the] reservation.'" *Sturgeon*, 139 S. Ct. at 1079 (citation omitted). For example, in

5   *Winters*, the right was one held by the United States on behalf of a tribe as against other users of the

6   Milk River, and the right enabled the United States to enjoin other users from taking the

7   reservation's share of the water. *See Winters v. United States*, 207 U.S. 564, 574-578 (1908).

8        What the Tribe asserts here is very different:  an affirmative "duty" to assess the Tribe's

9   private property water needs and meet them when it assesses the SUP of an unrelated private

10  corporation. While the *Winters* doctrine established the legal principle that Tribes have certain

11  reserved water rights, in the absence of specific legislation or federal enactment reserving these

12  rights for the Tribe, USFS is not empowered to affirmatively manage land to the detriment of the

13  public trust or the public's future water requirements. Nor is it empowered to approve a permit for a

14  third-party beneficiaries' implied water rights. Indeed, the *Winters* doctrine applies to all federal

15  reservations generally. *See Cappaert*, 426 U.S. at 138 ("The doctrine applies to Indian reservations

16  and other federal enclaves."). In *Cappaert*, for example, the Supreme Court held that when the

17  government reserved land to preserve an underground pool that was the habitat of a rare species of

18  fish, the government impliedly reserved "water sufficient to maintain the level of the pool." *Id*. at

19  147. And in *Arizona v. California*, the Court held that when the government reserved land for

20  various national recreation areas and refuges, the government impliedly reserved "water sufficient

21  for the future requirements" of those "federal establishments." 373 U.S. at 601.

22       The Tribe has failed to identify a specific, applicable, trust-creating statute or regulation that

23  the Agency has violated, or that which would require the Agency to elevate the Tribe's implied

24  reservation of rights over other public trust rights. In the absence of any trust duty that the

25  government has "expressly accept[ed]," *Jicarilla*, 564 U.S. at 177, the Tribe's breach-of-trust claim

26  cannot succeed, and the USFS was not required to give its interest in the water diverted by BTB any

27  more weight than it attributed to other beneficiaries of the water source.

28

**B.     The Public will be harmed if preliminary relief is granted the Nation**

By all credible accounts, the diversion of water from Strawberry Canyon has profoundly

changed and deeply harmed that ecosystem on public lands. See Doughty Decl., Exh. 4

Steve Loe, longtime USFS biologist responsible for Strawberry Canyon writes in his

declaration:

> The Strawberry Creek watershed, springs, and Strawberry Creek are
> extremely important to the long-term survival and health of numerous
> threatened, endangered and Forest Service sensitive species and to the
> maintenance of biological diversity in the region. Prior to diverting
> the springs, which has resulted in complete drying of several miles of
> stream in the summer months, Strawberry Creek supported a trout
> population and numerous species that are now pushed toward
> extinction, including Santa Ana speckled dace, Santa Ana sucker, and
> mountain yellow-legged frogs. These species, which had been in
> Strawberry Creek for thousands of years, have been eliminated since
> the total diversion of the most productive springs in the watershed by
> BTB. The stream that had been perennial for thousands of years is
> now almost totally dry in the summer throughout its length,
> precluding all fish and yellow-legged frogs. Dry, hot streambeds are
> not suitable for spotted owls, rubber boa, willow flycatchers, and least
> Bell's vireo.
>
> With continuing rapid development of private land and increase in
> devastating wildfires in southern California, public lands and waters
> are becoming the last stronghold for maintaining natural biological
> diversity in the region. Species are running out of places to exist.
> Strawberry Creek is recognized by experts as having very high
> potential for riparian habitat and species recovery *if* natural water can
> be returned to the stream. Imperiled species such as California
> Spotted Owl, willow flycatcher, and southern rubber boa will respond
> to returning water in the springs and streams and their populations
> will benefit, helping to maintain species viability in the San
> Bernardino Mountains and southern California.
>
> The aquatic species are the National Forest species that are most at
> risk in southern California, and getting water back in Strawberry
> Creek would allow re-introduction of the species that have been lost
> to dewatering. Strawberry Creek has very high potential for re-
> introduction due to amount of potentially suitable habitat and the
> protected status of the watershed. It is important that water be
> returned as quickly as possible to the stream as climate change,
> urbanization, and increasing wildfire continue to alter more essential

- 14 -
SAVE OUR FOREST ASSOCIATION, INC. OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION (ECF 64-2)
2:24-cv-09720-JGB-DTB

habitat in the region. A restored Strawberry Creek will be very
important to species recovery and long-term survival in the region.
Local agencies and private organizations are trying to restore
degraded habitats and species at a huge cost. Millions of public
dollars are being spent on small projects where there are opportunities
because of the importance. Returning water to Strawberry Creek will
create several miles of protected stream and riparian habitat where
imperiled species could be on the road to recovery right away with
little cost to the public.

No meaningful restoration can take place while diversion of
Strawberry Creek's water continues.

Water that is being taken by BTB from the springs at the top of the
mountain reduces the amount of water in the ground available for
percolation into the mountain lakes and local groundwater. There is
little doubt that with the fractured rock geology and tapped springs
being totally diverted, it has affected groundwater at lower elevations
on both sides of the mountain. This is very important as mountain
residents affected have had to ration in the recent past. Lakes that are
affected by removal of spring water are extremely important to the
economy and well-being of the mountain community. With climate
change, it is increasingly important to protect every water source.

Having a dry stream and no riparian/wetland habitat below the
mountaintop communities--where there normally would be lush,
moist, and cooler conditions--is a great fire threat. Fire starts, spread,
and intensity are all reduced with healthy, moist stream conditions.
Dewatered, dry streamside areas burn just like the uplands. As climate
change makes conditions even hotter and dryer, it is important that we
get this natural water back into the ground, springs, streams and lakes
to help prevent devastating wildfire. Water should be returned to the
ground quickly as these areas are threatened this summer and fall if
there is a fire downslope.

Loe Decl. ¶¶12-17; *See also* Doughty Decl., Exh. 5-7 (testimony of former USGS's Greg Allord re

the impact of diversion); Loe Decl. Exh. A-D; Doughty Decl., Exh. 4, pp. 10-12 (summarizing

evidence of the pre-diversion ecosystem with a rich riparian habitat and capable of supporting fish).

The public has shown intense, broad, and sustained interest in getting water back into Strawberry

Canyon so it can be restored. Doughty Decl. ¶¶2-5; Bialecki Decl. ¶¶2-8. The Nation, which has

declined until now to engage with the USFS in any meaningful and publicly transparent way,

SAVE OUR FOREST ASSOCIATION, INC. OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION (ECF 64-2)
2:24-cv-09720-JGB-DTB

1  should not be allowed to ignore and bypass the normal steps required to protect public resources

2  and to stop the USFS from requiring BTB to remove infrastructure that has been identified by the

3  USFS itself as impaired and at risk due to unnaturally low flow.[3] Doughty Decl. Exh. 4, p. 13.

4

5

6    Dated: January 10, 2025                              Respectfully Submitted,

7

8                                          By:    /s/ Rachel Doughty

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    _____

26  [3] And the Nation should have ample other options for water, including perhaps riparian access to what should be a more
    fully flowing Twin Creek (Doughty Decl. Exh. 4), the water to which the Del Rosa Mutual Water Company is entitled,
27  which is sufficient for a far more intense development than presently exists at the Hotel Property (Doughty Decl. ¶¶7,9),
    and municipal supplies, including for fire suppression needs. Loe Decl. ¶21.

28                                          - 16 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SAVE OUR FOREST ASSOCIATION, INC. OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION (ECF 64-2)
2:24-cv-09720-JGB-DTB