# Exhibit  4
# to Declaration of Rachel Doughty

RACHEL S. DOUGHTY (Cal. Bar No. 255904)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
Telephone: 510-900-9502
Email: rdoughty@greenfirelaw.com

*Attorneys for the Story of Stuff Project*

**BEFORE THE STATE WATER RESOURCE CONTROL BOARD, OFFICE OF ADMINISTRATIVE HEARINGS**

**STATE OF CALIFORNIA**

| | |
|---|---|
| In the Matter of:<br><br>DRAFT CEASE AND DESIST ORDER ISSUES AGAINST BLUETRITON BRANDS, INC. | **STORY OF STUFF PROJECT CLOSING BRIEF** |

## Table of Contents

TABLE OF AUTHORITIES ....................................................................................... iv

INDEX OF KEY CITED EXHIBITS ........................................................................ v

ABREIVIATIONS USED ........................................................................................ vi

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

I.    Key Locations ................................................................................................. 2

II.   The Headwater Springs would be perennial, adding substantial flow (approximately 10 miners inches) to Strawberry Creek, as they did historically, if not for BTB's diversions. ....... 3

    A.  Historical Records ..................................................................................... 3

    B.  Modern Diversion ...................................................................................... 5

    C.  Modern Scientific Consensus ................................................................... 5

        1.   Robert Taylor (USFS) ...................................................................... 5

        2.   Dr. Manjiang Zhang (USFS) ........................................................... 6

        3.   Dr. Michelle Bearmar (USFS) ......................................................... 6

        4.   Hydrodynamics Group (BTB-contracted) ....................................... 6

        5.   Mann (BTB-contracted) ................................................................... 6

        6.   Dames & Moore/URS (BTB-contracted) ......................................... 7

        7.   Steve Loe (former USFS) ................................................................. 7

        8.   CDFW ............................................................................................... 8

        9.   Geologist Andrew Zdon .................................................................... 8

        10.  N. Stork (SWRCB) ........................................................................... 8

    D.  Much of the water BTB diverts is simply dumped lower on the mountain. ........................... 8

    E.  BTB's diversion cause harm to the Strawberry Creek watershed. .......................................... 9

    F.  BTB itself has long represented that the water it diverts is all surface water regulated by the Board. ............................................................................................... 9

III.  BlueTriton holds no right to any water from Strawberry Canyon. ..................................... 10

    A.  Pre-1929, there was no use of Strawberry Creek Water above the Del Rosa diversion. ........ 10

        1.   No water resources claim ever made on federal land. ...................... 11

        2.   In the late 1800s, the Arrowhead Hot Springs Hotel Company filed a number of claims for riparian rights, all for water outside and not downstream of Strawberry Canyon/Creek. ................. 11

    B.  Base of the Mountain Development Era (1900-1929) ......................... 13

        1.   First commercialization of Cold Water Creek water in 1909 ........... 13

        2.   1910-1929 LA bottling of water from Cold Water Creek continues, adding Indian Creek and Waterman Canyon as additional sources ....................................... 14

    C.  Strawberry Canyon Era (1929 to present) ........................................... 15

        1.   A groundskeeper for the Hotel identified untapped "natural spring" in the headwaters of Strawberry Creek. ........................................................ 15

        2.   Arrowhead Springs Corporation (the Hotel) could not convey a right it did not have California Consolidated any right to surface water. ....................................... 16

3. The private quiet title action, Del Rosa, did not transfer any right to the water of Strawberry Cannon to BTB's predecessor. ............................................ 17

D. The USFS has never conveyed any water right whatsoever to BTB. .................... 17

**RESPONSE TO QUESTIONS POSED BY ADMINISTRATIVE HEARING OFFICER ...... 18**

**I.    Response to 1: All of the water BlueTriton diverts is surface water within the Jurisdiction of the Board. .......................................................................................................... 18**

**II.   Response to 1.b.iii: The Board should not treat any of the BTB infrastructure as natural subterranean streams. ..................................................................................................... 18**

**III.  Response 1.c: There are no riparian rights properly at issue in this hearing. .................. 19**

**IV.   Response 1.d: BlueTriton's predecessors did not perfect any pre-1914 appropriative rights to the water in Strawberry Canyon. .......................................................................... 20**

A. BlueTriton could not have established appropriative rights to the water of Strawberry Canyon because no water was taken from the Canyon until 1929. ....................... 20

B. Response to 1.d.iii.: Any appropriative right of BTB's predecessors was not to the water of Strawberry Canyon and has not and cannot be relocated to Strawberry Canyon. ................. 20

**V.    Response 1.e: It is possible, though unlikely, that some small amount of the water diverted is developed water, but BTB has no right to that water either. ..................................... 21**

**VI.   Response 2: The Board should issue a cease and desist order. .......................................... 21**

**VII.  Response 3: The Board order should require immediate cessation by BTB of all unauthorized diversion. .......................................................................................................... 21**

A. Response 3.a: The Board's order may enjoin diversion of flow from Boreholes 10, 11, 12. 21

B. Response 3.b: The Board should issue a cease and desist order curtailing all diversion from Strawberry Canyon and must consider additional provisions. ............................... 22

1. The Board must consider any additional provisions deemed necessary to protect the public trust, curtain unreasonable use, and prevent waste. ................................. 22

2. The Board should levy penalties to recover from BTB the costs of bringing this action and to replenish the Water Rights Fund. .......................................................... 25

3. The Board Should require proof of compliance. .......................................... 25

**VIII.      CONCLUSION .......................................................................................................... 25**

1

## TABLE OF AUTHORITIES

2

**CASES**

*Barneich v Mercy* (1902) 136 California 205 ............................................................... 18
*Brewer v. Murphy* (2008) 161 Cal.App.4th 928 ......................................................... 18
*Chowchilla Farms, Inc. v. Martin* (1933) 219 Cal. 1 ................................................. 19
*Envtl. Law Found. v. State Water Res. Control Bd*. (2018) 26 Cal App. 5th 844 ............ 18
*Envtl. Law Found. v. State Water Res. Control Bd.* (2020) Cal. Super. LEXIS 8374 .......... 18
*Guitierrez v. Wege* (1905) 145 Cal. 730 ...................................................................... 18
*Imperial Irrigation Dist. v. State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548 ............. 23
*In re Water of Hallett Creek Stream System* (1988) 44 Cal.3d 448 ................................. 23
*Light v. State Water Resources Control Board* (2014) 226 Cal.App.4th 14 ..................... 23
*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419 ....................... 23, 24
*NLRB v Kanmak Mills, Inc*. (3d Cir. 1952) 200 F.2d 542 ............................................. 21
*Norgrart v. Upjohn Co.* (1999) 21 Cal. 4th 383 .......................................................... 17
*Thornbrough v Western Placer Unified Sch. Dist.* (2013) 223 Cal. App. 4th 169 ............. 21
*United States v. State Board*, (1986) 182 Cal.App.3d 82 ............................................ 25

**STATUTES**

AB 747 ......................................................................................................... 23, 24
Gov. Code, § 11513 ............................................................................................ 24
Gov. Code, §§ 11405.20 ..................................................................................... 24
Gov. Code, section 11507 ................................................................................... 21
Wat. Code, § 1052 ............................................................................................. 25
Wat. Code, § 1112 ............................................................................................. 24
Wat. Code, § 275 ............................................................................................... 23
Wat. Code,§ 1831 .............................................................................................. 25

**OTHER SOURCES**

Cal. Const., art. X, section 2 .................................................................... 23, 24, 25
Judicial Council of California, Tenth Biennial Report 72 (1944) ..................................... 21
Sen. Rules Com., Off. Of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 747 (2018-2019 Reg. Sess.)............................................................................................... 23
Water Boards Hearings Program, Frequently Asked Questions: The Hearing Process ................... 24

**TREATISES**

Hutchins, The California Law of Water Rights (1956) ................................................. 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INDEX OF KEY CITED EXHIBITS

Sur-Rebuttal Testimony of Amanda Frye ("Frye Decl."), **SOS 280**

Sur-Rebuttal Slides of Amanda Frye, **SOS 281**

Testimony of Steve Loe ("Loe Dec. Decl."), **SOS 31**

Sur-Rebuttal Testimony of Steve Loe ("Loe April Decl."), **SOS 282**

Sur-Rebuttal Slides of Steve Loe, **SOS 283**

Policy Statement of Paul Kibel, **SOS 284**

Sur-Sur Rebuttal Testimony of Gregory Allord ("Allord Decl."), **SOS 288**

Sur-Sur Rebuttal Slides of Gregory Allord, **SOS 295**

The above testimony and slides largely summarize and compile historical and contemporary evidence—primary sources—which primary sources are themselves intended to be incorporated into this brief when the key exhibits above are cited. The same is true when testimony and slides prepared by the Prosecution Team are referenced.

## **ABREIVIATIONS USED**

References to the questions posed by the Administrative Hearing Officer in the May 26, 2022, Post-Hearing Order are designated by question number presented in red text.

| | |
|---|---|
| Administrative Hearing Officer and Administrative Hearing Office, interchangeably | AHO |
| BlueTriton Brands, Inc. and/or its predecessors in interest | BTB or BlueTriton |
| California Consolidated Water Company | CCWC |
| Del Rosa Mutual Water Company | Del Rosa Co. |
| *Del Rosa Mutual Water Company v. D.J. Carpenter et al. (Case 31798)* | *Del Rosa* Case |
| Draft Cease and Desist Order | Draft CDO |
| Nestle Waters North America | Nestle |
| San Bernardino National Forest | SBNF or the Forest |
| San Manual Band of Mission Indians | SMB |
| Story of Stuff Project | SOS |
| The Water Board's prosecution team in this administrative hearing | PT |
| Those springs located on the SBNF, at the headwaters of Strawberry Creek, in Strawberry Canyon in T2N R3W Sections 30 and 31 other than the Cienega Springs | Headwaters Springs |
| United States Forest Service | USFS |
| Dames & Moore | D&M |
| The drainage area A tributary of Strawberry Creek immediately above the confluence of drainage area A and B as defined in URS 2002 | Cienega Springs |

**INTRODUCTION**

For more than six years, members of SOS in California and around the world have worked with Inland Empire residents to end nearly a century of removal of substantially all of the critical source waters of Strawberry Creek in the SBNF by BTB and its predecessor water bottlers, including Nestlé Waters North America. While SOS and its members have supported many communities around the United States and Canada negatively impacted by the bulk removal of water for commercial bottling, BTB's operation in the SBNF has been of particular interest, both because of its location on public forest lands held in trust for the people of the United States and the unique environmental threat the project poses to a key, drought-impacted Southern California watershed.

The matter is also of particular interest because of the egregious facts. BTB in fact has <u>no</u> right whatsoever to any of the water it syphons off public land, despite years of contrary assertion: to the public, to the USFS, and now, to the Board. Only through the dedication and persistence of former public servant Steve Loe and private citizen Amanda Frye have these facts come to light. The PT, SOS, and other members of the public have submitted substantial evidence, at great commitment of time and money, which includes: historical documents, scientific evidence, and public records. The record supports three points vital to the AHO's recommendation to the Board regarding the Draft Cease and Desist Order ("Draft CDO") issued against BTB: (1) this is a diversion of surface water well within the regulatory authority of the Water Board to curtail, (2) neither BlueTriton nor its predecessor companies ever held the pre-1914 right to this water they repeatedly asserted, and (3) the arguments BlueTriton is making before this body, as well as before the USFS, CDFW, and other government and regulatory authorities, are aimed at sowing confusion and forcing a delay of the inevitable, namely the loss of a valuable water source for their polluting business. BTB offered no compelling defense because there is none to be had.

The evidence submitted by SOS makes clear that the Board can and must issue a Cease and Desist Order to BTB. directing it to stop its unlawful diversions and allow the SBNF to recover from being dewatered by BTB for nearly a century.

**FACTUAL BACKGROUND**

**I.    Key Locations**

**Strawberry Creek** is tributary to **East Twin Creek** and the Santa Ana River. It originates in the SBNF with its headwaters in Township 2 North Range 3 West (T2N R3W) ("**Headwaters Springs**"). Strawberry Creek flows approximately three miles, into Township 1 North Range 3 and 4 West (T1N R3W and R4W), which is where the Arrowhead Hotel is located. SOS 281_2 (labeled SBNF Atlas), SOS 086, 087 (SBNF Atlas). BTB's present-day spring diversions are from the Headwaters Springs and from a complex of springs (10, 11, 12) which are located, like the Headwaters Springs, in "the drainage area A tributary of Strawberry Creek immediately above the confluence of drainage area A and B as defined in URS 2002" (the "**Cienega Springs**"), all within the SBNF. SOS 271_6-7 (USFS Decision Memo); SOS 283_9 (Loe Slides excerpting the URS 2002 report showing watersheds referenced); PT 3_61, 63 (ROI, showing diversion points and boundary of the Strawberry Creek Watershed); SOS 281_6 (Showing USFS delineation of the "W. Fk. Strawberry Creek Watershed). Thus, all of the water at issue in this hearing is diverted from the West Fork of Strawberry Creek Watershed, also called drainage area A, which is within the Strawberry Creek Watershed, delineated by the heavy black line in the URS report (SOS 283_9) and the pink line in the ROI (PT 3_63), and all within the SBNF.

Other key locations, *all outside of the Strawberry Creek Watershed*, are: the **Arrowhead Hot Springs Hotel**, at the base of the famous Arrowhead landmark near the hot springs (PT 3_63, 64 (ROI shows location in the **Hot Springs Creek Watershed**, delineated in pale green, which is east of the Strawberry Creek Watershed); **Cold Water Canyon** (also shown in the URS 2002 map excerpted at SOS 283_9), its own watershed, located between the Strawberry Creek and Hot Springs Creek Watersheds (see also SOS 281_6 (showing USFS delineation of the Coldwater Canyon Watershed)); **Indian Springs**  in the Hot Springs Creek Watershed (PT 3_63, 64, SOS 111_2 (FS report showing location at T1N, R4W, sec. 2)); **Waterman Canyon**, located in its own watershed to the East of all of the other watersheds mentioned in this matter (PT 3_63 (showing Waterman Canyon location, located in the furthest east watershed visible)); and the **Del Rosa Co. diversion point**, in East Twin Creek "about one mile north of the mouth of said East Twin Creek"

downstream of the Strawberry Creek Watershed (PT-189_18).

Further discussion of these key locations is in the Sur-Rebuttal Testimony of Amanda Frye, SOS 280, ¶¶ 1-6, and accompanying slides SOS 281_2-7, as well as the recitation of location in the *Del Rosa* judgment (discussed at length, below, section III.C.3). PT-189_17-18, 22.

## II. The Headwater Springs would be perennial, adding substantial flow (approximately 10 miners inches) to Strawberry Creek, as they did historically, if not for BTB's diversions.

### A. Historical Records

In the early 1900s, before anyone bottled any water for off-site consumption, the canyons near the Hot Springs Hotel were wet and lush, with flower decorated and musical with the songs of mountain brooks. Overhead are the arches formed by the branches of the heavy tree growth; sycamore, maple, oak, alder, pine, cedar and juniper, hiding the sun. . . Sparkling streams of purest water, gushing from eternal springs, tumble and leap over ledges and among the boulders; now stopping to play a while in some emerald pool sunk in the granite, then hiding in the shadows of ferns and vines." SOS 6_6. This is what Engineer W.P. Rowe,[1] hired by BTB's predecessor in interest around 1929 to explore water to develop, found when he first explored Strawberry Canyon:

> Strawberry creek drains a portion of the south slope of the San Bernardino Mountains. It has its source at a group of springs which issue from the side of Strawberry peak. The elevation of the top of Strawberry peak is 6150 feet above sea level and the springs issue from the broken rock between elevation 6400 and 6050 feet above seal level. The flow from these springs being deep seated should be fairly regular, especially during the late summer season. The observations show this to be the case. The dependable supply will aggregate about 10 inches.

SOS 051_1; see also SOS 282, ¶¶ 2, 3, 7, 10 (Loe April Decl.); SOS 31_¶¶26-30 (Loe Dec. Decl. summarizing Rowe reported observations with citations). Rowe went on to describe the water as supporting "alder, sycamore, dogwood and cedar trees together with ferns and thimble berry bushes." SOS 051_1.

The years that Rowe observed were actually dry years, relative to average. SOS 283_4 (Loe April Decl.) Rowe described flow in parts of Strawberry Creek and its headwaters springs, which

---

[1] W.P. Rowe was a well respected engineer, who would today be called a hydrologist. See SOS 31_¶¶22-24.

1    are now essentially dry creek bed or missing entirely, even during dry months. See SOS 040

2    (Rowe's handwritten records of water flow in East Twin Creek from July 1930 during an unusually

3    dry summer); SOS 048 (Rowe's handwritten records of water flow in East Twin Creek from August

4    and September 1930 during an unusually dry summer); SOS 046 (Rowe's handwritten records of

5    water flow in East and West Twin Creeks from summer months in 1925, 1926, 1931, and 1948).

6         Rowe's observations are consistent with the direct field observations of USGS survey teams

7    in the late 1890s. See SOS 290, 291 (quadrangle maps showing Strawberry Creek as a perennial

8    stream, and the Headwaters Springs and the Cienega Springs all as USGS maps showed Strawberry

9    Creek, and it Headwater Springs as blue lines. Mr. Allord testified that the purpose of the USGS

10   quadrangle maps (SOS 290 and 291) "was to *accurately* represent these natural features, including

11   water." SOS 288_¶7. He further testified that the mapped physical features would have been "based

12   upon direct observation"  and that "It is my opinion, based upon my viewing of tens of thousands of

13   historical USGS maps, that the symbols for perennial and intermittent streams have stayed the same

14   for the approximately 140 years, since the first USGS topographic maps were released, and the

15   upper reaches of Strawberry Creek are therefore accurately portrayed on the 1901 Redlands

16   quadrangle as they were observed in 1898/99 (SOS 291), which were relatively dry years (SOS

17   001_019)" *Id.* at ¶¶7, 9; Accord testimony of Allord 5/23/22 (morning) at 1:49:06-1:50:56 (offering

18   opinion that maps SOS 290 and 291 accurately portray on the ground observations by the USGS

19   scientist of hydrological features that were present in the 1893-94 and 1898-99 field seasons,

20   respectively); Accord SOS 280_¶¶ 8-10, SOS 281_5 (Frye Testimony summarizing historical

21   documents regarding USGS conventions). These years in which perennial flow was observed by the

22   USGS were, like those in which Rowe observed streamflow, relatively dry as compared to average

23   years. SOS 295_16 (G. Allord Decl.) The Cienega Springs and Strawberry Creek are portrayed as

24   perennial streams and the Headlands Spring are shown as intermittent in the Redlands Quadrangle.

25   SOS 291; see also summary of Zdon testimony, below, section II.C.9 (discussing contextual

26   definition of "intermittent"); Accord Testimony of N. Stork (3/21/22, morning) 1:32:02; PT-

27   313_¶¶2-4 (revised testimony of N. Stork comparing present-day to historical maps and concluding

28   that BTB has dewatered the Headwaters Springs); PT-312_¶¶2-6 (Eggars Testimony reaching

conclusion that differences in modern and historical maps are evidence of dewatering by BTB).

Even into the 1950s, before all of BTB's infrastructure was in place, there was sufficient continuous water in Strawberry Creek that the Forest Service was regularly stocking Strawberry Creek with trout.[2] SOS 255-261 (various articles re fishing in Strawberry Creek).

**B.    Modern Diversion**

BlueTriton diverts nearly exactly the amount of water Rowe reported flowing from the spring sources in Strawberry Canyon.[3] SOS 80_2 (BTB infographic stating 45.3 million gallons (9.2 miner's inches) diverted in 2018, 68.4 million gallons (14.5 miner's inches) in 2019, and 59 million gallons (12.5 miner's inches) in 2020), which was confirmed as accurate by L. Lawrence, in his testimony on 1/13/22 morning, commencing at 00:43:04 ; see also, SOS 282_¶21 (Loe testimony that flows from the diversion points do not exceed those observed by Rowe pre-diversion); SOS 283_7 (Loe slide summarizing flow observed by Rowe pre-diversion).

BTB only bottles a small portion of the water it diverts. *Id.* (16.8, 10.4, and 6.4 million gallons in each of the years represented). Until some time after 2020 every bit of this "overflow" water was dumped at the base of the mountain. Testimony L. Lawrence 1/12/22 (morning) 1:23:13 et seq. There are no known present-day diverters from Strawberry Canyon other than BTB. Stork testimony on 1/11/22, afternoon, commencing at 01:33:46; accord Vasquez testimony on 1/11/22, afternoon, commencing at 01:35:03.

**C.    Modern Scientific Consensus**

Based upon physical and historical evidence, scientific consensus is that but for BTB's diversion, there would be substantially greater surface flow in Strawberry Canyon. The water BTB diverts, in other words, is surface flow, or hydrologically connected to surface flow. Loe Decl. ¶49.

**1.    Robert Taylor (USFS)**

USFS hydrologist Robert Taylor, concluded that spring drainages and mainstream flows which are now intermittent would have been perennial before development. SOS 27 (USFS Surface Water Hydrology Specialist Report); SOS 31_¶35 (Loe Apr. Decl. summarizing findings of Robert

---

[2] Mr. Loe, a former USFS biologist who has studied Strawberry Creek for 40 years (SOS 31_¶2)

[3] BTB's infrastructure is described at SOS 121_7-8, 35.

Taylor); SOS 283:11 (Loe Slide Summary of USFS findings). Taylor found Strawberry Creek to be impaired and at risk due to unnaturally low flows. SOS 27_32-40 (Table at 39). He concluded the watershed was imperiled as a result of the removal of all the spring flows and a significant amount of groundwater responsible for base flows in the summer months. Id.

### 2. Dr. Manjiang Zhang (USFS)

USFS Hydrologist Zhang determined that that BTB's diversions amounted to 39 to 75.3 percent of the total water available in East Twin Creek. SOS 104.

### 3. Dr. Michelle Bearmar (USFS)

Forest Service Michelle Bearmar is a highly respected hydrogeologist for the USFS. SOS 31_¶37 (Loe April Decl.). Ms. Bearmar concluded, "based on reported information, documents and site visits there are or were potentially 10 spring sites in the upper watershed. Most, if not all are associated with documented structural features or traces of features (lineaments)." SOS 25_21 (USFS report authored by Ms. Bearmar). Dr. Bearmar determined that the Headwaters Springs and Strawberry stream would be flowing and gave some flow predictions based on water removal, historical records and on-site hydrogeology. Id.

### 4. Hydrodynamics Group (BTB-contracted)

In 1997, BTB contracted the Hydrodynamics Group, which studied BTB's water sources in Strawberry Canyon and determined that "Spring tunnel No.'s 2, 3, and 7 are natural springs," "Springs 1 and 8 are natural springs that discharge through bore-hole developments," and that "Bore-hole 1A is in hydraulic connection to Spring No. 7." SOS 121_54 (Letter to BTB, submitted by BTB to the USFS).

### 5. Mann (BTB-contracted)

Mr. Mann observed the Cienega Springs prior to development, in January and February 1964, stating: "a good flow of water was observed coming from the base of the alluvium, at the contact with the underlying basement rock. Spring alcoves at this location indicate persistent spring flow."[4] SOS 277_16. Mr. Mann revisited the area in 1987, and described BTB's operations: "[t]he

---

[4] Note that BTB states that Mann's recommended infrastructure was not constructed, with the implication being made to the USFS that the water taken from the Cienega Springs is not groundwater. See SOS 277_5.

1  water-gathering facilities consist of groups of short tunnels and horizontal wells constructed in the

2  vicinity of natural spring orifices." *Id.* at 20. Mr. Mann cited to the then-operative California

3  definition of "spring water" which required that water carrying that label be "water which issues by

4  natural forces out of the earth of a particular place. Bottled or vended water may be derived from

5  the natural orifice or from a bore hole adjacent to the natural orifice." *Id.* at 21. Mr. Mann

6  concluded that "in my opinion, the water flowing from [BTB's infrastructure] should be classified

7  as 'Spring Water'." *Id.* BTB reaffirmed these results in 1996, in correspondence to the USFS. SOS

8  121_59.

9          **6.    Dames & Moore/URS (BTB-contracted)**

10         Dames & Moore ("D&M"), classified the Headwater Springs as "perennial", "subarial,

11  discharge to the surface", "fourth to sixth order", with "subvariable to variable discharge." SOS

12  16_62; see also SOS 283:9-10 (Loe slide summarizing D&M findings, including estimated stream

13  flows in reaches below the BTB diversions absent the diversions).)[5] D&M

14         **7.    Steve Loe[6] (former USFS)**

15         Mr. Loe, former SBNF biologist in charge of Strawberry Creek, testified that "[i]n my

16  professional opinion nearly all of the water that BlueTriton removes from Strawberry Canyon in the

17  San Bernardino National Forest used to flow to Strawberry Creek on the surface or in underground

18  alluvium, eventually creating the hydrologically-connected base flows which are so critical to plants

19  and animals in the dry summer months." SOS 31_¶19. As a result of BTB's diversion, the sort of

20  flows that Rowe described allowed Strawberry Creek to support high quality fish and lush riparian

21  wildlife, including many now-endangered species, but that is not possible today. SOS 31_¶¶32, 40-

22  42. Water-dependent flora like alders and willows no longer line the upper reaches of Strawberry

23  Creek because BlueTriton has withdrawn so much water, and the habitat observed in the 1920s is

24  gone. *Id.* at ¶¶31-33, 43-44.

25  _____

26  Mr. Mann also concluded that the flow in Strawberry Canyon was very unlikely to derive from water coming from the North side of Strawberry Peak. SOS 277_16.

27  [5] Although D&M call the springs the "Arrowhead Springs," in fact they are referring to the Headwater Springs located at "Sections 30 and 31, Township 2 North, Range 3 West." SOS 16_7.

28  [6] See SOS 32_¶¶2-15 establishing Mr. Loe's expertise and basis as a percipient witness.

**8.    CDFW**

The CDFW wrote to the USFS upon application of BTB for a new SUP: "the project [BTB's Headwater Springs USFS permit] includes facilities and appurtenances that have been constructed within the bed, bank, or channel of a stream," and questioned the impact to aquatic and riparian resources. SOS 117_4 (emphasis added).

**9.    Geologist Andrew Zdon**

Certified hydrogeologist Andrew Zdon offered his opinion "that springs with substantial surface discharge have historically been present in the Strawberry Creek watershed." CBD 1_¶7. He further testified that "waters captured by the existing infrastructure and piped down-canyon are waters that previously would have otherwise remained in the Strawberry Creek watershed hydrologic regime supplementing spring flow and/or baseflow to Strawberry Creek." *Id.* at ¶10. Mr. Zdon described the Headwaters Springs as "rheocrene" and explained that "[a] rheocrene spring is a spring where there is subsurface-derived water discharge to the surface in a defined channel (e.g., streambed) such as that present in the bottom of Strawberry Creek Canyon. Where baseflow is low relative to the evapotranspiration requirements of riparian vegetation, that flow may decrease or cease all together seasonally and can give rise to intermittent flow conditions." *Id.* at ¶ 14.

**10.    N. Stork (SWRCB)**

Natalie Stork,[7] Senior Engineering Geologist for the SWRCB, concluded upon evidence presented before and at the hearing that in addition to the conclusions in the Revised ROI, it is unlikely that BTB's manipulation of the Headwaters Springs has resulted in any developed water from the Spring 7 Complex. PT-313_¶¶5-8 (revised). Further, she concluded that BTB's actions have likely dewatered stream segments in the vicinity of Springs 3, 1, 8, and 7. *Id.* at ¶¶3-4; PT-314 (map comparison supporting Stork conclusion).

**D.    Much of the water BTB diverts is simply dumped lower on the mountain.**

BlueTriton dumps millions of gallons downstream of the parched public lands from which they are removed, without having used the water for any purpose whatsoever. Loe Decl. ¶ 60; SOS 80 (infographic); Testimony of L. Lawrence 1/13/22, morning, commencing at

[7] See PT 311 (corrected) (Ms. Stork's CV).

1  00:43:04(authenticating and verifying content of SOS 80); SOS 263[8] (Article in the Palm Desert

2  Sun (10/14/21) stating that BTB asserts that "90% of the water it takes is returned to the same

3  watershed or supplied to a Native American tribe").

4      **E.    BTB's diversion cause harm to the Strawberry Creek watershed.**

5        The USFS has rated each of the Headwater and Cienega Springs, public resources on public

6  lands set aside for the protection of watersheds and habitat, as in poor condition as a direct result of

7  BTB's diversions. SOS 27 (USFS Surface Water Hydrology Specialist Report); SOS 283:11 (Loe

8  Slide Summary of USFS findings). Downstream water right holder SBVMWD reports adverse

9  impacts–both in a reduction in the quantity of water to which it is entitled, and in damage to natural

10  resource restoration efforts. SOS 115. The Southern California Native Freshwater Fauna Working

11  Group notes it is "extremely concerned" about the "huge" amount of water diverted. SOS 116.

12      **F.    BTB itself has long represented that the water it diverts is all surface water regulated by the Board.**

13        BTB has repeatedly represented that the water it takes from Strawberry Canyon is surface

14  water, including to Water Board enforcement staff. See PT-10_¶¶14, 34 (Testimony of Eggers). In

15  seeking a permit from the USFS to occupy federal land with its infrastructure, BTB's counsel, R.

16  Johnson wrote: "It is clear that [BTB's] rights to the use of springs on public lands were properly

17  obtained <u>by prior</u> <u>appropriation</u> under the laws of the State of California."[9] SOS 265_2 (emphasis

18  added). And, in 2016, L. Lawrence wrote to the USFS that:

19       [BTB] and its predecessors-in-interest have, for well over a century, diverted and put

20       to beneficial use, under applicable California state law, the waters in Strawberry
     Canyon located within the [SBNF]. This beneficial water use predates the

21       reservation of the land that comprises the SBNF. <u>[BTB's] exercise of its water rights</u>
     <u>in Strawberry Canyon is exclusively regulated by the California State Water</u>

22       <u>Resources Control Board.</u>

23  SOS 277_3-4 (emphasis added). In reliance upon these representations, the USFS has repeatedly

24  granted termed permits (a license, not a lease or a contract) for to BTB's predecessors in interest to

25

26  _____

27  [8] The author also reported that the San Manuel Tribal representative "had no comment about the agreement or what it does with the water."

28  [9] Note that L. Lawrence testified that BTB has not changed its operation or position with change in ownership. Testimony L. Lawrence 1/12/22, afternoon, commencing at 01:14:03.

STORY OF STUFF PROJECT CLOSING BRIEF

place diversion infrastructure in the SBNF, but in each permit issued, the USFS has expressly stated that it is not transferring any water right.[10] See SOS 150-165. For example, the most recent SUP states: "[t]his permit does not confer any water rights on the holder." *Id.* at 14. It also does not "confer any rights on any third party as a beneficiary under this permit." *Id.* at 6. Upon revocation or termination, "the holder shall remove all structures and improvements . . . and shall restore the site to the satisfaction of the authorize officer [of the USFS]." *Id.* at 12.

BTB represents the same to the public. See SOS 266 (Op Ed written by L. Lawrence, in his capacity as a representative of BTB, stating: "We do not pump water out of the aquifer, but rather only source water that naturally flows to the surface. This helps ensure we are never collecting more than is naturally available."); see also L. Lawrence Testimony 1/13/22, morning, commencing at 00:48:56 (authenticating SOS 266).

## III. BlueTriton holds no right to any water from Strawberry Canyon.

Given the surface water classification of the entirety of the flow diverted (see above, section II), and the ownership of all of Strawberry Canyon by the federal government (SBNF) (see above, section I), it is not possible that BTB has any valid right or authorization to the waters of Strawberry Creek.

### A. Pre-1929, there was no use of Strawberry Creek Water above the Del Rosa diversion.

The present-day engineering of the water diversion system in Strawberry Canyon started in 1929 and 1930, and has been improved over the years with additional boreholes, deeper boreholes, larger pipes, etc. SOS 31_¶ 18 (Loe April Decl. referencing multiple primary sources indicating years of infrastructure construction); SOS 27_21 (USFS hydrologist R. Taylor stating: ("The Arrowhead water extraction beginning in the late 1920s to early 1930s affected the portion of the streamflow supported by contributions from springs located in the upper western portion of the project watershed . . . As other areas were developed, extraction reduced contributions to surface from the area of boreholes"). Prior to 1929, there is no evidence whatsoever of diversion

---

[10] The current SUP is invalid as of the date of transfer of ownership to BTB by BTB's predecessor in interest. See SOS 165_5 ("Any change in control of the business entity . . . shall result in termination of this permit.")

infrastructure anywhere near the Headwater or Cienega Springs, or in any part of Strawberry Canyon by any predecessor in interest to BTB. SOS 282_¶¶22-25 (Loe Dec. Decl.); SOS 280_¶¶11-42 (Frye April Decl.). There is further no evidence even of any use of the waters of Strawberry Creek above the Del Rosa diversion point prior to 1929, and considerable evidence to the contrary.[11] See SOS 280_¶¶12-26 (Frye April Decl. summarizing primary source evidence of pre-1929 sources of water for the Hotel and Smith).

### 1.    No water resources claim ever made on federal land.

The SBNF was created in 1894, to conserve and protect watersheds, provide water for neighboring communities, and help protect and ensure timber supply. SOS 253. Any party wishing to establish a prior claim to the land or resources within the forest reservation boundary was required to file a claim by the deadline noticed and published by the federal government in 1894. SOS 252. There is no evidence that any predecessor of BTB made any such claim to water within the surveyed boundary of the SBNF, which includes the entire Strawberry Canyon Watershed. SOS 280_¶12; see also, section I, above.

### 2.    In the late 1800s, the Arrowhead Hot Springs Hotel Company filed a number of claims for riparian rights, all for water outside and not downstream of Strawberry Canyon/Creek.

In May 1887, the Arrowhead Hot Springs Hotel Company laid claim to what it called "the water here flowing or to flow in this Strawberry Canon," but its description of Strawberry Canyon instead matches Cold Water Canyon: **"the Northwest fork of Twin Creeks in Township one North Range four West."** BTB-2_153 (emphasis added) (Copy of notice in "Water Records"). The 1887 notice goes on to describe purely riparian uses by the Hot Springs Company of 140 inches measured under four inches of pressure: "for irrigation domestic, mechanical, manufacturing, bathing and medical purposes *upon its land in the Township and Range above mentioned*." BTB-

---

[11] BTB has historically claimed that its right to water from the headwaters of Strawberry Creek can be traced to a possessory claim of David Noble Smith in 1865, but Mr. Smith's claim was to "the table land and hot springs at the foot of Arrowhead Mountains, commonly known as the "Ace of Spades" and the bottom land and wash of [East Twin Creek] from a little below the mouth of 'Hot Canon' . . . on the West or right bank of said canon immediately below the main forks." BTB-2_151. Further, there is substantial evidence in the record in the form of eye-witness sworn testimony from various lawsuits that, wherever Mr. Smith may have begun his operations, those operations were concentrated near the present-day Hotel by the late 1800s early 1900s. See SOS 281_11-13 (Frye summary of eye witness excerpts describing D. Smith operation around the Arrowhead Hot Springs and in Cold Water Canyon).

2:153 (emphasis added); see also Id.[12] at 155 (similar November 1887 notice describing the point of diversion as "In the Canon known as Cold Canon and also as Strawberry Creek at the upper end of a rocky precipice on the **Westerly side of said Canon where it changes from a westerly to a southerly course, about one eighty of a mile above the house in said Canon where D.N. Smith resided at the time of his death. . . situated in the South east quarter of the North west quarter of Section twelve in Township one north, Range four west**" an again for "domestic and irrigation purposes" at the Hotel. (emphasis added).)

Finally, in November 1889, The Arrowhead Hot Springs Company filed amended notices that more fully describe the locations of the intended appropriation of "the water flowing and to flow at the point where this notice is posted" which was: "**On the West side (as the Canon there runs) of the Canon commonly known as Cold Canon, and also as Strawberry Creek, . . . a short distance from North line of Section twelve, Township one North, Range four West, San Bernardino Base and Meridian**." BTB-2_157 The purpose of use of this water was for "domestic, irrigation, bathing and manufacturing purposes" and "the place of intended use of said water is upon lands belonging to said Arrowhead Hot Springs Hotel Company." *Id.* It described the means of conveyance: "an ordinary dam of earth, brush and stone; thence along northwest side of said Canon by a wooden flume 104 feet long, 12 inches wide, 10 inches deep.  . . then a sand box 12 feet long . . .thence by iron pipe as follows; 10 inches in diameter for first 28 feet, 7 inches in diameter for about 6500 feet to road from bridge over Hot Canon to Arrowhead Hot Springs Hotel." *Id.*

A comparison of the descriptions of the points of diversion above, and the quadrangle maps in evidence, makes clear that the described points of diversion are **Cold Water Canyon** and **Hot Springs Creek Watershed**. See SOS 281:2 (USFS Atlas township and quadrangle maps); SOS 290 (San Bernardino Quadrangle, survey 1893-94);[13] SOS 291 (Redlands Quadrangle, survey 1898-99,

---

[12] See also SOS 280_¶16 (testimony of A. Frye noting source document in which attorney John Brown testified under oath that David Noble Smith drew his water from Cold Water Canyon), SOS 281_11 (A. Frye slide with actual excerpt from historical testimony of John Brown).

[13] Note that Coldwater Creek is mislabeled as "East Twin Creek" above its confluence with Strawberry Creek in SOS 290. Compare SOS 86 & 87 (more recent quadrangle maps showing more clearly township and range lines, but with the relevant streams largely dewatered); see also SOS 85 (explanation of PLSS system); SOS 88 (A.Frye demonstrative of points of diversion 1909 to present).

1   notably showing no infrastructure in Strawberry Canyon upgradient of the Hotel); See also Allord

2   Testimony regarding USGS map accuracy, discussed above, section II.A.

3          The facts corroborate the conclusion stated above that no early notice referenced Strawberry

4   Canyon or Creek Water, or even East Twin Creek Water. Notably, although the location description

5   above mentions crossing "Hot Canon" no mention is made of crossing Cold Water Creek or

6   Canyon, although to reach any point of Strawberry Creek up-gradient of the Hotel, one would have

7   to do so, lacking a pump. As Steve, Loe observed:

8              Based upon my review of topographical maps and understanding of the
               landscape, accessing Strawberry Creek from the Hotel would have been very
9              difficult and would have necessitated crossing Cold Water Canyon. And, as
               East Twin Creek near the Hotel is at a considerably lower elevation than the
10             Hotel, accessing that source of water fed by Strawberry Creek would have
               required pumping water uphill. Neither of these engineering exercises would
11             have made little sense with the availability of water from Cold Water and
               Waterman Canyon. If such an undertaking had been made, it surely would have
12             been mentioned in the numerous historical papers.

13
14   SOS 282_¶25. Coldwater Creek as the location of diversion is consistent with multiple later

15   descriptions of the source of water for the hotel prior to 1929, which was Coldwater Canyon, Indian

16   Creek, and Waterman Canyon, but not Strawberry Canyon. See SOS 280_¶¶13-27 (Frye summary

17   of historical documents in evidence); accord SOS 281_9-21 (Frye slides excerpting historical

18   documents in evidence). In short, the easily-reached water of Cold Water Canyon was pure and

19   abundant (id.), so there would have been no logical reason to proceed into rugged Strawberry

20   Canyon to obtain water when Cold Water and Waterman Canyon water were much more easily

21   accessed. See SOS 282_¶25 (Testimony of Steve Loe describing the relative elevation of

22   Strawberry Creek, Cold Water Canyon, and the hotel); SOS 283:25-27 (Loe Slides on same point).

23     **B.    Base of the Mountain Development Era (1900-1929)**

24          **1.    First commercialization of Cold Water Creek water in 1909**

25          In 1909 James Mumford and some associates formed a company that would first export

26   water from near the Hotel. See SOS 280_¶13 (testimony of A. Frye with reference to primary

27   sources); SOS 281_9 (images of excerpts from historical documents); see also BTB-12_1

28   (newspaper article submitted by BTB referencing these historical events). The source of the water

1  was **Coldwater Canyon**. *Id.* This water was transported by electric carline to Los Angeles, where it

2  was sold by the Arrowhead Springs Water Co. as "ginger ale, soda water, and other similar

3  products." Id.

       **2.**       **1910-1929 LA bottling of water from Cold Water Creek continues,**
                    **adding Indian Creek and Waterman Canyon as additional sources**

5        In 1910, Arrowhead Hot Springs Company (the Arrowhead Hotel owners) got into a legal

6  dispute with the Arrowhead Springs Water Co. (LA bottlers) ("1910 Case"). SOS 280_¶¶15-22

7  (testimony of A. Frye with reference to primary sources); SOS 281_10-13 (images of historical

8  documents regarding the dispute). Testimony from multiple people, many with no stake in the case

9  and with personal knowledge of the area and bottling operation, identified **Coldwater Canyon** as

10  the source of the bottled water. *Id.* No person testified that the water bottled in LA came from

11  Strawberry Canyon or Creek. *Id.*

12        In addition to the 1910 Case testimony, other contemporary sources discussed Coldwater

13  Creek as the water feeding the reservoir above the Hotel, which was the source of both the water for

14  bottling and the water used by the hotel SOS 280_¶23 (A. Frye testimony summarizing writings of

15  G.E. Bailey.); SOS 281_14 (slide of A. Frye with excerpts of G.E. Bailey texts). G.E. Bailey, a

16  professor of geology at the University of Southern California with an interest in hot springs,

17  identified "Fuente Frio" (Indian Springs) as an untapped source of clean and cold water and "Agua

18  Fria" (from Coldwater Canyon) as "at the head of the pipe line leading to the main reservoir on the

19  high mesa north of the hotel"—the same one discussed as the source of the water bottled in LA. *Id.*

20  Waring in 1915 identifies Fuente Frio (Indian Springs) as a source of the LA bottled water. SOS

21  280_¶24; SOS 281_14; accord SOS 281_15 (slide showing additional excerpts of publications from

22  the 19-teens and twenties corroborating Indian Springs and Coldwater Canyon as the source of

23  bottled and Hotel domestic use water).

24        In 2018, the USFS prepared a report that identified the location of the historical Indian

25  Springs adit and remnants of the old pipeline, confirming that Indian Springs is not downstream of,

26  or in the same watershed as Strawberry Creek. SOS 280_¶25; SOS 281_16-17 (slides excerpting the

27  USFS report showing photos with captions describing Indian Springs, correspondence with the

28

1  USFS showing location of Indian Springs with the township and range identified, and a letter from

2  Byron Waters (1929) describing water taken from Indian Springs); Accord SOS 280_¶26

3  (Reference to Byron White 1929 correspondence with CCWC regarding the location of Indian

4  Springs); SOS 280_¶27 (Frye summarizing recollection of former Hotel employee "ETW" that an

5  early source of spring water was Indian Spring.).

6         At some point, water from Waterman Canyon was also added to feed the demand for bottled

7  water, but, as houses were built in Waterman Canyon, that source became contaminated. SOS

8  280_¶¶27-28, 36 (testimony of A. Frye summarizing primary source in evidence); SOS 281_18, 22

9  (Frye slides excerpting historical primary sources which are in evidence).

10      **C.      Strawberry Canyon Era (1929 to present)**

11           **1.     A groundskeeper for the Hotel identified untapped "natural spring" in
                   the headwaters of Strawberry Creek.**

12        As a result of the contamination of the source in Waterman Canyon, in or around 1929,

13  long-time Hotel groundskeeper A.J. (Tony) Martins began a search for other sources, and it was he

14  who "located a source in Strawberry Canyon at the 5300-foot level." SOS 280_¶¶28-30 (testimony

15  of A. Frye summarizing primary source in evidence); SOS 281_18. Had Strawberry Canyon water

16  previously been tapped, this reconnaissance would not have been necessary. In any event, it was

17  then, a decade and a half after 1914, that Strawberry Canyon water was first contemplated as a

18  source. At that time "[i]t was decided to build two tunnels up the steep and rugged canyon.

19  Conditions were so bad even pack animals could not be used to transport materials; mend had to do

20  it." *Id.* The pipelines drew water from "**natural springs** in the head waters of Strawberry Canyon at

21  an elevation of approximately 5,300 feet. . . . It was found that the water was of excellent quality

22  and of sufficient quantity to supply the needs of the Company at that time and for many years to

23  come. Spring No. 2 was placed in service in June of 1930 and it had sufficient volume so that it

24  supplied all of the Company needs until several years later." SOS 281_19 (slide excerpting primary

25  source memoir) (emphasis added); SOS 280_¶¶28-30 (testimony of A. Frye summarizing primary

26  source evidence). It was around this time that the USFS issued its first permit to BTB's predecessor

27

28

for water diversion infrastructure, for a pipeline running "to a spring".[14] SOS 150_1. Notably, developing Spring 2 "resulted in the complete cessation of flow at Spring 4", "the largest spring before development." SOS 280_¶32 (A.Frye quoting primary source in evidence). ETW goes on to describe subsequent development of other "springs" in the Headwaters Springs. *Id.* at ¶¶30-31, 33. His recollections are corroborated by other historical documents, including contracts and court filings, including those of BTB's predecessor in interest. *Id.* at ¶¶28-34; SOS 281_20-21(Frye slides excerpting primary sources in evidence).

### 2.    Arrowhead Springs Corporation (the Hotel) could not convey a right it did not have California Consolidated any right to surface water.

On February 27, 1929, the Arrowhead Springs Corporation purported to convey rights to waters in Waterman and Strawberry Canyons to CCWC. SOS 280_¶35 (Frye testimony summarizing and quoting primary documents); SOS 281_22 (Frye slide excerpting primary document). But, as discussed above, Arrowhead Springs Corporation did not use the waters of Strawberry Creek until 1929, so it had no pre-1914 right to the waters of Strawberry Canyon. The PT examined records of the Boar and found "no record of a permit or license, issued under Division 2 of the Water Code, for [BTB] to appropriate water from Strawberry Creek." PT-10_¶13. The USFS has expressly conveyed no right to any sort of water to BTB or its predecessors. See below, section III.D. Arrowhead Springs Corporation had no right to convey Strawberry Canyon water to CCWC.

On August 6, 1930, the parties clarified their agreement regarding the water of Strawberry Canyon. SOS 280_¶37 (A. Frye testimony); SOS 281_23 (slide showing excerpt of agreement). Arrowhead Springs Corporation again conveyed only whatever dubious right it had to the waters of Strawberry Canyon "(without any warranty whatsoever, except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein)" to CCWC. *Id.* at ¶38, slide 23. CCWC, BTB's predecessor in interest, also conveyed any and all interest it may have previously gained to the water of Coldwater Canyon, and to Indian Springs,

---

[14] The 1931 permit "confers no rights upon the permittee to use of the water involved." SOS 150_3; see also, below section III.D.

1  "except such surplus of said water as may exist after Arrowhead has made use of the same", back to

2  Arrowhead Springs Corporation. *Id.* at ¶40, slide 23. But, of course, nothing in this second

3  agreement could cure the fact that there was no basis to the right Arrowhead Springs Corporation

4  allegedly offered as consideration.

### 3.    The private quiet title action, Del Rosa, did not transfer any right to the water of Strawberry Cannon to BTB's predecessor.

6      Del Rosa Co. claimed that CCWC had "entered in and upon the springs at the headwater of

7  said Strawberry Creek and developed the water at said Springs that would **not** naturally flow to

8  plaintiff's mid point of diversion [one mile above the mouth of East Twin Creek], and diverted the

9  water of said springs, including the water so developed into a pipe line [for transport to CCWC's

10  water bottling operation]." PT-189_22 (emphasis added). The parties to this consent judgment

11  reasoned that because any claim plaintiff Del Rosa Co. had to the water in the East Twin Creek

12  watershed did **not** include water diverted by CCWC in Strawberry Canyon above a line delineated

13  in the judgment (PT-189_25-26), the parties, including Del Rosa Co., did not purport or apparently

14  intend through the judgment to transfer any right that Del Rosa Co. or any other party may have had

15  to the water originating in Strawberry Canyon to BTB's predecessor in interest. The "Del Rosa

16  Line" is down-gradient of all of BTB's points of diversion. See PT-12_2 (Egger's slide showing

17  location of the Del Rosa Line). Because the agreement was a consent judgment—a contract—this

18  intention matters. See *Norgrart v. Upjohn Co.* (1999) 21 Cal. 4th 383, 400 (a consent judgment is a

19  contract). The *Del Rosa* case neither expanded nor contracted any right of BTB to the water of

20  Strawberry Canyon.

### D.    The USFS has never conveyed any water right whatsoever to BTB.

22      The USFS has issued SUPs to BTB for physical infrastructure only, and always in reliance

23  upon BTB's representation that it has a valid right to that water. See above, section II.F. The USFS

24  has always recited, in each permit issued to BTB since the 1930s, that the permits are for physical

25  infrastructure only, and each states on its face that it does not grant or convey any water right. See

26  SOS 150-165. For example, the most recent SUP states: "[t]his permit does not confer any water

27  rights on the holder." *Id.* at 14.

28

---

17

## RESPONSE TO QUESTIONS POSED BY ADMINISTRATIVE HEARING OFFICER

**I.    Response to 1**: All of the water BlueTriton diverts is surface water within the Jurisdiction of the Board.

Under California law, where a spring supplies a stream, it is part of the stream, and thus within the State Water Resources Control Board's regulatory purview. *Guitierrez v. Wege* (1905) 145 Cal. 730 ("*Guitierrez*") , 734; *Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 931-932, 937, fn. 5. This is true "whether the water from the spring percolates into the stream through the soil or reaches it into one or more running streams." Hutchins, The California Law of Water Rights (1956) (citing *Gutierrrez*at 734; *Barneich v Mercy* (1902) 136 California 205, 206-7); See also, CBD Oppo to MTD, 4; SOS 204-5:9-12 (Policy Statement of Paul Kibel ("Kibel") explaining why tests for groundwater jurisdiction do no apply when considering jurisdiction of surface waters). This is true whether the surfacing water pools at the point of surface expression or flows into another watercourse. SOS 284_¶¶13-14 (Professor P. Kibel[15] policy statement). Even though BTB's infrastructure reaches beneath the original point of surface expression to capture flow, the Board's jurisdiction extends even to groundwater that is "hydrologically connected to navigable waters." *Envtl. Law Found. v. State Water Res. Control Bd.* (2020) Cal. Super. LEXIS 8374, *54 (referencing *Envtl. Law Found. v. State Water Res. Control Bd*. (2018) 26 Cal App. 5th 844, 855-859). Historically, each of the Headwaters Springs and the Cienega Springs were surface waters, and all of the water that BTB withdraws is hydrologically connected and naturally tributary to Strawberry Creek. See above, section II.

BTB has no appropriative right to any of this spring water. See above, section III. Therefore, it is violating Water Code section 1052.

**II.    Response to 1.b.iii**: The Board should not treat any of the BTB infrastructure as natural subterranean streams.

*Chowchilla* addresses a circumstance in which an artificial channel may legally evolve into a jurisdictional water. The Supreme Court held "that a watercourse, although originally constructed artificially, may from the circumstances under which it originated and by long-continued use and

---

[15] Mr. Kibel's CV is included in evidence as SOS 285.

1    acquiescence by persons interested therein become and be held to be a natural watercourse, and that

2    riparian owners thereon and those affected thereby may have all the rights to the waters therein that

3    they would have in a natural stream or watercourse." *Chowchilla Farms, Inc. v. Martin* (1933) 219

4    Cal. 1, 18. Elements considered are whether the channel "possess[es] all the attribute of a natural

5    watercourse," whether it is tributary to a jurisdictional water, and whether riparian users have all of

6    the same rights as on a similar "naturally flowing" water. *Id.* at 19. BTB's infrastructure does not

7    possess the attributes of a natural watercourse. BTB's piping persists only pursuant to a special

8    permit from the USFS for a discreet term. BTB has a contractual obligation to remove all of its

9    infrastructure upon the expiration of that term, unless it gets a new permit. SOS 165-12. Therefore,

10   it cannot be said that the diversion structures on the SBNF possess the attributes of a natural

11   watercourse, or that their placement has been "done under such circumstances as to indicate that it

12   is to be permanent." *Chowchilla Farms*, 219 Cal.1 at 18.

13           And, the primary riparian rights holder, the USFS, reports damage as a result of BTB's

14   diversion, as the water in the diversion pipeline is not available to the SBNF. See SOS 283_11 (Loe

15   summarizing USFS's poor rating of the Headwater and Cienega Springs as a result of the "altered

16   hydrograph).

17           *Chowchilla*'s only potential function here is to address the question of the location of

18   surface expression, given BTB's destruction of the original geology. See CBD 1, ¶¶ 9-12 (testimony

19   of hydrogeologist A. Zdon describing the impact of BTB's development on the natural springs).

20   But, there is no significant question about the location of the Headwaters or Cienega Springs, as

21   BTB's tunnels and boreholes were constructed at or very near the original point of diversion. See

22   SOS 283:14 (Loe Slide summarizing testimony). However, since the Board has jurisdiction over

23   groundwater tributary to surface springs, and there has been ample testimony that but for BTB's

24   alteration of the natural system, that is where all of this water was bound, reliance on *Chowchilla* is

25   unnecessary.

26   **III.    Response 1.c: There are no riparian rights properly at issue in this hearing.**

27           A riparian water right is a right to use the natural flow of water on riparian land. BTB has

28   not argued that it is the owner or even lessor of any land adjacent to Strawberry Creek. As this

enforcement matter addresses BTB's rights (see Draft CDO and Report on Investigation), whether the San Manual Band has any right, riparian or otherwise, to water in Strawberry Creek or its tributaries is not at issue properly considered in this proceeding. Evidence was not collected on this issue and the San Manual Band did not participate in the hearing. Further, the only evidence in the record about the uses to which the San Manual Band may put the water does not establish riparian use. When a reporter asked what use the water was put to, the San Manual Band representative had no comment. See above, footnote 8. If the San Manual Band has riparian rights, those rights will not be diminished by any ruling in this enforcement action.

## IV. **Response 1.d**: BlueTriton's predecessors did not perfect any pre-1914 appropriative rights to the water in Strawberry Canyon.

### A. **BlueTriton could not have established appropriative rights to the water of Strawberry Canyon because no water was taken from the Canyon until 1929.**

See above, section III.

### B. **Response to 1.d.iii.: Any appropriative right of BTB's predecessors was not to the water of Strawberry Canyon and has not and cannot be relocated to Strawberry Canyon.**

If BlueTriton's predecessors perfected any right at all, those rights were to water from Indian Springs in Hot Springs Creek Watershed, Cold Water Canyon, or Waterman Canyon. See above, section III.A. BTB cannot claim any right to the flow of the Headwater Springs or the Cienega Springs based upon any prior right it may have had to water from these other sources.

Water Code section 1706 reads:

> The person entitled to the use of water by virtue of an appropriation other than under the Water Commission Act or this code may change the point of diversion, place of use, or purpose of use if others are not injured by such change, and may **extend** the ditch, flume, pipe or aqueduct by which the diversion is made to places **beyond** that where the first use was made.

(emphasis added.) Neither the Headwater Springs nor the Cienega Springs are upstream or "beyond" these early sources of bottled water as Indian Springs, Cold Water Canyon, and Waterman Canyon are all different watersheds to which Strawberry Creek is not tributary. See above, section I.

Even were the Headwaters Springs or Cienega Springs "beyond" the original point of

diversion instead of on wholly separate tributaries, BTB would have to have established that

moving the point of diversion had not injured others, and there is no evidence in the record that they

have done so. In fact, the evidence documents harm to others. See above, section II.E.

**V.    Response 1.e: It is possible, though unlikely, that some small amount of the water diverted is developed water, but BTB has no right to that water either.**

The historical record and modern scientific consensus is that the water BTB diverts is

surface water. See above, section II. If, for the sake of argument, some small portion of the water is

instead developed or salvaged water, BTB still would have no right to that water.

**VI.    Response 2: The Board should issue a cease and desist order.**

Because BTB is diverting surface and thereby committing a trespass in violation of Water

Code section 1052(a), the Board should issue a cease and desist order. The record collected at

hearing contains substantial evidence more than adequate to sustain an order enjoining all diversion

of water by BTB from Strawberry Canyon. If the Board concludes that some portion of the water

diverted is not surface water, the Board should provide a clear explanation as to what the proper

classification of any such water, to assist the USFS, which has repeatedly asserted no intention to

transfer any water right to BTB. See above, section III.D.

**VII.    Response 3: The Board order should require immediate cessation by BTB of all unauthorized diversion.**

    **A.    Response 3.a: The Board's order may enjoin diversion of flow from Boreholes 10, 11, 12.**

All the law and fairness require is that all parties must be notified and, if new charges are

presented, the respondent must be afforded a reasonable opportunity to prepare a defense to them.

(Gov. Code, § 11507; see also, *Thornbrough v Western Placer Unified Sch. Dist.* (2013) 223 Cal.

App. 4th 169, 180; *NLRB v Kanmak Mills, Inc.* (3d Cir. 1952) 200 F.2d 542, 545; Judicial Council

of California, Tenth Biennial Report 72 (1944). The draft CDO and ROI both addressed flow from

Boreholes 10, 11, 12. See PT 1_4 (Draft CDO); PT 3 (Revised ROI, discussing 10, 11, 12

throughout).The PT originally expressed some uncertainty as to the extent of jurisdiction of the

Board over the water from 10, 11, 12, acknowledging that pre-hearing its preliminary conclusions

were conservative and "based on the limited available information at the time of the investigation

1  and may be revised if new information becomes available. PT 1_3. The purpose of an evidentiary

2  hearing is to collect information. BTB requested an evidentiary hearing, presumably to test the facts

3  underlying the Draft CDO. The AHO appropriately noted in its August 16, 2021, Pre-Hearing

4  Conference Order that "[t]he purpose of this proceeding is for the State Water Resources Control

5  Board ("State Water Board" or "Board"), Administrative Hearings Office ("AHO") <u>to receive</u>

6  <u>evidence relevant to</u>, and arguments regarding, the Draft Cease and Desist Order ("Draft CDO")

7  described above and any responses or defenses to it." (emphasis added). In its Ruling on BTB's

8  Motion to Dismiss, the AHO acknowledged the information-gathering purpose of the hearing noting

9  that:

10  
> There also may be factual issues regarding the pre-development geology and hydrology of the springs and the construction of BlueTriton's facilities. The AHO's hearing process will give the parties opportunities to address these issues in detail. The hearing process will benefit from an administrative record that will have more-detailed information about the relevant geology and hydrology and BlueTriton's facilities after the AHO conducts its hearing.

14  Order 11/4/2021, p. 4. Evidence was submitted, and the PT ultimately concluded that "[o]n balance,

15  evidence indicates Boreholes 10-12 divert water from springs that supply a stream." See PT-

16  316_¶¶6-16 (testimony of T. Eggers summarizing evidence relied upon by the PT to reach its post-

17  hearing conclusion). On February 17, 2022, a site inspection of Boreholes 10, 11, and 12 was

18  conducted. See Notice of Site Visit (2/9/22). BTB had ample notice therefore that water it diverts

19  from 10, 11, 12 was at issue and to challenge the same evidence that the PT addressed in Mr.

20  Eggers Sur-Rebuttal, and, in fact, BTB offered testimony of its expert in response. See BTB-42. As

21  such, there are no Due Process concerns, and BTB was given notice and every opportunity to

22  address the regulatory authority of the Board over Boreholes 10, 11, and 12.

23      See also, below, section VII.B, describing the Board's ability to assert its authority beyond

24  the scope of issues addressed by the AHO.

25      **B.    Response 3.b: The Board should issue a cease and desist order curtailing all diversion from Strawberry Canyon and must consider additional provisions.**

26          **1.    The Board must consider any additional provisions deemed necessary to protect the public trust, curtail unreasonable use, and prevent waste.**

27  The Board should exercise its discretion under Water Code section 1831 to curtail all

28

1  diversion of water from Strawberry Canyon by BTB. See above, section VI.

2          In exercising its discretion, the Board must also consider evidence beyond that considered

3  by the AHO in preparing its transmittal to the Board. The AHO addressed only the issue of

4  unauthorized use at the hearing, citing Water Code section 1112, subdivision (a)(2). Order

5  (11/4/21). In executing its responsibilities, the Board is charged by the state's constitution and

6  supporting statutory language to prevent the waste or unreasonable use of water, regardless of the

7  basis of right under which the use is claimed. See Cal. Const., art. X, § 2; Wat. Code, § 275;

8  *Imperial Irrigation Dist. v. State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548, 557-61.

9  Further, at all times and in each of its actions, the Board has the obligation to protect the interests of

10  the public in trust resources, including interests in commerce, fisheries, recreation, and ecology.

11  *National Audubon Society v. Superior Court* ("*Audubon*") (1983) 33 Cal.3d 419; see generally *In re*

12  *Water of Hallett Creek Stream System* (1988) 44 Cal.3d 448, 472 fn. 16. In exercising its duties, the

13  Board, "shall take all appropriate proceedings or actions before executive, legislative, or judicial

14  agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method

15  of diversion of water in this state." Wat. Code, § 275. The Board has plenary authority to

16  investigate, condition permits, and enforce the constitutional requirement for reasonable use of the

17  state's water resources. *Imperial Irrigation Dist. v. State Board*, 225 Cal. App.3d at 566-67. The

18  constitutional provisions on reasonable use apply to all sources of water, including groundwater and

19  sources of surface water that might not otherwise come under the State Board's regulatory

20  authority. *Light v. State Water Resources Control Board* (2014) 226 Cal.App.4th 14.

21          The intention behind AB 747 which created the AHO was to "bolster confidence in the

22  process" and "ensur[e] fairness in decisions involving California water, especially as important

23  issues like drought. . . and competing water uses continue to define California's unique landscape."

24  Sen. Rules Com., Off. Of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 747 (2018-

25  2019 Reg. Sess.). To meaningfully and fairly consider whether valid water rights support any of

26  BTB's diversions, the Board must analyze how they affect communities and natural resources

27  served by the watershed, both under current conditions and in a wide range of twenty-first century

28  hydrologic conditions that includes a potential multi-year drought, devastating fires exacerbated by

1    overly dry flora, and public lands degraded by years of BTB and its predecessors' physical

2    manipulation and dewatering. Trust and reasonable use evidence is thus relevant to the water rights

3    determination noticed, and may not be excluded wholesale, even if those issues were not addressed

4    at the hearing. Wat. Code, § 1112, subdiv. (a)(2). The purpose of the hearing just concluded, as

5    defined by the AHO interpreting AB 747, was to collect all relevant evidence for a determination of

6    facts upon which the Board can formulate and issue a decision promptly on the issue of

7    unauthorized use without unnecessary delay and expense to participating parties or the State Water

8    Board. Gov. Code, §§ 11405.20, 11513; Water Boards Hearings Program, Frequently Asked

9    Questions: The Hearing Process, available at

10   https://www.waterboards.ca.gov/waterrights/water_issues/programs/hearings/faqs.html#Water_Rig

11   ht_Hearing.

12          The AHO expressly and repeatedly declined to consider trust and reasonable use evidence,

13   but the Board may not do so, lest it fail to fulfill its cornerstone duties to protect against injury to

14   other legal users of water, protect public trust resources, and enforce the prohibition of waste and

15   unreasonable use of water in article X, section 2 of the California Constitution. These duties are

16   entrusted to the State Board and the obligation they impose cannot be ignored or worse yet,

17   scrubbed from the administrative record. However, if BTB's diversion can be fully curtailed upon

18   the basis of unauthorized use alone, the point may be moot, except as to the authority of the Board

19   to require remediation or to impose penalties.

20   In *Audubon* the California Supreme Court addressed the damage to Mono Lake caused by Los

21   Angeles' diversion of nearly the entire flow of tributary streams to the lake. Expanding the trust to

22   the waters themselves, the Court recognized a necessary balance between the state's system of

23   appropriative rights versus its obligations under the public trust, finding that the State "has an

24   affirmative duty to take the public trust into account in the planning and allocation of water

25   resources, and to protect public trust uses whenever feasible." (*Id.* at 447.) The State's affirmative

26   duty "is not confined by past allocation decisions which may be incorrect in light of current

27   knowledge or inconsistent with current needs." (*Id.*) Any water rights discussion should be

28   informed by the history of this place, including its misuse by BTB and its predecessors.

1    The seminal ruling of Judge Racenelli addressing the parameters of the State Board's public

2    trust responsibilities, *United States v. State Board*, observes that "the public trust imposes a duty of

3    continuing supervision over the taking and use of the appropriated water. In exercising its sovereign

4    power to allocate water resources in the public interest, the state is not confined by past allocation

5    decisions which may be incorrect in light of current knowledge or inconsistent with current needs."

6    *United States v. State Board*, (1986) 182 Cal.App.3d 82, 149-150. To fulfill its essential legal

7    duties, the State Board must act diligently and proactively to protect the public trust, which relates

8    to and is considered in light of the "cardinal principle" of California water law, article X, section 2's

9    protection against waste and unreasonable use of water. *United States v. State Board*, 182

10   Cal.App.3d at 106. Consequently, "the state, as trustee, has a duty to preserve this trust property

11   from harmful diversions by water rights holders," and "no one has a vested right to use water in a

12   manner harmful to the state's waters" *Id.*

13              **2.    The Board should levy penalties to recover from BTB the costs of
                        bringing this action and to replenish the Water Rights Fund.**

14   Water Code section 1052 authorizes the Board to levy penalties and to apply the funds

15   recovered to the cost of bringing this action and also to the Water Rights Fund. In this case, where

16   the water taken dewatered public lands (See above, section II.C.1), diminished the flow to

17              **3.    The Board Should require proof of compliance.**

18   The Board should require that BTB provide proof that BTB has cease all unauthorized

19   diversions within 90 days of issuance of the cease and desist. See PT-7_¶110. Because the USFS is

20   likely to require some level of restoration, and this is relevant to protection of public trust and the

21   speed with which a more natural hydrological regime can be restored to Strawberry Canyon, BTB

22   should also be required to provide the Division, not less frequently than every 30 days, with a copy

23   of any and all communication with the USFS. See PT-7_¶112.

24   **VIII.   CONCLUSION**

25   As discussed above, the record compiled at hearing contains substantial evidence to support

26   a cease and desist order, issued pursuant to Water Code section 1831 for the unauthorized diversion

27   of 100% of the water BTB takes from Strawberry Canyon in violation of Water Code section 1052,

28

subdivision (a). In addition, and particularly if the AHO retains any reservations about the classification of any portion of the water diverted, the AHO may consider transmitting a recommendation that the Board to also consider the impact of BTB's diversions upon public trust resources, the wastefulness of BTB's dumping of substantial quantities of water far below the point of diversion, thus depriving public and fire-prone lands of much needed water, and the unreasonableness of BTB's diversions.

Finally, we would like to extend our appreciation to the State Water Resources Control Board and staff, as well as the Administrative Hearing Officer in this case, for the opportunity to participate in this important process. As Californians and others in the American West have learned anew the past several years, water is a precious shared resource, and we honor the public service of those charged by the people of California with preserving our state's water resources.


DATED: August 5, 2022                    GREENFIRE LAW, PC

                                         By:_____
                                              Rachel S. Doughty
                                              Attorneys for Petitioner
                                              Story of Stuff Project