SOMACH SIMMONS & DUNN
A Professional Corporation
STUART L. SOMACH, ESQ. (SBN 90959)
MAXIMILIAN C. BRICKER, ESQ. (SBN 350150)
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
Facsimile: (916) 446-8199
ssomach@somachlaw.com
mbricker@somachlaw.com

MICHAEL W. DAUGHERTY, ESQ. (Co. Bar 49074)
*Pro Hac Vice* Pending
RAMSEY L. KROPF, ESQ. (Co. Bar 21528)
*Pro Hac Vice* Pending
1155 Canyon Blvd., Suite 110
Boulder, CO 80302
Telephone: (916) 446-7979
Facsimile: (916) 446-8199
mdaugherty@somachlaw.com
rkropf@somachlaw.com

Attorneys for [PROPOSED] Plaintiff-Intervenor
YUHAAVIATAM OF SAN MANUEL NATION,
a federally recognized Indian tribe, also federally
recognized as SAN MANUEL BAND OF MISSION INDIANS

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| BLUETRITON BRANDS, INC.,<br><br>                    Plaintiff,<br><br>     v.<br><br>UNITED STATES FOREST SERVICE,<br><br>RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service,<br><br>CHRISTOPHER FRENCH, in his official capacity as Deputy Chief for the National Forest System of the U.S. Forest Service, | Case No.: 2:24-cv-09720-JGB-DTB<br><br>**DECLARATION OF ALLISON BINNEY IN SUPPORT OF YUHAAVIATAM OF SAN MANUEL NATION'S MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: January 13, 2025<br>Hearing Time: 9:00 AM<br>Courtroom: 1<br>Judge: Hon. Jesus G. Bernal<br><br>Action Filed: August 6, 2024 |

BINNEY DECL. IN SUPPORT OF YUHAAVIATAM OF SAN MANUEL NATION'S
MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION                    -1-

| | |
|---|---|
| 1 | JENNIFER EBERLEIN, in her official capacity as Regional Forester for the Pacific Southwest Region of the U.S. Forest Service, |
| 2 | |
| 3 | |
| 4 | DANELLE HARRISON, in her official capacity as Forest Supervisor of the San Bernardino National Forest of the U.S. Forest Service, |
| 5 | |
| 6 | MICHAEL NOBLES, in his official capacity as Front Country District Ranger of the U.S. Forest Service, |
| 7 | |
| 8 | Defendants. |
| 9 | YUHAAVIATAM OF SAN MANUEL NATION, a federally recognized Indian tribe, also federally recognized as SAN MANUEL BAND OF MISSION INDIANS, |
| 10 | |
| 11 | |
| 12 | [PROPOSED] Plaintiff-Intervenor. |

BINNEY DECL. IN SUPPORT OF YUHAAVIATAM OF SAN MANUEL NATION'S MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION   -2-

I, Allison C. Binney, declare as follows:

1. I am a licensed attorney, and I represent the Yuhaaviatam of San Manuel Nation, a federally recognized tribe also recognized as the San Manuel Band of Mission Indians (the Nation), as its registered federal lobbyist and on whose behalf, I submit this declaration. In my work for the Nation, my primary responsibility is to educate officials in Washington, D.C., about my client and to advocate for its interests before federal agencies and Congress. The facts set forth herein are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.

2. On or around July 29, 2024, the Nation's Chief Intergovernmental Affairs Officer Daniel Little notified me of a decision by the U.S. Forest Service (USFS) that would effectively cut off the Nation's water supply for its Arrowhead Springs property (Arrowhead Springs) within seven days. The Notice of Denial letter, issued July 26, 2024, by Front Country District Ranger Nobles, rejected a special use permit application and terminated an existing special use permit for BlueTriton Brands, Inc. (BlueTriton), a company that I understood pulled water from Strawberry Canyon in the San Bernadino National Forest ("SBNF" or "Forest") and delivered a portion of that water to the Nation for its use at Arrowhead Springs.

3. I understood the Nation's only viable source of water for Arrowhead Springs was the water delivered by BlueTriton, and the Notice of Denial's effect would leave the Nation without any viable water for Arrowhead Springs as of August 2, 2024. I also understood the property lay within the Nation's ancestral territory, and that the Nation and other government agencies relied upon the water delivered to Arrowhead Springs to combat wildfire in and around Arrowhead Springs as well as the surrounding community.

4. I was directed by Mr. Little, to immediately inform the Nation's Congressional Representatives and Senators of this decision and request a meeting

with the Chief of the USFS to discuss the Nation's concerns in this urgent matter, underscoring the Nation's reliance on this water for fire prevention efforts. I immediately began such outreach, including contacting the office of the Chief of the USFS to secure a meeting for the Nation's leaders.

5.   On July 30, 2024, I received and reviewed the letter the Nation sent to SBNF Forest Supervisor Danelle Harrison requesting government-to-government consultation on the impacts of Forest Ranger Nobles' decision. *See* ECF No. 65-4. This letter also requested that SBNF Supervisor Harrison rescind or stay Ranger Nobles' decision to allow the two governments to explore a collaborative solution that protects the Nation's lands and resources.

6.   On July 31, 2024, I learned that SBNF Supervisor Harrison had not yet read the Notice of Denial but committed to raising the Nation's concerns with her legal counsel to see if anything could be done about the effects it posed for the Nation.

7.   On August 1, 2024, the day before the water shut off deadline, SBNF Supervisor Harrison informed the Nation that she would not be able to provide the Nation an answer until the following week. Given that this was after BlueTriton's August 2 deadline to cease water deliveries, I contacted central office staff of the U.S. Department of Agriculture (USDA) to inform them of the matter and express the Nation's urgent need for an extension to continue receiving water at Arrowhead Springs. I also informed relevant Congressional offices about the most recent status and requested they assist. I understood that local public officials from the surrounding region were separately weighing in with Congressional offices to support the Nation. Specifically, they expressed serious concerns about ceasing water deliveries during the height of California's fire season.

8.   On this same day, I followed up yet again with the Chief of the USFS office to request a meeting with the Nation's leaders.

9. On August 2, 2024, the water shut off deadline, I learned that SBNF Supervisor Harrison would be modifying Ranger Nobles' decision, extending water delivery to the Nation until September 2, 2024. I informed the relevant Congressional offices. Some Congressional offices informed me that they would be requesting regular updates from USFS officials so that they could monitor any progress or lack thereof, given that Congress would only be in session for a limited period for the remainder of the year and would have limited opportunity to take legislative action if the USFS could not find a way to extend water delivery to the Nation.

10. The extension until September 2 was, from the Nation's perspective, to enable the Nation and SBNF officials an opportunity to engage in the government-to-government consultation that the law required. Notably, no consultation had occurred with the Nation before Forest Ranger Nobles issued the Notice of Denial, despite agency officials' knowledge that directing BlueTriton to cease all water deliveries would leave the Nation without water for Arrowhead Springs.

11. On August 21, 2024, I participated in a meeting between the Nation's leaders and representatives and USFS officials. Attorneys from the USDA also attended.

12. The meeting lasted approximately two hours. During the first part of the meeting, Tribal leaders and representatives explained the Nation's ancestral and cultural ties to the Forest and Arrowhead Springs; the Nation's reliance on water from the Forest for Arrowhead Springs; how the Nation was blindsided by Forest Ranger Nobles' decision, even though agency officials knew the Nation relied on water delivered by BlueTriton and that the decision would leave the Nation without water for Arrowhead Springs; and the fact that the decision was made without any consultation with or notice to the Nation. The Nation's leaders and representatives expressed their frustration that they learned of the decision from BlueTriton rather

than from the federal agency officials themselves. In response, agency leadership stated their only obligation was to BlueTriton, that any concerns the Nation had about accessing water needed to be resolved between the Nation and BlueTriton, and that federal agency officials needed to be careful about what they said and did in light of pending and ongoing litigation.

13. The agency officials also said they did not know how much water the Nation uses at Arrowhead Springs or for what purpose. In response, the Nation's leaders and representatives described the various water uses taking place at Arrowhead Springs and provided them maps of the property.

14. Much of the second portion of the meeting consisted of agency officials stating they could not continue allowing water from the Forest to be delivered to Arrowhead Springs until there was some type of document in place that authorizes such activity. Agency officials and staff detailed the special use permitting process and indicated the Nation may want to consider applying for such a permit. SBNF Supervisor Harrison said the process takes two to three years, and there was no guarantee the Nation could secure such a permit as it would have to justify its use of SBNF water. Agency officials said the aquifers are not being recharged and that SBNF's Strawberry Creek has experienced degraded environmental health. The Nation's leaders and representatives requested copies of any studies showing Strawberry Creek's degraded environmental health, and SBNF officials said such studies were still being developed.

15. In response, the Nation's leaders and representatives expressed a willingness to connect Arrowhead Springs to a local municipal water source, but research showed it would take a minimum of three years to just build the necessary infrastructure (at significant expense) once entitlements and adequate funding was obtained. As such, the Nation's leaders and representatives asked the agency officials to help find a mechanism enabling the Nation to continue to receive water through BlueTriton's infrastructure until the property could be connected to

BINNEY DECL. IN SUPPORT OF YUHAAVIATAM OF SAN MANUEL NATION'S
MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION             -6-

municipal water. SBNF officials responded that the only available mechanism was a special use permit, and that process would take too long, with no certainty as to outcome.

16. At this point, the Nation's representatives, including myself, asked whether a co-stewardship agreement between the Nation and USFS was a possibility, inquiring whether this path might be quicker and more respectful of the government-to-government relationship. SBNF officials said co-stewardship agreements cannot be used to extract resources from national forests.

17. The meeting ended with no solutions identified. However, it was agreed the parties would continue meeting to try and find some solutions. Additionally, the Nation invited agency officials and staff to tour Arrowhead Springs on August 29, 2024, so they could see the property for themselves and better understand the Nation's various water uses on the property.

18. On August 26, 2024, SBNF Supervisor Harrison issued another letter extending water delivery to the Nation's Arrowhead Springs until January 15, 2025.

19. On August 29, 2024, the Nation's staff guided SBNF officials and staff around Arrowhead Springs, and I participated in that tour. While on the tour, agency officials and staff expressed frustration that they were receiving regular outreach from Congressional offices and felt misinformation was being shared. In response, the Nation's staff communicated their concerns that agency officials and staff did not adequately understand the Nation's water needs and uses and that the agency was not sharing full information about the environmental health of Strawberry Creek. The Nation also expressed concern that the agency was not meaningfully working with the Nation to develop a collaborative solution, as requested in the Nation's formal request for government-to-government consultation, including finding a solution for the Nation to smoothly transition from SBNF water to a local municipal water system. The tour transitioned to a

meeting in Arrowhead Springs' main building during which I explained to agency officials and staff that Congressional offices were also regularly reaching out to me personally for updates on the matter and that I interpreted their outreach as an effort to be prepared and help with solutions in the event legislation was needed, as there were only a limited number of days left in session.

20. Subsequent meetings between the Nation's leaders and representatives and USFS officials occurred on September 17, 25, and November 6, 2024. Additional meetings involving the Nation's staff and SBNF officials took place in September and October of 2024.

21. Much of my time in September and October of 2024 was spent researching co-stewardship agreements between the USFS and other Tribal Nations to determine how long such agreements took to put in place and which ones, if any, involved a Tribal Nation extracting resources from a national forest. This included discussions with the USFS Office of Tribal Affairs central office staff. Contrary to what we were told by SBNF officials, central office Tribal Affairs staff said co-stewardship agreements involving Tribal Nations could include extracting natural resources from national forests but that local forest officials had to lead the development of such co-stewardship agreements, with central office staff serving only as a resource.

22. On November 4, 2024, the Nation's leadership wrote SBNF Supervisor Danelle Harrison to: (1) summarize the substance of the meetings to date; (2) describe the Nation's ancestral and cultural ties to the SBNF; (3) explain the Nation's expectations for government-to-government consultation, identifying individuals authorized to speak for the Nation; and (4) identify specific issues the Nation wanted to address during subsequent meetings. The letter's purpose was to focus discussions on specific issues given that time was running out. Additionally, Congressional offices had reached out to assist with implementing a legislative

solution but needed to know what solution the parties thought was viable, given the limited number of legislative days left in the 118th Congress.

23. I informed the Congressional offices that the Nation discussed legislative proposals with the USFS and SBNF officials but that they had not provided us with any feedback, and I was unclear whether the agency would support or oppose any legislative solution. Regardless, I provided certain Congressional offices with draft legislative language that would direct the USFS to continue the Nation's access to and delivery of water from the Forest until the Nation connected its lands to a municipal water system. Ultimately, a legislative solution was unavailable because Congress passed a limited Continuing Resolution to fund the federal government through March 14, 2025, and recessed until January 3, 2025, leaving no opportunity to add legislative language related to this matter.

24. Two days later, on November 6, 2024, the Nation's leaders and representatives met with SBNF officials and staff. While collegial, the meeting ended with no identified solution. SBNF officials spent much of the meeting explaining their inability to fully communicate with the Nation due to the ongoing litigation with BlueTriton and a local environmental group. SBNF Supervisor Harrison said the litigation dictated how she could engage with the Nation. The Nation's representatives again explored the ability to secure a special use permit to continue accessing water. SBNF Supervisor Harrison reiterated that the process could take two to three years. Asked whether the application would be subject to a categorical exclusion for environmental review purposes, Supervisor Harrison said it would reduce the time but the overall process would still be long and the public comment period itself would take six to seven months. SBNF officials then asked what water delivery system the Nation would use when BlueTriton's system is decommissioned beginning on January 16, 2025. Additionally, SBNF officials said

they still lacked enough information about the Nation's water needs and usage for Arrowhead Springs.

25. After the November 6, 2024 meeting with SBNF officials, I recommended the Nation's leadership traveled to Washington, D.C., and meet with senior officials at the USFS and USDA. It was my belief that little progress would be made with SBNF officials and staff, particularly since they had indicated they could not fully engage with the Nation due to the ongoing litigation.

26. On November 14, 2024, I contacted USDA's External and Intergovernmental Affairs Office requesting a meeting with senior USDA officials on November 19, 2024, in Washington, D.C. I explained the meeting would involve the Nation's leaders and staff to discuss the Nation's need to ensure the continued delivery of water until the Nation could connect Arrowhead Springs to the local municipal water system.

27. With the request, I provided a background document so the USDA could determine which officials should attend. The document provided, in part:

> The [Nation] has been meeting with the Forest officials since mid-August to try and find a mechanism to allow the Nation to continue to have access to water until the Nation can connect to municipal water, but no solution has been found yet. The Forest is planning to cut off the Nation's access to water on January 15, 2025, and the Nation is wanting to find a mutually agreeable mechanism that will allow it to continue access to water until it can connect to municipal water.

28. On November 17, 2024, I forwarded to the USDA External and Intergovernmental Affairs Office a copy of correspondence Chairwoman Lynn Valbuena sent to SBNF Supervisor Harrison on November 15, 2024. The letter detailed the history of the Nation's engagement with SBNF officials to date, explaining the nature of the problem, the issue that required resolution, and the Nation's expectations for meaningful government-to-government consultation to protect its access to water.

29. The next day, on November 18, the USDA granted my meeting request, and I was informed the lead USDA official in attendance would be

Dr. Homer Wilkes, who serves as the Under Secretary for Natural Resources and Environment and oversees the USFS. I forwarded to the Under Secretary's office a copy of the letter the Nation sent to SBNF Supervisor Harrison on November 15, 2024, requesting that it be shared with all USDA attendees in advance of the pending meeting.

30. The meeting proceeded the next day, on November 19, and was attended by Yuhaaviatam Tribal Council Member Joseph Maarango, Mr. Little, and myself, on behalf of the Nation, and Under Secretary Wilkes and approximately seven USDA staff on behalf of the federal government.

31. At the meeting, Councilman Maarango briefly summarized the issue from the Nation's perspective. Under Secretary Wilkes indicated he had been briefed before the meeting and assured Councilman Maarango the USDA did not want to see the Nation's water shut off. Under Secretary Wilkes said he believed the quickest way to assure the Nation's continued access to water is for the Nation to apply for a special use permit. I informed Under Secretary Wilkes that the option had been discussed with SBNF Supervisor Harrison and her staff, but they consistently told the Nation it would take two to three years to process an application given the regulatory requirements of the National Environmental Policy Act (NEPA). As a consequence, we were told the Nation could not secure a special use permit before January 15, 2025, and Supervisor Harrison said she could not extend access to water for the Nation beyond January 15 without some document in place providing her authority to do so.

32. Under Secretary Wilkes balked at the two to three year timeframe and indicated that he has worked at the USDA and USFS for decades and was confident a special use permit could be expedited for the Nation and put in place by January 15, 2025. I then asked the Under Secretary what would happen if the Nation's application for a special use permit was still being processed on January 15, 2025, but not yet approved. I expressed concern about the time it

BINNEY DECL. IN SUPPORT OF YUHAAVIATAM OF SAN MANUEL NATION'S MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION    -11-

would take to complete the NEPA portion of the application and said this was the portion that the Forest Supervisor had indicated would take the longest. Under Secretary Wilkes said he did not believe NEPA compliance would take that long as the Nation is already using the water and would not be changing its use. We briefly discussed the Nation's application falling within the categorical exclusion provision of the NEPA process.

33. Importantly, Under Secretary Wilkes told us that the USFS could extend the Nation's access to water while the special use permit application was being processed, assuming it could not be approved by January 15, 2025. I reminded the Under Secretary that there was a lawsuit pending by Save Our Forest Association challenging the USFS's authority to grant a special use permit allowing water to be drawn from the Forest. Under Secretary Wilkes asked his staff if a decision had been issued in that case, and his staff responded that no decision had been made and likely would not be made by January 15, 2025. Under Secretary Wilkes reiterated that SBNF Supervisor Harrison could extend the Nation's access to water beyond January 15, 2025, while the application for a special use permit was being processed. Under Secretary Wilkes asked his staff to confirm his views and get back to him.

34. The Nation's Chief Intergovernmental Affairs Officer Daniel Little asked Under Secretary Wilkes whether the Nation and USFS could enter a co-stewardship (or co-management) agreement, which might be faster than the special use permit process. Mr. Little mentioned how the Biden Administration was prioritizing co-stewardship agreements and that more than 200 such agreements are already in place. Under Secretary Wilkes indicated that while there are many co-management agreements, they are a relatively new vehicle; by contrast, he said, the special use permit process is a well-known process within the USDA and would be much quicker. Under Secretary Wilkes restated his belief that

a special use permit would be the best path for the Nation and encouraged the Nation to apply.

35. At this point, Councilman Maarango thanked the Under Secretary for his time and said the Nation would follow the Under Secretary's recommendation and apply for a special use permit. I informed Under Secretary Wilkes that the Nation was not familiar with the application process for special use permits and asked if the USDA or USFS would be able to provide the Nation with technical assistance with the application. Under Secretary Wilkes approved the request for the USDA to provide the requested technical assistance, and he designated two members of his staff – Anthony Scardina, the Senior Advisor for Programs within the Office of the Under Secretary, and Christine Dawe, who I understand to be Senior Advisor, Natural Resources and Environment, USDA – to serve as the Nation's points of contact. Mr. Scardina and Ms. Dawe indicated they would reach out to the USFS after the meeting to start the process.

36. My next outreach to USDA was on December 3, 2024, when I spoke with Mr. Scardina. Mr. Scardina confirmed the USDA was committed to helping the Nation develop the application for the special use permit and said he had reached out to the Regional Forester (who I understood to be Pacific Southwest Regional Forester Jennifer Eberlin) to identify which USFS staff would help the Nation with the application.

37. On or about December 10, 2024, Mr. Scardina and I spoke again. He informed me the USFS needed more information regarding how much water the Nation needed. He also said there had been internal meetings between USDA and USFS staff and there was a concern raised about whether a special use permit could be issued to the Nation for accessing water from SBNF when the water delivery system currently in place is owned by BlueTriton and not the Nation. Mr. Scardina said this issue needed to be resolved as the application needed to describe how the Nation would have the water delivered to Arrowhead Springs. I

asked Mr. Scardina whether a lease or temporary use agreement between the Nation and BlueTriton would resolve any concerns of the agencies. Mr. Scardina said he would check internally and get back to me.

38. That same day, Mr. Scardina followed up to inform me that a lease or temporary use agreement between the Nation and BlueTriton would be sufficient for the Nation to obtain a special use permit so long as such agreement gave the Nation "control" over the delivery system. I indicated that I would inform the Nation and keep Mr. Scardina abreast of the development of such an agreement between the Nation and BlueTriton. I also informed Mr. Scardina that the Nation had staff ready to start working with the appropriate agency staff on the application. He said he would follow up with me.

39. On December 11, 2024, I sent Mr. Scardina the Nation's November 15, 2024 letter to SBNF Supervisor Harrison, explaining that the letter provides background on the Nation's Arrowhead Springs property, includes a map, and describes the Nation's water rights, the water needs for Arrowhead Springs, and Arrowhead Springs' water-related uses.

40. On that same day, I responded to inquiries from specific Congressional offices who indicated that certain Congressional Members wanted to send a letter to the USDA Secretary and Under Secretary requesting that they ensure the Nation has continued access to water from the SBNF until the Nation can connect its Arrowhead Springs property to a local municipal water system. I informed these Congressional offices of the progress made with the support of the Under Secretary, and that the Under Secretary committed to providing technical assistance and having the Nation's application expedited so that water access can continue. Attached hereto as **Exhibit 24** is a true and correct copy of the December 18, 2024 correspondence to the USDA Secretary and Under Secretary from certain Congressional Members urging the agency officials to take the action needed to keep the Nation's water in place. This letter specifically acknowledged

the pending work on a special use permit and states, "[w]e understand as of the date of this letter, the Department is working with the Tribe to obtain a Special Use Permit. We urge you to expedite that process to ensure no disruption in the Tribe's access to water."

41. On December 30, 2024, I communicated to Mr. Scardina that the Nation was in the process of negotiating an agreement with BlueTriton to use the company's water delivery system and that I was confident such an agreement could be included with the Nation's timely-submitted special use permit application. I asked Mr. Scardina if we could coordinate a meeting between the Nation's staff and the USDA and USFS that week to begin compiling the application materials. Mr. Scardina informed me of an internal agency meeting that was occurring that day to discuss the Nation's application and that he would get back to me.

42. On January 3, 2025, Mr. Scardina informed me the USFS was now questioning whether the Nation had any legal rights to access water from the SBNF and asked me if I could provide some analysis of the issue to him to share with the USFS. I indicated to him that the November 15, 2024 letter from the Nation to SBNF Supervisor Harrison described the Nation's legal rights to water from the SBNF and that the USFS attorneys and staff should read that letter and its attachments and let me know if there are any remaining questions.

43. I have not had further communication with the USDA as of the date of execution of this declaration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 11th day of January 2025 at North Andover, Massachusetts.

*ALLISON C. BINNEY*