JS-6 (admin Stay)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 24-9720 JGB (DTBx)** | Date | January 13, 2025 |
|---|---|---|---|
| Title | *BlueTriton Brands v. United States Forest Service et al.* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Phyllis A. Preston |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| Todd Mikolop<br>George P. Sibley, III | Tyler McVeigh Alexander<br>Maggie Woodward<br>Rachel S. Doughty(Zoom) |

**Proceedings:** Order (1) GRANTING BlueTriton Brand's Motion for Preliminary Injunction (Dkt. No. 2) and (2) STAYING proceedings

Before the Court is a Motion for a Preliminary Injunction filed by Plaintiff BlueTriton Brands ("BlueTriton"). ("Motion," Dkt. No. 2.) A hearing was held on January 13, 2025. After considering the papers filed in support of and in opposition to the Motion, the Court **GRANTS** the Motion and **STAYS** the case.

## I. BACKGROUND

On August 6, 2024, BlueTriton filed a complaint in the United States District Court for the District of Columbia seeking to enjoin the Forest Service's Notice of Denial of a permit to occupy a right of way to divert water across the San Bernardino National Forest. ("Compl.," Dkt. No. 1.) On October 21, 2024, the Forest Service answered. (Dkt. No. 33.)

Accompanying the complaint was a motion for a preliminary injunction to halt the Forest Service from enforcing the Notice of Denial. (Motion.) On August 13, 2024, the Forest Service opposed the preliminary injunction. ("Opp.," Dkt. No. 15.) On August 20, 2024, BlueTriton replied. ("Reply," Dkt. No. 23.)

On August 15, 2024, the Court granted the environmental group Save Our Forest Association's (SOFA) motion for leave to file an amicus brief regarding the pending motion.

("SOFA Br.," Dkt. No. 19.)  On August 20, 2024, the California State Water Resources Control Board ("Water Board") also filed an amicus brief.  ("SWRCB Br.," Dkt. No. 22).  On August 23, 2024, BlueTriton responded to the Board's brief.  ("SWRCB Response," Dkt. No. 26.)

On August 28, 2024, the Forest Service moved to transfer the case to the United States District Court for the Central District of California.  (Dkt. No. 28.)  On October 23, 2024, after briefing, the Court granted the Forest Service's motion and transferred the case to this court.  (Dkt. No. 35.)

Upon receipt of the case and a joint stipulation by the parties (Dkt. No. 59), the Court set the motion for hearing on January 13, 2025 and granted BlueTriton's request for supplemental briefing.  (Dkt. No. 60.)  On January 8, 2025, the parties and amicus SOFA submitted supplemental briefing.  ("USFS Supp.," Dkt. No. 73; "SOFA Supp.," Dkt. No. 74; "BlueTriton Supp.," Dkt. No. 75.)

While resolution of this motion was pending, proposed Plaintiff-Intervenor Yuhaaviatam of San Manuel Nation ("Nation") filed a motion to intervene and motion for a preliminary injunction.  ("Nation Motion to Intervene," Dkt. No. 64; "Nation PI Motion," Dkt. No. 64-2.)  Amicus SOFA also filed a motion to consolidate this case with its separately-filed case against the Forest Service.  ("Consol. Motion," Dkt. No. 72.)

## II. FACTUAL ALLEGATIONS

Nestled in Strawberry Canyon in the foothills of San Bernardino National Forest, groundwater percolates to the surface at Arrowhead Springs.  Here, allegedly since the 1880s, BlueTriton and its predecessors-in-interest have diverted water for bottling, in recent years available for sale under the eponymous Arrowhead Mountain Spring Water brand.  ("Maguire Memo," Dkt. No. 2-3.)

At the springs sources, BlueTriton operates twelve tunnels and boreholes (numbered 1, 1A, 2, 3, 7, 7A, 7B, 7C, 8, 10, 11, and 12) to collect water.  ("Mixon Decl.," Dkt. No. 2-2 ¶ 9.)  The water from this tunnel system is funneled into a four-inch 23,000 foot long steel pipeline, built in the 1930s, which delivers the water downstream to a collection point for bottling by BlueTriton and use at the Arrowhead Springs Hotel. (Id. ¶ 8.)  Pursuant to a contract its predecessor-in-interest entered into with the Nation's predecessor-in-interest, BlueTriton delivers a minimum of twenty percent of the flow to the Arrowhead Springs Hotel Property outside the boundaries of the San Bernardino National Forest.  (Maguire Memo at 1–2.)

BlueTriton claims rights to water in Strawberry Canyon as diverted since the 1860s.  (Maguire Memo at 2.)  Early diversions went to the Arrowhead Springs Hotel for its operations and bottling.  (Id. at 3.)  In 1929 through 1931, the owner of the hotel, Arrowhead Springs Corporation (ASC), conveyed its appropriative rights in the East Twin Creek watershed to the California Consolidated Water Company (CCWC) in exchange for CCWC's construction of a pipeline to the springs, and twenty percent of the water conveyed through that pipeline.  (Id. at

1–2.)  BlueTriton is the successor-in-interest to CCWC and the San Manuel Band is the successor-in-interest of ASC.

Ultimately, the development of the water by CCWC and ASC led to a lawsuit by a downstream user, the Del Rosa Mutual Water Company.  In 1931, pursuant to a stipulated judgment, the San Bernardino County Superior Court affirmed CCWC's appropriative right as against the Del Rosa Mutual Water Company. Del Rosa Mut. Water Co. v. D.J. Carpenter, et al., No. 31798, slip op. at 10-11 (San Bernardino Cty. Sup. Ct. 1931) (Dkt. No. 2-5).

The federal government created the San Bernardino National Forest by reservation in 1893.  (Motion at 6.)  Starting in 1930, the Forest Service permitted BlueTriton's right-of-way on 4.51 acres of forest service land to transport water from Arrowhead Springs.  (Motion at 9.)  The right-of-way and pipeline have remained since the 1930s.  (Maguire Memo at 4.)  The Forest Service reissued permits to BlueTriton and its successors seven more times over the last near-century.  (Motion at 9.)

In 2015, after receiving several complaints, Water Board began an investigation of BlueTriton's water rights at Arrowhead Springs.  ("Water Board Order," Dkt. No. 15-6, at 2.)  The complaints alleged that BlueTriton was "diverting water without a valid basis of right, was unreasonably using water, was injuring public trust resources, and was not reporting or was incorrectly reporting its diversions."  (Id.)  In July 2023, an administrative hearing officer of the Water Board proposed that BlueTriton appropriated the water after 1914,[1] such diversions were subject to the jurisdiction of the Water Board, and BlueTriton was appropriating water without a permit. (Id. at 90–91.)  The proposed order restricted BlueTriton's rights to divert water at Arrowhead Springs (from Tunnels 2, 3 and 7, and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8), permitted continued deliveries to the Nation consistent with its riparian uses, and allowed continued withdrawals by BlueTriton at three spring sources (Boreholes 10, 11 and 12).  The Water Board adopted the proposed order in September 2023. (Water Board Order at 90–91.)

BlueTriton then sought review of the Water Board Order in Fresno Superior Court, and in January 2024, the Court stayed the Water Board Order pending the resolution of the litigation.  BlueTriton Brands, Inc. v. Cal. Water Resources Control Board et al., 23CECG04292 (Fresno Super. Ct. Feb. 7, 2024).  That litigation remains pending.

Meanwhile, BlueTriton sought a new permit to replace its expiring 2018 permit.  (Ex. 5 at 32–34.)  As the Forest Service explained, the terms of the 2018 permit required BlueTriton "to comply with all applicable State laws . . . , to obtain any necessary water rights from the State . . . , and to refrain from altering the authorized facilities and uses of those facilities without further authorization from the Forest Service." (Opp. at 4 (citing "2018 Permit," Dkt. No. 15-4).)  BlueTriton's timely application for a new permit in February 2023 extended the 2018 permit until the Forest Service reached a decision on its new permit application.  (Opp. at 4–5 (citing 5

---

[1] In California, groundwater and water appropriated before 1914 is outside the jurisdiction of the Water Board.

U.S.C. § 558).) The permit was not automatically renewable, and would only issue after a new permitting process. (Opp. at 5 (citing 2018 Permit).)

Following the Water Board Order, the Forest Service began processing BlueTriton's permit application. Over the course of months of correspondence, the Forest Service requested information on where and how the water was being put to use. The Forest Service was concerned that the permit was for bottling water, but in recent months, the deliveries through the pipeline were solely to the Nation for use at Arrowhead. (Dkt. Nos. 5-10, 5-15.) BlueTriton did not change its application to account for the alleged changes in use, and provided general information it received from the Nation on its uses at the Arrowhead Springs Hotel property.

Ultimately, for stated reasons discussed in depth below, the Forest Service denied its request in July 2024. The Forest Service's Notice of Denial required BlueTriton complete the following. ("NoD," Dkt. No. 15-3.)

> 1.  Within seven (7) days of the date of this letter, take any necessary steps to stop use of the BlueTriton pipeline for water conveyance in Strawberry Canyon, by severing or blocking the pipe at each tunnel or borehole (1, 1A, 8, 7, 7A, 7B, 7C, 2, 3, 10, 11, 12), or other such means as to bypass all flow to the surface from each point of diversion. Provide a confirmation to me via email immediately following the completion of step 1. Include photo documentation with the statement.
>
> 2.  Remove locks from all BlueTriton equipment on SBNF land. Alternatively, it will be sufficient to provide the USFS with copies of all keys. If this alternative is chosen, the BlueTriton will arrange to hand over keys on site. This step shall be completed within two (2) weeks of the date of this letter.
>
> 3.  Prepare and submit a plan to remove its infrastructure from SBNF lands. The plan shall be submitted within twelve (12) weeks of the date of this letter and shall include a time frame for complete removal. Infrastructure to include in the removal plan:
>     a. All stainless steel pipes and structural scaffolding installed after 1974.
>     b. All valves, valve cages, and support structures.
>     c. All electronic monitoring and power equipment
>     d. Any discharge, bypass, and/or hydropower equipment

(NoD at 3.)

BlueTriton filed suit against the Forest Service. Following the lawsuit, on August 26, 2024, the Forest Service extended the authorization for flows to continue to the Nation until January 15, 2025. ("Extended Auth.," Dkt. No. 27.) In compliance with the Notice of Denial, BlueTriton submitted a decommissioning plan that would remove the infrastructure over the course of twelve months at a cost of approximately twelve million dollars. ("Decommissioning Notice," Dkt. No. 34.) That plan is still under review by the Forest Service, which plans to propose some revisions. (USFS Supp.)

## III.  LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted).  An injunction is binding only on parties to the action, their officers, agents, servants, employees and attorneys and those "in active concert or participation" with them.  Fed. R. Civ. P. 65(d).

Under the Ninth Circuit's "sliding scale" approach to preliminary injunctions, the four "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." All for The Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" Id. at 1131–32 (internal quotation omitted).  Put differently, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements [likelihood of irreparable injury and public interest] of the Winter test are also met." Id. at 1132.  Regardless of the strength of its showings on the other factors, a plaintiff may not obtain a preliminary injunction unless he or she establishes that irreparable harm is likely to result in the absence of the requested injunction.  Id. at 1135.

## IV.  DISCUSSION

### A.  Success on the Merits or Serious Questions

#### 1.  Administrative Procedure Act

BlueTriton argues that the Forest Service violated the Administrative Procedure Act (APA) in issuing its Notice of Denial.  Under the APA, courts must "hold unlawful and set aside a final order of an agency if the order is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Nat. Res. Def. Council, Inc. v. Pritzker, 828 F.3d 1125 (9th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)).

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1907 (2020) (quoting Michigan v. E.P.A., 576 U.S. 743, 758 (2015)).  The Court reviews agency action "based on the full administrative record that was before the [agency] at the time [it] made his decision." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971).  Because both parties' arguments exceed the scope

of issues actually discussed by the Forest Service, the Court briefly reviews the Forest Service's stated reasons for the Notice of Denial.

The Forest Service provided three reasons for its denial. One, the Forest Service found that permitting continued use would not "conform to the Forest Land and Resource Management Plan." (NoD at 1.) The Forest Service first notes that BlueTriton "has not sufficiently demonstrated" that granting a new permit would "minimize adverse effects on groundwater aquifers and their surface expressions" and "that the water extracted is excess to the current and reasonably foreseeable future needs of forest resources." (Id. at 2.) Second, the Forest Service argues that "conditions in Strawberry Canyon have significantly changed since [its] last evaluation in 2018," and BlueTriton's application was insufficient to demonstrate compliance with the Plan. (Id. at 2.) Third and of "greater concern" to the Forest Service, was BlueTriton's "refus[al] to provide sufficient information about the uses of the waters being taken from the SBNF to assure that [BlueTriton is] in compliance with California law." (Id. at 2.)

Two, the Forest Service rejected BlueTriton's application because the "purpose of the use" was no longer "the same for which it was authorized." (Id. at 2.) In the 2018 Decision Memo, the permit authorized BlueTriton's predecessor Nestle to "continue to operate and maintain the existing system to supply bottled drinking water for retail sale." (Id. at 2.) In 2023, BlueTriton stated it planned to divert water "to supply bottled drinking water for retail purposes." (Id. at 2.) However, in 2023, ninety-four to ninety-eight percent of the water went to the Arrowhead Springs Hotel, not water bottling. (Id. at 2.) And the volume of deliveries increased from 4.5 million gallons to 9.5 million gallons from December 2023 to May 2024. (Id. at 2.) Moreover, the Arrowhead Springs Hotel had closed for hospitality purposes, and to the Forest Service's knowledge "has no irrigated agriculture, no industrial uses, no residences, and no municipalities." (Id. at 2.) The Forest Service found that BlueTriton had not "explained in sufficient detail" the "unprecedented volume of water" diverted. (Id. at 2.)

Three, the Forest Service argued BlueTriton was not "in compliance with the terms and conditions of the authorization." (Id. at 2.) The Forest Service pointed to language in the previous special use authorization that "Any change in a water facility, including a change in the ownership or beneficial use of water or location of use of water from a water facility, that is not expressly Authorized in this permit shall result in termination of the authorization for that water facility." (Id. at 2.) As discussed above, the Forest Service thought BlueTriton's application materials evinced a changed in use and the location of that use.

The Court must analyze the Forest Service's decision within its four corners—what it considers and what it fails to consider.

### a. Statutory Authority

An agency action may be set aside if it exceeds the agency's authority under statute. Under 43 U.S.C. § 661, a "vested water right and the accompanying right-of-way" are "subject to reasonable regulations" by the Forest Service. Adams v. United States, 3 F.3d 1254, 1260 (9th

Cir. 1993). Here, the question is, if BlueTriton does indeed have a vested water right, is the Forest Service's regulation, the Notice of Denial, reasonable.

In analyzing whether the Forest Service has exceeded its statutory authority, the Court proceeds cautiously. To avoid treading on ongoing state court proceedings reviewing the Water Board's Order, the Court focuses its analysis on those water rights not at issue in the Order or its ongoing review in state court. The State Water Board's Order does not purport to ban all uses at all twelve tunnels and boreholes. Instead, the State Water Board Order accomplishes the following:

- Requires BlueTriton to halt its appropriations "through its Tunnels 2, 3 and 7, and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8." (SWRCB Order at 90.)
- Limits the "diversions through its Tunnels 2, 3 and 7, and Boreholes 1, 1A, 7, 7A, 7B, 7C and 8, so that the total amount diverted through these facilities during each day will not exceed the total amount of water BlueTriton delivers to the San Manuel Band of Mission Indians (San Manuel Band) for its riparian uses during the same day." (Id. at 90–91.)
- Permits BlueTriton's continued diversions through "Boreholes 10, 11 and 12." (Id. at 90.)

In other words, though the parties spend significant time debating principles of abstention, the San Manuel Band's riparian rights (as owner of the Arrowhead Springs Hotel) and BlueTriton's diversions through Boreholes 10, 11, and 12 are not challenged in the State Water Board Order or its review. Because the Forest Service does not meaningfully dispute the legitimacy of those rights,[2] the Court sees no issues of abstention or comity in asking whether the Forest Service's regulation of those rights is "reasonable." Adams, 3 F.3d at 1260.

The Forest Service's regulation is not likely to be found "reasonable." As the Ninth Circuit has explained, a "vested water right and the accompanying right-of-way" are "subject to reasonable regulations." Id. While the Ninth Circuit has not offered definitive guidance on what constitutes a "reasonable" regulation, it and lower courts have given "reasonableness" some definition in analogous contexts. Courts have upheld regulations on the manner of access, or temporary closures to protect the environment as reasonable exercises of Forest Service authority. Mountain States Legal Foundation v. Espy, 833 F. Supp. 808, 820 (D. Idaho 1993) (regulations of winter use of road by inholders and mechanisms of snowplowing to protect salmon habitat reasonable); Fitzgerald v. United States, 932 F. Supp. 1195, 1205 (D. Ariz. 1996) (access fee reasonable regulation). On the other hand, courts have suggested a regulation is unreasonable if it completely denies a rightsholder access. United States v. Vogler, 859 F.2d 638, 642 n.5 (9th Cir. 1988) (finding a Tenth Circuit holding that "permits may be required to prevent the unreasonableness degradation of a wilderness study area, even if access to the area could not

---

[2] As BlueTriton points out, prior to the Order, the Forest Service found sufficient evidence of those rights to grant permits over the last near-century, and nothing in the Notice of Denial explains why the Forest Service thinks otherwise, or why this Court should hold otherwise.

be totally denied" consistent with Ninth Circuit precedent (citing Sierra Club v. Hodel, 848 F.2d 1068 (10th Cir. 1988)).

The Notice of Denial does not reasonably regulate BlueTriton and the San Manuel Band's water rights. We judge the Forest Service's Notice of Denial by its stated reasons—here, the failure to explain changes in use, and provide information explaining current uses. The Notice of Denial purports to stop diversions through all tunnels and boreholes—even those not at issue in the Water Board Order—and remove the infrastructure by which water is transported from those tunnels and boreholes downstream.

To be sure, the Forest Service is not without authority to request the information it desires. The Forest Service does not owe all members of the public access akin to inholders, so ensuring that permitted uses are supported by valid property rights, and that the actual use is consistent with those rights, is likely within its statutory authority. See United States v. Jenks, 22 F.3d 1513 (10th Cir. 1994) (in land access context, discussing how "any deed or common law access rights a landowner possesses may affect the terms of the permit or play a role in the decision to issue a permit"). Here, the Forest Service's requests for information about the amount and ultimate uses of the water seem reasonable for the Forest Service to assess whether and how to grant a permit.[3]

Where the Forest Service likely strays past its statutory authority is the consequences it imposes for noncompliance. In effect, the Notice of Denial blocks all access by either BlueTriton or the San Manuel Band in the foreseeable future. The Notice requires BlueTriton to cover up all boreholes and tunnels, even those to which it possesses a valid water right. And the Notice requires the removal of infrastructure necessary to transport the water downstream—if the Notice were to take full effect and the infrastructure removed, BlueTriton and the San Manuel Band would be denied their valid water rights for a significant and unknown period of time based

---

[3] BlueTriton takes umbrage at the Forest Service's alleged "right to know where the water BlueTriton is collecting is being used after it leaves the SBNF" as "restrict[ing] how either BlueTriton or its contractual partner, the San Manuel Band, could use the water collected." (Motion at 12–13.) The Court disagrees the Forest Service erred in requesting such information. Such details might be helpful in order for the Forest Service to verify that a permittee's continued use is consistent with their state law rights. Likewise, such information may help the Forest Service impose reasonable, targeted regulations. (Opp. at 26 ("For example, upon review of the requested information, the Forest Service could decide to impose a term requiring that waters in excess of those required by the San Manuel Band be released at the bypass point to protect the rights of the Forest and other riparian rights holders.").) The relevant question today, however, is what consequences are appropriate when a permit applicant and rightsholder fails to provide that information.

simply on a single failed permit application.[4]  As discussed above, while the Forest Service can reasonably regulate BlueTriton, permanently banning access is not a reasonable regulation.

Previewing the merits, the Forest Service's denial of BlueTriton's permit is likely an unreasonable regulation.

### b. Arbitrary and Capricious

In addition to demonstrating a likelihood of success that the Forest Service has exceeded its statutory authority, BlueTriton has also shown a likelihood the Notice will be found arbitrary and capricious. "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

The Notice of Denial is likely deficient because it does not grapple with an "important aspect of the problem"—dynamic state court proceedings affecting BlueTriton's water rights. Id.  The Notice of Denial claims it denied BlueTriton's application because it "refuse[d] to provide sufficient information about the uses of the waters being taken from the SBNF to assure that [BlueTriton is] in compliance with California law." (Id. at 2.)  However, the Notice of Denial never explains its position on BlueTriton's water rights, the San Manuel Band's rights, or the ongoing state proceedings.[5]  The Water Board Order is not mentioned in the Notice of Denial.  (See id.)  The Forest Service does not explain how it can assess whether BlueTriton is in compliance with California law without determining what rights BlueTriton has under state law.  Likewise, as discussed above, the Forest Service regulates rightsholders differently than other members of the public.  The Forest Service does not explain how it could determine the appropriate way to regulate BlueTriton without determining its rights under state law.

---

[4] The Forest Service also failed to consider several apparent alternatives to an effectively permanent access ban.  Stopping diversions temporarily, for example, until the Forest Service received sufficient information to show the diversions complied with the State Water Board Order would seem a reasonable alternative.  Or as another example, in opposition, the Forest Service suggests that the San Manuel Band should apply for a permit to operate the pipeline. (Opp. at 37.)  But that post-hoc strategic advice is nowhere within the Notice of Denial, the Notice does not contemplate a period by which BlueTriton could transfer operation of the pipeline to the San Manuel Band.  The Notice instead sets in motion the removal of the pipeline, and as of January 16, 2025, will shut off all water deliveries through the pipeline.

[5] That said, in briefing, counsel states "the Forest Service no longer views BlueTriton as having an appropriative right to the water at Strawberry Canyon. The reason for that change, though, is understood by all: the intervening Water Board decision." (Opp. at 27.)  To the extent the Forest Service rests upon such a conclusion, it is nowhere to be found in the Notice of Denial.

In its briefing, the Forest Service states the agency did decide BlueTriton lacked rights to withdraw water at most collection points, as it "reasonably relied on the decision by the Water Board as the best and conclusive evidence of BlueTriton's claim." (Opp. at 27.) While the Court ordinarily would not consider counsel's post hoc explanations for agency action, counsel's assertion raises more questions than it answers. For example, why did the Forest Service give the Water Board's Order "conclusive" legal effect when it is stayed (and was stayed at the time of the Notice of Denial) pending ongoing state court litigation? Both the Forest Service and SOFA suggest that because California state law does not require a party to show a likelihood of success on the merits to obtain a stay, they and this Court should not defer to such a stay. Cal. Civ. Proc. Code § 1094.5(g) (Opp. at 14 n. 5; SOFA Br. at 15.) But neither offers any authority for the idea that this Court should give the Water Board Order an effect different from what it would be given in California State Court: none.

As BlueTriton points out, the agency's failure to grapple with dynamic state proceedings leads to misplaced inferences in the Notice of Denial. For example, the Forest Service takes issue with "BlueTriton's reporting" that shows "94-98% of the total diverted monthly volume was delivered to the Arrowhead Springs Hotel property for undisclosed purposes, rather than for the purpose of supplying bottled drinking water as described in the permit and application." (NoD at 2.) But considering that BlueTriton had to cease the majority of its collections in September 2023 when the Water Board Order took effect (which did not affect the San Manuel Band's diversions to the Arrowhead Springs Hotel) until the Order was stayed in January 2024, it does not seem odd that such a high percentage of diversions would go to the San Manuel Band. The Forest Service did not grapple with an important component of its decision-making.

Reviewing the agency's exercise of discretion under the APA, the Court finds it is likely BlueTriton will be successful in showing the agency's action is arbitrary and capricious.

**2. Abstention**

Both parties argue that principles of abstention counsel for or against issuing a preliminary injunction. BlueTriton argues that an injunction would preserve the status quo. The Forest Service, on the other hand, warns that resolving BlueTriton's APA challenge would require the Court to weigh in on an issue of state law while the same issue is currently pending in a California court. (Opp. at 13.)

Complete abstention under these circumstances is inappropriate. BlueTriton cannot bring an APA claim in California state court, and so is not able to enjoin the Notice of Denial in state court. As discussed above, the Court adjudicates this motion relying only on rights not at issue in pending state court proceedings. In any event, the Court thinks the principles underlying abstention—not treading on active state court proceedings until a final decision on the merits is reached—are best served by preserving the status quo. Inasmuch as the Forest Service's denial is based on the Water Board Order, such reliance is premature until there is a final decision on the merits and BlueTriton has exhausted its state remedies.

In sum, the Forest Service has not shown that the Court should abstain from deciding the present motion for a preliminary injunction.

**B.  Likelihood of Irreparable Harm**

A plaintiff must demonstrate she is likely to suffer irreparable harm in the absence of a preliminary injunction.  See Winter, 555 U.S. at 20.  The Ninth Circuit cautions that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  Caribbean Marine Servs. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  A plaintiff seeking injunctive relief must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate" for the injury.  Herb Reed Enters., LLC v. Fla. Entm't Mgmt., 736 F.3d 1239, 1249 (9th Cir. 2013).  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).

BlueTriton's allegations of economic harm due to halted diversions and the potential damage to the pipeline from stopped flows are sufficiently irreparable.[6]  While economic harm can generally be remedied by money damages, economic harm becomes irreparable in an APA case where the plaintiff cannot recover money damages from the federal government.  California v. Azar, 911 F.3d 558, 581 (9th Cir. 2018).  Additionally, this case is no longer being heard in the D.C. Circuit where economic harm must be "significant."  Air Trans. Ass'n of Am., 840 F. Supp. 2d at 335.  In the Ninth Circuit, a moving party must only "demonstrate[] a significant threat of irreparable injury, irrespective of the magnitude of the injury."  Simula, Inc. v. Autoliv, Inc., 175 F.3d 716 (9th Cir. 1999) (emphasis added).

Here, BlueTriton has made a sufficient showing of irreparable harm.  While BlueTriton has been able to meet demand by finding alternative water sources, the loss of future profits—from not being able to fully access its water sources—is irreparable.  That BlueTriton has already had to find alternative sources, does not mean that is not already suffering an injury in operating those sources, and an injury to future profits if access to Arrowhead Springs is blocked off.

---

[6] The Court is not so sure that planning the removal of the pipeline is irreparable.  The removal of infrastructure may qualify as an irreparable harm, however, such harm must also be imminent: "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."  Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis omitted) (internal citations omitted).  In other words, BlueTriton must show irreparable harm if the Court were not to enjoin the portion of the Notice of Denial that requires the planning and dismantling of the pipeline.  The Court agrees that BlueTriton probably would be able to renew its request for relief once the Forest Service approves its plan but before removal is required.  (USFS Supp. at 3.)  Because, however, the other harms are irreparable, no party argues for differentiated relief, and vacatur is the standard remedy under the APA, the Court enjoins the entire Notice of Denial.

Likewise, the potential damage to the pipeline from stopping all flows is irreparable. (Mixon Decl. ¶ 23.)

### C. Public Interest & Balancing of Harms

Where the government is the opposing party, balancing of the harm and the public interest merge. See Nken v. Holder, 556 U.S. 418, 435 (2009). Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction. Winter, 555 U.S. at 24.

This factor seems neutral. On one hand, the Forest Service points out the environmental harm that results from continued diversion. (Opp. at 36.) On the other, BlueTriton points to fire suppression activities by the Nation, and the economic benefits from its bottling operations. League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 766 (9th Cir. 2014) (fire mitigation is in the public interest) (Motion at 37.) Fundamentally, the issuance of the preliminary injunction preserves a status quo that has existed for a near-century. The Court is unconvinced that the public interest will be sufficiently injured while this case is heard on the merits so as to preclude issuing an injunction.

## V.     CONCLUSION

After weighing the factors—which either weigh in BlueTriton's favor or are neutral—the Court finds granting a preliminary injunction appropriate. The Court **GRANTS** Plaintiff BlueTriton's Motion for a preliminary injunction, and **ORDERS** as follows:

- The Forest Service shall not take any action to enforce the Notice of Denial against BlueTriton or the Nation until this matter is fully adjudicated.
- The Court will not require a bond.

A court may stay proceedings as part of its inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936); see also Clinton v. Jones, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). Considering the ongoing proceedings in Fresno Superior Court, the Court **STAYS** the case until there is a final judgment on the merits in that proceeding. The parties are asked to provide a written status report to the Court every sixty days.

**IT IS SO ORDERED.**