FILED
CLERK, U.S. DISTRICT COURT

JAN 14 2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ____MG____ DEPUTY

SOMACH SIMMONS & DUNN
A Professional Corporation
STUART L. SOMACH, ESQ. (SBN 90959)
MAXIMILIAN C. BRICKER, ESQ. (SBN 350150)
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
Facsimile:  (916) 446-8199
ssomach@somachlaw.com
mbricker@somachlaw.com

MICHAEL W. DAUGHERTY, ESQ. (Co. Bar 49074)
*Pro Hac Vice* Forthcoming
RAMSEY L. KROPF, ESQ. (Co. Bar 21528)
*Pro Hac Vice* Forthcoming
1155 Canyon Blvd., Suite 110
Boulder, CO 80302
Telephone: (916) 446-7979
Facsimile: (916) 446-8199
mdaugherty@somachlaw.com
rkropf@somachlaw.com

Attorneys for [PROPOSED] Plaintiff-Intervenor
YUHAÁVIATAM OF SAN MANUEL NATION,
a federally recognized Indian tribe, also federally
recognized as SAN MANUEL BAND OF MISSION INDIANS

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| BLUETRITON BRANDS, INC.,<br><br>                         Plaintiff,<br><br>     v.<br><br>UNITED STATES FOREST SERVICE,<br><br>RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service,<br><br>CHRISTOPHER FRENCH, in his official capacity as Deputy Chief for the National Forest System of the U.S. Forest Service, | Case No.: 2:24-cv-09720-JGB-DTB<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF-INTERVENOR'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:    February 3, 2025<br>Hearing Time:   9:00 AM<br>Courtroom:       1<br>Judge: Hon. Jesus G. Bernal<br><br>Action Filed:  August 6, 2024 |

SOMACH SIMMONS & DUNN
A Professional Corporation

JENNIFER EBERLEIN, in her official
capacity as Regional Forester for the
Pacific Southwest Region of the
U.S. Forest Service,

DANELLE HARRISON, in her official
capacity as Forest Supervisor of the San
Bernardino National Forest of the
U.S. Forest Service,

MICHAEL NOBLES, in his official
capacity as Front Country District Ranger
of the U.S. Forest Service,

                          Defendants.

YUHAAVIATAM OF SAN MANUEL
NATION, a federally recognized Indian
tribe, also federally recognized as SAN
MANUEL BAND OF MISSION
INDIANS,

          [PROPOSED] Plaintiff-Intervenor.

SOMACH SIMMONS & DUNN
A Professional Corporation

MEMO. OF LAW IN SUPPORT OF PLAINTIFF-INTERVENOR'S MOTION FOR
PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................ 1

II.  BACKGROUND ................................................................................. 1

    A.    Sacred and Historic Arrowhead Springs................................... 1

    B.    Over a Century of Use and Reliance on Water from
          Strawberry Canyon ................................................................... 2

    C.    The Nation's Water Rights ....................................................... 3

    D.    Defendants' Action to Terminate Water Deliveries to
          Arrowhead Springs .................................................................. 3

III.  STANDARD OF REVIEW ................................................................. 5

IV.  ARGUMENT ...................................................................................... 6

    A.    The Nation Is Likely to Succeed on the Merits ........................ 6

          1.    This Court Should Hold Unlawful and Set Aside
                Defendants' Issuance of the Notice of Denial ............................. 6

          2.    Defendants' Issuance of the Notice of Denial Violated
                Their Trust Responsibility to the Nation ................................... 17

          3.    The Nation Will Suffer Irreparable Harm Unless the
                Court Preliminarily Enjoins the Notice of Denial ..................... 19

          4.    The Balance of Equities and the Public Interest Favor
                Issuing a Preliminary Injunction................................................ 21

V.  THE NATION SHOULD NOT BE REQUIRED TO POST A BOND ........... 22

VI.  CONCLUSION................................................................................... 22

TABLE OF EXHIBITS ...................................................................................24

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Alcaraz v. INS,*
  384 F.3d 1150 (9th Cir. 2004) ......................................................... 15

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ........................................................ 5, 6

*All. for the Wild Rockies v. United States Forest Service,*
  907 F.3d 1105 (9th Cir. 2018) ......................................................... 12

*Apache Survival Coal. v. United States,*
  21 F.3d 895 (9th Cir. 1994) .............................................................. 6

*Baccarat Fremont Developers, LLC*
  *v. United States Army Corps of Eng'rs,*
  425 F.3d 1150 (9th Cir. 2005) ........................................................ 6, 7

*Burford v. Sun Oil Co.,*
  319 U.S. 315 (1943) ....................................................................... 18

*California Oregon Power Co. v. Beaver Portland Cement Co.,*
  295 U.S. 142 (1935) ....................................................................... 18

*Church of Scientology of Cal. v. United States,*
  920 F.2d 1481 (9th Cir. 1990) ......................................................... 15

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,*
  321 F.3d 878 (9th Cir. 2003) .......................................................... 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ............................................................................ 7

*E. Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) ........................................................ 5, 21

*Gros Ventre Tribe v. United States,*
  469 F.3d 801 (9th Cir. 1998) .......................................................... 18

*Hoopa Valley Indian Tribe v. Ryan,*
  415 F.3d 986 (9th Cir. 2005) .......................................................... 17

*Inland Empire Pub. Lands Council v. United States Forest Serv.,*
  88 F.3d 754 (9th Cir. 1996) ............................................................ 12

*Kammeyer v. Oneida Total Integrated Enters.,*
  2015 U.S. Dist. LEXIS 112910, 21 (C.D. Cal. 2015) ....................................... 7

*Marlys Bear Medicine v. United States,*
  241 F.3d 1208 (9th Cir. 2009) ......................................................... 18

*Montana Wilderness Ass'n v. Connell,*
  725 F.3d 988 (9th Cir. 2013) ............................................................ 7

SOMACH SIMMONS & DUNN
A Professional Corporation

*Morongo Band of Mission Indians v. FAA*,
    161 F.3d 569 (9th Cir. 1998) ...................................................................... 7, 17

*Morton v. Ruiz*,
    415 U.S. 199 (9th Cir. 2004) ............................................................................ 15

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ............................................................................. 9

*Native Ecosystems Council v. United States Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) ........................................................................... 12

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) ......................................................................... 12

*Quechan Indian Tribe v. United States*,
    535 F.Supp.2d 1072 (S.D. Cal. 2008) ............................................................. 18

*Railroad Commission v. Pullman Co.*,
    312 U.S. 496 (1941) ......................................................................................... 19

*Seminole Nation v. United States*,
    316 U.S. 286 (1942) ......................................................................................... 17

*Skokomish Indian Tribe v. FERC*,
    121 F.3d 1303 (9th Cir. 1997) ......................................................................... 17

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010) ............................................................................. 7

*Textile Unlimited, Inc. v. A. BMH and Co., Inc.*,
    240 F.3d 781 (9th Cir. 2001) ............................................................................. 6

*Tyler v. Cuomo*,
    236 F.3d 1124 (9th Cir. 2000) ........................................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 20 (2008) ...................................................................................... 19


Statutes

36 C.F.R. §
    219.10(e) .......................................................................................................... 12
    800.1 ................................................................................................................... 8
    800.2(c)(ii)(A) .................................................................................................. 10
    800.2(c)(ii)(D) ................................................................................................... 9
    800.2(c)(2) ......................................................................................................... 8
    800.2(c)(4) ........................................................................................................ 10
    800.3(f) ............................................................................................................... 9
    800.4(a) ............................................................................................................... 9
    800.4(a)(1) .......................................................................................................... 9
    800.4(c) ............................................................................................................... 9
    800.5 ................................................................................................................... 9

MEMO. OF LAW IN SUPPORT OF PLAINTIFF-INTERVENOR'S MOTION FOR
PRELIMINARY INJUNCTION                                                    -iii-

800.5(c)(2) ............................................................................. 9
800.6 ..................................................................................... 9
800.16(d) .............................................................................. 9
800.16(f) ............................................................................. 10

5 U.S.C. § 706(2) ...................................................................... 6

16 U.S.C. § 1600 *et seq.* ....................................................... 12

16 U.S.C. § 1604(i) ................................................................ 12

54 U.S.C. § 302706 .................................................................. 8

54 U.S.C. § 300320 .................................................................. 8


Other Authorities

FRCP, Rule
    65 ....................................................................................... 5
    65(c) ................................................................................. 22

Local Rule
    65-1 ................................................................................... 5

Joe Nelson, *Potential water restrictions at Arrowhead Springs Hotel raise concerns over wildfire danger,* The Sun, https://www.sbsun.com/2024/08/23/potential-water-restrictions-at-arrowhead-springs-hotel-raise-concerns-over-wildfire-danger (last visited Jan. 2, 2025) ................................................................... 2

Law and Motion Minute Order, *BlueTriton Brands, Inc. v. Eileen Sobeck/ WM,* No. 23CECG04292 (Fres. Dist. Ct. Jan. 24, 2024) ............................. 4

SOMACH SIMMONS & DUNN
A Professional Corporation

# I.   <u>INTRODUCTION</u>

Yuhaaviatam of San Manuel Nation, a federally recognized Indian tribe, also federally recognized as the San Manuel Band of Mission Indians ("Nation"), brings this motion to preliminarily enjoin official agency action that purports to disrupt the status quo that has been in place for nearly a century and that will completely cut off the delivery of water to the Nation's Arrowhead Springs property (Arrowhead Springs), in direct violation of numerous federal laws, regulations, and policies, as well as the trust responsibility that the United States Forest Service (USFS) and its employees (collectively, "Defendants") owe the Nation.

# II.   <u>BACKGROUND</u>

## A.   Sacred and Historic Arrowhead Springs

Arrowhead Springs totals approximately 2,000 acres, is located within the Nation's ancestral territory, and constitutes one of the Serrano people's most culturally significant landscapes. *See* Declaration of Alexandra McCleary in Support of Motion to Intervene and Motion for Preliminary Injunction (McCleary Decl.) at ¶¶ 5, 8, 10. Arrowhead Springs features prominently in the Nation's oral history, was once the site of an ancient village known as Apuiva't occupied by the Nation's ancestors, and includes a large arrowhead-shaped natural landmark, natural hot mineral springs, and other culturally valuable resources. *Id.* at ¶ 8. The property also includes a historic hotel constructed in 1939, which served as a naval hospital during World War II and a Hollywood filming and vacation destination thereafter. *Id.* at ¶ 9. The Tribe reacquired Arrowhead Springs in 2016 in an ongoing effort to reclaim and steward its ancestral lands. *Id.* at ¶ 7. In addition to the property's historical significance and cultural resources, Arrowhead Springs contains administrative offices, an events center, recreational facilities, irrigated land used for defensible space, cultural sites, and fire protection facilities upon which the Nation and surrounding local governments depend to combat wildfire. *See* Ex. 13, Letter from Nation to USFS (Nov. 15, 2024); *see also* Declaration of Rodney Garton in

SOMACH SIMMONS & DUNN
A Professional Corporation

Support of Motion to Intervene and Motion for Preliminary Injunction (Garton Decl.) at ¶¶ 6, 8, 9, 10; *see also* Ex. 12, Letter from San Bernardino County Board of Supervisors to Dan Little Aug. 1, 2024).

**B.      Over a Century of Use and Reliance on Water from Strawberry Canyon**

Arrowhead Springs abuts the San Bernardino National Forest (SBNF), and for well over a century, has used and relied upon water from SBNF's Strawberry Canyon.  ECF No. 2-6 at 2.  Since 1930, Plaintiff BlueTriton Brands, Inc. (BlueTriton) and its predecessors in interest have accessed and operated water diversion and conveyance structures on SBNF lands through a series of special use permits (SUP) the USFS issued.  *See* Garton Decl. at ¶ 4.  Since 1931, Arrowhead Springs has received a portion of the water delivered through the water delivery system operated by BlueTriton and its predecessors (Subject Water).  The Nation relies on the Subject Water to operate Arrowhead Springs.  *See id.* at ¶ 6.

Arrowhead Springs requires water for a variety of year-round uses, including domestic and irrigation purposes, but also fire protection purposes in an area that is at elevated risk for wildfire.  *See* Garton Decl. at ¶ 6, 9, 10.  Accordingly, a safe and reliable water supply is crucial to meet these demands, which benefit not only the Nation but also other fire-fighting agencies[1] that depend on the water to protect Arrowhead Springs as well as the community at large.  *See id.* at ¶ 8; *see also* Ex. 12.  Defendants knew about the Nation's reliance upon the water delivered to Arrowhead Springs by BlueTriton before taking action to terminate this water supply, because the Nation so informed them.  Declaration of Daniel Little in Support of Motion to Intervene and Motion for Preliminary Injunction (Little Decl.)

---

[1] Local elected officials have expressed grave concern over Arrowhead Springs no longer having access to water sourced from Strawberry Canyon, as those supplies are vital to fire-fighting efforts in the region.  *See, e.g.*, Joe Nelson, *Potential water restrictions at Arrowhead Springs Hotel raise concerns over wildfire danger,* The Sun, *https://www.sbsun.com/2024/08/23/potential-water-restrictions-at-arrowhead-springs-hotel-raise-concerns-over-wildfire-danger* (last visited Jan. 2, 2025).

SOMACH SIMMONS & DUNN
A Professional Corporation

at ¶¶ 10-13.  Defendants nonetheless took this adverse action without notice to, or consultation with, the Nation.

**C.     The Nation's Water Rights**

The Nation has protectable property rights that are separate and distinct from those of BlueTriton.  The Nation and its predecessors have diverted and used water from sources in the vicinity of Arrowhead Springs for well over a century and accordingly possesses broad water rights in Strawberry Canyon, including riparian, groundwater, and pre-1914 appropriative rights that pre-date the SBNF.  *See* ECF No. 15-6 at 87; *see also* ECF No. 2-6 at 2.  In addition to these uses, Arrowhead Springs has relied upon water delivered by BlueTriton and its predecessors since 1931.  *See* ECF No. 2-5 at 7.  The California State Water Resources Control Board (SWRCB) order related to BlueTriton specifically states the [Nation] has "rights that authorize diversions through [BlueTriton's] facilities for beneficial use on [Arrowhead Springs]."  ECF No. 15-6 at 87.

**D.     Defendants' Action to Terminate Water Deliveries to Arrowhead Springs**

Despite this historic operation and reliance, Defendants took action in July 2024 to terminate the Nation's water supply at Arrowhead Springs.  The Notice of Denial dated July 26, 2024, purports to terminate BlueTriton's authorization to operate its infrastructure within the SBNF, and thereby effectively terminates all water deliveries to the Nation.  *See* ECF No. 1-1 at 1.  Defendants provided no notice of the agency decision to the Nation, nor did Defendants engage in any government-to-government consultation with the Nation whatsoever before issuing the Notice of Denial.  *See* Little Decl. at ¶¶ 7, 8.  Rather, the Notice of Denial required that all water supply be terminated within *seven days* of the Notice.  *See* ECF No. 1-1 at 3 (emphasis added).  Defendants took these steps to curtail water deliveries to the Nation even though Defendants knew about the Nation's needs and uses for the Subject Water, including for the Nation's and local agencies'

SOMACH SIMMONS & DUNN
A Professional Corporation

firefighting purposes.  Defendants also knew the Nation lacks an alternative water resource for Arrowhead Springs.  Little Decl. at ¶¶ 10-13.

In response to the Nation's protest, Defendants modified their Notice of Denial to temporarily authorize continued delivery of the Subject Water to Arrowhead Springs until January 15, 2025.  *See* ECF No. 27-1 at 1.  At the Nation's request, Defendants have attended meetings to discuss a solution to protect the Nation's (and surrounding community's) interests.  Defendants informed the Nation they had no solution that could be implemented before January 15, 2025, and they do not plan to further modify the Notice of Denial.  *See* Little Decl. at ¶ 23. Accordingly, BlueTriton will be required to turn off its entire water system and stop delivering water to the Nation on January 15, 2025.

Defendants' refusal to permit continued water delivery to the Nation is perplexing given the known importance of the water to the Nation, Arrowhead Springs, and the surrounding community, all of which depend on the water for fire protection.  Garton Decl. at ¶¶ 9-11.  It is also confounding given Defendants' trust responsibility to the Nation, compared to a state agency's own acknowledgment and protection of the Nation's water supply.  Indeed, the SWRCB issued an order in 2023 that purported to terminate BlueTriton's water rights and prohibit certain appropriations from continuing in the SBNF.  ECF No. 15-6.  However, the SWRCB's order specifically carves out a water supply for the Nation and allows continued delivery of the Subject Water to Arrowhead Springs.  *Id*. at 87.[2]

Since before they issued the directive to curtail all water deliveries, Defendants knew the Nation relied on the Subject Water to operate Arrowhead Springs, which warrants federal consideration and protection given its historical and cultural significance.  They knew the Nation uses the Subject Water for not only a

---

[2] The SWRCB order is currently stayed.  *See* Law and Motion Minute Order, *BlueTriton Brands, Inc. v. Eileen Sobeck/ WM*, No. 23CECG04292 (Fres. Dist. Ct. Jan. 24, 2024).

SOMACH SIMMONS & DUNN
A Professional Corporation

SOMACH SIMMONS & DUNN
A Professional Corporation

1   variety of on-site uses, but also for SBNF, state, local, and the Nation's firefighting

2   purposes.  *See* Ex. 12.  And they knew the Nation lacks an alternative water source

3   available to meet the needs of Arrowhead Springs if the Subject Water is terminated.

4   *See* Garton Decl. at ¶ 12; *see also* Little Decl. at ¶¶ 21, 22.  And yet, not only did

5   Defendants fail to consult the Nation before deciding to deprive the Nation of the

6   water it needs for Arrowhead Springs; they have failed to meaningfully consult

7   thereafter—both with respect to the impacts of the Notice of Denial to the Nation

8   and the impacts of BlueTriton's decommissioning plan.  Little Decl. at ¶¶ 16-20.

9       Defendants' decision to terminate the Nation's water supply, and direction to

10  BlueTriton to decommission the infrastructure that delivers that water supply,

11  violates numerous federal laws, regulations, and policies, as well as the trust

12  obligation that Defendants owe the Nation.  Defendants have provided no

13  justification as to why the Nation's water supply should be immediately cut off.[3]

14  *See* ECF No. 1-1 at 1-3.  They must be compelled to adequately address and

15  mitigate adverse impacts of their action on the Nation, and therefore, should be

16  preliminarily enjoined from prohibiting deliveries of the Subject Water pending the

17  outcome of this lawsuit.

18              **III.    STANDARD OF REVIEW**

19      Federal courts are empowered to grant injunctive relief.  FRCP 65; *see also*

20  L.R. 65-1.  A plaintiff seeking a preliminary injunction must establish that (1) it is

21  likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the

22  absence of preliminary relief, (3) the balance of equities tip in its favor, and (4) an

23  injunction is in the public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d

24  1127, 1131 (9th Cir. 2011) (citation omitted).  "When the government is a party, the

25  last two factors (equities and public interest) merge."  *E. Bay Sanctuary Covenant v.*

26  *Biden*, 993 F.3d 640, 668 (9th Cir. 2021).  The factors for preliminary injunctive

27

28

---

[3] The Notice of Denial does not include or address tribal water deliveries.

1   relief are evaluated on a "sliding scale," meaning that "a stronger showing of one

2   element may offset a weaker showing of another." *All. for the Wild Rockies*,

3   632 F.3d at 1131-32.

4      A preliminary injunction is not an adjudication on the merits, but rather a

5   device for preserving the status quo and preventing irreparable loss of rights before

6   judgment. *Textile Unlimited, Inc. v. A. BMH and Co., Inc.*, 240 F.3d 781, 786 (9th

7   Cir. 2001).  Relevant to the Nation's National Historic Preservation Act (NHPA)

8   claim, courts apply a "lenient standard for granting a preliminary injunction" to

9   challenges brought under the NHPA, particularly when the movant seeks to simply

10  maintain the status quo. *Apache Survival Coal. v. United States*, 21 F.3d 895, 912

11  (9th Cir. 1994).

## IV.   ARGUMENT

**A.   The Nation Is Likely to Succeed on the Merits**

14     As explained below, Defendants' issuance of the Notice of Denial violates the

15  NHPA, the National Forest Management Act (NFMA), the Administrative Procedure

16  Act (APA), numerous executive orders, and Defendants' own regulations and

17  internal procedures.  As a result, Defendants also violated their federal trust

18  responsibility to the Nation.

**1.   This Court Should Hold Unlawful and Set Aside Defendants'
Issuance of the Notice of Denial**

21     The APA provides for judicial review of agency action.  Courts must set aside

22  an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise

23  not in accordance with law," "contrary to constitutional right, power, privilege, or

24  immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of

25  statutory right," or "without observance of procedure required by law."  5 U.S.C.

26  § 706(2).  "In reviewing agency decision under the APA, we ask whether the

27  decision was based on a consideration of all the relevant factors and whether there

28  has been a clear error of judgment." *Baccarat Fremont Developers, LLC v. United*

SOMACH SIMMONS & DUNN
A Professional Corporation

1  *States Army Corps of Eng'rs*, 425 F.3d 1150, 1153 (9th Cir. 2005) (citation

2  omitted).  Decisions regarding the NHPA are reviewed under the APA's standards.

3  *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 573 (9th Cir. 1998).

4  Furthermore, when an agency changes positions, "it must 'be cognizant that

5  longstanding policies may have engendered serious reliance interests that must be

6  taken into account.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

7  591 U.S. 1, 30 (2020) (citation omitted).

8      Defendants' action in issuing the Notice of Denial violates the APA.  As

9  discussed below, Defendants failed to engage in meaningful consultation with the

10  Nation as the NHPA required, failed to abide by the SBNF's forest management

11  plan as the NFMA required, and failed to comply with numerous other federal laws,

12  including executive orders, regulations, and internal agency policies and procedures

13  that are described in detail below.  Accordingly, the Nation is likely to prevail on the

14  merits of its claim.

15          **a.    Defendants Violated the NHPA**

16      The NHPA has been characterized as a "stop, look and listen" provision that

17  requires agencies to fully consider the effects of their actions on historic and cultural

18  resources.  *See, e.g., Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of*

19  *Interior*, 608 F.3d 592, 606 (9th Cir. 2010).

20          Under NHPA, a federal agency must make a reasonable and good faith
           effort to identify historic properties; determine whether identified
21          properties are eligible for listing on the National Register based on
           criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any
22          eligible historic properties found; determine whether the effect will be
           adverse; and avoid or mitigate any adverse effects.
23
   *Kammeyer v. Oneida Total Integrated Enters.*, 2015 U.S. Dist. LEXIS 112910, 21

24  (C.D. Cal. 2015) (quoting *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988,

25  1005 (9th Cir. 2013)).  The NHPA specifically requires agencies to consult with

26  tribes (and other property owners) regarding properties that are eligible for listing in

27  the National Register of Historic Places, including sites that are culturally significant

28

SOMACH SIMMONS & DUNN
A Professional Corporation

1   to tribes.  54 U.S.C. § 302706; 36 C.F.R. § 800.2(c)(2).  Agencies "must *complete*

2   the section 106 process . . . *prior* to the issuance of any license." 36 C.F.R. § 800.1

3   (emphasis added).

4           **i.      Defendants Never Considered the Impact to Historical
                       and Cultural Properties**
5

6           Agencies must comply with the NHPA for any "undertaking" that may impact

7   a culturally or historically significant site.  Under the NHPA, an undertaking is

8   broadly defined as any project, activity, or program with federal agency

9   involvement, such as those carried out by federal agencies, assisted by federal

10  agencies, or that require a federal permit, license, or approval.  54 U.S.C. § 300320;

11  *see also Tyler v. Cuomo*, 236 F.3d 1124, 1128 (9th Cir. 2000).

12          Terminating the Nation's water supply at Arrowhead Springs and issuing the

13  Notice of Denial constitutes an "undertaking" under the NHPA.  The Notice of

14  Denial cuts off a physical water supply to a historically and culturally significant

15  property that has flowed continuously for over a century and to which the Nation

16  possesses broad and undisputed water rights.  *See* ECF No. 2-6 at 2, *see also* ECF

17  No. 15-6.  The Notice of Denial also grants an implied license to BlueTriton to

18  access the SBNF to sever pipes and boreholes and bypass all flow to the surface

19  from each point of diversion.  *See* ECF No. 1-1 at 3.  Furthermore, the Notice of

20  Denial requires BlueTriton's submittal and, upon Defendants' approval,

21  implementation of an intensive decommissioning plan.  *Id*.  Defendants' approval of

22  BlueTriton's decommissioning plan could be imminent, and BlueTriton's plan as

23  currently proposed schedules decommissioning to begin on January 16, 2025.

24  Because the Notice of Denial constitutes an "undertaking," Defendants cannot

25  require BlueTriton to cease water delivery to the Nation absent Defendants' NHPA

26  compliance.

27          Agencies must meaningfully consider the potential effects of an undertaking

28  that may impact a culturally or historically significant site.  NHPA compliance

SOMACH SIMMONS & DUNN
A Professional Corporation

SOMACH SIMMONS & DUNN
A Professional Corporation

1    involves a multi-step process to evaluate potential effects to listed or potentially

2    eligible sites. *See, e.g., Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d

3    800, 805 (9th Cir. 1999). A threshold step is determining the area of potential

4    effects (APE) of the agency activity. 36 C.F.R. § 800.4(a)(1). The APE is defined

5    to include the area "within which an undertaking may directly or indirectly cause

6    alterations in the character or use of historic properties." *Id*. § 800.16(d). The

7    agency must evaluate the historic significance of such sites and determine whether

8    they are potentially eligible for listing under the National Register. *Id*. § 800.4(c).

9    Next, the agency must evaluate the potential effects that its activity may have on

10   those properties, *id*. § 800.5, and, finally, the agency must resolve any adverse

11   effects through the development of mitigation measures. *Id*. § 800.6. At every step,

12   the agency must consult with Indian tribes that attach religious and cultural

13   significance to affected sites, even if the sites are outside tribal lands. *Id*.

14   §§ 800.3(f), 800.4(a), 800.5(c)(2), 800.6, 800.2(c)(ii)(D).

15       Defendants did not consider the impacts of their action to terminate the

16   Nation's water supply on historically and culturally significant properties.

17   Arrowhead Springs and the surrounding area constitute culturally significant sacred

18   sites, as defined in Executive Order 13007. These lands feature prominently in the

19   Nation's oral history, were once the site of an ancient village known as Apuiva't

20   occupied by the Nation's ancestors, and the SBNF parcels implicated in the Notice

21   of Denial likely contain historic Serrano artifacts and sacred sites, which also exist

22   at Arrowhead Springs. *See* McCleary Decl. at ¶ 10.

23       The Notice of Denial incorrectly asserts that "[t]he hotel and conference

24   facility on the property is not operating." *See* ECF No. 2-9 at 2. The USFS

25   included this inaccurate assertion in its Notice of Denial even though the Nation's

26   representatives previously met with Defendants to ensure they had a full

27   understanding of the Nation's water use at Arrowhead Springs. Not only did

28   Defendants refuse to engage with the Nation on a government-to-government basis,

1  they proceeded to issue a Notice of Denial that contained inaccurate statements

2  about the Nation's water needs, and did so in complete disregard for the significant

3  impacts that terminating the Nation's water supply poses for the Nation.  *See* Little

4  Decl. at ¶¶ 10-13.  Defendants' decision to cut off an existing, near century-old

5  water supply for the Nation was hurried, incomplete, based on false assertions

6  Defendants refused to acknowledge or correct, and casually undertaken without any

7  regard to the required NHPA analysis.

8                    ii.        **Defendants Did Not Meaningfully Consult the Nation**

9          The NHPA imposes specific requirements with which agencies must comply

10  in their consultations.  Federal agencies that provide permit authorizations remain

11  responsible for their government-to-government relationships with tribes.  36 C.F.R.

12  § 800.2(c)(4).  "Consultation means the process of seeking, discussing, and

13  considering the views of other participants, and, where feasible, seeking agreement

14  with them."  *Id.* § 800.16(f).  An agency must "ensure" that the consultation process

15  provides a tribe with "a reasonable opportunity to identify its concerns about historic

16  properties, advise on the identification and evaluation of historic properties,

17  including those of traditional religious and cultural importance . . . and participate in

18  the resolution of adverse effects."  *Id*. § 800.2(c)(ii)(A).

19          Defendants failed to engage in the government-to-government consultation

20  that the NHPA required.  Arrowhead Springs constitutes an important historic and

21  cultural resource, as Defendants have conceded, and terminating the Nation's water

22  supply there is likely to adversely affect it.  *See* Ex. 14, Record of Decision San

23  Bernardino National Forest Land Management Plan 2006 Revision.[4]  And yet,

24  Defendants failed to notify the Nation before or after issuing the Notice of Denial;

25  rather, the Nation only learned of Defendants' action from BlueTriton.

26

27

28  [4] Phase I, II, and III, and the 2006 Revision, are combined and referenced via the
four digit bates number in red in the bottom right corner of the combined document.

SOMACH SIMMONS & DUNN
A Professional Corporation

Defendants conducted no assessment whatsoever of how the federal actions may impact Arrowhead Springs or the Nation.  Defendants not only allege—incorrectly—that the Nation does need the water, they also inaccurately contend the Nation is wasting water.  *See* ECF No. 1-1 at 2.  While Defendants have met with the Nation since issuing the Notice of Denial, it was only at the Nation's insistence, and such "consultation" has hardly been meaningful.  Little Decl. at ¶ 16.  Indeed, Defendants intend to prohibit further deliveries of the Subject Water to the Nation beginning on January 15, 2025, even though they offer no solutions, refusing to hold the water stoppage in abeyance without basis, knowing the action will leave the Nation without water despite its well-established water rights.  Little Decl. at ¶ 18.

Furthermore, BlueTriton plans to begin decommissioning on January 16, 2025, which could significantly and adversely impact Arrowhead Springs beyond eliminating its water supply.  Arrowhead Springs is located immediately downstream of BlueTriton's infrastructure, and the decommissioning process could involve a risk of landslides, flooding, and reducing the water quality in Strawberry Creek.  Declaration of Paul Hamai in Support of Motion to Intervene and Motion for Preliminary Injunction (Hamai Decl.) at ¶ 13.  The Nation asked Defendants for the decommissioning plan, only to be told to submit a Freedom of Information Act request or to get the plan from BlueTriton.  Little Decl. at ¶ 20.  Further, the Nation repeatedly requested that the parties enter a co-stewardship agreement or other resolution that would balance the variety of interests involved.  Joint Secretarial Order 3403 requires Defendants to undertake collaborative co-stewardship agreements with federally recognized tribes to manage federal lands and waters. *See* Ex. 15, Joint Secretarial Order 3403 (2023).  But Defendants have refused the Nation's requests, inventing new reasons for acting unilaterally, and without engaging the Nation, every step of the way.  Little Decl. at ¶ 19.

Defendants failed to comply with the NHPA by identifying historic and cultural resources that could be impacted by the Notice of Denial and working to

SOMACH SIMMONS & DUNN
A Professional Corporation

1  mitigate any such impacts.  Defendants also failed to engage in meaningful

2  consultation with the Nation as the NHPA required.  Accordingly, Defendants'

3  termination of the Nation's water supply at Arrowhead Springs violates the NHPA.

### b.    Defendants Violated the NFMA

5      The NFMA charges Defendants with managing national forest land, including

6  planning for the protection and use of the land and its natural resources.  *See*

7  16 U.S.C. § 1600 *et seq.*  Under the NFMA, forest land management occurs on two

8  levels: (1) the forest level, and (2) the individual project level.  *Native Ecosystems*

9  *Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  "On the forest level,

10  [USFS] develops a Land and Resource Management Plan . . . which consists of

11  broad, long-term plans and objectives for the entire forest."  *Id.*  The forest

12  management plan is then implemented at the project level.  *Id.*  Site-specific projects

13  and activities must be consistent with an approved forest plan.  16 U.S.C. § 1604(i);

14  36 C.F.R. § 219.10(e); *Native Ecosystems Council v. United States Forest Serv.*,

15  418 F.3d 953, 961 (9th Cir. 2005) ("It is well-settled that [USFS's] failure to comply

16  with the provisions of a Forest Plan is a violation of NFMA.").  Site-specific actions

17  may include resource plans, permits, contracts, and other instruments for occupancy

18  or use of forest lands.  *Inland Empire Pub. Lands Council v. United States Forest*

19  *Serv.*, 88 F.3d 754, 757 (9th Cir. 1996).  Agency actions are considered consistent if

20  they conform to the applicable "components" of the forest plan, including the

21  standards, guidelines, and desired conditions that are set forth in the forest plan and

22  that collectively establish the details of forest management.  *All. for the Wild*

23  *Rockies v. United States Forest Service*, 907 F.3d 1105, 1109-10 (9th Cir. 2018).

24  Defendants' failure to comply with the provisions of a forest management plan

25  violates the NFMA.  *Native Ecosystems Council*, 697 F.3d at 1056 (citation

26  omitted).

27

28

SOMACH SIMMONS & DUNN
A Professional Corporation

1

2

SOMACH SIMMONS & DUNN
A Professional Corporation

### i. Defendants Failed to Comply with the SBNF's Forest Management Plan

The current land management plan for the San Bernardino National Forest (SBNF management plan) became effective on October 31, 2005, and was thereafter revised to better coordinate the SBNF's multiple uses. *See* Ex. 14 at 0008. The SBNF management plan acknowledges the Nation's role in stewarding the SBNF and historical reliance on SBNF resources. Accordingly, the SBNF management plan directs how agency officials should engage with the Nation and requires Defendants to make significant effort to identify and protect the Nation's traditional and contemporary uses of SBNF resources. Recent revisions to the SBNF management plan reaffirm Defendants' obligation to consider tribal priorities and practices early on in the national forest planning, analyses, decision making, and adaptive management processes. *Id.* at 0009-10.

Specifically, the SBNF management plan challenges forest managers to "develop government-to-government relationships with the tribes in order to protect resources, to resolve access issues, supply resources, and to continue the important traditional or cultural uses of the national forests." Ex. 14 at 0044. Defendants must maintain the SBNF in a condition so tribes can exercise and retain traditional and contemporary connections to the land. *Id*. at 0067. Accordingly, Defendants are encouraged to continue historic access to the SBNF and consider contemporary uses of SBNF resources. *Id*. at 0304. In doing so, Defendants should "use opportunities during project planning and implementation to identify, enhance, and protect traditionally or contemporarily used resources," "establish effective partnerships to address issues of mutual concern," "establish effective relationships with . . . federally recognized tribes," "develop protocols to promote collaborative partnerships for heritage resources management . . . ecosystem restoration, comprehensive fire planning, and to recognize historic Native American access rights to land areas and resources." *Id*. at 0304.

The SBNF management plan also expresses a desire to identify and protect heritage properties and to increase partnerships between Defendants and the Nation. Ex. 14 at 0266.  When consulting the Nation, the SBNF management plan directs Defendants to "[i]mprove tribal consultation by making concerted effort to reach tribes via initial and follow-up letters, phone calls, emails, and meetings to obtain their concerns and opinions regarding proposed projects." *Id*. at 0304.  Finally, the SBNF management plan acknowledges that "[w]ildland fire may be the biggest challenge forest managers and the public face over the next couple of decades." *Id*. at 0044.

Defendants failed to take any of the required steps discussed above when issuing the Notice of Denial.  Little Decl. at ¶ 16.  Defendants failed to notify the Nation of the federal decision to terminate the Nation's water supply.  They likewise failed to consider the Nation's historic and contemporary uses of SBNF resources, issues of historic access and reliance, or heritage properties and cultural resources that could be impacted by infrastructure removal.  Defendants' actions over the past six months have not indicated an attempt to improve relations with the Nation through consultation, cooperation, and respectful communication, but rather, Defendants' actions have deteriorated those relations.  Defendants have excluded the Nation from the decision-making process regarding Strawberry Canyon water diversion and use, propounded inaccurate assumptions regarding the Nation's operation of Arrowhead Springs, and refused the Nation's request to enter a co-stewardship or other cooperative agreement.  Additionally, Defendants seek to terminate a water supply used to fight wildfires throughout the region, including within the SBNF, even though the SBNF management plan places special emphasis on preparation and defense related to wildfires.  Garton Decl. at ¶¶ 8, 9; *see also* Ex. 14 at 0052-63.

Defendants' issuance of the Notice of Denial violates the SBNF management plan and its required procedures.  Accordingly, Defendants violated the NFMA.

SOMACH SIMMONS & DUNN
A Professional Corporation

### c.    Defendants Failed to Comply with Their Own Policies and Procedures

Agency actions that fail to comply with executive orders, agency regulations, and internal policies and procedures should be set aside.  "The legal proposition that agencies may be required to abide by certain internal policies is well-established." *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004).  "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (9th Cir. 2004) (holding APA requires agencies to follow internal procedures even when the procedures are "more rigorous than otherwise would be required").  Federal courts routinely hold that when an agency fails to comply with its own regulations, directives, and policies, it has acted arbitrarily and capriciously.  *See, e.g., Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) ("an administrative agency is required to adhere to its own internal operating procedures").

The following executive orders, agency regulations, and USFS policies and procedures apply to Defendants:

- Joint Secretarial Order 3403 (2023) establishes that the United States Department of Agriculture (USDA) and Department of the Interior will manage "Federal lands and waters in a manner that seeks to protect the treaty, religious, subsistence, and cultural interests of federally recognized Indian Tribes . . . is consistent with the nation-to-nation relationship between the United States and federally recognized Indian Tribes; and, that such management fulfills the United States' trust obligation."  Ex. 15, Joint Secretarial Order 3403 (2023).

- Presidential Memorandum on Uniform Standards for Tribal Consultation (2022) orders that federal agency consultation "requires that information obtained from Tribes be given meaningful consideration, and agencies should strive for consensus with Tribes or a mutually desired outcome."  Ex. 16,

SOMACH SIMMONS & DUNN
A Professional Corporation

Presidential Memorandum on Uniform Standards for Tribal Consultation (2022).

- Executive Order 13647 (2013) recognizes "a government-to-government relationship, as well as a unique legal and political relationship, with federally recognized tribes" and in seeking to "better [carry] out its trust responsibilities," declares it the policy of the United States "to promote the development of prosperous and resilient tribal communities" by "protecting tribal lands, environments, and natural resources, and promoting respect for tribal cultures." Ex. 17, Executive Order 13647 (2013).

- Executive Order 13175 (2000) directs federal agencies to establish regular and meaningful consultation and collaboration with tribal officials regarding policies that have tribal implications and to operate within a government-to-government relationship. Ex. 18, Executive Order 13175 (2000).

- Executive Order 13007 (1996) directs federal land managing agencies to avoid adversely affecting the physical integrity of Indian sacred sites. Ex. 19, Executive Order 13007 (1996).

- USDA Departmental Regulation 1350-002 directs the USDA and its agencies to provide federally recognized Indian tribes the opportunity for government-to-government consultation and coordination in policy development and program activities which have direct and substantial effects on the tribes. Ex. 20, USDA Departmental Regulation 1350-002.

- Forest Service Manual section 1563.1 provides that "[b]ecause Tribes . . . are affected by Forest Service land and resource management policies, as well as research, development, and other programs and actions, the [USFS] must consult with them on matters that could affect their rights and interests." Ex. 21, Forest Service Manual section 1563.1. USFS consultation policies specifically provide that "if an action or activity is confined to National Forest System lands," the USFS should "evaluate which Tribes . . . have connections

SOMACH SIMMONS & DUNN
A Professional Corporation

SOMACH SIMMONS & DUNN
A Professional Corporation

1    to, or benefit from, those lands" or "have cultural or historic connections to

2    those lands"; and to "err on the side of more rather than less consultation."

3    *Id*.

4        Defendants' actions completely fail to recognize the unique relationship that

5    exists between the United States and tribes.  Defendants have not considered the

6    impact that the Notice of Denial is having as the Nation prepares for its

7    implementation and will continue to have on the Nation.  The Notice of Denial does

8    not even consider the Nation's cultural and natural resources, let alone protect them.

9    Further, it actually terminates an existing and historic water supply upon which the

10   Nation relies to operate Arrowhead Springs.  Numerous executive orders,

11   regulations, and policies require Defendants to act differently than they have.

12   Defendants' blatant disregard for the law and their obligations when issuing the

13   Notice of Denial constitutes an egregious violation of their legal duties to the

14   Nation.

15       **2.**    **Defendants' Issuance of the Notice of Denial Violated Their Trust
16   Responsibility to the Nation**

17       The U.S. Supreme Court has continuously recognized the existence of a trust

18   relationship between the United States and Indian tribes.  *See Seminole Nation v.*

19   *United States*, 316 U.S. 286, 296 (1942); *Hoopa Valley Indian Tribe v. Ryan*,

20   415 F.3d 986 (9th Cir. 2005).  This relationship requires the government's conduct

21   in its dealings with tribes to be judged "by the most exacting fiduciary standards."

22   *Seminole Nation*, 316 U.S. at 297.  The federal government's trust responsibility to

23   tribes, "in essence, consists of acting in the general interests of the tribes."

24   *Skokomish Indian Tribe v. FERC*, 121 F.3d 1303, 1308 (9th Cir. 1997).  As a result,

25   "agencies of the federal government owe a fiduciary responsibility to Indian tribes."

26   *Morongo Band of Mission Indians*, 161 F.3d at 574.

27       The federal government's trust responsibility extends to a tribe's off-

28   reservation resources.  Courts have held that "the various federal statutes aimed at

MEMO. OF LAW IN SUPPORT OF PLAINTIFF-INTERVENOR'S MOTION FOR
PRELIMINARY INJUNCTION                                                          -17-

protecting Indian cultural resources, located both on Indian land and public land,

demonstrate the government's comprehensive responsibility to protect those

resources and, thereby establishes a fiduciary relationship." *Quechan Indian Tribe

v. United States*, 535 F.Supp.2d 1072, 1109 (S.D. Cal. 2008) (citing *Marlys Bear

Medicine v. United States*, 241 F.3d 1208, 1218 (9th Cir. 2009)).  Indeed, this trust

responsibility also requires "compliance with general regulations and statutes not

specifically aimed at protecting Indian tribes." *Gros Ventre Tribe v. United States*,

469 F.3d 801, 810 (9th Cir. 1998).  Although compliance with statutory and

regulatory requirements can discharge an agency's specific duty with respect to

tribes, that is not the case here, where Defendants have violated numerous federal

laws in issuing the Notice of Denial.  As explained above, Defendants have violated

the NHPA, the NFMA, as well as executive orders, regulations, and policies that

mandate Defendants follow specific procedures when engaging with, or taking

action affecting, the Nation.  These violations flaunt the significant federal trust

relationship.

Furthermore, Defendants attempt to prioritize their own water rights and uses

over those of the Nation, further violating Defendants' trust obligation to the Nation.

The Nation possesses broad water rights in Strawberry Canyon that pre-date the

SBNF.  *See* ECF No. 15-6; *see also* ECF No. 2-6.  Defendants admitted in 1964 "the

government has never held any water rights" in Strawberry Canyon; whereas the

Subject Water has been delivered to Arrowhead Springs through BlueTriton's

infrastructure since 1931.  *See* ECF No. 2-9.  Over the past six months, Defendants

have seemingly alleged that they possess water rights superior to those of both

BlueTriton and the Nation without providing any evidence of their needs or uses.

In California, federal law defers to state law to determine water rights.

*California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 162

(1935).  At times, "it may be necessary to stay federal action pending authoritative

determination of [a] difficult state question." *Burford v. Sun Oil Co.*, 319 U.S. 315,

331 (1943) (citing *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941)). Here, Defendants not only refuse to defer to state water law, but they also exceed their statutory authority by attempting to terminate the Nation's water supply.  The SWRCB order on which Defendants partially base their justification for issuing the Notice of Denial specifically acknowledges the Nation's senior water rights and carves out a water supply for the Nation.  ECF No. 15-6 at 87.  The Notice of Denial does no such thing, but instead orders immediate termination of water deliveries to the Nation and removal of the infrastructure that has delivered the Subject Water to Arrowhead Springs for nearly a century.  Given the Nation's senior rights under state law, Defendants have twice modified the Notice of Denial to permit limited water deliveries to Arrowhead Springs.  However, that temporary authorization expires on January 15, 2025, and Defendants have never explained why Defendants are refusing to extend such temporary authorization further.  ECF No. 27-1 at 1.

Defendants' violations of the NHPA, the NFMA, the APA, and other federal laws violate the trust responsibility Defendants owe the Nation.  Furthermore, their interference in the operation of state water law to the detriment of the Nation, without any basis whatsoever, renders their trust violations even more egregious.

Because Defendants acted arbitrarily and capriciously, contrary to their constitutional right, beyond their statutory authority, and without observance of procedures required by law, and because Defendants violated their trust obligation to the Nation, this Court should set aside and invalidate the Notice of Denial to the extent that it terminates and prohibits delivery of the Subject Water to the Nation.

### 3.    The Nation Will Suffer Irreparable Harm Unless the Court Preliminarily Enjoins the Notice of Denial

The Court must set aside Defendants' action if it would irreparably harm the moving party.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Here, terminating the Nation's water supply for Arrowhead Springs before the Nation can secure an alternative water supply would irreparably harm the Nation.

SOMACH SIMMONS & DUNN
A Professional Corporation

1      Arrowhead Springs has received the Subject Water for nearly a century, and

2   the Nation depends on it.  Without sufficient water to maintain the Nation's facilities

3   at Arrowhead Springs, let alone to fight fires in the area, the Nation and surrounding

4   communities face significant risk of property damage and loss of life from wildfire.

5   Garton Decl. at ¶ 9.

6      Furthermore, if Defendants order BlueTriton to move forward with its

7   decommissioning plan, the Nation and Arrowhead Springs would be harmed.

8   Arrowhead Springs is located at the base of Strawberry Canyon, downstream of

9   BlueTriton's water delivery infrastructure proposed to be removed.  The removal

10  plan contemplates intensive construction and remediation, all taking place in a

11  rugged and remote wilderness canyon.  Such a project would likely negatively

12  impact both the quantity and quality of the water flowing across the Nation's

13  property and endanger the property itself.  Hamai Decl. at ¶ 13.  The removal plan

14  requires significant technical and legal review to protect the Nation's interests;

15  however, the Nation has not had sufficient time to review the plan.  Indeed,

16  Defendants refused to even provide the Nation the decommissioning plan, and like

17  the Notice of Denial, the Nation had to obtain a copy from BlueTriton.  Little Decl.

18  at ¶ 20.

19     Defendants seem to allege that forest resources require an immediate action to

20  prohibit diversions from Strawberry Canyon and that immediate infrastructure

21  removal is necessary, but they provide no facts in support.  Further, the Nation has

22  engaged technical experts who believe the existing infrastructure could actually be

23  used to increase water flow in Strawberry Creek; whereas removal may permanently

24  alter its hydrology and damage the surrounding environment.  Hamai Decl. at ¶ 13.

25  It is crystal clear that further analysis is essential to avoid irreparable injury to the

26  Nation, the SBNF, and its natural resources.  *Id*.

27     The Notice of Denial terminates the Nation's water supply at Arrowhead

28  Springs and mandates BlueTriton engage in a complicated and intensive removal

SOMACH SIMMONS & DUNN
A Professional Corporation

process, which is scheduled to begin on January 16, 2025.  Given the peril the decommissioning plan poses for the Nation's property and cultural interests, the Nation is likely to suffer irreparable harm if Defendants are not preliminarily enjoined from enforcing the Notice of Denial.

### 4. The Balance of Equities and the Public Interest Favor Issuing a Preliminary Injunction

"When the government is a party, the last two factors (equities and public interest) merge" in assessing whether to grant a preliminary injunction.  *E. Bay Sanctuary Covenant*, 993 F.3d at 668.  Here, both factors support preliminary injunctive relief.

By this motion, the Nation seeks to maintain the status quo for the continued delivery of the Subject Water upon which Arrowhead Springs has relied for nearly a century.  Defendants, on the other hand, seek to disrupt that status quo immediately without engaging in proper review or consulting the Nation regarding potential adverse impacts.  Defendants have not justified their reasoning for seeking to immediately terminate the Nation's water supply, particularly considering multiple courts are currently engaging in relevant judicial reviews of Defendants' actions and underlying basis for those actions.  *See* ECF No. 50.  Defendants have also failed to justify their shift in policy on which the Nation and Plaintiff (and their predecessors) have relied for nearly a century.

The public interest strongly favors an injunction.  The Nation not only relies on the Subject Water to operate its own property and facilities, but also to maintain fire suppression facilities in an area prone to fire risk.  Garton Decl. at ¶¶ 5, 6, 8-10.  The SBNF management plan acknowledges wildfire risk as Defendants' "biggest challenge."  Ex. 14 at 0044.  Regardless, Defendants seek to terminate the Nation's firefighting water supply, which will harm surrounding communities that are not party to this case.  Without an injunction, life and property will be placed in peril as

SOMACH SIMMONS & DUNN
A Professional Corporation

1   water that is used to fight fires on and around Arrowhead Springs is taken away.
2   Ex. 12 at 1.

3       Given the significant harm the Nation would suffer from Defendants' actions,
4   and the lack of justification for Defendants' Notice of Denial, the balance of equities
5   strongly favors injunctive relief.  Furthermore, given the risk to property and life
6   imposed by Defendants' actions, the public interest strongly favors injunctive relief.

7   ## V.   THE NATION SHOULD NOT BE REQUIRED TO POST A BOND

8       When a court issues a preliminary injunction, it may also require that the
9   movant post a bond "in an amount that the court considers proper to pay the costs
10  and damages sustained by any party found to have been wrongfully enjoined."
11  FRCP 65(c).  "The court is afforded wide discretion in setting the amount of the
12  bond, and the bond amount may be zero if there is no evidence the [restrained] party
13  will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New*
14  *Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citation omitted).

15      The Court should decline to impose a bond here.  The requested injunction
16  would maintain the status quo that has existed since 1931.  Defendants would suffer
17  no harm from a preliminary injunction preventing their enforcement of the Notice of
18  Denial pending a final judgment in this matter.  Accordingly, no bond is necessary.

19  ## VI.   CONCLUSION

20      This Court should preliminarily enjoin Defendants from (1) enforcing the
21  Notice of Denial as related to the Nation, thereby terminating the Nation's water
22  supply at Arrowhead Springs, and (2) moving forward with BlueTriton's removal
23  plan.  The Nation, which is only seeking to maintain the status quo for water
24  delivery that has been in place for nearly a century, is likely to succeed on the merits
25  because Defendants seek to violate the Nation's clearly established water rights, and
26  in doing so, have violated their trust obligation to the Nation, the NHPA, the
27  NFMA, and numerous other federal laws, regulations, and policies.  Without
28  preliminary relief, the Nation is likely to suffer irreparable harm.  The balance of

SOMACH SIMMONS & DUNN
A Professional Corporation

equities and public interest tip strongly in favor of the Nation.  Accordingly, the

Nation respectfully requests the Court grant the preliminary injunctive relief sought

by the Nation against Defendants.

     The undersigned, counsel of record certifies that the Memorandum of Points

and Authorities contains 6,900 words, which complies with the word limit of

L.R. 11-6.1.

                       Respectfully submitted,

                       SOMACH SIMMONS & DUNN, PC

Dated:  January 3, 2025      By *s/ Stuart L. Somach*
                       Stuart L. Somach (SBN 90959)
                       Maximilian C. Bricker (SBN 350150)
                       Attorneys for [PROPOSED] Plaintiff-
                       Intervenor YUHAAVIATAM OF SAN
                       MANUEL NATION, a federally recognized
                       Indian tribe, also federally recognized as
                       SAN MANUEL BAND OF MISSION
                       INDIANS

## **TABLE OF EXHIBITS**

| 1 | April 18, 2024, Letter from BlueTriton Brands, Inc. to Nobles |
|---|---|
| 2 | May 24, 2024, Letter from Nobles to BlueTriton Brands, Inc. |
| 3 | June 4, 2024, Letter from BlueTriton Brands, Inc. to Nobles |
| 4 | July 30, 2024 Letter Request for Consultation |
| 5 | November 4 and November 15, 2024, Letter From Nation to United States Forest Service |
| 6 | 1931 Contract Also mentioned in Paragraph 7 of Hamai Decl. |
| 7 | December 11, 2023 80/20 Letter Agreement |
| 8 | NCRE Map |
| 9 | SWRCB Order 2023-0042 |
| 10 | Notice of Denial July 26, 2024 |
| 11 | Decommissioning Plan October 2024 |
| 12 | August 1, 2024 Letter regarding Loss of Water Supply at Arrowhead Springs Property |
| 13 | November 15, 2024 Letter from Nation to United States Forest Service |
| 14 | San Bernardino National Forest Land Management Plan 2006 Revision, Phase I, II, and III |
| 15 | Joint Secretarial Order 3403-2023 |
| 16 | Presidential Memorandum on Uniform Standards for Tribal Consultation |
| 17 | Executive Order 13647 |
| 18 | Executive Order 13175 |
| 19 | Executive Order 13007 |
| 20 | USDA Departmental Regulation 1350-002 |
| 21 | Forest Service Manual section 1563.1 |

SOMACH SIMMONS & DUNN
A Professional Corporation